COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                                      HAMPDEN SUPERIOR COURT

                                                        CIVIL ACTION NO. _____

Retain for Proof of Payment
Hampden County
50 State Street
Springfield MA          01102
Receipt 4013                Date 1
2/24/2015
Case Number 1579CV00917
Description 1579CV00917 Oulton, Sarah
A. vs. Hladick, Carol B.
Received From Goodwin, Esq., Coreen
On Behalf Of Oulton, Sarah A.
Payment Type    Amount    Reference
Check           275.00    144
Applied Type    Amount
Filing Fee      275.00
Change  .00
Balance Due .00
Clerk LSIROIS    Trans Date 1
Comments

SARAH A. OULTON

      Plaintiff,

v.

CAROL B. HLADICK, in his capacity as a Lieutenant
with the Town of [...], DAVID P. OULTON,
KEOUGH + SWEENEY II, ATTORNEY
JEROME V. SWEENEY, as Registered Agent of Keough +
Sweeney, Ltd., ATTORNEY SEAN F. KEOUGH, ATTORNEY JOSEPH A. KEOUGH III,
ATHENA HEALTH CARE SYSTEMS MA III LLC, dba MARLBOROUGH HILLS
HEALTHCARE CENTER, COLONIAL HEALTH GROUP-WESTRIDGE, LLC, MICHAEL
LINCOLN, GINA QUIEROS, ANDREA EDWARDS, DONNA DELCID, KAREN SPERONI,
CHRISTINE FRENCH, DENISE STEPHENSON, SAUDA MATOVU, MIRICK O'CONNELL
DIMALLIE & LOUGEE LLP, ATTORNEY JOHN O. MIRICK, ATTORNEY JASON A.
PORT, ATTORNEY ARTHUR P. BERGERON, THE JOWDY GROUP, INC., ALEXANDER
R. JOWDY, CYNTHIA BRACCIALE, JOHN EVERETT & SONS FUNERAL HOME,
JOSEPH EVERETT, individually and in his capacity as Registered Agent of John Everett &
Sons Funeral Home, DENNIS CUNNINGHAM, SUSAN DAVIS, MAUREEN REEVE, BRIAN
FALVEY, LUKE SIMPSON, RICHARD KELLY, PLOURDE BOGUE MOYLAN &
MARINO LLP, ATTORNEY THOMAS MOYLAN, individually and in his capacity as
Registered Agent of Plourde Bogue Moylan & Marino LLP, ATTORNEY MELISSA CURLEY,
THE LAW OFFICE OF DEBORAH MASTERSON, ATTORNEY DEBORAH MASTERSON,
individually and in her capacity as Owner of The Law Office of Deborah Masterson, WINSTON
LAW GROUP, ATTORNEY NEAL WINSTON, individually and in his capacity as Registered
Agent of Winston Law Group, ATTORNEY MICHAEL COUTURE, JOHN DOES I-X, in their
individual and official capacities, and JANE DOES I-X, in their individual and official
capacities,

      Defendants.

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Sarah A. Oulton, who resides at 69 Autumn Street, Agawam,

Massachusetts ("Plaintiff"), by and through her counsel, Attorney Coreen Goodwin and Attorney

James Bailey Brislin, and hereby brings this Complaint and alleges the following:

2015 DEC 24 P M 11

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 15 917 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

PLAINTIFF(S): Sarah A. Oulton
ADDRESS: PO Box 888
Agawam, Ma 01001

COUNTY: Hampden

DEFENDANT(S): Carol B. Hladick et al.
20 Causeway St
Medway Ma 02053
ADDRESS:

ATTORNEY: Coreen Gardwin
ADDRESS: 64 Donbray Rd
Springfield, Ma 01119

BBO: 693188

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| (013) Other | Multiple claims | A | ☒ YES   ☐ NO |

*If "Other" please describe: Fraud, conspiracy, torts, unjust enrichment

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ................................................................................................. $ _____
2. Total doctor expenses ................................................................................................... $ _____
3. Total chiropractic expenses ........................................................................................... $ _____
4. Total physical therapy expenses .................................................................................... $ _____
5. Total other expenses (describe below) ........................................................................... $ _____
                                                                                            Subtotal (A): $ _____

B. Documented lost wages and compensation to date ....................................................... $ _____
C. Documented property damages to date ......................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ...................................... $ _____
E. Reasonably anticipated lost wages ............................................................................... $ _____
F. Other documented items of damages (describe below) .................................................. $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

                                                                                            TOTAL (A-F): $ _____

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

                                                                                            TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X Coreen Gardwin        Date: 12-31-15

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X Coreen Gardwin        Date: 12-31-15

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 1579CV00917 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Oulton, Sarah A. vs. Hladick, Carol B. et al | Laura S Gentile, Clerk of Courts |
|---|---|

| TO: Coreen Goodwin, Esq. Law Office Of Coreen Goodwin 64 Donbray Road Springfield, MA 01119 | COURT NAME & ADDRESS Hampden County Superior Court Hall of Justice - 50 State Street P.O. Box 559 Springfield, MA 01102 |
|---|---|

### TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                    DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 03/23/2016 | |
| Response to the complaint filed (also see MRCP 12) | | 04/22/2016 | |
| All motions under MRCP 12, 19, and 20 | 04/22/2016 | 05/23/2016 | 06/21/2016 |
| All motions under MRCP 15 | 02/16/2017 | 03/20/2017 | 03/20/2017 |
| All discovery requests and depositions served and non-expert despositions completed | 12/13/2017 | | |
| All motions under MRCP 56 | 01/12/2018 | 02/12/2018 | |
| Final pre-trial conference held and/or firm trial date set | | | 06/11/2018 |
| Case shall be resolved and judgment shall issue by | | | 12/24/2018 |

The final pre-trial deadline is not the scheduled date of the conference. You will be notified of that date at a later time.

Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.

This case is assigned to

| DATE ISSUED 12/28/2015 | ASSISTANT CLERK Cheryl Coakley-Rivera | PHONE |
|---|---|---|

Date/Time Printed 12-23-2015 15:29:33                                                          SCV026\1 12-2014

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): | SARAH A. OULTON | COUNTY |
| ADDRESS: | P.O. BOX 888 | |
| | AGAWAM, MA 01001 | DEFENDANT(S): |
| | | CAROL B. HANICK, ET AL. |
| ATTORNEY: | COREEN GOODWIN | 20 CAUSEWAY STREET |
| ADDRESS: | LAW OFFICE OF COREEN GOODWIN | ADDRESS: |
| | 64 DONBRAY ROAD | MEDWAY MA 02053 |
| | SPRINGFIELD, MA 01119 | |
| BBO: | 693188 | |

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| D(3) OTHER | MULTIPLE CLAIMS INCLUDING | A | ☒ YES ☐ NO |

If "Other" please describe: FRAUD, CONVERSION CONSPIRACY, TORTS, UNJUST ENRICHMENT, BOFA

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
- 1. Total hospital expenses .......................................................... $ _____
- 2. Total doctor expenses ........................................................... $ _____
- 3. Total chiropractic expenses .................................................... $ _____
- 4. Total physical therapy expenses ............................................. $ _____
- 5. Total other expenses (describe below) ..................................... $ _____
  - Subtotal (A): $ _____

B. Documented lost wages and compensation to date ............................ $ _____
C. Documented property damages to dated ......................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ............ $ _____
E. Reasonably anticipated lost wages .............................................. $ _____
F. Other documented items of damages (describe below) ..................... $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ _____

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X _____    Date: 12-21-2015

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____    Date: _____

Retain for Proof of Payment
Hampden County
50 State Street
Springfield MA        01102
        Receipt 4013              Date 1
2/24/2015
    Case Number 1579CV00917
    Description 1579CV00917 Oulton, Sarah
A. vs. Hladick, Carol B.
Received From Goodwin, Esq., Coreen

    On Behalf Of Oulton, Sarah A.
Payment Type      Amount      Reference
Check             275.00      144
Applied Type      Amount
Filing Fee        275.00
        Change     .00
    Balance Due .00
        Clerk LSIROIS    Trans Date 1
2/24/2015 04:14 PM
Comments

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                                                    HAMPDEN SUPERIOR COURT

CIVIL ACTION NO. _____

---

SARAH A. OULTON,
    Plaintiff,

v.

CAROL B. HLADICK, ANDREW HLADICK, individually, and in his capacity as a Lieutenant
with the Town of Natick Fire Department, NANCY J. WILLIAMS, DAVID P. OULTON,
KEOUGH + SWEENEY, LTD., ATTORNEY JEROME V. SWEENEY II, ATTORNEY
JEROME V. SWEENEY III, individually and in his capacity as Registered Agent of Keough +
Sweeney, Ltd., ATTORNEY SEAN P. KEOUGH, ATTORNEY JOSEPH A. KEOUGH III,
ATHENA HEALTH CARE SYSTEMS MA III LLC, dba MARLBOROUGH HILLS
HEALTHCARE CENTER, COLONIAL HEALTH GROUP-WESTRIDGE, LLC, MICHAEL
LINCOLN, GINA QUIEROS, ANDREA EDWARDS, DONNA DELCID, KAREN SPERONI,
CHRISTINE FRENCH, DENISE STEPHENSON, SAUDA MATOVU, MIRICK O'CONNELL
DIMALLIE & LOUGEE LLP, ATTORNEY JOHN O. MIRICK, ATTORNEY JASON A.
PORT, ATTORNEY ARTHUR P. BERGERON, THE JOWDY GROUP, INC., ALEXANDER
R. JOWDY, CYNTHIA BRACCIALE, JOHN EVERETT & SONS FUNERAL HOME,
JOSEPH EVERETT, individually and in his capacity as Registered Agent of John Everett &
Sons Funeral Home, DENNIS CUNNINGHAM, SUSAN DAVIS, MAUREEN REEVE, BRIAN
FALVEY, LUKE SIMPSON, RICHARD KELLY, PLOURDE BOGUE MOYLAN &
MARINO LLP, ATTORNEY THOMAS MOYLAN, individually and in his capacity as
Registered Agent of Plourde Bogue Moylan & Marino LLP, ATTORNEY MELISSA CURLEY,
THE LAW OFFICE OF DEBORAH MASTERSON, ATTORNEY DEBORAH MASTERSON,
individually and in her capacity as Owner of The Law Office of Deborah Masterson, WINSTON
LAW GROUP, ATTORNEY NEAL WINSTON, individually and in his capacity as Registered
Agent of Winston Law Group, ATTORNEY MICHAEL COUTURE, JOHN DOES I-X, in their
individual and official capacities, and JANE DOES I-X, in their individual and official
capacities,

    Defendants.

---

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Sarah A. Oulton, who resides at 69 Autumn Street, Agawam,

Massachusetts ("Plaintiff"), by and through her counsel, Attorney Coreen Goodwin and Attorney

James Bailey Brislin, and hereby brings this Complaint and alleges the following:

## I.   INTRODUCTION

This case involves an elaborate criminal enterprise comprised of elder abuse, conspiracy, fraud, grand larceny, and unjust enrichment commencing in December 2011 and continuing to the present day. Plaintiff discovered the criminal acts underlying this criminal enterprise when she was informed, via Google Alerts, of the death of her father, Attorney Donald Paul Oulton ("Donald"), on December 22, 2012, and the death of her mother, Carol Jane Oulton ("Carol"), on December 25, 2012. Together, Donald and Carol are the "Oultons." In March 2013, Plaintiff also learned that she had been a devisee named in her parents' Wills and that she held a one-quarter property interest in her parents' assets.

Plaintiff's siblings, sister Carol Hladick ("C. Hladick"), brother-law-law Natick Fire Lieutenant Andrew Hladick ("Lt. Hladick"), sister Nancy Williams ("N. Williams"), and brother David Oulton ("D. Oulton") (together, the "Sibling Defendants"), aided and abetted by numerous co-conspirators (including Jerome V. Sweeney II ("Attorney Sweeney-2"), the administrators and staff of Marlborough Hills Healthcare Center ("Marlborough Hills"), attorneys working at Mirick O'Connell DiMallie & Lougee LLP ("Mirick O'Connell"), public safety officials working for the City of Marlborough and the Town of Natick Police Departments, and others), unlawfully interfered with Plaintiff's loving relationship with her parents, the Oultons, in order to unlawfully take from the Oultons' estate and cover up the crimes.

The criminal enterprise forming the foundation of this case was set in motion by the Sibling Defendants and Keough + Sweeney, Ltd. Attorneys Jerome V. Sweeney II ("Attorney Sweeney-2"), Jerome V. Sweeney III ("Attorney Sweeney-3"), and Sean Keough on or about December 7, 2011. Attorney Sweeney-2 was Donald Oulton's law school classmate and the Oultons' tax and estate planning attorney. He also served as Plaintiff's former tax attorney.

Attorney Sweeney-2 was the author of the Oultons' estate, confidential details of which he unlawfully shared with his co-conspirators in this case prior to the Oultons' deaths. Attorney Sweeney-2 and Attorney Sweeney-3 coached their co-conspirators on how to remove Plaintiff from her parents' lives, frustrate the purposes of the Oultons' Wills, take the Oultons' assets, and then – with the help of additional willing co-conspirators – cover up their crimes.

The purpose of the criminal 1 enterprise forming the foundation of this case was to:

(1)  institutionalize and isolate the Oultons in a nursing home;

(2)  take from the Oultons while they were still alive;

(3)  take from Plaintiff after the Oultons died;

(4)  inflict pain, suffering, damage, and emotional distress on Plaintiff; and

(5)  cover up the crimes, torts, and civil rights violations committed by the Defendants in furtherance of their conspiracy.

At the commencement of the criminal scheme, the Oultons, who were incapacitated by chronic alcoholism and major illness, were confined to Marlborough Hills. Carol Oulton was overdosed on medication during her first 24 hours in residence at Marlborough Hills. The staff and administrators of Marlborough Hills isolated the Oultons from people and unlawfully barred Plaintiff from having contact with her elderly parents during the final months of their lives. Through fraudulent documents used at various times, Defendants defamed Plaintiff and attempted to silence her with threats of physical, financial, and professional harm.

The Oultons, at their most frail, fragile, and vulnerable stage of life, were abused by licensed professionals in positions of trust, and, as a result, they suffered immeasurably – both physically and emotionally – in the last year of their lives. Plaintiff was also abused by those same licensed professionals and also by public safety officials working for the Town of Natick

3

and the City of Marlborough. The Oultons were also manipulated by attorneys of Mirick O'Connell, who forced the Oultons to execute invalid Powers of Attorney while trapped inside the Marlborough Hills nursing home. The Sibling Defendants engaged a number of licensed professionals and public safety officials – including attorneys, social workers, nursing home administrators, nurses, and police and fire officials with the Town of Natick and City of Marlborough – in furtherance of their conspiracy. The Oultons lived under constant pressure exerted on them by the Sibling Defendants, the Marlborough Hills administrators, and the Mirick O'Connell attorneys, and Plaintiff has lived under constant fear and duress since this criminal enterprise was hatched by Defendants.

At least as early as December 2011 Attorney Sweeney-2 unlawfully informed The Sibling Defendants of the contents of the Oultons' Wills, thus all actions taken by the Sibling Defendants, Attorney Sweeney-2, Mirick O'Connell attorneys, and others were done in a concerted effort to intentionally frustrate the purposes of the Oultons' Wills and defy the Oultons' last wishes. Plaintiff did not learn that she was a devisee under the Oultons' Wills until March 2013; by then a large amount of the Oultons' assets had been stolen by Defendants..

In contrast with the fraudulent and defamatory statements made by Defendants in statements and in numerous court proceedings leading up to the filing of this lawsuit, Plaintiff shared a mutually loving relationship with the Oultons. The Oultons named Plaintiff as a devisee in their Wills, they refused to change their Wills despite pressure exerted on them in the last year of their lives, and – in a final act of love for Plaintiff – they refused to disinherit Plaintiff.

Donald and Carol Oulton died on December 19, 2012, and December 25, 2012, respectively after being held in Marlborough Hills through the use of invalid contracts executed by Marlborough Hills and C. Hladick. Plaintiff was completely devastated when she learned, on

4

December 22, 2012, and December 25, 2012, of the Oultons' deaths via Google Alerts. Adding to Plaintiff's injuries, Sibling Defendants conspired with Lt. Hladick's friends on the Natick Police Department and with the owner and staff of the John Everett & Sons Funeral Home to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials.

Wakes and funerals are open to the public and they are the most sacred rituals in our society. They are held to provide for the dignified and respectful care of the decedents and they allow the mourners to pay special tribute to those who have passed. Wakes and funerals are extremely important to the survivors, and even more so when the survivors and decedents have a parent-child relationship. Wakes and funerals are such an integral and important part of the grieving process that furloughs to attend them are routinely given to enlisted members of the armed forces. Additionally, Massachusetts grants furloughs to prisoners (including inmates serving a life sentence for murder in the second degree) so that they may attend wakes and funerals (103 C.M.R. 463). Everett Funeral Home acted in bad faith to willfully and knowingly exacerbate this tragic situation by agreeing (in violation of, *inter alia*, 239 C.M.R. 3.00-5.00) to post armed Natick Police personnel inside Everett Funeral Home for the sole purpose of keeping Plaintiff away from the Oultons' wakes, funerals, and burials. To date, Plaintiff does not know where her parents, the Oultons, are buried. Plaintiff has been severely damaged by the actions of the Defendants in this case.

5

## II.   PARTIES

1.      Plaintiff Sarah A. Oulton ("Plaintiff") resides at 69 Autumn Street in Agawam, Massachusetts 01001. Plaintiff is the daughter of the late Attorney Donald Paul Oulton ("Donald") (who allegedly died on December 19, 2012) and the late Carol Jane Oulton ("Carol") (who allegedly died on December 25, 2012). Plaintiff was named as a devisee under both the Last Will and Testament of Donald Paul Oulton (the "Will of Donald") (allegedly executed on June 28, 2000) and the Last Will and Testament of Carol Jane Oulton (the "Will of Carol") (allegedly executed on April 19, 2001).

2.      Defendant Carol B. Hladick ("C. Hladick") resides at 20 Causeway Street in Medway, Massachusetts 02053 and is employed as a Payroll Administrator for the Town of Millis in Millis, Massachusetts. C. Hladick is the daughter of Donald and Carol and was named as a devisee under both the Will of Donald and the Will of Carol. C. Hladick is the obligor on contracts fraudulently executed with Marlborough Hills Healthcare Center ("Marlborough Hills"), the nursing home in which the Oultons were unlawfully held from November 2011 until the dates of their deaths in December 2012.

3.      Defendant Andrew Hladick ("A. Hladick") resides at 20 Causeway Street, Medway, Massachusetts 02053, is the husband of Defendant C. Hladick, and is employed as both a Lieutenant with the Town of Natick Fire Department in Natick, Massachusetts.

4.      Defendant Nancy Jane Williams ("N. Williams") resides at 291 Flat Rock Road in Athol, Massachusetts 01331 and is employed by The Commonwealth of Massachusetts (the "Commonwealth") as Assistant Director of the Fitness and Wellness Center at Mount Wachusett Community College. N. Williams is the daughter of Donald and Carol and was named as a devisee under both the Will of Donald and the Will of Carol.

6

5.      Defendant David Paul Oulton ("D. Oulton") resides at 61 Crescent Street in Franklin, Massachusetts  02038.  D. Oulton is the self-employed son of Donald and Carol and was named as a devisee under both the Will of Donald and the Will of Carol.

6.      Defendant Keough + Sweeney, Ltd. ("Keough + Sweeney") is a Massachusetts and Rhode Island law firm with offices at 171 Milk Street, Suite 30, Boston, Massachusetts 02109 and 41 Mendon Avenue, Pawtucket, RI  02861.  Said firm was responsible for the actions of Attorneys Sweeney-2, Sweeney-3, Attorney S. Keough, and Attorney J. Keough.

7.      Defendant Attorney Jerome V. Sweeney II ("Attorney Sweeney-2") is a Massachusetts attorney (BBO # 490020) practicing with the law firm of Keough + Sweeney from its Boston, Massachusetts office at 171 Milk Street, Suite 32, Boston, Massachusetts 02109.  Attorney Sweeney-2 authored the substandard Will of Donald and the Will of Carol, unlawfully revealed the confidential content of the instruments to his co-conspirators prior to the Oultons' deaths, exploited the very deficiencies he created in order to unjustly enrich himself and others in this case, and has tried desperately to cover up the wrongdoing.

8.      Defendant Attorney Jerome V. Sweeney III ("Attorney Sweeney-3"), son of Attorney Sweeney-2,  is a Rhode Island and Massachusetts attorney (BBO # 562119) practicing as Partner with and Registered Agent of the law firm of Keough + Sweeney from its Pawtucket, Rhode Island office at 41 Mendon Avenue, Pawtucket, RI  02861.  Attorney Sweeney-3 consulted with the Sibling Defendants, revealed confidential content of the Oultons' estate plan to his co-conspirators prior to the Oultons' deaths, and exploited the very deficiencies in the Will of Donald and the Will of Carol order to unjustly enrich himself and others in this case

9.      Defendant Attorney Sean P. Keough ("Attorney S. Keough") is a Rhode Island and Massachusetts attorney (BBO # 662771) practicing with law firm of Keough + Sweeney

from its Pawtucket, Rhode Island office at 41 Mendon Avenue Pawtucket, RI 02861. Attorney Keough conspired with Attorney Sweeney-2 and Attorney Sweeney-3 to unlawfully coach the Sibling Defendants on how to exploit the deficiencies in the Oultons' inferior estate plan.

10.     Defendant Attorney Joseph A. Keough, Jr. ("J. Keough") is a Rhode Island and Massachusetts attorney practicing as a Partner with the law firm of Keough + Sweeney from its Pawtucket, Rhode Island office at 41 Mendon Avenue Pawtucket, RI 02861.

11.     Defendant Athena Health Care Systems MA III LLC ("Athena") has an address of Attention: MCR&P Service Corporation 99 High Street, 20th Floor, Boston, MA 02110. Athena is the current owner of Marlborough Hills, which operates at 121 Northboro Road East, Marlborough, MA 01752 ("Marlborough Hills").

12.     Defendant Colonial Health Group-Westridge, LLC ("Colonial") has an address of 35 Avco Road Haverhill, MA 01835. Colonial was the owner of Marlborough Hills for much of time the Oultons were unlawfully held in Marlborough Hills through the fraudulent contracts executed by Marlborough Hills. Marlborough Hills the nursing home in which the Oultons were unlawfully held from November 2011 until the dates of their deaths in December 2012 and is the obligee on the Oultons' fraudulently executed contracts.

13.     Defendant Michael B. Lincoln ("Lincoln") resides at 12 Howard Avenue in Foxborough, Massachusetts 02035, holds Massachusetts Nursing Home Administrator License No. NH2122, is currently the Regional Director of Operations of Wingate Healthcare in Needham, Massachusetts with a business address of Wingate Healthcare, One Charles River Place, 63 Kendrick Street, Needham, MA 02494, and is the former Administrator of Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012.

8

14.     Defendant Gina M. Quieros ("Quieros"), residence unknown at the time of filing this lawsuit is the former Senior Administrator of Marlborough Hills who resides, upon information and belief, in New Hampshire, and holds Nursing Home Administrator License No. NH3001, and is employed by Colonial Poplin, 442 Main Street, Fremont, NH 03044.

15.     Defendant Andrea B. Edwards ("Edwards"), residence unknown at the time of filing this lawsuit, holds Massachusetts Licensed Independent Clinical Social Worker License No. 114473, is the former Social Worker for Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012, and currently is employed by Golden Living Center located at 1199 John Fitch Highway in Fitchburg, Massachusetts 01420.

16.     Defendant Donna DelCid ("DelCid") resides at 26 Washburn Street in Northborough, Massachusetts 01532, is the former Director of Nursing for Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012, and holds Registered Nurse License No. RN213787 issued by The Commonwealth.

17.     Defendant Karen M. Speroni ("Speroni") resides at 19 John Robert Drive in Rutland, Massachusetts 01543, is a former nurse at Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012, and holds Licensed Practical Nurse License No. LN85797 issued by The Commonwealth.

18.     Defendant Christine A. French ("French") resides at 42 Roosevelt Street in Maynard, Massachusetts, is a former nurse at Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012, and holds Licensed Practical Nurse License No. LN24343 issued by The Commonwealth.

9

19.     Defendant Denise Stephenson ("Stephenson") resides at 14 Harriman Road, Hudson, Massachusetts 01749 and is a former Unit Clerk who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012.

20.     Defendant Sauda Matovu ("Matovu") resides at 15 Houghton Street, Apartment 9, Worcester, Massachusetts 01604, is a former nurse at Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were unlawfully held in the facility in 2011 and 2012, and holds Licensed Practical Nurse License No. LN70113 issued by The Commonwealth.

21.     Defendant Mirick O'Connell DiMallie & Lougee LLP ("Mirick O'Connell") is a Massachusetts law firm with offices at 100 Front Street, Worcester, MA 01608 and 1800 West Park Drive, Suite 400, Westborough, MA 01581. Said firm is responsible for the actions of Attorney Jason A. Port and Attorney Arthur P. Bergeron.

22.     Defendant John O. Mirick ("Attorney Mirick") is a Massachusetts attorney (BBO # 349240) practicing as Partner at the law firm of Mirick O'Connell. Mirick is a founding partner of Mirick O'Connell who took responsibility for this case from the firm's Registered Agent after Plaintiff's counsel sent a Chapter 93A Demand Letter to the firm's Registered Agent in June 2015.

23.     Defendant Attorney Jason A. Port ("Attorney Port") is a Massachusetts attorney (BBO # 672952) practicing as an Associate of the law firm of Mirick O'Connell with a business address of 100 Front Street, Worcester, MA 01608. After the Oultons were unlawfully confined to Marlborough Hills through fraudulent contracts executed by C. Hladick and Marlborough Hills, Attorney Port was retained by the Sibling Defendants to fight Petitions for Conservator that Plaintiff filed. Attorney Port fraudulently induced Plaintiff to dismiss the Petitions for Conservator and then aided the Sibling Defendants and others – through the use of invalid

10

Powers of Attorney that the incapacitated Oultons were forced to sign from the Alzheimer's Unit of Marlborough Hills in the absence of witnesses – in the theft of the Oultons' assets.

24.     Defendant Arthur P. Bergeron ("Attorney Bergeron") is a Massachusetts attorney (BBO # 038960) as Of Counsel of the law firm of Mirick O'Connell with a business address of 1800 West Park Drive, Suite 400, Westborough, MA 01581. Attorney Bergeron was retained by the Sibling Defendants to fight Petitions for Conservator that Plaintiff filed. Attorney Bergeron assisted Attorney Port in creating and executing the Oultons' invalid Powers of Attorney so that the Sibling Defendants and others would have unlimited access to the Oultons' assets.

25.     Defendant the Jowdy Group, Inc. (the "Jowdy Group") is a Massachusetts corporation with and address of 24 Wellington Drive, Westwood, MA 02090. The Jowdy Group employs and employed Defendant Alexander R. Jowdy during all times relevant to this lawsuit.

26.     Defendant Alexander R. Jowdy ("Jowdy") resides at 16 Pleasant Street, Medfield, Massachusetts 02052, works at RE/MAX Distinct Advantage of 736 High Street in Westwood, Massachusetts 02090, and holds Massachusetts Real Estate Sales & Brokers Salesperson License No. 9042583.

27.     Defendant Cynthia Bracciale ("Bracciale") is the purported purchaser of the Oulton Residence (described below) and has a mailing address of 54 MacArthur Road, Natick, MA 01760.

28.     Defendant John Everett & Sons Funeral Home ("Everett Funeral Home") is the funeral homer out of which the Oultons had wakes, funerals, and burials from which Plaintiff was unlawfully barred, and has an address of 4 Park Street Natick, MA 01760. Everett Funeral Home collaborated with the Sibling Defendants and officials from the Natick Police Department to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials in December 2012.

11

29. Defendant Joseph T. Everett ("Everett") is the owner and Registered Agent of Everett Funeral Home and has an address of 4 Park Street Natick, MA 01760. Everett collaborated with the Sibling Defendants and officials from the Natick Police Department to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials in December 2012.

30. Defendant Dennis Cunningham ("Cunningham") is the holder of Type 6 Funeral Director & Embalmer License No. 6258 issued by The Commonwealth of Massachusetts, is employed as a Funeral Director at Everett Funeral Home, and has an address of 4 Park Street Natick, MA 01760. Cunningham collaborated with the Sibling Defendants and officials from the Natick Police Department to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials in December 2012.

31. Defendant Susan Davis ("Davis") is the holder of Type 6 Funeral Director & Embalmer License No. 50567 issued by The Commonwealth of Massachusetts, is employed by Everett Funeral Home, and has an address of 4 Park Street Natick, MA 01760. Davis collaborated with the Sibling Defendants and officials from the Natick Police Department to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials in December 2012 and then unlawfully disseminated confidential details of the Oultons' funerals via telephone in February 2013.

32. Defendant Maureen Reeve ("Reeve") is employed by Everett Funeral Home, and has an address of 4 Park Street Natick, MA 01760. Reeve collaborated with the Sibling Defendants and officials from the Natick Police Department to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials in December 2012 and then unlawfully disseminated confidential details of the Oultons' funerals via telephone in February 2013.

12

33. Defendant Brian Falvey ("Falvey") is a former employee of Everett Funeral Home and holder of Type 6 Funeral Director & Embalmer License No. 7521 issued by The Commonwealth of Massachusetts. Falvey is currently employed by Brezniak Rodman Funeral Directors with an address of 1251 Washington Street, West Newton, MA 02465. Falvey collaborated with the Sibling Defendants and officials from the Natick Police Department to unlawfully bar Plaintiff from the Oultons' wakes, funerals, and burials in December 2012 and then unlawfully disseminated confidential details of the Oultons' funerals via telephone in February 2013.

34. Defendant Luke Simpson ("Simpson") is employed by Everett Funeral Home, and has an address of 4 Park Street Natick, MA 01760 and was a dress man for the Oultons' wakes, funerals, and burials from which Plaintiff was unlawfully barred.

35. Defendant Richard Kelly ("Kelly") is a former employee of Everett Funeral Home who is currently employed by George F. Doherty & Sons Funeral Homes of 477 Washington Street, Wellesley, MA 02482. Kelly was a dress man for the Oultons' wakes, funerals, and burials from which Plaintiff was unlawfully barred.

36. Defendant Plourde Bogue Moylan & Marino, LLP ("PBMM") is a Massachusetts and Rhode Island law firm with offices at 171 Milk Street, Suite 30, Boston, Massachusetts 02109 and 50 Exchange Terrace # 320, Providence, RI 02903. Said firm is responsible for the actions of Attorney Thomas Moylan and Attorney Melissa Curley.

37. Defendant Thomas J. Moylan ("Attorney Moylan") is a Massachusetts attorney (BBO # 564781) practicing with PBMM and has offices at 171 Milk Street, Suite 30, Boston, Massachusetts 02109. Attorney Moylan assisted Attorney Sweeney-2, Mirick O'Connell, and

13

others in attempting to seize control of the Oultons' estates in order to cover up the theft of the Oultons' assets and theft of Plaintiff's one-quarter interest in the Oultons' property.

38.     Defendant Melissa L. Curley ("Attorney Curley") is a Massachusetts attorney (BBO #655826) practicing with PBMM and has offices at 171 Milk Street, Suite 30, Boston, Massachusetts 02109. Attorney Couture Attorney Sweeney-2, Mirick O'Connell, and others in attempting to seize control of the Oultons' estates in order to cover up the theft of the Oultons' assets and theft of Plaintiff's one-quarter interest in the Oultons' property.

39.     Defendant Law Office of Deborah C. Masterson is a Massachusetts law firm with offices at 675 Massachusetts Avenue Fifth Floor, Cambridge, MA  02139. Said firm was responsible for the actions of Attorney Deborah Masterson.

40.     Defendant Deborah C. Masterson ("Attorney Masterson") is a Massachusetts attorney (BBO # 546340) practicing with The Law Firm of Deborah C. Masterson, with an address of 675 Massachusetts Avenue Fifth Floor, Cambridge, MA  02139. Attorney Masterson assisted Attorney Sweeney-2, Mirick O'Connell, and others in attempting to unlawfully seize control of the Oultons' estates in order to cover up the theft of the Oultons' assets and theft of Plaintiff's one-quarter interest in the Oultons' property, and in order to unlawfully divert the assets to Marlborough Hills.

41.     Defendant Winston Law Group, LLC ("Winston Law") is a Massachusetts law firm with offices at 440 Broadway , Somerville, MA  02145. Said firm is responsible for the actions of Attorney Neal Winston and Attorney Michael Couture.

42.     Defendant Neal Winston is a Massachusetts attorney (BBO # 531000), the Registered Agent of Winston Law, and the Winston Law Partner supervising Winston Law Associate Attorney Michael Couture.

14

43.     Defendant Michael Couture is a Massachusetts attorney (BBO # 674046) is an

Associate at Winston Law who assisted Attorney Sweeney-2 , Mirick O'Connell, Attorney

Masterson, and others in attempting to unlawfully seize control of the Oultons' estates in order to

cover up the theft of the Oultons' assets and theft of Plaintiff's one-quarter interest in the

Oultons' property, and in order to unlawfully divert the assets to Marlborough Hills.

## III.     JURISDICTION AND VENUE

44.     This Court has jurisdiction over the instant matter pursuant to M.G.L. c. 212 § 3.

Venue is properly laid in Hampden County pursuant to M.G.L. c.223 § 5.

## IV.     FACTS

45.     Carol and Donald Oulton ("Carol," and "Donald," together, "the Oultons") loved

their daughter, Sarah ("Plaintiff"). Plaintiff and her parents long enjoyed a close and mutually

supportive relationship. Together, they shared lunches out and frequent card games at the

Oultons residence. Sarah's parents also depended on her for their care (rides to doctor's

appointments, paying bills, etc.). Up until their parents' physical decline, Sarah and her siblings

maintained a close relationship, getting together often for family events and holidays. The

Oultons were supportive and very generous to all of their children. In fact so accustomed were

the Oultons to financially assisting their children that three of the Oulton children's personal

checking account numbers were listed on the front page of the Oultons check register. Carol

Oulton kept the account numbers of her children, Plaintiff, D. Oulton and C. Hladick, so that she

could deposit money in these accounts whenever she wished to help.

15

46.     On August 12, 1994, after a serious discussion about Plaintiff switching her career

plans from veterinary medicine to law, Donald sent a letter to Plaintiff (on behalf of himself and

Carol) (**Exhibit 1**) in which he stated, *inter alia:*

> Enclosed is a check for $750.00 from Mom and I. It's a little
> more than we discussed but when Mom & I looked at our
> circumstances we can handle it. It is not a loan.
> It's just some help for you "over the rough spots."
>
> I'm sorry if I was short with you on the phone. It's just that
> I'm frustrated for you. We love you so! There isn't anything
> we would prefer to see than you as the outstanding successful
> person we know you can be....
>
> 3. Finally, always remember Mom and I are behind all your
> efforts. There is nothing we wish more than to see you
> successful. We are behind you always. - -
>
> We love you so!
>
>                  With love,
>                  Dad + Mom
>                  P.S. Call collect whenever you wish
>                  (to cut down on your expenses!)

47.     In 2000 or 2001 (indeterminable because dates and initials on documents appear

to have been altered), Attorney Sweeney-2 prepared an "estate plan" for the Oultons, which

failed to protect the Oultons financial interests adequately. The "estate plan" created by

Attorney Sweeney-2 contained no estate planning documents other than the Will of Donald Paul

Oulton and the Will of Carol Jane Oulton. Notably absent, the estate plan failed to include a

Family Tree, an Estate Inventory, Durable Powers of Attorney for each of the Oultons,

Substitutions of Attorney-In-Fact, Health Care Proxy documents, Health Care Directives, Living

Wills, Anatomical Gifts, HIPAA Releases, a Residence Trust, Certification of Residence Trust,

Revocable Trusts for each of the Oultons, and Trust Protectors.

16

48.     The failure of Attorney Sweeney-2 to prepare a well-crafted, protective estate plan forms the foundation of all issues brought forth in this Complaint. Attorney Sweeney-2, through his negligence or malpractice, is solely responsible for the deficient estate plan that left: (a) the Oultons vulnerable to financial abuse and conversion; (b) the Estate of Donald Paul Oulton and the Estate of Carol Jane Oulton vulnerable to conversion, embezzlement, fraud, and unnecessarily time-consuming and expensive litigation.

49.     Not only did Attorney Sweeney-2 create the Oultons' woefully substandard "estate plan," but, after leaving the Oultons in the most vulnerable of conditions, he willfully and knowingly.

50.     In 2000 Attorney Sweeney-2 created The Last Will and Testament of Donald Paul Oulton (the "Will of Donald"), and the Will of Donald was allegedly executed on June 28, 2000 (Exhibit 2).

51.     It is quite noteworthy that the dates and initials shown on all Will-related documents prepared for Donald by Attorney Sweeney-2 and later introduced as evidence in the Middlesex County Probate and Family Court (Docket No. MI13P2282EA) appear to have been altered.

52.     The FIRST paragraph of the Will of Donald gave and bequeathed "all of my personal property to my spouse, Carol Jane Oulton, if my spouse survives me. If my spouse predeceases me, I give and bequeath all my personal property to my children who survive me in equal shares as they shall agree, but if they cannot agree, then as the Executor shall decide, and his decision shall be final [emphasis added]."

53.     The FIRST paragraph further stated that "[r]eferences in this Will to my children include: my son David Paul Oulton, and my three daughters Nancy (Oulton) Gambone, Sarah

17

Ann Oulton, and Carol (Oulton) Hladick, and other lawful children born to or adopted by me subsequent to the execution of this Will."

54.     The SECOND paragraph of the Will of Donald states "I give, devise, and bequeath all the rest, residue and remainder of my property, tangible or intangible, personal or real, owned by me at my death and which is not otherwise disposed of by the provisions of this Will, to my spouse, if my spouse survives me. If my spouse predeceases me, I then give, devise and bequeath all the rest, residue and remainder of my estate in equal shares to my children who survive me...." [emphasis added]

55.     Throughout Donald's lifetime, Plaintiff was unaware of the contents of the Will of Donald. Plaintiff never inquired of Donald or anyone as to the contents of the Will of Donald, and, given Plaintiff's legal education, Plaintiff knew it would be unethical for Attorney Sweeney-2 or any attorney to reveal the contents of the Will of Donald prior to the death of Donald. Attorney Sweeney-2, in violation of Massachusetts Rules of Professional Conduct Rule 1.6(a), not only revealed the contents of the Will of Donald to C. Hladick, N. Williams, D. Oulton and others prior to Donald's death, but also willfully and knowingly used and disseminated that confidential information to circumvent and frustrate Donald's last wishes and desires as they related to Plaintiff and as declared in the Will of Donald.

56.     The FOURTH paragraph of the Will of Donald nominated and appointed Donald's spouse, Carol, as Executor. It further named Attorney John Mahaney of Natick, MA to serve as Successor Executor in place of Carol if Carol should "predecease me, fail to qualify, refuse, or cease to act for any reason." The FOURTH paragraph of the Will of Donald also named Attorney Alan Lehman (of Peabody, MA) to serve as Executor if Carol and Attorney

18

Mahaney should predecease Donald, fail to qualify, or refuse or cease to act as Donald's
Executor.

57.     The SEVENTH paragraph of the Will of Donald states, "I request that no
beneficiary, devisee or legatee shall take under my Will unless such beneficiary, devisee or
legatee shall survive me by thirty (30) days not including the day of my death
[emphasis added]."

58.     In 2000 or 2001 (indeterminable due to the altered dates described above),
Attorney Sweeney-2 prepared the Last Will and Testament of Carol Jane Oulton, allegedly
executed on April 19, 2001 (Exhibit 3) (the "Will of Carol").

59.     It is apparent that dates and initials shown on all Will-related documents prepared
for Carol by Attorney Sweeney-2 and later introduced as evidence in the Middlesex County
Probate and Family Court (Docket No. MI13P1828EA) appear to have been altered.

60.     The FIRST paragraph of the Will of Carol gave and bequeathed "all of my
personal property to my spouse, Donald Paul Oulton, if my spouse survives me. If my spouse
predeceases me, I give and bequeath all my personal property to my children who survive me in
equal shares as they shall agree [emphasis added]... but if they cannot agree, then as the Executor
shall decide, and his decision shall be final." The FIRST paragraph further stated that
"[r]eferences in this Will to my children include: my son David Paul Oulton, and my three
daughters Nancy (Oulton) Gambone, Sarah Ann Oulton, and Carol (Oulton) Hladick, and other
lawful children born to or adopted by me subsequent to the execution of this Will."
[emphasis added]

61.     The SECOND paragraph of the Will of Carol stated that "I give, devise, and
bequeath all the rest, residue and remainder of my property, tangible or intangible, personal or

real, owned by me at my death and which is not otherwise disposed of by the provisions of this Will, to my spouse, if my spouse survives me. If my spouse predeceases me, I then give, devise and bequeath all the rest, residue and remainder of my estate in equal shares to my children who survive me...." [emphasis added]

62.     Throughout Carol's lifetime Plaintiff was unaware of the contents of the Will of Carol. Plaintiff never inquired of Donald or anyone as to the contents of the Will of Carol. Given Plaintiff's legal education, Plaintiff knew it would be unethical for Attorney Sweeney-2 or any attorney to reveal the contents of the Will of Carol prior to her death. Attorney Sweeney-2, in violation of Massachusetts Rules of Professional Conduct Rule 1.6(a), not only revealed the contents of the Will of Carol to C. Hladick, N. Williams, D. Oulton and others prior to Donald's death, but also willfully and knowingly used and disseminated that confidential information to circumvent and frustrate decedent's wishes as related to Plaintiff.

63.     The FOURTH paragraph of the Will of Carol nominated and appointed Donald as Executor. It further named Attorney John Mahaney of Natick, MA to serve as Successor Executor in place of Donald if Donald should "predecease me, fail to qualify, refuse, or cease to act for any reason." The FOURTH paragraph of the Will of Carol also named Attorney Gerard Mahaney of Natick, MA to serve as Executor if Donald and Attorney John Mahaney should predecease Carol, fail to qualify, or refuse or cease to act as Carol's Executor.

64.     The EIGHTH paragraph of the Will of Carol contained a 30-day survivorship clause (the "30-Day Survivorship Clause") which states, "I request that no beneficiary, devisee or legatee shall take under my Will unless such beneficiary, devisee or legatee shall survive me by thirty (30) days not including the day of my death" [emphasis added].

20

65.     Plaintiff rented an apartment in Framingham, Massachusetts in January 2002 and remained in that residence through July 2009, at which time Plaintiff moved to Agawam, Massachusetts to attend law school at Western New England University School of Law ("WNE Law").

66.     Plaintiff enjoyed good relations with all members of the Oulton family after moving to Framingham in January 2002. Plaintiff, who lived only 6.5 miles away from the Oultons, was the closest Oulton Child in proximity to the Oultons. Plaintiff, Donald, and Carol enjoyed multiple visits each week and lunches at various restaurants in the MetroWest area each weekend. Several times each year, Plaintiff drove the Oultons to the home of C. Hladick and Lt. Hladick, N. Williams, and D. Oulton for holidays that the family celebrated together, including Christmas, Easter, and Thanksgiving.

67.     Plaintiff enjoyed good relations with her siblings during most of the time between 2001, when she returned to Massachusetts from Colorado, and November 2011, when the actions that form the basis of this lawsuit took place.

68.     In April 2002, for example, C. Hladick and Lt. Hladick invited Plaintiff to their daughter's dance recital (**Exhibit 4**).

69.     For Christmas 2002, Plaintiff promised to purchase a Dell computer for D. Oulton and completed the transaction, for $320.23, on December 28, 2002 (**Exhibit 5**).

70.     In the Spring of 2004, Donald invited Plaintiff to attend a luncheon at the Union Oyster House with Defendant Attorney Sweeney-2. Donald and Attorney Sweeney-2 had been law school classmates in the Suffolk University School of Law Class of 1969, and Plaintiff and Attorney Sweeney-2 had known each other since the late 1960s, when Plaintiff was a child. The

21

purpose of the luncheon was to congratulate Donald's former colleague on his new position with the BBA and to socialize.

71.    During the Spring of 2004 Union Oyster House luncheon, Plaintiff and Attorney Sweeney-2, who had not seen each other for years, discussed Plaintiff's hopes and plans to attend law school. At the time Attorney Sweeney-2 had been representing the Oultons in the Oultons' estate planning and tax matters, and Attorney Sweeney-2 told Plaintiff that he would help if Plaintiff needed any assistance in preparing to apply to law school.

72.    In early 2005 Plaintiff contacted Attorney Sweeney-2 for legal help in rehabilitating an outstanding student loan and filing outstanding tax returns.

73.    Sweeney2 had verbally agreed to represent Plaintiff in both Plaintiff's tax and outstanding student loan matters. Attorney Sweeney-2 did not execute an Engagement Letter or a Fee Agreement with Plaintiff. Instead, Attorney Sweeney-2 asked Plaintiff to assist Attorney Sweeney-2 with some technological issues that Attorney Sweeney-2 and his wife (Mary Sweeney) were having with their cellular telephones' "contacts" files.

74.    In order to resolve Attorney Sweeney-2's "contacts" issues, Plaintiff met several times with Attorney Sweeney-2 at his office (171 Milk Street, Suite 30, Boston, Massachusetts). At Attorney Sweeney-2's office, Attorney Sweeney-2 gave Plaintiff his "rolodex" containing all handwritten contact information for parties Attorney Sweeney-2 wanted to include on both his and his wife's cellular telephones and in the Sweeneys' home computer. Over the course of approximately two weeks (including a Sunday spent at Attorney Sweeney-2's home in Wakefield, Massachusetts), Plaintiff painstakingly entered the "contacts" data into both telephones for Attorney Sweeney-2 and his wife, and into the "Contacts Listing" on Attorney Sweeney-2's home computer.

22

75. Attorney Sweeney-2 filed a Power of Attorney with the Internal Revenue Service ("IRS") which granted Attorney Sweeney-2 the authority to communicate with the IRS on behalf of Plaintiff. Attorney Sweeney-2 filed several outstanding tax returns in his capacity as attorney for Plaintiff, including a return for Tax Year 2004, which listed Attorney Sweeney-2 (and his Social Security Number) in the sections listing "Paid Preparer's Name" and "Preparer's SSN" (Exhibit 6).

76. During the course of Attorney Sweeney-2's representation of Plaintiff in 2005, Plaintiff communicated with Attorney Sweeney-2 only at his office at the law firm of Keough + Sweeney, 171 Milk Street, Suite 30, Boston, Massachusetts 02109 (Exhibit 7). .

77. Subsequent to the cessation of Attorney Sweeney-2's legal representation of Plaintiff, Attorney Sweeney-2 owed Plaintiff the duties owed to former clients set forth in the Massachusetts Rules of Professional Conduct Rule 1.9.

78. In May 2006, a fire broke out under the kitchen sink of the Oulton Residence. As a result of smoke inhalation, the Oultons were transported via ambulance to Leonard Morse Hospital in Natick, Massachusetts. All four Oulton Children cooperatively worked together to help the Oultons recover from this very difficult event.

79. In the summer of 2007, the effects of the Oultons' chronic alcoholism took a tremendous toll on their health and marriage. Donald underwent a particularly bad drinking binge, which ended in detox at the Leonard Morse Hospital in Natick, Massachusetts ("LMH"). At the time, Carol was also hospitalized in Leonard Morse Hospital. After Donald was admitted, Carol demanded that Donald leave the Oulton Residence when he was discharged from LMH. Carol also demanded a separation from Donald.

23

80.     Upon information and belief, Donald was discharged from the detoxification unit of LMH within a week of his admission.  Donald was transported from LMH to The Hampton Inn in Natick by Donald's older brother, Andrew Oulton.  Since no plans for Donald had been made post-hospital discharge, so Donald checked into the hotel.

81.     On one visit to Donald's hotel, Plaintiff noticed that Donald had a fresh supply of Smirnoff's Vodka.  Plaintiff realized that Donald would likely drink himself to death in the hotel, so Plaintiff begged Donald to leave the hotel and live with her in Framingham while the Oultons worked out their marital and alcohol-related issues.

82.     Donald made the decision to live with Plaintiff during the separation because Donald had no other options at the time.  Donald's brother Andrew refused to allow Donald to stay at his home in Walpole, Massachusetts.  None of the other three Oulton children would permit Donald to reside with them.  Based on conversations that Plaintiff had with C. Hladick, Lt. Hladick, N. Williams, and D. Oulton at the time, Plaintiff knew that the other three considered Donald to be too far gone in his alcoholism to want to have Donald in their homes or in their lives for any length of time.

83.     The following morning, Lt. Hladick and Plaintiff drove to The Hampton Inn to get  Donald and move him into Plaintiff's apartment.

84.     Plaintiff communicated freely with Carol during this difficult transition in order to set up Donald's medicine list and arrange for Donald's visiting nurses to visit Donald at Plaintiff's apartment.  Plaintiff also coordinated with neighbors and friends to keep Donald company during the day while Plaintiff worked.

85.     Donald lived with Plaintiff in her Framingham apartment for approximately two months in 2007, and it was a wonderful time for both of them.  Plaintiff does not drink or take

24

drugs, and she did not allow Donald to have any alcohol in the apartment. Donald, who was eager to repair his fractured relationship with Carol and return to the Oulton Residence, complied with Plaintiff's "NO ALCOHOL" rule, and Donald maintained his sobriety for months following his move to Plaintiff's apartment and his eventual return to the Oulton Residence.

86.     While residing at Plaintiff's Framingham apartment, Donald and Plaintiff developed a pleasant and cooperative routine. Plaintiff cooked and visited with Donald, shopped for Donald, did Donald's laundry, and made numerous trips to see Carol. Plaintiff and Donald enjoyed a number of wonderful times during that otherwise difficult period, and Plaintiff's siblings often contacted Donald (via telephone and in person) while Donald resided with Plaintiff in the summer of 2007.

87.     On August 16, 2007, a process server visited Donald at Plaintiff's apartment and served a Complaint for Divorce filed by Carol (Exhibit 8). Donald was not expecting the separation to turn into a Complaint for, at that time, so he called Plaintiff at work and was quite upset.

88.     Plaintiff was stunned to learn that the divorce case prepared against Donald and served on Donald at Plaintiff's apartment was prepared by Donald's own attorneys, i.e., by the lawyers of the law firm of Keough + Sweeney. Attorney Sweeney-2, who had been Donald's law school classmate, had previously prepared the Oultons' tax and "estate-plan" described above. Despite Attorney Sweeney-2's conflict of interest, a breach of the Massachusetts Rules of Professional billed Donald for Keough + Sweeney's representation of Carol in the divorce proceedings against Donald. Attorney Sweeney-2's son, Attorney Sweeney-3, prepared the divorce documents for Carol and had them served on Donald while Donald lived with Plaintiff.

25

89.     On August 22, 2007, at Donald's request, Plaintiff emailed to N. Williams the entire Complaint for Divorce packet that Attorney Sweeney-3 had served on Donald at Plaintiff's apartment on August 16, 2007 (**Exhibit 9**).

90.     During the Oultons' separation, Donald moved from Plaintiff's home in Framingham, Massachusetts to N. Williams's home in Winchendon, Massachusetts. Donald's health was declining, likely due to the stress brought on by the Complaint for Divorce prepared by Attorney Sweeney-3. The family members thought Donald would do better at N. Williams's home, because more people would be home with Donald during the day.

91.     Donald's health declined precipitously and he was hospitalized several times after moving to N. Williams's home in Winchendon.

92.     By the fall of 2007, the Oultons had resolved their differences and they declined to pursue the Complaint for Divorce. Donald moved back into the Oulton Residence and the Oultons remained there (with intermittent periods of hospitalization due to their continually declining health) until the end of November and early December 2011.

93.     On April 17, 2008, upon information and belief, C. Hladick accompanied the Oultons to a medical procedure performed at Newton-Wellesley Hospital ("Newton-Wellesley") in Wellesley, Massachusetts. There, the Oultons executed Newton-Wellesley's standard "Massachusetts Health Care Proxy" documents appointing C. Hladick as Health Care Agent for Donald (**Exhibit 10**) and Carol (**Exhibit 11**).

94.     Until November 2011, the Oultons continued to live alone at the Oulton Residence. After Carol dropped the Complaint for Divorce in the fall of 2007, the Oultons eventually returned to drinking alcohol (Smirnoff's Vodka) on a daily basis.

95.     By 2008, Plaintiff had become the Oultons' primary helper around the house, regularly doing chores and running errands for the Oultons as needed. Given Plaintiff's close proximity to the Oulton Residence, and given that the Oultons were very supportive of Plaintiff's desire to attend law school, the frequent visits between Plaintiff and the Oultons were enjoyed by all three.

96.     The Oultons' alcoholism affected the entire family for decades, however by 2009, the Oultons declining health was far worse than it had ever been.

97.     In March 2009, the Oultons water and sewer service was scheduled for disconnection due to non-payment of a costly water bill. This large bill was due to a water leak in the Oultons upstairs bathroom, that they were completely unaware for a long period of time, despite receiving two extraordinarily large bills. The Oultons requested that Plaintiff assist them in resolving this issue with the Town of Natick.

98.     Plaintiff corresponded several times with Town of Natick officials (both in writing and in person) in order to resolve the Oultons' Water & Sewer bill problem (Exhibit 12). On behalf of the Oultons, Plaintiff spoke by telephone with Selectman John Connelly about the matter. Plaintiff had additional communications with Town of Natick Officials regarding the Oultons' Water & Sewer problem, all of which are contained in (Exhibit 12).

99.     Plaintiff appeared at the Town of Natick Board of Selectmen meeting held on June 22, 2009 to request help in implementing the payment plan. Reference was made to the Oultons' failing health, and to the fact that Plaintiff was appearing before the Board of Selectmen as the Oultons' agent. The Selectboard thereafter established a new policy of payment plans for people with high utility bills.

27

100.    On July 4, 2009, Plaintiff drove the Oultons to the wedding of N. Williams and Daniel Williams in Central Massachusetts and the family celebrated together.

101.    In July 2009, Plaintiff moved from Framingham, Massachusetts to Agawam, Massachusetts in order to enroll in law school at WNE Law. Prior to moving, Plaintiff, Carol, and Donald had made arrangements for Plaintiff to continue to run errands for the Oultons and to check in on them daily with telephone calls.

102.    From July 2009 until the end of 2011, Plaintiff called her parents twice daily on most days, at approximately 7:30 a.m. and at approximately 7:00 p.m.

103.    The Oultons' health continued to decline in 2009, and their chronic alcoholism continued to be a primary factor in the deterioration of their health. Donald was hospitalized on numerous occasions and had to spend time in various rehabilitative facilities before being discharged. The stress of Donald's frequent hospitalizations took a tremendous toll on Carol, and her health also declined as a result.

104.    On October 18, 2009, the four Oulton Children held a meeting at McDonald's on Worcester Road in Natick, Massachusetts to discuss the deleterious effects of the Oultons' chronic alcoholism. During the meeting, the Oulton Children wrote and signed a letter (Exhibit 13) (the "Oulton Children's Letter") to the Oultons stating, *inter alia*,

> ... as long as alcohol is a part of your lives, we will not be. We will not receive calls, we will not respond to requests. For us this is a heartbreaking choice that we must make because we each are done with the bedlam that your choices cause in our lives.

The Oulton Children's Letter suggested a treatment program that would accept the Oultons, and the Oulton Children hand-delivered the letter to the Oultons later in the morning. The Oultons' reaction to the letter was rage and anger, and the Oulton Children left without making any impact on the Oultons' chronic alcoholism.

28

105.   Sometime after the delivery of the Oulton Children's Letter, the Oultons were in need of assistance at the Oulton Residence. Upon information and belief, D. Oulton had resumed paying periodic visits to the Oultons; eventually, Plaintiff also resumed making visits to the Oultons.

106.   In 2010 the Oultons had experienced numerous, repeated problems with bill-paying. The Oultons requested Plaintiff's help in creating a system through which the Oultons could better keep track of the bills that came to the house. In response to that request, Plaintiff established an "Oulton File Folder List" (Exhibit 14) and created folders for the Oultons to use to sort their mail. As requested by the Oultons, Plaintiff would visit more frequently to help with special projects (e.g., cleaning carpets, flipping the Oultons' mattress, painting, etc.). Plaintiff helped the Oultons pay their bills by simply organizing the bills that came in. At the Oultons' request, Plaintiff wrote out the details of checks to be paid to various creditors.

107.   All checks paid by the Oultons were signed by either Carol or Donald. All checks were written for the payment of the Oultons bills and expenses.

108.   It is noteworthy that over the years the Oultons were generous to their children. A sampling of checks freely written by Carol and/or Donald to the Oulton children over the years is found in (Exhibit 15) The following amounts of money were given by the Oultons :

| David Oulton | January 2007 through November 2011 | $47,235.00; |
| Carol Hladick | January 2001 through August 2011 | $38,398.19; |
| Sarah Oulton | November 2001 through July 2011 | $22,398.34; |
| Nancy Williams | April 2007 through August 2008 | $4,300.00 |

109.   During the 2009-2010 winter break from law school, Plaintiff discovered that her vehicle's frame had rusted and the car was no longer safe to drive. Because Plaintiff was, at this

29

time, the Oultons' primary helper and frequent visitor (the distance between Plaintiff's house and the Oultons' house totaled 81.3 miles each way), the Oultons offered to purchase a used vehicle for Plaintiff. On January 12, 2010, the Oultons paid $12,900.00 for a 2004 Jeep Wrangler, chosen for its four-wheel drive capability so that Plaintiff would be able to get to the Oultons in all types of weather (**Exhibit 16**).

110.   On March 5, 2011, Plaintiff created a "Medication List" for Carol (**Exhibit 17**). Plaintiff, Carol, and Donald had discussed the utility of keeping such lists on hand at the Oulton Residence so that the many home health aides could access the lists, and so the lists could be taken to hospitals when the Oultons were admitted, as they were, on increasingly frequent occasions.

111.   On May 25, 2011, approximately one year before Plaintiff was scheduled to graduate from law school, Plaintiff booked a hotel room for the Oultons at the Sheraton Springfield Monarch Place in anticipation of Plaintiff's graduation (**Exhibit 18**). Plaintiff, Donald, and Carol were extremely excited that Plaintiff's graduation from law school was less than one year away, and all three were excited to celebrate the event together. To ensure that the Oultons would have a handicap-accessible place to stay, Plaintiff booked the hotel in May 2011 for the dates of May 18 – May 20, 2012.

112.   On June 7, 2011, Plaintiff was unable to reach her parents by telephone; she received a message that said their number was not accepting calls at that time. Very concerned Plaintiff sent an email to the Oultons neighbor, Kristen Maichen ("Mrs. Maichen"), who was the person Plaintiff frequently contacted to inquire about the Oultons well-being asking her to knock on the door and check on her parents (**Exhibit 19**).

30

113.    Worried for her parent's ability to get help in an emergency, Plaintiff contacted Comcast and persuaded the company to accept a payment from her in order to restore phone service to her parents' home.

114.    On June 15, 2011, Plaintiff updated the Medication Lists she had created for the Oultons (**Exhibit 20**).

115.    On July 11, 2011, Plaintiff accompanied Carol to an appointment with Carol's primary care physician (Danielle Brook, M.D.) and she helped Carol create a list of questions to ask the doctor (**Exhibit 21**).

116.    On August 12, 2011, Plaintiff was about to enter her third and final year of law school. Plaintiff had completed her requisite FAFSA paperwork earlier in 2011, but in August Plaintiff was notified of a delay in the disbursement of funding (due to a reversible error).

117.    The Oultons were so invested in Plaintiff's law school success that, upon learning of the FAFSA problem, Carol volunteered to complete Federal Form OMB No. 1845-0068, a "Direct Loans Endorser Addendum – Federal Direct PLUS Loan Application and Promissory Note" on behalf of Plaintiff (**Exhibit 22**). The Oultons agreed to guarantee Plaintiff's final year of law school loans in the event that Plaintiff's FAFSA issues were not resolved in time.

118.    By the summer of 2011 Donald had been hospitalized and rehabilitated at a number of different hospitals and rehabilitation facilities.

119.    In August 2011 Donald received a "Motion by Board of Bar Overseers for Suspension of Attorneys" (the "BBO Motion") (**Exhibit 23**). The BBO Motion indicated that "IF [Donald did] NOT RESPOND TO THIS LETTER WITHIN 31 DAYS, [Donald would] BE ADMINISTRATIVELY SUSPENDED FROM THE PRACTICE OF LAW." Four attempts had

31

been made by the BBO to obtain the information. Despite not actively practicing law, it was very important to Donald Oulton that he remain a member in good standing.

120.    Plaintiff contacted Francis Kenneally, First Assistant Clerk of the Supreme Judicial Court for Suffolk County and took steps to resolve the BBO Motion completely (Exhibit 24).

121.    On September 12, 2011, Plaintiff updated Donald's Medication List for Donald (Exhibit 25).

122.    On October 1, 2011, Plaintiff updated Carol's Medication List (Exhibit 26) for Carol.

123.    On Saturday, October 29, 2011, The Commonwealth of Massachusetts suffered an historic ice storm (Storm Alfred). During the storm, the roads in Massachusetts were closed temporarily due to a state of emergency and the dangerous conditions. Plaintiff lost power at her Agawam home, as did the Oultons in Natick.

124.    During the storm, Plaintiff made contact with Kristen Maichen, who offered to check on the Oultons until Plaintiff could arrive to assist. Notably, none of the other Oulton Children, who live in much closer proximity, checked on the Oultons during the historic ice storm.

125.    On Sunday, October 30, 2011, when the state of emergency had been lifted, Plaintiff drove from Agawam, Massachusetts to the Oultons' residence in Natick. Upon Plaintiff's arrival, she discovered the Oultons were without electricity, heat, and telephone. Plaintiff found them huddled together, shivering, under the covers in bed. The Oultons had not eaten all day and Donald Oulton had not taken his necessary insulin. Plaintiff, shocked to discover the condition her parents had been in for over two days, informed the Oultons that they

32

couldn't stay here like that because it was too dangerous. The Oultons responded that they had

been ok because they knew Plaintiff would come for them. ...

126.    Plaintiff immediately offered to take the Oultons to a hotel in Natick so that they

could live comfortably while power was out at their residence. The Oultons, however,

adamantly refused to leave the Oulton Residence and insisted on staying home.

127.    Plaintiff drove to Walmart and purchased blankets, coffee, flashlights, food, and

other items for the Oultons. Plaintiff charged Carol's cell phone in her vehicle and told the

Oultons to conserve the battery as the storm damage was extensive and it was unknown when

power would be restore.

128.    On Monday, October 31, 2011, Plaintiff sent an email to Kristen Maichen:

> Thanks so much for checking on my parents...
>
> My father's not eating and drinking much at all, and he's diabetic,
> so it's just a matter of time before he really crashes. My mom's
> weak as heck, too, as you know. I drove there and tried getting
> them to go to a hotel refused. So I left them with a cell phone
> (508-654-6266), some new blankets, a new flashlight, and some
> coffee and food.
>
> I shudder to think of them in there alone but they insisted. So what
> can I do?
>
> If you'd be willing to please knock on the door, I'd appreciate it
> (Exhibit 27).

129.    On Thursday, November 17, 2011, Carol was home alone in the Oulton

Residence because Donald was hospitalized at Leonard Morse Hospital in Natick,

Massachusetts. Plaintiff received a telephone call from the Oultons' neighbor, Michael Maichen,

to inform Plaintiff that Carol had fallen while home alone that evening.

130.    The Natick emergency dispatch log entry referencing the emergency call to the

Oulton Residence on November 17, 2011, is attached hereto (Exhibit 28).

33

131.    Carol broke her leg in the fall that she incurred on November 17, 2011.

132.    Mr. Maichen informed Plaintiff that because Carol was alone in the house, the Town of Natick Fire Department personnel were forced to break a window in order to rescue Carol. Mr. Maichen advised Plaintiff to drive to Natick as soon as possible in order to lock up the Oulton Residence and visit Carol at the Emergency Room of Leonard Morse Hospital.

133.    In response to Mr. Maichen's telephone call, Plaintiff left WNE Law and immediately drove to the Oulton Residence. Plaintiff checked the broken window through which the Town of Natick Fire Department personnel had entered the Oulton Residence, removed three empty Smirnoff Vodka bottles, secured the house to the best of her ability, gathered Carol's pocketbook (containing wallet), packed a small bag with clothing, slippers, toiletries, and Carol's medicines, and also picked up a copy of Carol's "Medicine List" that Plaintiff routinely maintained for Carol.

134.    Plaintiff stayed with Carol in the Emergency Room of Leonard Morse for several hours and then drove to Agawam in order to catch an early flight to Denver on the following morning.

135.    From November 18, 2011, through the end of the month Carol remained hospitalized at Leonard Morse Hospital in Natick. During the week of Thanksgiving, Carol went into a comatose state while hospitalized in the Intensive Care Unit.

136.    On November 23, 2011, all four of the Oulton Children made plans for the entire family to gather at the hospital, met with Carol's doctors and a priest, and prepared to say "goodbye" to Carol, because Carol's condition was so grave.

137.    Plaintiff attempted to drive from Agawam, Massachusetts to Natick, Massachusetts to attend the family gathering at the hospital. On the way to Natick, the brakes on

34

Plaintiff's vehicle failed as Plaintiff headed eastbound on the Massachusetts Turnpike. Plaintiff telephoned N. Williams, who was already at Leonard Morse Hospital, and informed N. Williams that the brakes on Plaintiff's vehicle had failed.

138.    N. Williams conferred with other family members who were already at the hospital, and a consensus was reached that Plaintiff should put her vehicle in the shop and borrow the Oultons' Ford 500 (the "Oultons' Car") during the time that Plaintiff's vehicle was in the shop.

139.    On Thanksgiving morning, November 24, 2011, Plaintiff drove the Oultons' Car and visited the comatose Carol at the Intensive Care Unit of Leonard Morse Hospital.

140.    Plaintiff found Carol's "Lifeline" call button (attached to a string) on the floor underneath Carol's hospital bed. Plaintiff asked one of the nurses to please put the call button with Carol's pocketbook, which Plaintiff left with Carol in the Emergency Room on November 17, 2011. A nurse stationed at the Intensive Care Unit informed Plaintiff that Carol's "son" had checked the pocketbook out and took it home. The nurse showed Plaintiff the form signed by "Carol's son" when he took Carol's pocketbook out of the Intensive Care Unit, and Plaintiff noted that the name on the form was Lt. Hladick, Carol's son-in-law.

141.    Plaintiff called D. Oulton (Carol's son) to confirm that he had not checked Carol's pocketbook out of the Intensive Care Unit.

142.    Over the next several days, Plaintiff called the Hladick residence and conferred with C. Hladick, who denied having any knowledge of the location of Carol's pocketbook. All three of Plaintiff's siblings denied having any knowledge of the location of Carol's pocketbook.

143.    Plaintiff suggested filing a report about Carol's stolen pocketbook with the Natick Police Department, but Plaintiff's siblings did not agree.

35

144.     Of the four siblings, only Plaintiff was ailing to care for Donald after his release
from the Leonard Morse Hospital on November 29, 2011 and stay with him at the Oulton
Residence.

145.     On the evening of November 29, 2011, Carol, who recovered from her coma, was
released from Leonard Morse Hospital and transferred to Marlborough Hills Healthcare Center
in Marlborough, Massachusetts ("Marlborough Hills").

146.     On the morning of November 30, 2011, Donald was in dire need of insulin and
other medications. Plaintiff had arranged for Donald's prescriptions to be filled at CVS
Pharmacy on West Central Street in Natick, Massachusetts.

147.     Donald asked Plaintiff to buy groceries and other items that he needed while
Plaintiff was picking up Donald's medications, and Donald said he would pay for the items he
needed. Plaintiff and Donald, however, were unable to find Donald's wallet anywhere in the
Oulton Residence.

148.     Plaintiff made a number of telephone calls from the Oulton Residence to
C. Hladick in an attempt to get Carol's pocketbook and Donald's wallet back from C. Hladick
and Lt. Hladick so that Plaintiff could pick up the medicine and supplies that Donald so
desperately needed.

149.     Each time Plaintiff spoke to C. Hladick, C. Hladick denied that Carol's missing
pocketbook and Donald's missing wallet were in the possession of either C. Hladick or
Lt. Hladick.

150.     Donald suggested to Plaintiff that Plaintiff simply take a blank check (which
Donald offered to sign) to the CVS Pharmacy in order to pay for the items that Donald

36

desperately needed, only to discover that the Oultons' Checkbook (the "Oultons' Checkbook") was also missing from the Oulton Residence.

151.   With Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook missing, Plaintiff and Donald had no way for Donald to purchase the essential medicines and items that he needed on November 30, 2011.

152.   Worried about Donald's low blood sugar, Plaintiff informed C. Hladick that if Donald's wallet and Carol's pocketbook were not returned to Donald at the Oulton Residence, Plaintiff would be left with no other choice but to report the items as having been stolen by C. Hladick and Lt. Hladick. C. Hladick's response to Plaintiff was "F*ck you, Sarah!"

153.   Plaintiff informed Donald that C. Hladick and Lt. Hladick were in possession of Carol's missing pocketbook, Donald's missing wallet, and the Oultons' missing checkbook.

154.   Donald, quite upset that C. Hladick and Lt. Hladick had stolen Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook (and were refusing to return the items when Donald so desperately needed them) made several telephone calls to C. Hladick and Lt. Hladick. Donald begged the Hladicks to please return the missing items so that Plaintiff could run to CVS and purchase Donald's medicines and other needed items. The Hladicks denied being in possession of Carol's missing pocketbook, Donald's missing wallet, and the Oultons' Checkbook.

155.   Plaintiff and Donald contacted Carol at Marlborough Hills to inform her of the missing pocketbook, wallet, and checkbook, and to see if Carol could please convince C. Hladick and Lt. Hladick to return the items to Donald.

156.   At 9:21 a.m. on November 30, 2011, N. Williams left the following voice mail message for Plaintiff:

37

Hey Sarah, it's me (Nancy Williams).

I understand that you're calling the police. Um, you need to really re-think that and obviously you'll do whatever you want to do, but, um, my understanding is there's some stuff about that checkbook that, um, you're the one that's been writing the checks, and, I don't understand why you're doing this.

You can do whatever you want with Dad but it's just wrong, Sarah, it's wrong. And, uh, it's lies. And so, I know you're pissed off. I know the stuff you've been saying bye you need to call me, all right?

157.    Plaintiff and Donald were left with no other option but to contact the Natick Police and report the pocketbook, wallet, and checkbook stolen. At 9:47 a.m. Officer Robert Murphy was dispatched to the Oulton Residence. Officer Murphy informed Plaintiff and Donald that he was personal friends with Lt. Hladick, and Officer Murphy offered to try to resolve the situation for Donald.

158.    During the visit Officer Murphy pulled out his cell phone and called Lt. Hladick on a phone number that Officer Murphy had in his "contacts" list. Officer Murphy asked Lt. Hladick to please return the missing wallet, pocketbook, and checkbook to Donald.

159.    The log entry referencing Officer Murphy's call to the Oulton Residence to resolve the theft of Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook is attached hereto as (Exhibit 29).

160.    Officer Murphy ascertained that C. Hladick and Lt. Hladick were, indeed, in possession of Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook.

161.    Plaintiff encouraged Donald to press charges against C. Hladick and Lt. Hladick for the theft of Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook. Donald declined to press charges against C. Hladick and Lt. Hladick, telling Plaintiff that he did not want

38

the charges to interfere with Lt. Hladick's employment with the Town of Natick Fire Department.

162.    At approximately 11:00 a.m. on November 30, 2011, following a number of telephone calls among Plaintiff, C. Hladick, N. Williams, Carol, and Donald, C. Hladick burst into the living room of the Oulton Residence, and threw Carol's pocketbook at Plaintiff's head. C. Hladick screamed, "F*CK YOU, SARAH!, F*CK YOU, SARAH! F*CK YOU, SARAH!" and then immediately left the Oulton Residence in her vehicle.

163.    C. Hladick returned Carol's stolen pocketbook, however C. Hladick did not return Donald's wallet or the Oultons' Checkbook on November 30, 2011.

164.    The following morning, December 1, 2011, Plaintiff and Donald visited with at Middlesex Savings Bank officials, Branch Manager Wayne Hawkins and Assistant Manager Marjorie Cappucci to discuss the missing checkbook.

165.    At Donald's request, Mr. Hawkins printed a statement of the Oultons' Middlesex Bank checking account on the morning of December 1, 2011 (**Exhibit 30**).

166.    Given that N. Williams had alleged financial abuse by Plaintiff in N. Williams's voice mail message to Plaintiff on November 30, 2011, Donald and Plaintiff asked Mr. Hawkins to look at the history of checks and determine if any fraud or abuse had occurred.

167.    Mr. Hawkins spent approximately 30 minutes reviewing cancelled checks from the Oultons' checking account and confirmed for Donald and Plaintiff that as of that date, December 1, 2011, everything related to the Oultons' checking account looked to be in completely proper order.

168.    Mr. Hawkins suggested that Donald should close the jointly held checking account.

39

169. Mr. Hawkins generated a number of "starter checks" for Donald and told Donald

that the Middlesex Savings Bank fraud team would keep a close eye on the Oultons' checking

account in order to prevent any possible fraud.

170. Plaintiff, who was receiving false accusations of wrongdoing from her siblings,

asked Donald to sign a statement giving his permission for Plaintiff to drive the Oultons' Ford

500. The "Statement of Donald Oulton" dated December 1, 2011, is attached hereto (**Exhibit**

**31**).

> By my signature below I hereby attest and affirm that I have freely
> and voluntarily given financial and other assistance to my
> daughter, Sarah Oulton, and to my other children.
>
> At the present time and for the immediate future I give Sarah
> permission to drive my car, as needed, and assist me in the
> maintenance of my home (bills, etc.) and health.
>
> Signed: Donald P. Oulton
> Date: December 1, 2011

171. At approximately 11:00 p.m. on December 1, 2011, the Marlborough Hills

representative called to alert Donald that Carol had been found "unresponsive" in her bed at

Marlborough Hills, and that, as a result, Carol was rushed to UMass Memorial Hospital in

Worcester.

172. At approximately 11:30 p.m. on December 1, 2011, Plaintiff drove Donald to

UMass Memorial Hospital in Worcester so that Donald could be with Carol in the Emergency

Room.

173. Carol was in a coma and completely unresponsive.

174. A physician on staff of the UMass Memorial Hospital informed Donald and

Plaintiff that Carol had been overdosed on Ativan (Lorazepam) by the staff at Marlborough

40

Hills. The physician told Donald and Plaintiff that Carol's condition was extremely fragile and it was possible that Carol would not survive the overdose.

175. None of the records provided by Marlborough Hills in this case made any mention of the overdose of Carol by Marlborough Hills staff on December 1, 2011. Indeed, in all billing-related records, Marlborough Hills has intentionally omitted all reference to the dates of service during which the staff at Marlborough Hills overdosed Carol within 24 hours of Carol's admission to Marlborough Hills.

176. At Plaintiff's request, the staff of the UMass Memorial Hospital Emergency Room brought an extra bed into Carol's Emergency Room suite and the Oultons rested, side-by-side, on beds in the Emergency Room. For several hours, Plaintiff stayed with the Oultons in a chair in Carol's UMass Memorial Hospital Emergency Room suite.

177. At approximately 2:00 a.m., N. Williams arrived at the Emergency Room of UMass Memorial Hospital. N. Williams uttered several threats to Plaintiff and irrationally expressed rage to both Plaintiff and Donald.

178. Donald, upset by N. Williams's irrational outburst at the Emergency Room, asked Plaintiff to return him to the Oulton Residence. Plaintiff drove Donald home.

179. Amidst the sudden stress, Donald's health took turn for the worse.

180. On the morning of December 3, 2011, Plaintiff contacted one of Donald's visiting nurses, Nurse Patti Supple, who agreed to visit to the Oulton Residence to check on Donald.

181. Nurse Supple found Donald dehydrated, unstable, and in a state of low blood sugar, so she recommended that Donald be admitted to the hospital immediately. Donald refused to go to the hospital in an ambulance, so Plaintiff and Nurse Supple packed a bag and helped Donald get into the Oultons' Car.

41

182.    On December 3, 2011, Plaintiff checked Donald into Leonard Morse Hospital and was given a letter signed by Deborah McBride, the Admitting Supervisor of MetroWest Medical Center stating, "Dear Ms. Oulton You have been identified as the patient representative for Mr. Donald Oulton" (Exhibit 32).

183.    At some point in early December 2011, Carol made a recovery from Marlborough Hills's drug overdose and was discharged from UMass Memorial Medical Center while Donald was still hospitalized at Leonard Morse Hospital in Natick.

184.    Carol was discharged from UMass Memorial Hospital and returned to Marlborough Hills against Plaintiff's wishes. Plaintiff was extremely concerned for Carol's well-being because the staff at Marlborough Hills had overdosed Carol within 24 hours of Carol's admission to Marlborough Hills.

185.    Donald was transferred from Leonard Morse Hospital in Natick to Marlborough Hills against Plaintiff's wishes, who was reviewing other facilities in which the Oultons could recover.

186.    On December 13, 2011, Audra Collins, Director of the Marlborough Hills Social Services Department, invited Plaintiff to attend a "Comprehensive Planning Conference on December 27, 2011 (Exhibit 33). ( Plaintiff did not attend the Care Planning Conference because Marlborough Hills unlawfully banned her from premises on Christmas Day 2011.)

187.    Once Carol returned to Marlborough Hills from UMass Memorial Hospital in December 2011, Plaintiff visited Carol at Marlborough Hills and maintained communication with Carol by telephone.

188.    Carol requested Plaintiff to continue to process the Oultons' mail at the Oulton Residence, and to help the Oultons write checks to pay their monthly bills.

42

189.    On December 17, 2011, at 9:23 a.m., Plaintiff received an email (Exhibit 34) from Kristen Maichen which read: "We still have all the mail so you can stop by any time."

190.    On December 24, 2011, Carol left a voice mail message for Plaintiff:

> Give me a call. I've already had OT. They grabbed me quick.
> Okay. I'll talk to you. Call me, please. Bye.
> Hello? Hello?

191.    At Carol's request, Plaintiff visited with Carol at Marlborough Hills on the evening of December 24, 2011, for the purpose of paying bills. Plaintiff brought the mail to Carol's room at Marlborough Hills along with the new checkbook.

192.    At Carol's request, Plaintiff brought a blue lockbox and cable so that Carol could keep her checkbook and other personal items locked to her bed in Marlborough Hills. Plaintiff set this up for Carol, and locked the blue lockbox to Carol's bed with a heavy-duty cable and a padlock.

193.    On December 24, 2011, as Plaintiff and Carol paid the Oultons' bills while visiting in Carol's room at Marlborough Hills, Plaintiff's brother, D. Oulton, joined them and visited with Carol and Plaintiff for approximately one hour. D. Oulton asked Plaintiff why Plaintiff was helping Carol pay bills and Plaintiff explained that she had been helping the Oultons since approximately 2010.

194.    On December 25, 2011, Plaintiff tried calling Carol several times at Marlborough Hills to arrange for a visit with the Oultons on Christmas Day, but discovered that Carol's telephone number at Marlborough Hills was not working.

195.    On December 25, 2011, Donald was residing in a room in the Marlborough Hills Alzheimer's' Unit and did not have a telephone in his room, so Plaintiff was unable to directly reach either Carol or Donald at Marlborough Hills.

43

196.    On December 25, 2011 Plaintiff called the Nurse's Station at Marlborough Hills and asked to be connected to Carol, but was told that Plaintiff was no longer allowed to talk with Carol or Donald.

197.    The staff at Marlborough Hills told Plaintiff, "The Health Care Proxy has been invoked. You are not allowed to be in contact with your parents anymore."

198.    Plaintiff knew that Health Care Proxy documents may be invoked only when a person becomes incapacitated and only when that incapacity is verified in writing by a separate physician. Plaintiff also knew that Health Care Proxy documents grant the Health Care Agent only the power to make health care decisions.

199.    Plaintiff attempted to reach the Oultons by telephone on multiple occasions after learning that "the Health Care Proxy documents had been invoked" by Marlborough Hills staff on December 25, 2011.

200.    At some point between December 25, 2011, and December 30, 2011, the staff at Marlborough Hills conspired with C. Hladick, Lt. Hladick, N. Williams, and others to keep Plaintiff away from the Oultons.

201.    The unlawful separation of Plaintiff from the Oultons was imposed by parties who mutually benefited from the absence of Plaintiff from the Oultons' lives, giving them the opportunity to take the Oultons' assets without any interference from Plaintiff.

202.    On December 29, 2011 Plaintiff received a voice mail from Donald:


Hi Sarah.

It's your Dad.

And, uh, if you can find a way to get to the hospital, mom will give you some money. I told her $50. Now that's a start. I know you

44