need more than that. So does she, I think period. So we will have to work that out. But for start, we ought to be able to give you $50. You hear me? I wish I could talk to you in person now.

I hate this tape but here I am on it.

Ok? Ok. Love. Take care.

203.    On December 30, 2011, Plaintiff spent the day doing yard work at her Agawam home. Plaintiff was outside cleaning shrubs, brush, sticks, and leaves that had fallen in the yard during the late-October 2011 ice storm. Plaintiff had been in the yard working all day when, at approximately 3:00 p.m., officers from the Agawam Police Department showed up to meet with Plaintiff.

204.    The Agawam Police officers informed Plaintiff that they had been dispatched by staff members at Marlborough Hills. Marlborough Hills staff members told the Agawam Police that Plaintiff had locked herself into her house and was a danger to herself and others.

205.    When the Agawam Police officers arrived at Plaintiff's home, they found her out in the yard, where Plaintiff had been working since morning. The Agawam Police officers found absolutely nothing wrong with Plaintiff when they arrived to check on Plaintiff's welfare at the request of Marlborough Hills staff.

206.    The call for a "welfare check" placed by Marlborough Hills staff to the Agawam Police Department was fabricated and malicious in nature. The Agawam Police Log entry reflecting this call was unfounded and that "NO POLICE SERVICE NECESSARY" is attached hereto as (Exhibit 35).

207.    Plaintiff contacted her friend, Agawam Mayor Rich Cohen, to inform the Mayor of Marlborough Hills's abusive use of the Agawam Police to harass Plaintiff. Mayor Cohen arranged for a meeting among himself, Plaintiff, and Agawam Police Lieutenant (now Chief)

45

Eric Gillis. Plaintiff and Mayor Cohen informed Lt. Gillis about the details of the Oulton Family situation, and Lt. Gillis assured Plaintiff that he would not allow the Agawam Police Department to be used by Marlborough Hills staff, Plaintiff's siblings, or anyone as a tool to harass Plaintiff.

208.    Between December 25, 2011, when Plaintiff was unlawfully banned by staff at Marlborough Hills from visiting and contacting her parents, and early January 2012, Plaintiff initiated a search for an attorney who could lawfully assist Plaintiff in resuming contact with the Oultons.

369

209.    On December 31, 2011 Plaintiff received a voice mail from Donald (Exhibit 80):

Hi Sarah, It's me Dad.

You've got to talk to me, Sare. Don't leave me like this, please?

I need your call. I need your call now. Would you call me? I need your call.

Please call me.

Hello? Hello?

210.    On January 4, 2012, Plaintiff took an unexpected trip to veterinarian, Dr. Gail McNeill, in Sudbury to seek emergency care for her dog. While the dog recovered from the anesthesia and radiographs, Plaintiff decided to visit with her parents, who were only about nine miles from the veterinary clinic.

211.    Plaintiff drove to Marlborough Hills at approximately 9:15 a.m. on January 4, 2012. Plaintiff walked to the room in which Plaintiff and Carol had visited on December 24, 2011, and Plaintiff noticed that Carol's bed was empty but the lockbox that Plaintiff loaned to Carol was still locked to the bed frame. Carol's bed was empty, the linen was stripped, all of Carol's possessions were tied up in plastic bags, and Carol's roommate, an elderly woman with

46

that someone from Marlborough Hills accompany Plaintiff back to Carol's room so that Plaintiff

could retrieve Plaintiff's personal property (the lockbox) from Carol's former room at

Marlborough Hills.

219.    At Plaintiff's request, Ms. DelCid and Ms. Stephenson accompanied Plaintiff

back to Carol's former room at Marlborough Hills so that Plaintiff could retrieve Plaintiff's

personal property (the lockbox that Plaintiff loaned to Carol, which was still locked to the bed

frame in Carol's former room at Marlborough Hills).

220.    After retrieving Plaintiff's lockbox, Plaintiff visited Donald in the Alzheimer's

unit of Marlborough Hills and then left to go visit Carol at Marlborough Hospital.

221.    On January 4, 2012, Plaintiff went to Marlborough Hospital to visit with her

mother, Carol, who questioned Plaintiff about her lack of recent communication.  Plaintiff told

her mother that if she wished to communicate with her, she needed to inform her doctors of this.

At this time, Carol Oulton hand wrote a letter on Marlborough Hospital stationery indicating her

continued desire to see Sarah and receive telephone calls from Sarah while a patient at

Marlborough Hospital and Marlborough Hills, and her desire was to see and hear from Sarah

without limitation (**Exhibit 36**).

222.    On January 4, 2012, Keough + Sweeney sent to <u>Carol Oulton</u>, at the Oulton

Residence, an invoice (**Exhibit 37**) for $440 for services rendered by Attorney Sweeney-2,

Attorney Sweeney-3, and Attorney S. Keough to <u>C. Hladick</u>:

2011-12-07 – (JVS) – Telephone call to client regarding status

2011-12-08  – (JVS) – Telephone call to JVS regarding guardianship
                      of mother and telephone call to client regarding same

2011-12-09 – (JVS) – Conference with SK regarding guardianship

2011-12-21 – (JVS) – Telephone call to Hladick and drafted Power of Attorney

48

whom Plaintiff had visited in the past, was alone in the room. Plaintiff asked the elderly patient what happened to Carol and the woman replied, "Oh, that lady died."

212. Plaintiff went to the Nurse's Station for the Marlborough Hills wing in which Carol had been staying and inquired of Unit Clerk Denise Stephenson about Carol. Ms. Stephenson adamantly refused to tell Plaintiff anything about Carol's condition and informed Plaintiff that Plaintiff was not allowed to visit Carol or Donald anymore.

213. Plaintiff asked Ms. Stephenson on what legal basis the decision to bar Plaintiff from visiting had been made, and Ms. Stephenson told Plaintiff, "The Healthcare Proxy has been invoked, and you are not allowed to visit your parents anymore."

214. Plaintiff requested that Ms. Stephenson please summons a manager to discuss this unlawful barring of visitation between Plaintiff and her parents, and Ms. Stephenson summonsed Donna DelCid, the Marlborough Hills Director of Nursing, to the unit in which Carol had been housed.

215. Notably, nobody would inform Plaintiff of Carol's condition, whether Carol was dead or alive, or where Carol was.

216. Plaintiff reminded Ms. DelCid that there was no court order of any kind in effect and the Marlborough Hills had a duty to inform Carol's next-of-kin (Plaintiff) about Carol's condition.

217. Ms. DelCid very reluctantly informed Plaintiff that Carol was not dead, but that Carol had experienced another major health setback and had been rushed to Marlborough Hospital.

218. Plaintiff then informed Ms. DelCid that Plaintiff's personal property (the lockbox) was still locked to the frame of the bed in which Carol had been sleeping, and Plaintiff requested

47

JANUARY 4, 2012

### KEOUGH & SWEENEY, LTD

ATTORNEYS AND COUNSELORS AT LAW
41 MENDON AVENUE
PAWTUCKET, RI. 02861
TELEPHONE 601-724-3600
FACSIMILE (401-724-9909

BOSTON OFFICE
171 MILK STREET
SUITE 30
BOSTON, MA 02109
TEL. (617) 374-0034
FAX (617) 451-1914

January 4, 2012

Carol Oulton
54 MacArthur Road
Natick, MA  01760

Case No:
Invoice No. 5370

RE:Estate Planning

#### Fees

| | | Hours | |
|---|---|---|---|
| 12/07/2011 JVS | Telephone call to client re status | 0.40 | |
| 12/08/2011 JVS | Telephone call with JVS re guardianship of mother and telephone call to client re same | 0.40 | |
| 12/08/2011 JVS | Conference with SK re guardianship | 0.30 | |
| 12/21/2011 JVS | Telephone call to Hladick and drafted Power of Attorney | 0.50 | |
| | For Current Services Rendered | 1.60 | 480.00 |
| | Total Current Work | | 460.00 |
| | Balance Due | | $480.00 |

223.   It is noteworthy that Keough + Sweeney sent the firm's invoice to the Oultons for services rendered to C. Hladick.

224.   Also noteworthy is that the Keogh & Sweeney revealed that C. Hladick, Attorney Sweeney-2, Attorney Sweeney-3, and Attorney S. Keough had been discussing "guardianship of MOTHER" on December 8, 2011.

225.   In early December 2011, Attorney Sweeney-2, who wrote the Oulton Wills, and his associates at Keough + Sweeney, began to insert themselves into the Oultons' affairs in order

49

to profit from the Oultons' situation and, in so doing so, they engaged in questionable billing

practices.

226. On January 5, 2012, Plaintiff sought the legal assistance of Attorney Kelly Koch

to represent her in resolving the difficulties Plaintiff was having in trying to visit her parents.

227. On January 7, 2012, at 8:08 a.m. Plaintiff sent an Email to Koch (**Exhibit 38**) :

> I need advice ASAP on how to proceed so that my parents'
> overdue bills can be paid ASAP....The problem is that since the
> healthcare facilities have banned me, there is no way to get my
> parent's checks signed. Their homeowners' insurance, auto
> insurance, and real estate taxes are overdue and must be paid
> immediately.
>
> I am currently in possession of their checkbook pursuant to my
> Dad's instructions to help them run the house.
>
> The most recent date on which my mom and I wrote out checks to
> pay bills is December 24, 2011, and we did so in my mother's
> room at Marlborough Hills nursing home.
>
> My brother, David, was with us for most of that time so he can
> vouch that I was writing out the checks and my mom was signing
> them.

228. On January 8, 2012, Attorney Kochi sent a letter (**Exhibit 39**) to Marlborough

Hills in which she wrote:

> I represent Sarah Oulton in visitation issues she has recently
> encountered regarding her parents. I believe what is currently
> transpiring is something your facility has dealt with on numerous
> occasions - familial strife during the illness of a loved one. I am
> aware that the Oultons have Healthcare Proxies naming Carol
> Hladick as their health care agent.
>
> Their HCP vests decision making power in Carol if either or both
> of the Oultons is/are unable to make health care decisions
> themselves.
>
> To be sure, there is no provision in the HCPs that vests power to
> control visitors or phone calls with the health care agent.
>
> There is also no guardian, attorney-in-fact, or court order in place

50

that expressly limits visitation between Sarah and her parents. To that end, there should be no limitation on visitation between Sarah and her parents, and she should be permitted to visit or call the Oultons during the hours that are set aside for public visitation.

Sarah's parents have both expressed a desire to see Sarah and talk to her considering the amount of time she has spent caring for them in the past.

Please do not further limit any visitation.

229.   Throughout the entire time period relative to this case, Donald's visiting nurse, Patti Supple, has remained close with Plaintiff and can verify that Plaintiff was unlawfully blocked from visiting with the Oultons on December 25, 2011.

230.   On January 13, 2012, Kelli Koch sent a second copy of her letter (Exhibit 39) to Marlborough Hills, originally sent January 8, 2012.

231.   On January 20, 2012, Plaintiff, answered a phone call and spoke to Officer Insani who told Plaintiff that Carol was about to be released from Marlborough Hills in the next few days and she desired her car back.

232.   Officer Insani informed Plaintiff that he had already telephoned Dean Arthur Gaudio, the Dean of the WNE Law, and informed Dean Gaudio that Plaintiff had stolen the Oultons' Car and that he intended to charge Plaintiff with larceny of a motor vehicle. Officer Insani's defamatory telephone call to Dean Gaudio was made to maliciously, willfully, and knowingly inflict as much emotional distress on Plaintiff as possible.

233.   Officer Insani demanded that Plaintiff return the Oultons' Car immediately. Plaintiff then telephoned Attorney Koch for advice on how to proceed.

234.   Plaintiff, after consulting with Attorney Koch, returned the Oultons' Car to their garage on the night of January 20, 2012. Plaintiff left a copy of a Receipt from George's Service

for maintenance to the Oultons' Car while it was in Plaintiff's possession (Exhibit 40). Plaintiff documented its lawful return with photographs (Exhibit 41).

235.    On January 23, 2012, Plaintiff was gravely concerned that the Oultons were suffering and in great danger at Marlborough Hills, given that the staff of Marlborough Hills overdosed Carol on December 1, 2011 and had unlawfully denied Plaintiff all contact with her parents since December 25, 2011.  With concern for her parent's physical, emotional, and financial well-being, Plaintiff filed:

(a) Petition for the Appointment of Conservator for a Disabled Person or for a Single Transaction in the interests of Donald Paul Oulton (Middlesex County Probate and Family Court Docket No. MI12P0268PM) (Exhibit 42) and

(b) Petition for the Appointment of Conservator for a Disabled Person or for a Single Transaction in the interests of Carol Oulton (Middlesex County Probate and Family Court Docket No. MI12P0269PM) (Exhibit 43).

236.    The Affidavits in support of these Petitions stated the facts that are also presented in this lawsuit, through January 23, 2012.  Plaintiff requested that the court appoint a neutral, disinterested third party Conservator to oversee the Oultons' financial affairs in order to protect them from the fraud, abuse, and conversion that now forms the basis of this lawsuit.

237.    On January 23, 2012, Attorney Koch advised Plaintiff to take a friend with her to the Marlborough Police Station when she brought in the Oultons car keys, so Plaintiff's 75-year old friend, John Baer, accompanied her.

238.    On the morning of January 24, 2012, Plaintiff met with Officer Insani at the Marlborough Police Station to deliver the Oultons' Car keys and house key.  At Plaintiff's request, Officer Insani reluctantly signed a receipt for the keys (Exhibit 44).

52

239.   Rather than simply take the keys from Plaintiff, Officer Insani detained Plaintiff at the station for several hours.  Even though Officer Insani knew that Plaintiff had borrowed the Oultons' Car with their permission (Officer Insani's Incident Report **Exhibit 45**), and despite stating that he was in a rush to return the keys to Carol, he read Plaintiff a Miranda warning and detained her, asking her personal questions and demanding that Plaintiff return the Oultons' checkbook and mail, which Plaintiff had been safekeeping.

240.   Officer Insani had made no mention of the Oultons' mail or checkbook during his telephone conversation with Plaintiff prior to Plaintiff's and Mr. Baer's trip to the Marlborough Police Station.

241.   It was during this interview that Officer Insani revealed to Plaintiff that he was acting on behalf of the Natick Police Department.

242.   Plaintiff remained calm, courteous, and respectful throughout the entire interview. It appeared that Officer Insani was trying to goad Plaintiff and cause Plaintiff to get angry. Plaintiff asked Officer Insani several times if she were being arrested but Officer Insani refused to answer.  He would not, however, allow Plaintiff to leave the Marlborough Police Station after being given a Miranda warning.

243.   Plaintiff was instructed to return to the Marlborough Police Station with the Oultons' checkbook, mail, and any other items that Plaintiff had been safekeeping.

244.   Plaintiff returned to the Marlborough Police Station later that day to drop off the Oultons' mail and checkbook that Plaintiff had been safekeeping for the Oultons.

245.   At some point during the interview Officer Insani mentioned to Plaintiff that he, too, had attended Western New England University, the school that Plaintiff was attending at the time.  Officer Insani then sarcastically told Plaintiff that she should be grateful that he did not

53

charge her with Larceny of a Motor Vehicle, and she should thank him for not arresting her that day. Officer Insani told Plaintiff that he would appreciate a token from his alma mater, now that the name of the school had changed from Western New England College to Western New England University. Plaintiff realized that Officer Insani's request for a gift was improper, but she chose to comply with it, anyway. Upon Plaintiff's return to school, Plaintiff dutifully purchased a hooded sweatshirt from the Western New England University Bookstore and had it shipped, via FedEx, to Officer Insani at the Marlborough Police Station. Plaintiff willingly complied with Officer Insani's improper request because Officer Insani had been rude and hostile during the interview, Plaintiff was scared of him and had been greatly intimidated by him, and because Plaintiff did not want any more trouble with anyone from the Marlborough Police Department.

246.    In the Marlborough Police Incident Report (#12-238 OF) subsequently written by Officer Insani and approved by Lieutenant Thomas Bryant on January 26, 2012 (Exhibit 45), Officer Insani deceitfully characterized the incident as one of "**Larceny of a Motor Vehicle, M.G.L. 266 26B.**"

247.    Officer Insani began the narrative in his Incident Report with the following:

> On Thursday [sic] January 19, 2012, I was dispatched to Marlboro [sic] Hills on Northboro Rd. to speak with a patient. At this location I spoke with Carol Oulton who stated that her husband gave their daughter permission to take her car while the daughters [sic] car was being repaired. Carol stated that her Husband [sic] has dimensia [sic], therefore prefers if I did not speak with him. Carol stated that she allowed their daughter to use the vehicle with the understanding that she will returned [sic] the vehicle to them prior to their release from Marlboro [sic] Hills.

248.    Officer Insani purposely omitted all mention of his defamatory telephone calls to Dean Gaudio from the Incident Report.

54

249.   Officer Insani omitted all mention of his three hour detention of Plaintiff, his

issuance of a Miranda warning on Plaintiff, and his intimidating request for a "thank you" gift

from the Incident Report.

250.   On January 24, 2012, at 2:39 p.m., as Plaintiff and her friend, John Baer, drove

home from the interview at the Marlborough Police Station, Plaintiff received a text message

from D. Oulton that said:

> YOU BETTER BE LISTENING TO WHAT I'M TELLING YOU.
> PUT EVERYTING BACK IN PLACE OR YOUR WORLD WILL
> CHANGE. THIS IS YOUR LAST SIDEBAR.

251.   Plaintiff then received a telephone call from D. Oulton. Plaintiff and John Baer

listened to D. Oulton through the speaker phone:

> ALL OF US ARE RIPSHIT AT YOU FOR FILING IN COURT
> AND GETTING A LAWYER. I'M GETTING TEXTS AND
> CALLS FROM CAROL, NANCY, AND EVERYONE. IF YOU
> DON'T BACK OFF, DROP THIS CASE, GET RID OF YOUR
> LAWYER, PUT YOUR HANDS UP, AND BACK AWAY, WE
> WILL FUCK YOU UP. YOUR WORLD AND YOUR LIFE AS
> YOU KNOW IT WILL END.

252.   Plaintiff asked D. Oulton, *"Who is threatening me?"*

253.   D. Oulton replied:

> ALL OF US. JUST DROP THE CASE OR YOUR LIFE AS YOU
> KNOW IT WILL END. WE WILL FUCK YOU UP FOREVER.
> YOU HAVE NO IDEA WHAT THEY ARE PLANNING FOR
> YOU....

254.   Plaintiff was extremely intimidated and shaken by D. Oulton's text and telephone

call. Plaintiff took D. Oulton's threats very seriously.

255.   On January 31, 2012, at 7:47 p.m. Plaintiff received a voice mail from Donald's

visiting nurse, Patti Supple. Nurse Supple was concerned that Plaintiff had been blocked from

all access to and contact with her parents.

256.    On February 3, 2012, Plaintiff filed a Motion to Amend Petition for

Conservatorship of Carol Jane Oulton and Upgrade the Status of This Petition to Emergency

(Docket No. MI12P0269PM) (Exhibit 46) and a Motion to Amend Petition for Conservatorship

of Donald Paul Oulton and Upgrade the Status of This Petition to Emergency (Docket

No. MI12P0268PM) (Exhibit 46). These petitions requested a disinterested third party be

appointed conservator and restated the urgent need to involve a disinterested third party to

oversee the Oultons' affairs.

257.    On February 15, 2012, Plaintiff, still desperate to remain in contact with the

Oultons, mailed Donald Oulton a package containing stationery, pens, paper, and postage.

Plaintiff also enclosed a card for Donald (Exhibit 47).

258.    On February 16, 2012, a letter from Donald to Plaintiff was mailed and

postmarked (Exhibit 48). In this letter to Plaintiff Donald wrote:

> Of course I want to keep in touch. Two doctors told me I am well
> enough to go home but neither is my "releasing" doctor. They tell
> me that I am all better but I am not released. Great hearing from
> you. My love to you.
>
> "Dear Old Dad."

259.    On February 17, 2012, a second letter from Donald to Plaintiff was mailed and

postmarked (Exhibit 49). In this second note to Plaintiff Donald wrote:

> Sarah. I don't know what day it is!
>
> I'm sending this because I love you!
> Keep in touch.
>
> Love, Dad

260.    Upon information and belief, the staff of Marlborough Hills unlawfully removed

the pens, paper and self-addressed envelopes from Donald's room immediately after learning

56

that Donald was using the items to communicate with Plaintiff. By this point in time the staff of

Marlborough Hills continued to prevent Plaintiff from visiting or contacting her parents, despite

the absence of any court order. Consequently, after receiving this second note from Donald,

Plaintiff never heard from Donald again.

261.    On February 17, 2012, Plaintiff filed a Motion for Emergency Appointment of

Third Party Guardian Ad Litem for Donald Oulton and a Motion for Emergency Appointment of

Third Party Guardian Ad Litem for Carol Oulton. Plaintiff executed a Fax Cover sheet and sent

to Worcester County Sheriff with the request to please serve "today" (Exhibit 50)

262.    On February 23, 2012, accompanied by her friend, John Baer, Plaintiff visited

with Attorney Robert O'Regan at Burns and Levinson LLP in Boston to discuss the nursing

home's unlawful interference with Plaintiff and the Oultons. Although not engaged as Plaintiff's

counsel, Attorney O'Regan offered to make a phone call to Lincoln, the Director of Marlborough

Hills, and inform Lincoln that it was unlawful to bar Plaintiff from visiting with her parents at

the facility. In the presence of Plaintiff and Mr. Baer, Attorney O'Regan placed the call to

Lincoln at Marlborough Hills but Lincoln was unavailable to speak. Attorney O'Regan informed

Plaintiff that he would contact her with the outcome of the conversation as soon as Lincoln

returned the call to Attorney O'Regan.

263.    On February 23, 2012, at 11:36 a.m., Attorney O'Regan's secretary left a voice

mail message that stated:

> Hi Sarah,
>
> It's Susan from Bob O'Regan's office. Bob wanted me to tell you
> that he spoke to Michael Lincoln of the nursing home and they
> said, **"Absolutely you can visit your father, your mother,
> whoever you want to visit there, it's perfectly fine."**
>
> Um, he straightened it out and you're all set. If you have any

57

questions, give me a call 617-345-3883.

Thanks. Bye-bye.

264. On March 2, 2012, after Attorney O'Regan had apparently cleared the way for Plaintiff to resume contact with the Oultons, Plaintiff purchased $82.87 worth of men's clothing items at Walmart for Donald (Exhibit 51) and attempted to deliver them to him. Plaintiff was allowed inside the facility for the first time since December 25, 2011, however once inside Marlborough Hills, Plaintiff was not allowed by Marlborough Hills staff (Social Worker Andrea Edwards and several nurses on the Alzheimer's Unit) to give the items of clothing and snacks to Donald.

265. Also on March 2, 2012, Plaintiff purchased a cell phone (Exhibit 51) for Donald Oulton because the staff of Marlborough Hills had consistently denied Donald access to a telephone, in violation of 111 C.M.R. 72D. Plaintiff attempted to deliver the phone to Donald but Nurse Karen Speroni, who was in charge of the Marlborough Hills Alzheimer's Unit on which Donald resided, would not allow Donald to have it. She told Plaintiff, "[t]he Health Care Proxy has been invoked, and you are not allowed to leave anything for your father."

266. On March 2, 2012, Plaintiff filed Motions for Extension of Time by Which to File Medical Certificate in the Petitions for Conservator cases that Plaintiff filed for the Oultons (Exhibit 52).

267. At various times in early March 2012, Plaintiff attempted to contact Donald by telephone, given that Attorney O'Regan had intervened with Lincoln on Plaintiff's behalf and Lincoln told Attorney O'Regan, ""Absolutely you can visit your father, your mother, whoever you want to visit there, it's perfectly fine" on February 23, 2012. Lincoln and the staff of Marlborough Hills, however, did not follow through with Lincoln's promise to allow Plaintiff to visit Donald and Carol. At various times between February 23, 2012, and April 2012 Plaintiff

58

was repeatedly denied access to Donald and Carol by nurses Donna DelCid, Karen Speroni, Christine French, Sauda Matovu, and Unit Secretary Denis Stephenson. Telephone calls to the Oultons were not allowed and Plaintiff was told that she was not allowed to visit the Oultons. When questioned by Plaintiff why this was still happening (after Attorney O'Regan's discussion with Lincoln) the staff informed Plaintiff that she should address the issue with Gina Quieros, Senior Administrator of Marlborough Hills, or Michael Lincoln, Administrator of Marlborough Hills.

268.    In early March 2012, Plaintiff contacted Attorney Brown and met with him at his office on March 7, 2012, to discuss the background of the case and seek Attorney Brown's assistance with the Petitions for Conservator.

269.    At no point in the meeting with Attorneys Brown and Vecchio was Plaintiff informed that Attorney Brown had represented Plaintiff's brother, D. Oulton, or Plaintiff's brother-in-law, Lt. Hladick, as is required under Massachusetts Rule of Professional Conduct 1.6(a). Moreover, at no time during the initial meeting or at any point thereafter did Attorneys Brown and Vecchio make any attempt to procure from any of the conflicted parties (Plaintiff, D. Oulton, or Lt. Hladick) the conflict waiver that attorneys representing adverse parties are required to procure pursuant to Massachusetts Rule of Professional Conduct 1.6(b) (2).

270.    Had Plaintiff been informed of the impermissible conflicts of interest Plaintiff would have refused to grant the waiver required under Massachusetts Rule of Professional Conduct 1.6(b) (2) and would have never retained Attorney Brown or Attorney Vecchio in the Petitions for Conservator.

59

271.    On March 8, 2012, Plaintiff, sent an email to Attorneys Brown and Vecchio in which Plaintiff noted the numerous violations that the staff of Marlborough Hills was committing with respect to the Oulton Family (**Exhibit 53**).

272.    The Marlborough Hills Billing and Payor Information document transmitted by Plaintiff to Attorneys Brown and Vecchio contains the following sections that are relevant to this case:

### ACKNOWLEDGMENT OF FAMILY COUNCIL POLICY
Marlborough Hills Healthcare Center, in accordance with state laws and recent amendments to Mass [sic] General Laws, allows resident's [sic] families, friends and representative [sic] may form and meet as a Family Council [sic]

The Facility Family Council can meet any time as requested. The Facility may not interfere with the family council's receipt of outside correspondence addressed to it, and must ensure that the correspondence is delivered unopened to the governing body.

### Meals
...
Visitors are encouraged to dine with their family members, especially when the facility observes Thanksgiving, Christmas, Easter, and Mother's Day.

...

### Television and Telephone Services
You may establish personal phone service and cable in your room. Phones, televisions, initiation of service and all charges are the responsibility of the resident. Please check with Social Services for the telephone vendor and t elephone number to contact them. There is a public pay phone in the facility for your convenience. Should you require television cable service, please check with Social Services for the cable vendor and telephone number to contact them.

### Your Family and Friends
Although residents are our focus, we believe your family and friends deserve special treatment too.

...

60

**Visiting**
You may have visits from family members, physicians and friends at reasonable times during the day and evening so long as it does not interfere with the rights of other Residents.

...

Subject to your right to deny and withdraw consent at any time, the Facility must provide access to immediate family or other relatives.  Subject to reasonable restrictions and your right to deny or withdraw consent at any time, the Facility must provide access to others who are visiting with your consent. The Facility will provide reasonable access to any resident by any entity or individual that provides health, social, legal, or other services to the resident, subject to the resident's right to deny or withdraw consent at any time.

**Resident's Rights and Responsibilities**
All residents have the right to a dignified existence and to communicate with individuals and representatives of their choice. The facility will protect and promote your rights. This guide is a written notification of your rights and responsibilities.

...

**Our Responsibilities**

The facility has the following obligations to our residents, their legal representatives and/or next of kin:

> -- not to mandate that a third party be responsible for giving authorization and consent on a resident's behalf, unless the resident has been judged incompetent by a court of law

> -- not to encourage residents to waive or limit our liability for loss of personal property or any injury a resident may suffer as a result of our negligence

> -- to not request or encourage residents to waive any benefit or right conferred by any statute or regulation intended to provide protection to or for residents of any long-term care facility.

**Residents' Rights**
Residents have the right to a dignified existence and to communicate with individuals and representatives of their

61

choice. The facility will protect and promote your rights as outlined below:

1. Each resident is recognized as an individual to be treated with respect by all family, visitors, personnel, volunteers and other caregivers and to be accepted as the person he/she is. Residents have the right to be free from verbal, sexual, physical and mental abuse, corporal punishment and involuntary seclusion. ...

6. Each resident's right to privacy will be respected with his or her room, bath, records, personal possessions, and making and receiving telephone calls. Every resident may send and receive ail unopened. Stationary, postage and writing implements are available at the facility....

11. Each resident is encouraged to retain and use personal clothing and possessions as space permits unless to do so would infringe upon the right of other residents.

...

19. Residents and their legal representative or next of kin, if known, will be informed immediately should there be:

> an accident involving the resident, which results in injury and has the potential for requiring physician intervention,

> a significant change in the resident's physical, mental, or psychosocial status such as a deterioration in health, mental, or psychosocial status in either life-threatening conditions or clinical complications or;

> a need to alter treatment significantly (e.g., a need to discontinue an existing form of treatment due to adverse consequences, or to commence a new form of treatment).

22. A resident may be discharged or transferred when the transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the nursing facility; the transfer or discharge is appropriate because the resident's health has improved sufficiently so that the resident no longer needs the services provided by the facility...

27. Residents have the right to make choices about aspects of their life in the facility that is important to them. Residents' opinions are valued.

62

### Health Care Proxy

...

The Health Care Agent may act for our only if your doctor
determines in writing that you are unable to make or
communicate your own health care decisions (e.g., if you are
in coma). Your health Care Agent would then have the legal
authority to make all health care decisions for you including
decisions regarding life-sustaining treatment. But the Health
Care Proxy Law also allows you to put specific limits on your
Agent's authority if you choose to do so.

The purpose of the Health Care Proxy is to make certain that
your wishes are respected and carried out if you become
unable to decide for yourself...

273.    On March 13, 2012, at 6:37 p.m. Plaintiff sent an email (**Exhibit 54**) to Attorney

Brown, which conveyed Plaintiff's continued concerns for the welfare of Donald and the

mistreatment of Donald at Marlborough Hills. The email said, in part:

I just spoke to my dad after class got out at 5:30 p.m. He didn't
mention what he calls "The Lawsuit" and he indicated that he
definitely <u>does</u> want to stay in touch with me. <u>He said that only
people who call him are my mother and me</u>. [emphasis added]

HE DOES NOT WANT TO BE THERE. He is always a nervous
wreck on the phone because he's out in Grand Central and there's
no privacy, patients run over his feet with their wheelchairs, etc.

NOTE: <u>the family could have a phone installed in his room but –
thanks to the Health Care Agent from Hell, Carol Hladick – they
won't let him have a phone</u>. They just want his pension check
(roughly $7,000 per month) deposited on the first of every month
so they don't have to actually talk with him or interact with him.

I asked him if he's had visitors lately and he said, "NO." I asked if
anyone calls him and he said, "No." I purposely asked twice (in the
beginning of the call and then, again, later) and he seemed pretty
sharp.

274.    In the same email, Plaintiff then provided to Attorney Brown instructions on how

to walk through the Marlborough Hills facility without signing into the Visitor Log. Prior to

being unlawfully banned by Marlborough Hills on December 25, 2011, Plaintiff had visited

63

Carol multiple times in December 2011 after Carol recovered from the overdose she incurred at
Marlborough Hills on November 30, 2011. For only a brief period of time before Christmas
December 2011, Plaintiff had undisturbed access to visiting her parents at Marlborough Hills. It
is those unfettered visits to which Plaintiff was referring in this email when she wrote to
Attorney Brown, "I have signed in only twice in all the visits."

275.   On March 15, 2012, at 10:47 a.m., Attorney Brown in an email to Plaintiff,
Attorney Brown inadvertently referred to Plaintiff as "Carol" (**Exhibit 55**)

276.   The (DRAFT) Motion for Appointment of Guardian Ad Litem that Plaintiff
drafted at the request of Attorneys Brown and Vecchio, contained all the facts that form the
foundation of this lawsuit.

277.   On March 20, 2012, at 6:52 a.m. Plaintiff sent an email to Attorneys Brown and
Vecchio (**Exhibit 56**) regarding "Parents' Visiting Nurse email and Voice Mail." Plaintiff
forwarded an email that Plaintiff received from Donald's long-time Visiting Nurse, Patti Supple
on February 8, 2012. Nurse Supple's emails indicate that, although Nurse Supple was able to
speak with Donald on the telephone on or around February 8, 2012, by February 23, 2012, Nurse
Supple could not get Donald on the phone. Nurse Supple's emails stated, in part:

> I spoke to your dad yesterday. I did not have any trouble getting
> through to him. He was not very talkative. He told me he does not
> belong there. Was expecting your mom and Nancy to visit
> yesterday but it was late afternoon when I spoke to him. He was
> not sure that they were still coming at that point...
> [emphasis added]

278.   Fifteen days later, Nurse Supple was unable to reach Donald on the telephone due
to Marlborough Hills' unlawful "invoking" of the Oultons' Health Care Proxy documents.
C. Hladick, the Oultons' Health Care Agent, was micromanaging the Oultons' lives and
preventing the Oultons from having contact with not only Plaintiff but they also restricted access

64

to other people outside of Marlborough Hills, including his visiting nurse and his long-time friend, John Baer.

279.   Nurse Supple's second February email was sent to Plaintiff on February 23, 2012. Not coincidentally, this is the same date on which Plaintiff had Attorney O'Regan contact Lincoln to discuss Marlborough Hills' unlawful ban of Plaintiff.

> Nurse Supple's Email of February 23, 2012, at 3:56 p.m.
> Just so you know I have not been able to reach him, but have tried, just tried again a little while ago and he was sleeping they said,, they asked who I was and definitely put me thru to 3 people each time I called...
>
> Hope you made some headway with your attorneys this week

280.   The email from Nurse Supple proves, in direct conflict with sworn statements made by Attorney Port and Lincoln (discussed below) that Plaintiff was, indeed, having great difficulty in reaching and seeing the Oultons once they were institutionalized at Marlborough Hills. Nurse Supple was very concerned for the Oultons and Plaintiff because, she met all three in 2007 and had become close to them, through visits she made to the Oulton Residence, over the years.

281.   On the evening of March 23, 2012, Plaintiff and Attorney Brown visited Donald, together, at Marlborough Hills. They first met outside Marlborough Hills and discussed how best to get in and out of the facility without Attorney Brown having to sign into the Visitors' Log. For some reason, Attorney Brown was adamant that he did not want there to be a record of his visit at Marlborough Hills.

282.   Plaintiff and Attorney Brown visited Donald together at approximately 7:30 p.m., after walking through the facility without signing into the Visitor Log.

65

283. While visiting Donald at Marlborough Hills, Plaintiff noticed an opened letter from the law firm of Mirick O'Connell on Donald's nightstand. Plaintiff picked up the envelope and pointed at the name in the return address to signify to Attorney Brown that Donald might be represented by counsel.

284. To date, despite Plaintiff making repeated requests for production of the engagement letter executed between Attorney Port, Arthur Bergeron, or anyone affiliated with the law firm of Mirick, neither Attorney Sweeney-2 (currently the proposed Personal Representative for the Estate of Donald) nor Attorney Couture (currently the Personal Representative for the Estate of Carol) has ever provided Plaintiff with proof that Attorneys Port and Bergeron did, in fact, represent Carol and Donald.

285. On March 24, 2012, at 9:48 p.m., Plaintiff sent an email to Attorneys Brown and Vecchio entitled, "Dad's Blue Cross/Blue Shield (Exhibit 57)." In the email, Plaintiff wrote:

> This may be something to bring up on Monday and it completely underscores why I sought to have the court appoint a third-party Conservator to oversee my mother's and father's finances. I spoke to my father on the phone tonight.
>
> When I first called at 7:00 p.m. the nurse named Darlene told me that he was asleep and she didn't want to wake him up.
>
> I said, "He gets so few calls and doesn't have a phone that he told me it's okay for you to wake him up." That's the truth, for sure.
>
> Darlene said, "Well, I'd rather not wake him up."
>
> Note, they've been balking at cooperating with me at every turn so I didn't know if this was true, but I didn't want to get argumentative so I said, "Okay, then I'll call him when it's time for his night-time medicine. What time will that be?"
>
> Darlene said, "We'll wake him up at 9:00 p.m. so yeah, call back then and we'll get him up for the phone."
>
> So I called at 9:00 p.m. and a nurse named Martha went and got

66

him.

He sounded really, really nervous to be on the phone out there at the desk. He is never calm and communicative, but that's the way the family wants him because they don't want him pestering them with his phone calls and they don't want to deal with him.

I said, "Dad, do you remember my visit from last night?" I didn't mention Dennis at all.

He said, "Of course I do!! It was a great visit last night!"

I said, "Did you have any visitors or calls today?"

He said, "<u>You're the only one who calls, other than Mom</u>, but Mom came and saw me today. Nancy was with her."

I asked if they brought him the clock that the nurse (Sauda) told me last night that he needs and he said, "No."

So I told him I'd bring him a clock next time I see him and that I will see him again soon.

Then I said, "Dad, you sound awful whenever we talk on the phone. Nervous. You don't seem happy there at all."

He said, "No, of course not. I want to get out of here more than anything."

I told him that I agree that he should be allowed to go home (and though I didn't mention it to him, I was thinking, "... especially since you're being detained there without any court order').

I said, "In a perfect world, what would you want?"

He said, "<u>I want to go home and I know that Mom wants to go home, too</u>."

I said, "Well, maybe we can arrange for that to happen, Dad. There's nothing to keep you both from living at home with some help there. For what the nursing home is charging, you could be paying for a professional to help you guys out at your own home. Everything I ever did for you, Dad, I did so that you and Mom

67

could stay in Natick and live at your own home. I want you to know that the whole purpose of getting the court involved is to get you in the best position possible for what you want, not what's convenient for the other family members."

When I mentioned the helper at home he got very nervous-sounding and said, "Sah, I don't have Blue Cross any more. I can't pay for anything anymore. That's why I am stuck here."

He sounded really upset talking about this, like maybe his finances have been decimated by the scumbags at that hell-hole of a nursing home, and I wouldn't be surprised if that's not the case.

So just to let you know: I think it's imperative that the court appoint an accountant or someone to give their finances the once-over. This nursing home has violated a number of its own policies (which I will note for you by sending the highlighted document that Dennis read last night before we went into the nursing home.

I'm just sick over the whole case. I thought you'd want this new info, for it's making my dad a nervous wreck. This is so sick. They're essentially imprisoning him on that tiny, uncomfortable bed in that rat-hole of a room. They won't let him communicate or wear the new clothes that I brought and am willing to launder personally. They've violated their own policies and surely Mass. General Laws and federal laws in their horrible treatment of me (the separation of us, refusal to let us interact, etc.).

Now he tells me that the reason he's stuck there is that there's no more money.

Whether it's due to negligent account-keeping (which is how I became ensnared in this mess last year when they asked me to write out their checks so they could sign them and pay the bills) or whether it's due to malevolence on the part of the scumbags at the nursing home (which, yes, I do believe is part of this), their finances are in rough shape, according to my Dad, and I hope all this will be addressed with the court.

I'll try to put this sad, gut-wrenching stuff out of my mind for the rest of the weekend. I do miss them both. I miss my mom before she was brainwashed by my psychotic sister (Jim's ex). I miss the visits, and I miss cheering them up with my dogs. I miss talking to my father about law school, for crying out loud, because despite

68

his age, he does not have dementia worthy of incarceration in the
Dementia Ward.

286.    On March 25, 2012, at 12:08 p.m., Plaintiff sent an email entitled "Parents'

Monthly Financial Obligations" to Attorney Brown (Exhibit 58) transmitting a document

entitled "Parents' File Folder List – 2011-2012" and wrote:

> Attached is the File Folder List that I made last year when my
> parents asked me to organize their files and help them maintain
> their bill-paying on a regular basis. We kept this list in the box full
> of their files so they would know what was there. The file names
> that are highlighted in green are files for the accounts that are due
> monthly. Given that the mail is currently being stockpiled at the
> Natick Post Office, I have no doubt that there are a lot of accounts
> in jeopardy at this point.
>
> I'm attaching this now so that you can consider it when making
> your case to the judge about why this screwed-up family needs an
> overseer.
>
> Last I heard most things were overdue. The insurance (housing
> and auto) was cancelled but then I intervened and convinced the
> agent to reinstate the Homeowners' policy on January 13th. Since
> this was the only company that would accept my parents after my
> mother had a fire (ignited by a cigarette in her kitchen trash can but
> miraculously reported as an "electrical fire" once Andy Hladick
> intervened), no other insurance company would have accepted
> their home if I let this policy lapse in January 2012.

287.    On March 26, 2012, a hearing was held in the Middlesex County Probate and

Family Court before Judge Donnelly.

288.    On March 26, 2012, at 3:15 p.m. Plaintiff sent an email to Attorney Brown

(Exhibit 59) Plaintiff wrote:

> I wonder if we should initiate the Guardian Ad Litem for my dad
> ASAP.
>
> If you'd be kind enough to let me know if I can help you proceed
> with the GAL, I'd be most appreciative.

69

289.    On March 27, 2012, one day after the hearing held before Judge Donnelly,

Attorney Port sent to the Middlesex County Probate and Family Court a letter (Exhibit 60)

stating:

> Enclosed for filing in the above referenced matters are the
> following:
>
> 1. Original Affidavit of Vinay Kumar, M.D. In the
> Conservatorship of Carol Oulton;
>
> 2. Original Affidavit of Michael Lincoln in the
> Conservatorship of Carol Oulton; and
>
> 3. Original Affidavit of Michael Lincoln in the
> Conservatorship of Donald Oulton.
>
> Please note these original affidavits were referenced and discussed
> in the hearing that took place on Monday, March 26, 2012;
> however, they were inadvertently not filed with the Court.

290.    The Affidavits sworn by Dr. Kumar and Lincoln under the pain and penalties of

perjury are fraudulent and defamatory.

291.    On March 27, 2012, Attorney Port send Dennis Brown the Opposition to

Petitioner's Motion for Extension of Medical Certificate and Motion to Dismiss Petition for

Conservatorship (Respondent Donald Oulton) (Exhibit 60 also) The following are the relevant

portions:

> Paragraph 4. At no time before the filing of the motion to file
> petition for Conservatorship without medical certificate, at the time
> of the filing of said motion, or after the motion was heard by this
> court and allowed was the Respondent ever properly served with a
> copy of the motion, noticed of a hearing, or allowed the chance to
> oppose that Motion either orally or by written opposition.
>
> Paragraph 6. The petitioner's claims in the affidavit are nothing
> more than self-serving statements based on conjecture, hearsay,
> and complete fabrications in order to bolster her version of events
> that essential boil down to nothing more than a family feud.

70

.

> Paragraph 8: In fact, the petitioner's primary reason for extending
> time to obtain the medical certificate was that she was "banned"
> from Marlborough Hills Nursing Home.
>
> Paragraph 9. At no time has the Petitioner ever been banned from
> visiting the respondent. See affidavit of Michael Lincoln.

292.   Attorney Koch was representing Plaintiff as of early January 2012, solely because

the staff at Marlborough Hills had unlawfully banned Plaintiff from the premises at the request

of the Sibling Defendants. In addition, Plaintiff had procured from Carol a handwritten note

stating, on January 4, 2012, that Carol wanted continued visitation and access to Plaintiff. The

note was necessitated by Marlborough Hills's unlawful ban of Plaintiff from the facility on

December 25, 2011.

> Paragraph 10. Michael Lincoln, the Administrator of that facility,
> states in his affidavit filed with this court that the petitioner was
> never "banned" until the Respondent's wife requested in writing
> that the Petitioner not be admitted because the Respondent was
> "fearful for her personal safety". See Letter from Carol Oulton.....
> However, Marlborough Hills never banned the petitioner from
> visiting the respondent, it only followed the order's of respondent's
> wife as to visits with the respondent's wife. The petitioner has
> continued to visit with the respondent over the last several months.

293.   Upon information and belief, the letter appended to Lincoln's affidavit is not

valid. Unlike the note that Plaintiff procured from Carol, which stated that Carol wanted

continued contact with Plaintiff and which was handwritten in Carol's shaky handwriting, the

letter appended to Lincoln's fraudulent affidavit was typewritten. Moreover, Carol's signature

appears to have been photo copied on and not signed in ink.

294.   Lincoln conveniently failed to mention the report of the stolen belongings was

found to be unfounded/unsubstantiated and dismissed:

> Paragraph 12. Although the Petitioner makes claims that the
> Respondent's property was stolen by the other children, it was
> Respondent who was investigated by the Marlborough Police
> regarding theft of the Respondent's belongings.

71

295. Here Lincoln refers to the "stolen vehicle" incident which was staged by the

Sibling Defendants and Marlborough Hills staff to keep Plaintiff out of her parents' lives for

their own benefit.

296. On March 27, 2012, at 6:14 p.m. Attorney Brown sent an email to Plaintiff

(Exhibit 61) stating:

> Take a real deep breath. None of this is actually unexpected. We
> knew they were lying some time ago. This material just confirms
> it. From my perspective, the main culprits are your sister, Carol,
> and Marlborough Hills but, again, we already knew that.

297. On March 29, 2012, Attorney Vecchio sent an email to Attorney Port

(Exhibit 62) regarding Mediator suggestions.

298. On March 30, 2012, at 10:11 a.m. Plaintiff sent an email (Exhibit 63) to Attorney

Brown stating, "My dad is suffering in that place. I'd like to pursue GAL."

299. On March 30, 2012, Attorney Vecchio sent an email to Attorney Port

(Exhibit 64):

> [i]n light of the new deadlines, it is important that we move
> forward with the mediation without delay. My client is concerned
> regarding the court-ordered deadlines and she will not hold out
> much longer on scheduling the independent medical exams and
> pursuing conservatorships and guardianships for your clients.

300. On March 31, 2012, at 10:19 a.m. Plaintiff sent an email to Attorneys Brown and

Vecchio (Exhibit 65) in which she stated "For now I'm gravely concerned about the safety of

my parents at Marlborough Hills.

301. On April 2, 2012, Plaintiff sent an email to Attorneys Brown and Vecchio

(Exhibit 66):

> Yesterday a friend of my father's (Jack Baer) tried to call him 5
> times and the staff refused to connect him." — "Another friend,
> Dr. Ed Zullo, also tried to call. The staff let him speak.... Dr.

72

> Zullo said my dad knows that we are working to get him into a
> better place but he is very sad and despondent.
>
> ...
>
> May we please just file emergency motions for appointments of
> GAL?"

302.     On April 3, 2012, at 5:24 p.m. Plaintiff sent an email (**Exhibit 67**) to Attorney

Vecchio:

> I feel a lot better after reading and contemplating your take on the
> situation and I do, of course, trust you and Dennis completely in
> this. I am glad to hear that you've been in touch with Attorney
> Port and I trust that we can work out the best scenario possible
> through mediation. I've seen it work firsthand... so I'm a big fan
> of alternate dispute resolution."

303.     On April 3, 2012, at 5:33 p.m. Plaintiff received an email (**Exhibit 68**) from

Attorney Vecchio in which Vecchio said, "Attorney Port and I plan to meet tomorrow to discuss

the scope of the mediation, select a mediator, and discuss things."

304.     On April 9, 2012, at 12:05 p.m. Plaintiff received an email (Exhibit 69) from

Attorney Vecchio stating

> I am still waiting to hear from Port on certain issues... For the
> mental health/neurological exam, I have engaged Dr. McGinnis.
> Attorney Port indicated he did not have a problem with Dr.
> McGinnis. I am still trying to find doctor to do physical exams. I
> have contacted many doctors and all have declined. Attorney Port
> indicated he does not believe it was appropriate for the court to
> order Physical Exams in a Conservatorship proceeding a
> Conservatorship, unlike a guardianship, involvement of a fiduciary
> to make financial decisions.
>
> Based on these facts, Attorney Port indicated that he planned to
> advise his clients that he believes that there is a basis for
> challenging the portion of the order allowing for the independent
> physical examinations. I asked him if he plans to file a Motion for
> Reconsideration and he indicated that he will only do so if that's
> what his clients want. He also told me that when he last spoke to
> your parents, they had no problem submitting to your requested
> examinations. He believes they will likely tell him not to

73

challenge the Order.

When we discussed the issue of extending the deadline for the exams, Attorney Port told me he does not have a problem agreeing to extending the deadline, as long as his clients don't elect to challenge the Order for the Physical Exam.

Dennis and I suggest that we agree with Attorney Port to forgo the physical examinations and to proceed with the mental health/neuro exams.

Port also indicated that he does not believe that your parents should travel alone and that he will likely have to accompany them.

We left it that he would speak with his clients (he was having trouble getting in touch with them) regarding submitting to the physical exams.

We left it that he would speak to his clients (he was having trouble getting touch with them.

305.    On April 9, 2012, at 2:57 p.m. Plaintiff received an email (Exhibit 70) from

Attorney Vecchio:

I've spoken with Jason Port. Your parents will not agree to an extension of time even if we agree to forego the physical exams. Attorney Port stated that although he sees the advantages to agreeing to extions [sic] to save time/money, his clients are not in an agreeable mood, and he cannot them of this. So, we will have to go back into court to ask for an extension.

I spoke with Judge Donnelly's clerk this afternoon about getting an emergency motion on the docket. I am trying to get us into Judge Donnelly's session in Marlborough on Wednesday, but it doesn't look likely.

306.    On April 10, 2012, at 7:01 p.m. Plaintiff sent an email (Exhibit 71) to Attorney

Vecchio stating

For the first time ever, I've developed asthma. Go figure. My pulmonologist had me undergo extensive testing, including pulmonary function tests at UMass Health Alliance Hospital and the results said 'asthma.' I've been feeling extremely crummy

74

lately – bad chest pain, persistent cough, and a lot of trouble breathing.

307.   On April 10, 2012, before Attorney Brown executed a Fee Agreement with Plaintiff, Plaintiff received an Invoice from Attorney Brown in the amount of $4,326.00 (**Exhibit 72**). The invoice billed for a period from 3/5/2012 to 3/30/2012. The Fee Agreement was not signed until April 11, 2012

308.   Attorney Brown presented Plaintiff with a back-dated Fee Agreement (**Exhibit 73**) and attempted to coerce Plaintiff into signing the back-dated Fee Agreement. Plaintiff refused and, instead, handwrote and initialed "the 11ᵗʰ day of April" in order to note the true and correct date on which she executed the Fee Agreement with Dennis R. Brown, P.C.

309.   On April 11, 2012, Attorney Port filed (**Exhibit** 73-6) Opposition to Petitioner's Motion for Extension of Time to Medical Certificate and Motion to Dismiss Petition for Conservatorship on behalf of Donald and Carol (Docket Nos.: MI12P0268PM and MI12P0269PM). The Oppositions filed by Attorney Port contained deliberate mischaracterizations of Plaintiff, the Oultons' state of affairs, their state of health, the inferior quality of care being given to the Oultons at Marlborough Hills.

310.   Upon information and belief, at some time in early April 2012, Attorney Port consulted with Attorneys Brown and Vecchio and convinced Attorneys Brown and Vecchio to do whatever they could to make the Petitions for Conservatorship go away. As discussed below, Attorneys Port fraudulently induced Plaintiff, to the detriment of the Oultons and ultimately Plaintiff, to dismiss the Petitions for Conservator.

311.   On April 12, 2012, at 1:25 p.m. Plaintiff sent an email to Attorney Vecchio (**Exhibit 74**) transcribing the message Plaintiff received from her sister Nancy Williams after her brother-in-law Andy Hladick took the Oultons' checkbook.

75

312.   On April 18, 2012, at 9:39 a.m. Plaintiff received an email from Attorney Vecchio (Exhibit 75) in which Attorney Vecchio wrote, "I spoke with Attorney Port this morning and I'd like to discuss that conversation with you."

313.   On April 20, 2012, Plaintiff received an email from Attorney Vecchio (Exhibit 76) transmitting the following letter:

> I've recently spoken with Attorney Port in the above-captioned. He indicated that your parents are agreeable to granting power of attorney to a third party in order to assist them with managing their finances.  Your parents are agreeable to selecting a third party who is not one of your siblings or an attorney from the law firm they previously engaged for estate planning attorney's firm.  Your parents' agreement to grant such powers of appointment is contingent upon your agreement to withdraw the petitions for Conservatorship.
>
> Attorney Port also indicated that, after considering your list of suggested candidates for such an appointment, your parents have not selected anyone from that list....Your parents plan to consider the matter...and they hope to select and contact that person this weekend or early next week.
>
> With regard to your request that your parents remove Carol Hladick ("Carol") as their health care agent....they are adamantly unwilling to do so.  As Attorney Port explained it to me, your parents are very happy with Carol's service as their health care agent thus far....Your mother stated to Attorney Port that Carol has acted exactly as she would have acted herself and that she is pleased with her service.
> [emphasis added]

314.   Note that Attorney Port and Attorney Vecchio are confirming, here, that Health Care Proxy documents had been "invoked" and abused by Marlborough Hills.  Attorney Vecchio's letter continues:

> Attorney Port indicates that, in order to address your concerns regarding access to them in the event of their incapacity, they are willing to consider making a written directive such that, in her service as their health care agent, Carol, is not permitted to prevent visitation between you and your parents.

76

> At this time...Dennis and I suggest you agree to withdraw the
> petitions for Conservatorship in exchange for your parents
> voluntarily granting power of attorney to a third party.
> [emphasis added]

315.   Upon information and belief the Sibling Defendants – none of whom had legal

authority to sign checks on the Oultons' behalf – were converting the Oultons' assets. Attorney

Port's Motion to Dismiss the Petitions for Conservator was proffered in order to prevent

independent oversight of the Oultons' assets.

316.   On April 25, 2012, at 9:40 a.m. Plaintiff received an email (Exhibit 77) from

Attorney Vecchio in which Attorney Vecchio wrote:

> I was able to reach Attorney Port yesterday afternoon. He is going
> to ask your parents about a possible meeting this Friday.

317.   On April 26, 2012, at 4:10 p.m. Plaintiff received an email (Exhibit 78) from

Attorney Vecchio:

> I heard back from Jason Port this afternoon. Your parents have
> agreed to meet with you after the petitions have been dismissed.
> [emphasis added]

318.   On May 11, 2012, Plaintiff received an email (Exhibit 79) from Lisa Vecchio:

> Although you have decided not to pursue conservatorships for your
> parents, I just want to remind you that the deadline for filing any
> medical certificates is approximately two weeks away. We should
> be prepared to file any responsive pleadings you wish to file before
> that deadline. When no medical certificates have been filed
> following the deadline, Attorney Port will likely quickly mark up
> his motions to dismiss the petitions and once dismissed we will not
> have the opportunity to file further pleadings.

319.   The Petitions for Conservator was withdrawn, manipulated through fraudulent

misrepresentations made by Attorneys Vecchio and Brown.

77

320.    On May 23, 2012, at 10:35 a.m. Plaintiff received an email (Exhibit 80) from

Attorney Vecchio to inform Plaintiff that her mother, Carol Oulton, had been admitted to

Marlborough Hospital and the emergency room and her doctors estimate she had less than 24

hours to live. Her email noted:

> Subject: URGENT – CALL ASAP!: "Your family, including your
> father, would like you to be there."

321.    When Plaintiff arrived at the Marlborough Hospital to see Carol in the Intensive

Care Unit. Once there, she was met by the hostile Sibling Defendants, and C. Hladick

immediately pushed Plaintiff across the room. Plaintiff summonsed a nurse from the Intensive

Care Unit and requested a Security Guard escort her out of the building so that the Sibling

Defendants would not come after her.

322.    N. Williams unlawfully tape recorded Plaintiff, i.e., without Plaintiff's consent,

for the entire time that Plaintiff visited with Carol and Donald in the Intensive Care Unit.

Although obtained without Plaintiff's consent, the tape shows that Plaintiff was an aggressor at

Marlborough Hospital.

323.    Plaintiff summarized the attack on her at Marlborough Hospital in an email to a

WNE Law Dean named Beth Cohen that Plaintiff sent shortly after arriving home (Exhibit 82):

> After being implored by everyone (my attorneys, my parents'
> attorney, and even my sister, who wrote me a series of very nicely-
> worded and encouraging text messages yesterday) yesterday
> morning, I zipped to the Marlborough Hospital where my mom's
> in organ failure and, much to my surprise, I had a horrible time at
> the Intensive Care Unit. It felt like a bit of a setup, for as soon as I
> arrived I was pounced on (verbally and physically) by my siblings
> and their spouses and children when I arrived at the I.C.U.
> Everyone there yelled at me to "Get the Off Out" (even the sister
> who sent me the sweet texts telling me exactly where to find my
> mom), and my younger sister ran up to me and pushed me for no
> reason at all. Perhaps her breast cancer may have metastasized to
> her brain.

78

...

> So the visit lasted only about 5 minutes, but my mom told me she
> loved me and missed, much to the chagrin of my siblings, and she
> told me that she'd been thinking of me all day on Saturday. She
> and my father were delighted to hear that I graduated, although all
> three of us are just sick over the way it happened and the turns that
> life took this year.

324.    Although the Sibling Defendants were the aggressors in the May 23, 2012 attack

on Plaintiff at Carol's Intensive Care Unit hospital room, although no police were called by

anyone at Marlborough Hospital, and although Plaintiff – not the Sibling Defendants – had

requested a Security Guard escort Plaintiff safely to her car, the Sibling Defendants, once again,

engaged the Marlborough Police.

325.    On May 22, 2012, the day before the Marlborough Hospital attack on Plaintiff

occurred, Defendant Michael Lincoln of Marlborough Hills, prepared a "No Trespass Order" that

was used the next day, on May 23, 2012, after Sibling Defendants tried to provoke Defendant

into an altercation.

326.    The Defendants, after they procured Plaintiff's agreement to dismiss the Petitions

for Conservator in exchange of a promise of reunification with her parents, they conspired to

create a disturbance at Marlborough Hospital in order to have grounds for the "No Trespass

Order" at Marlborough Hills.

327.    On May 23, 2012, at 5:01 p.m. Plaintiff receive an email (**Exhibit 83**) from Lisa

Vecchio stating:

> I just received a phone call from Jason Port indicating that a
> restraining order has issued against you for Marlborough Hills
> Nursing Home and Marlborough Hospital due to your conduct
> (which he characterized as threatening) at Marlborough Hospital
> earlier today. Attorney Port stated that my office will be faxed a
> copy of the order sometime today. I have not received any such
> fax at this time. Attorney Port indicated that you will be arrested if

79

you enter the property at Marlborough Hills or Marlborough
Hospital while the order is in effect.

328.   On May 23, 2012, at 5:49 p.m. Plaintiff received an email (**Exhibit 84**) from

Attorney Brown stating,

> As discussed, attached is a no trespass notice. It is NOT a
> restraining order. It's simply a notice from Marlborough Hills
> under a specific statute telling you to stay off their property.
> Violation of the notice is a criminal penalty. We'll obviously talk
> later.

329.   On May 23, 2012, at 10:14 p.m. Plaintiff sent an email to Lisa Vecchio

(**Exhibit 85**) in which Plaintiff states,

> 1. No police were called at the hospital today.
>
> 2. If Nancy was, in fact, recording things, I made it clear that
> Carol pushed me. Only when I protested about Carol committing
> assault and battery did the bunch of them start saying, "No. you
> pushed Carol."
>
> 3. If I had been the instigator of problems then you would have
> heard them protesting first on the tape if there is one and they
> would have most assuredly called the Marlborough Police to report
> the incident and the Marlborough Hospital Security Guard whose
> presence I requested would have detained me.

330.   On May 24, 2012, at 2:58 p.m. Plaintiff received an email (**Exhibit 86**) from Lisa

Vecchio in which she states,

> I spoke with Attorney Port. He received an update today that your
> mother's condition has improved since yesterday. Apparently she
> received an infusion (transfusion) of plasma which has helped her
> condition to stabilize. He has been informed that she is not in good
> condition, simply stable. He explained her doctors are not
> optimistic, but they stated that she could have these "ups and
> downs" for a period. They expect her heart will not be able to
> withstand this for long.

80

331.   On May 29, 2012, at10:47 a.m. Plaintiff received an email (Exhibit 87) from

Attorney Vecchio which stated

> I received an update from Attorney Port regarding your mother's
> condition. She was discharged from Marlborough Hospital and is
> back at Marlborough Hills. Her condition is stable at this time. He
> will let us know when he receives another update.

332.   On May 29, 2012, at 4:00 p.m. Plaintiff sent an email (Exhibit 90) to Lisa

Vecchio stating, inter alia,

> I want the court to determine if my parents are suffering from elder
> abuse. Remember the newly minted no trespass order, if it holds
> up it means I can never see my parents again, and I refuse to accept
> that just because its what Crazy Carol and the other unstable
> siblings want.
>
> It was issued on only their say, without any police involvement or
> documentation that anything bad occurred. Soon I will
> photographs showing you the deceptively friendly text messages
> that Nancy sent to lure me to Marlborough Hospital Tuesday, and
> the whole thing was a set up.

333.   On May 30, 2012, at 5:46 p.m. Plaintiff received an email from Attorney Vecchio

(Exhibit 90):

> I recently spoke with Attorney Port. He indicated that he would be
> filing supplemental memoranda to his motions to dismiss early this
> week and that he would mark up the motions to dismiss for
> hearing. As we have discussed, the court is likely to grant such
> motions because the deadline for filing medical certificates has
> expired and no certificates have been filed. Since both of your
> parents filed answers to the petitions for Conservatorship, you
> cannot unilaterally dismiss the petitions.
>
> Your parents must stipulate to the Dismissals. If your parents are
> forced to incur the expense of their attorney filing additional
> memoranda and marking up a hearing, they could be less likely to
> agree to sign Stipulations of Dismissal. — **Please be advised the
> longer you wait to file your responsive pleadings the more time
> you allow for your parents to file additional pleadings of their
> own in which they might make additional allegations against**

81

> **you and the less likely they will be to agree to dismissals on
> your terms**. [emphasis added]

334.    On June 5, 2012, Plaintiff sent an email (**Exhibit 88**) to Attorney Brown Subject:
Final Affidavits.  Plaintiff states in her email that she wants all her exhibits (containing evidence
Attorneys Brown and Vecchio thought reflected too negatively on the Sibling Defendants)
included in the final affidavits.  Plaintiff also points out to Attorney Vecchio that Jason Port's
statement from his affidavit that states "Petitioners statements are nothing more than self-serving
statements based on conjecture, hearsay and complete fabrications in order to bolster her version
of events that essentially boil down to nothing more than a family feud.

335.    On June 5, 2012, Plaintiff prepared, and Dennis Brown filed, (**Exhibit 89**) the
Affidavit of Sarah A. Oulton in Response to Respondent's Opposition to Petitioner's Motion for
Extension of Time to [sic] Medical Certificate and Motion to Dismiss Petition for
Conservatorship Docket:  MI12P0268PM.  In which Plaintiff provided all the facts that are
contained in this Complaint.

336.    On June 8, 2012, at 4:42 p.m. Plaintiff received an email (**Exhibit 91**)  from
Attorney Vecchio which read, "Jason has not been in contact with your parents yet.  But we
agree to continue the Motion Hearing scheduled for Wednesday."

337.    On June 8, 2012, at 7:09 p.m. Plaintiff, who was afraid that she had been tricked
and would not be able to visit with the Oultons despite signing the dismissals of the Petitions for
Conservator sent an email to Attorney Brown (**Exhibit 91** also):

> Don't you find it strange that Jason Port has claimed, since
> Wednesday this week (i.e., two days ago) that he's been unable to
> put a simple call in to speak with them at the nursing home?  It
> seems incredibly far-fetched while they are stuck in bed next to, or .
> right down the hall from, a telephone. — Do we have a plan in
> place for anyone keeping me posted on how they're doing?  I think

82

> they'd want me to know. And if they don't I'd like to hear it from
> them, not the siblings."

338. On June 18, 2012, after being coerced with fraudulent promises of visitation with her parents and the appointment of disinterested third party to get powers of attorney, Plaintiff agreed to file Petitioner's Assent to Respondent's Motion to Dismiss (Exhibit 92) in Docket No.: MI12P 0269-PM. Attorney Vecchio filed these assents on behalf of Plaintiff.

339. On June 19, 2012, at 5:10 p.m. Plaintiff received an email (Exhibit 93) from Attorney Vecchio:

> Were you able to obtain a copy of the Notice sent out rescheduling
> the hearing for July 9th? I spoke with Attorney Port this morning
> and neither of us has received any notice about a new date. —
> Attorney Port indicated that your parents will not move to strike
> the Affidavits you filed and they are amenable to the court
> discussing both cases without the parties appearing for a hearing.

340. On July 12, 2012, Dennis R. Brown, P.C. sent Plaintiff an invoice in the amount of $21,309.00 (Exhibit 94). Notably, the invoice does not state the basis for the amounts that Dennis R. Brown, P.C. is charging Plaintiff. The invoice simply lists the tasks that Attorneys Brown and Vecchio allegedly performed, but it does not reflect the amount of time devoted to each task. The invoice plainly states that Plaintiff owes Dennis R. Brown, P.C. the sum of $21,309.00, but there is no way that Plaintiff can ascertain if the stated "amount due" is accurate.

341. On July 25, 2012, a Decree of Dismissal of Petition for Conservator – In matter of Donald Oulton (Exhibit 95) was entered.

342. On July 25, 2012, a Decree of Dismissal of Petition for Conservator in the matter of Carol Oulton (Exhibit 95) was entered.

343. Fourteen days after the Petitions for Conservator were dismissed N. Williams and C. Hladick took over control of the Oultons' affairs by executing Powers of Attorney with the

83

incapacitated Oultons, in the Marlborough Hills Alzheimer's Unit, in the absence of any witnesses.

344.    On August 8, 2012, a Durable Power of Attorney (Exhibit 96) was executed by Carol Oulton naming Nancy Jane Williams as Attorney-In-Fact (the "POA of Carol"). This Power of Attorney also names Carol B. Hladick as Successor Attorney-In-Fact. This document was executed while Carol lacked capacity to execute it, it was not witnessed, and it was notarized by Arthur Bergeron of Mirick O'Connell, the very attorneys who represented C. Hladick and N. Williams, drafted Power of Attorney, and profited greatly once it was in place.

345.    The Notary Acknowledgment on the POA of Carol, which was signed by Attorney Bergeron, stated:

> On August 8, 2012, before me, the undersigned notary public, personally appeared CAROL JANE OULTON (the "Principal") and acknowledged to me that the Principal signed the preceding or attached document voluntarily and for its stated purpose. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document, which was:
>
> A current document issued by a federal or state government agency bearing the photographic image of the Principal face and signature. [emphasis added]

346.    On August 8, 2012, a Durable Power of Attorney (Exhibit 96) was executed by Donald Oulton naming Nancy Jane Williams as Attorney-In-Fact (the "POA of Donald"). This Power of Attorney also names Carol B. Hladick as Successor Attorney-In-Fact. This document was executed while Carol lacked capacity to execute it, it was not witnessed, and it was notarized by Arthur Bergeron of Mirick O'Connell, the very attorneys who represented C. Hladick and N. Williams, drafted Power of Attorney, and profited greatly once it was in place.

84

*Oulton v. Hladick, et al. – Verified Complaint and Demand for Jury Trial*

347.     The Notary Acknowledgment on the POA of Donald, unlike that on the POA of

Carol, indicates that Donald did not have a current federal or state government agency

identification document bearing Donald's photograph. Instead, the Acknowledgement that

signed by Attorney Bergeron, stated:

> On August 8, 2012, before me, the undersigned notary public,
> personally appeared DONALD PAUL OULTON (the "Principal")
> and acknowledged to me that the Principal signed the preceding or
> attached document voluntarily and for its stated purpose. The
> Principal proved to me through satisfactory evidence of
> identification that the Principal is the person whose name is signed
> on the preceding or attached document, which was:
>
> **On the oath or affirmation of a credible witness unaffected by
> the document or transaction who is personally known to the
> notary public and who personally knows the Principal.**
> [emphasis added]

348.     Noteworthy is that the Durable Powers of Attorney conferring full control over

the Oultons' finances were executed at a time when the Oultons lacked capacity to execute the

documents. Donald was residing in the Alzheimer's Unit of Marlborough Hills when he signed

the document and, even more importantly, the Durable Power of Attorney is that his document

was not witnessed, and was notarized by Mirick O'Connell Attorney Bergeron.

349.     The Oultons' property – real and personal – was jointly held.

350.     Plaintiff did not discover this timeline until 2013, after Plaintiff learned that she

had been named as a devisee under the Will of Carol and the Will of Donald.

351.     Attorneys Brown and Vecchio had informed Plaintiff that if Plaintiff dismissed

the Petitions:

> a. she would be allowed to visit the Oultons again; and
>
> b. a disinterested, third party would be given power of attorney for
> Donald and Carol

85

c. Williams and C. Hladick had Donald and Carol execute durable
powers of attorney.

352.    On August 22, 2012, the Natick Police Department issued a NO TRESPASS
NOTICE on Plaintiff, which prevented Plaintiff from going to the Oulton Residence again, and
had the Agawam Police serve the notice on the night before the Oulton Residence went on the
market.

353.    Sometime between January 8, 2012, the last day on which Plaintiff went to the
Oulton Residence to retrieve the Oultons' mail for them, and September 21, 2012, when the
Oulton Residence was fraudulently conveyed to Cynthia Bracciale, the Sibling Defendants
removed all of Donald's and Carol's personalty from the Oulton Residence.

354.    On September 21, 2012, a mortgage (Exhibit 97) in the amount of $100,988.50
was executed, on behalf of the Oultons by Nancy Williams, granting 54 MacArthur Road as
collateral to Colonial Health Group-Westridge, LLC, a Massachusetts Limited Liability
Company doing business as Marlborough Hills Healthcare Center with Mortgage covenants.
This document was notarized by Attorney Bergeron and it referenced Durable Power of
Attorneys recorded in Middlesex County Register of Deeds Book 60174, Page 501. This was
signed by N. Williams allegedly as Attorney-In-Fact for Donald.

355.    On September 21, 2012, a Mortgage (Exhibit 98) in the amount of $7,000 was
executed on behalf of the Oultons by Nancy Williams, granting as collateral for said mortgage 54
MacArthur Road to Mirick O'Connell DeMallie & Lougee, LLP, a Massachusetts Limited
Liability Partnership with Mortgage covenants. Attorney Bergeron notarized this document.
This was signed by N. Williams allegedly as Attorney-In-Fact for Donald and Carol.

356.    On November 16, 2012, a Quitclaim Deed (Exhibit 99) with Quitclaim
Covenants was executed by N. Williams on behalf of the Oultons. The deed states that:

86

> The Oultons...for good and valuable consideration paid
> $351,500.00 grant to Cynthia Bracciale... with quitclaim
> covenants.
> Notarized by Jason Port
> The deed stated "Record and Return to Philip Brown."
> Book – 60550 — Page – 485
> Southern Middlesex District
> Fee: $1,602.84
> Grantor – Nancy Williams
> Grantee – Cynthia Bracciale

357.   On November 19, 2012, a Discharge of Mortgage (**Exhibit 100**) was signed by

Richard Kravetz on behalf of Colonial Health Group-Westridge acknowledging satisfaction of

the $100,988.50 mortgage to Colonial. This document was notarized by Michelle Miller.

358.   On November 20, 2012, A Discharge of Mortgage (**Exhibit 101**) was executed on

behalf of Mirick O'Connell acknowledging satisfaction of the $7,000.00 mortgage to Mirick

O'Connell. This document was notarized by Jason Port.

359.   On November 29, 2012, Mirick O'Connell mailed a letter (**Exhibit 102**)

addressed to the Oultons c/o Nancy Williams at 291 Flat Rock Road Athol, Ma 01331, This is

Nancy Williams address. The letter states the following:

> I have enclosed a copy of the settlement statement signed at the
> closing for your records. As you can seem the $351, 500.00 sales
> price was increased by a credit for prepared real estate taxes in the
> amount of $556.24. This brought the gross amount due to
> $352,056.24. This gross amount was decreased by (i) a payoff to
> Middlesex Savings Bank for the home equity line in the amount of
> $10,200.00; (ii) a payoff to Mirick O'Connell for the outstanding
> mortgage provided to our firm to cover future legal expenses; (iii)
> a payoff to Colonial Health Group in the amount of $102,031.96;
> (iv) $124.99 paid to Alex Jowdy for reimbursement for obtaining
> smoke detector certificate and final water and sewer bill for the
> property; and (v) settlement charges in the amount of $23,777.84.
>
> The Settlement charges included (1) a broker's commission in the
> amount of $17,575.00 which was reduced by the initial deposits
> held by the Jowdy Group in the amount of $6,000.00, bringing a
> net commission due of $11,575.00; (2) recording fees in the

87

amount of $375.00; (3) deed stamps in the amount of $1,602.84; (4) a discharge tracking fee payable to the buyer's attorney in the amount of $225.00; (5) $2,500 payable to Mirick O'Connell for additional legal fees regarding sale of the property; and (6) $1,500.00 payable to Mirick O'Connell representing the application fees for the PLAN of Massachusetts for both of you.

The total proceeds from the sale of the property was $208,896.45.

360.    On December 4, 2012, and December 5, 2012, WNE Law Professor Leora Harpaz and Professor William Baker wrote letters of recommendations (Exhibit 103) for Plaintiff in support of her application to the Massachusetts Bar. Both Professors acknowledged they were aware of Plaintiff's family troubles and that despite that Plaintiff excelled.

361.    On December 6, 2012, Attorney Brown mailed to Plaintiff an invoice (Exhibit 104) in the amount of $21,609.00.

362.    Like the previous invoices from Dennis R. Brown, P.C., this invoice does not state the basis for the amounts that Dennis R. Brown, P.C. is charging Plaintiff. Nowhere on the invoice do Attorneys Brown and Vecchio account for the time they allegedly devoted to this matter. The invoice simply lists the tasks that Attorneys Brown and Vecchio allegedly performed, but it does not reflect the amount of time devoted to each task. The invoice plainly states that Plaintiff owes Dennis R. Brown, P.C. the sum of $21,609.00, but there is no way that Plaintiff can ascertain if the stated "amount due" is accurate.

363.    On December 22, 2012, Plaintiff learned that Donald died on December 19, 2012. Plaintiff was notified of her father's death via Google Alert (Exhibit 105). At no time did any of the Defendants or anyone affiliated with any hospital or facility notify Plaintiff of her father's death. Plaintiff was overcome with grief and anguish upon learning that her father died, for Plaintiff realized that there was absolutely no more chance to ever be reunited with Donald or to

88

resolve the many problems created by the Sibling Defendants and Marlborough Hills and exacerbated by Attorneys Port, Brown, and Vecchio.

364. Three days later, on December 25, 2012, Plaintiff learned, via Google Alert (Exhibit 106), of Carol's death. At no time did any of the Defendant's, or any one at all, notify Plaintiff of her mother's death. Plaintiff was, once again, overcome with grief and anguish upon learning that her mother died, for Plaintiff realized that there was absolutely no more chance to ever be reunited with Carol or to resolve the many problems created by the Sibling Defendants and Marlborough Hills and exacerbated by Attorneys Port, Brown, and Vecchio.

365. On December 27 and 28, 2012, the Oultons had wakes, funerals, and burials out of the John Everett & Sons Funeral Home in Natick, Massachusetts.

366. Plaintiff had been warned months earlier by N. Williams that if she ever attempted to attend her parents' funerals, the Sibling Defendants would have her arrested. Given Lt. Hladick's status on the Natick Fire Department, Plaintiff took the threat of arrest quite seriously, particularly in light of Officer Insani's arrest of Plaintiff (and the misleading Police Report that he subsequently generated) in January 2012.

367. On December 28,2012, Mirick O'Connell issued a check (Exhibit 107) to Alan Bush in the amount of $1,800.00 drawn from an Attorney IOLTA account at People's United Bank.

368. On December 28, 2012, Mirick O'Connell issued a check (Exhibit 107) to Dolphin Seafood Restaurant in the amount of$3,745.50 drawn from an Attorney IOLTA account at People's United Bank.

89

369.    On December 28, 2012, Mirick O'Connell issued a check (Exhibit 176) to John

Everett & Sons in the amount of $23,731.69 drawn from an Attorney IOLTA account at People's

United Bank.

370.    On December 28, 2012, Mirick O'Connell issued a check (Exhibit 107) to

Glenwood Cemetery Association in the amount of $2,300.00 drawn from an Attorney IOLTA

account at People's United Bank.

371.    Plaintiff learned that Attorney Brown, who, upon information and belief, had

never visited with or telephoned the Oultons in the 12 years that Plaintiff lived in close proximity

to the Oultons, had attended the wakes of Carol and Donald.  Plaintiff subsequently learned that

the Sibling Defendants and employees of Everett Funeral home had hired armed Natick Police

personnel to keep Plaintiff away from the wakes, funerals, and burials.

372.    Upon information and belief Attorney Brown learned, at the Oultons' wake, that

Plaintiff had been barred from the Oultons' wakes, funerals, and burials.

373.    No court order was in effect to bar Plaintiff from the Oultons' wakes, funerals,

and burials.  The Sibling Defendants, upon information and belief, had simply barred Plaintiff

from attending the Oultons wakes, funerals because, having successfully barred Plaintiff from

the last year of the Oultons' lives in order to convert the Oultons' assets without impediment by

Plaintiff during the last year of the Oultons' lives, Plaintiff's absence from the Oultons' wakes,

funerals, and burials would more easily allow the Sibling Defendants to continue their

defamation of Plaintiff and perpetrate the fiction that allowed them to commit the torts and

crimes described in this Complaint.

374.    On December 31, 2012, a Statement of Account (Exhibit 108) from Brookline

Credit Union  was mailed to Carol Oulton.  It showed a Dividend Percentage Yield of $158.54.

90

375.    On February 21, 2013, a collection agency invoice (Exhibit 109) for services

render on September 9, 2011, to Carol Oulton by Fallon Ambulance was mailed to Carol Oulton

at 20 Causeway Street, Medway, Massachusetts 02053, the address of C. Hladick. It is apparent

from this invoice that the Oultons finances were not being properly managed during the time that

numerous defendant's claim they were, as there is this outstanding bill from 2011 still going

unpaid in 2013.

376.    On March 26th, 2013, a letter (Exhibit 110) was sent from Stephanie Rossie of

Plourde Bogue Moylan & Marino, LLP transmitting an extra $10 for the Informal Probate filing

fee and requesting the Certificate of Appointment.

377.    On April 23, 2013, Plaintiff went to Middlesex County Probate and Family Court

to get a copy of the Conservatorship petition's docket sheets (Exhibit 111) for her Board of Bar

Examiners application. On this day an employee at the Probate Court summoned Plaintiff over

to her and notified her to the fact that a codicil had been offered in Carol Oulton's probate matter

after the Will had been filed, and that the judge thought something was amiss in the case

(Exhibit 112).

378.    On April 25, 2013, Plaintiff filed a petition for formal probate In Re Estate of

Carol Oulton requesting that disinterested third party be appointed personal representative. A

petition for bond without sureties and a military affidavit was also filed (Exhibit 113).

379.    On May 22, 2013, Plaintiff wrote a letter to Springwell Agency (Exhibit 114), the

investigative agency for elder abuse reports, asking the following:

> 1. Whether I have ever been reported to your office at Springwell for allegedly
> committing elder abuse against any person in the Commonwealth of
> Massachusetts;
>
> 2. The name(s), if any, of the elderly person(s) on behalf of whom the complaints
> against me may have been filed with your office2013;

91

3. The dates, if any, on which I allegedly abused the person(s) on behalf of whom complaints against me may have been filed with your office;

4. The name(s), if any, of the part(y/ies) who may have reported me to your office;

5. copies of police reports, if any, that accompanied the complaints against me that may have been filed with your office;

6. the steps, if any, that your office took to investigate me; and

7. the results of the investigation, if any, that was conducted by Springwell.

Plaintiff also stated in the letter:

> For your information, I have never been contacted by anyone in your office (or the Massachusetts Department of Elder Affairs) for any reason at any time in the past.

380.    On May 26, 2013, an invoice (**Exhibit 115**) was sent to Michael Couture from Plourde Bogue Moylan & Marino, LLP in the amount of $2,044.20. The invoice billed for preparation of decedent's final tax returns in the amount of $750, Preparation of petition for informal probate of will, Appointment of Personal Representative, Bond, Military Affidavit, Notice of Informal probate, notice of informal probate and Order of Informal Probate of Will in the amount of $750.00. In addition, the invoice also billed for expenses for Probate fees in the amount of $430.00, Federal express in the amount of $44.86 and certified mail in the amount of $69.34. The total due on the invoice was $2,044.20.

381.    On May 29, 2013, A notice of Appearance and Objection (**Exhibit 116**) was filed by Attorney Deborah Masterson on behalf of Colonial Health Group-Westridge LLC in Docket No. MI13P1828EA and was received by the court on May 30, 2013. Filed with the notice was the affidavit of Michael Lincoln. Lincoln's affidavit contained the following statements:

> Paragraph 4: Carol J. Oulton owes Marlborough Hills the sum of $34,542.71

Paragraph 5:  Donald P. Oulton owes Marlborough Hills the sum of $36,462.83.

Paragraph 7:  On or about May 23, 2012, an incident occurred at Marlborough Hills, involving Sarah Oulton, daughter of Mr. and Mrs. Oulton, who was alleged to have engaged in unstable and irrational behavior at the facility, reportedly threatening to kill herself if her mother, Carol Oulton, did not write a check.  The facility also learned that Sarah Oulton had a license to carry a firearm and they were unsure whether she had a gun.  This incident resulting in the Marlborough Police being called and reporting to the facility.  A copy of the police report is attached hereto.

Paragraph 8:  Marlborough Hills issues a No Trespass order to Sarah Oulton in which she instructed not to come to the facility.

The attached police report which is referenced in the affidavit of Lincoln and issued by Lieutenant David Giorgi, states as follows:

On May 23, 2012, this department was contact by staff at the Marlborough Hills Nursing Home regarding a safety concern involving one of their patients daughters.  I have dealt with Ms. Oulton and her intra-family disputes in the past so I responded to the location.  Upon arrival, officers were informed that Ms. Oulton's mother, Carol Oulton, who is a resident of the facility had been transported to Marlborough Hospital earlier in the day and was is very critical condition.  Ms. Oulton's father, Donald Oulton who is also a resident of Marlborough Hills, had been taken to the hospital by his other daughter, Carol Hladick, to see his wife before she passed away.  It was reported that Carol Oulton told her family that she did not wish to see her daughter Sarah before she went unconscious, but Mr. Oulton, requested that her siblings contact her before her mother passed away.  The siblings obliged and at some point Ms. Sarah Oulton came to the hospital where she began arguing with her family, accusing family members of assaulting her, and was eventually asked to leave by the family and hospital security.

Upon the elderly male's return to Marlborough Hills, the facility's administrators became concerned due to Ms. Sarah Oulton's unstable and irrational behaviors on this date and in the past.  I advised them that one option could be to issue a no trespass notice... It was also reported that Ms. Oulton does have a LTC and maybe is possession of a firearm (LEAPS check revealed that she does have a valid LTC, but has no firearms registered to her).

93

> Eventually, facility administrator Michael Lincoln did issue a
> trespass notice to Ms. Sarah Oulton and he provided a copy to this
> department. I was advised that Ms. Oulton would only
> communicate through her attorney Lisa Vecchio, and I therefore
> contacted her office and faxed a copy of the trespass notice to the
> office. Attorney Dennis Brown advised that he would contact
> Ms. Oulton and maker her aware of the Trespass Notice. A copy
> of the notice was placed on file at this department and another
> copy will accompany this report.

382.    Attorney Sweeney-2, Marlborough Hills, the Sibling Defendants, and others

advocated to have Attorney Sweeney-2 to be appointed as Personal Representative for the Estate

of Carol.

383.    If Colonial, the parent company of Marlborough Hills, had a valid claim against

the Estate of Carol then Colonial's people would not care so much who was appointed as

Personal Representative.

384.    Attorney Sweeney-2, Mirick O'Connell attorneys, and others were desperate to

hide the 30-Day Survivorship Clause in Donald's Will, because the intermeddlers – Mirick

O'Connell attorneys, Attorney Sweeney-2 and, upon information and belief, the Sibling

Defendants, had already ignored the clause, commingled the assets of the estates, and unlawfully

made distributions. The Defendants ignored Donald's last wishes and defied the Will of Donald;

they unlawfully commingled the assets of both estates as though Carol had inherited from

Donald when, under the Will of Donald (which Attorney Sweeney-2 wrote), the Estate of Carol

did not take under the Will of Donald.

385.    On May 29, 2013, Plaintiff received a letter (Exhibit 117) from April Evans at

Springwell, Inc. which stated as follows:

> I received your letter dated May 22, 2013, seeking information on
> any reports filed with Springwell Protective Services listing you as
> the alleged perpetrator of elder abuse. As per Executive Office of
> Elder Affairs Program Instruction (PI-07-01), I am not able to tell

94

you who filed a report of concern, nor am I able to release any information except that which you provided to us directly; as we did not interview you as part of our investigation, there is little information that I am able to release to you.

However I can tell you the following: <u>our office has received only one report, on January 18, 2012, listing you as the alleged perpetrator of elder abuse, against your mother, Carol Oulton. There were no accompanying police reports. We investigated the allegations against you, but they were unsubstantiated</u> (emphasis added).

386.   On May 31, 2013, Attorney Sweeney-2 filed a bond in the matter of the Estate of Donald. He fraudulently estimated the value of personal estate at $30,000 (**Exhibit 118**) because, although he is the author of Donald's Will, he and others have refused to honor Donald's last wishes, including the 30-Day Survivorship Clause in Donald's Will..

387.   On June 3, 2013, Plaintiff mailed a second letter (**Exhibit 119**) to April Evans at Springwell Protective Agency. This letter requested three additional pieces of information as follows:

1. Given that nobody from Springwell contacted me to discuss the complaint that was filed against me, how did Springwell investigate the allegations that were made against me and determine that they were unsubstantiated?

2. Did Springwell notify the Reporting Party ("RP") that the investigation conducted by Springwell concluded that the allegations against me were unsubstantiated?

3. If Springwell did, in fact, notify the RP of the results of the investigation, on what date and through what medium (mail, telephone, email, etc.) were the results of the Springwell's investigation of me transmitted to the RP?

388.   Note that Plaintiff was never contacted by the investigative authority, even though the complaint against Sarah came from a mandated reporter.