Amended Complaint – Part 1

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                                    HAMPDEN SUPERIOR COURT

                                                CIVIL ACTION NO. 1579CV00917

SARAH A. OULTON, SARAH A. OULTON on behalf of THE ESTATE OF DONALD PAUL OULTON, and SARAH A. OULTON on behalf of THE ESTATE OF CAROL JANE OULTON,

     Plaintiffs,

v.

CAROL B. HLADICK, ANDREW HLADICK, NANCY J. WILLIAMS, DAVID P. OULTON, KEOUGH + SWEENEY, LTD., ATTORNEY JEROME V. SWEENEY II, ATTORNEY JEROME V. SWEENEY III, individually and in his capacity as Registered Agent of Keough + Sweeney, Ltd., ATTORNEY SEAN P. KEOUGH, ATTORNEY JOSEPH A. KEOUGH, JR., ATHENA HEALTH CARE SYSTEMS MA III LLC, dba MARLBOROUGH HILLS HEALTHCARE CENTER, JAMES BOVE, VALERIE CHAKALOS-SANTILLI, DIANE CURTIS, KEVIN DIEHL, LAURA DOSSANTOS, MICHAEL MOSIER, KAREN PETRUCELLI, LAWRENCE SANTILLI, DEBRA M. SOUCEY, THOMAS WALKUSKI, COLONIAL HEALTH GROUP-WESTRIDGE, LLC dba MARLBOROUGH HILLS HEALTHCARE CENTER, MICHAEL WALSH, WILLIAM MANTZOUKAS, RICHARD KRAVETZ, JOHN KAIN, MICHAEL B. LINCOLN, GINA M. QUEIROS, ANDREA B. EDWARDS, DONNA DELCID, KAREN SPERONI, CHRISTINE FRENCH, DENISE STEPHENSON, SAUDA MATOVU, VINAY KUMAR, M.D., DENNIS R. BROWN, P.C., ATTORNEY DENNIS R. BROWN, individually and in his capacity as Registered Agent of Dennis R. Brown, P.C., ATTORNEY LISA A. VECCHIO, MIRICK O'CONNELL DEMALLIE & LOUGEE LLP, ATTORNEY JOHN O. MIRICK, ATTORNEY JASON A. PORT, ATTORNEY ARTHUR P. BERGERON, THE JOWDY GROUP, INC., ALEXANDER R. JOWDY, FREEDOM HOMES REALTY, PAUL R. PICCIOLI, LAW OFFICE OF PHILIP C. BROWN, ESQ., ATTORNEY PHILIP C. BROWN, individually and in his capacity as owner of Law Office of Philip C. Brown, Esq., CYNTHIA BRACCIALE, JOHN EVERETT & SONS FUNERAL HOME, JOSEPH EVERETT, individually and in his capacity as Registered Agent of John Everett & Sons Funeral Home, DENNIS CUNNINGHAM, SUSAN DAVIS, MAUREEN REEVE, BRIAN FALVEY, LUKE SIMPSON, RICHARD KELLY, PLOURDE BOGUE MOYLAN & MARINO LLP, ATTORNEY THOMAS MOYLAN, individually and in his capacity as Registered Agent of Plourde Bogue Moylan & Marino LLP, ATTORNEY MELISSA CURLEY, THE LAW OFFICE OF DEBORAH MASTERSON, ATTORNEY DEBORAH MASTERSON, individually and in her capacity as Owner of The Law Office of Deborah Masterson, A.A. DORITY COMPANY, INC., JEFFREY W. CRAWFORD, WINSTON LAW GROUP, LLC, ATTORNEY NEAL WINSTON, individually and in his capacity as Registered Agent of Winston Law Group, LLC, and ATTORNEY MICHAEL COUTURE,

     Defendants.

## AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

     COME NOW Plaintiffs, Sarah A. Oulton, with a mailing address of P.O. Box 888,

Agawam, Massachusetts ("Plaintiff"), individually, Sarah A. Oulton on behalf of The Estate of

Donald Paul Oulton, and Sarah A. Oulton on behalf of The Estate of Carol Jane Oulton (pursuant to G.L. c. 230, § 5), by and through counsel, Attorney Coreen Goodwin and Attorney James Bailey Brislin, and hereby bring this Amended Verified Complaint and Demand for Jury Trial (the "Amended Complaint") and allege the following:

## I.    INTRODUCTION

1.      This case involves an elaborate and unprecedented criminal enterprise that commenced in December 2011 and continues to the present day.  At the heart of this lawsuit is a complex, criminal elder abuse scheme committed by those responsible for the protection of elders.

2.      The most tragic victims in this case are Plaintiff's deceased parents, 81-year old Attorney Donald Paul Oulton ("Donald"), a retired Air Force Judge Advocate General's Corps ("JAG") attorney, and his Tufts University-educated wife of 53 years, 79-year old Carol Jane Oulton ("Carol") (together the "Oultons").

3.      For more than one year the Oultons suffered unimaginable abuse while they were falsely imprisoned in Marlborough Hills Healthcare Center ("Marlborough Hills"), one of the most dangerous nursing homes in The Commonwealth of Massachusetts ("The Commonwealth").

4.      The Oultons were falsely imprisoned in Marlborough Hills, through the abuse of their Health Care Proxy documents by Marlborough Hills administrators and staff, in late 2011.

5.      The Oultons succumbed to their abuse at Marlborough Hills, only days apart, in December 2012.  Donald allegedly died on December 19, 2012, and Carol allegedly died on Christmas Day 2012.

6.      In the absence of valid contracts for service the administrators and staff of Marlborough Hills illegally abused the Oultons' Health Care Proxy documents for financial gain,

2

fraudulently billed Medicare, and – without informing the Oultons – unlawfully banned Plaintiff from ever having contact with her parents again during the last horrific year of the Oultons' lives.

7.     The criminal scheme at the heart of this lawsuit was hatched at least as early as December 7, 2011, by Plaintiff's three siblings, Carol B. Hladick ("C. Hladick"), Nancy J. Williams ("N. Williams"), and David P. Oulton ("D. Oulton"), and C. Hladick's husband, Andrew Hladick ("Capt. Hladick") (together, the "Sibling Defendants").

8.     The Sibling Defendants were aided and abetted by a large number of unethical, professionally licensed co-conspirators, including attorneys, nursing home administrators, nurses, social workers, police officials working for the City of Marlborough and the Town of Natick Police Departments, real estate professionals, funeral home professionals, and others.

9.     The Sibling Defendants, Marlborough Hills staff and administrators, and other Defendants orchestrated the complex scheme through which the Oultons were mentally, physically, and financially abused through the Defendants':

     a)     false imprisonment and forced separation of the Oultons for more than one year in Marlborough Hills;

     b)     unlawful and forced interference with the loving relationship that Plaintiff and the Oultons enjoyed prior to the Oultons' unlawful detention at Marlborough Hills;

     c)     repeated subjecting of the Oultons to physical and emotional abuse, including near-lethal, coma-inducing medical emergencies while they were falsely imprisoned and abused at Marlborough Hills; and

     d)     denial of the Oultons' access to the most basic human necessities, e.g., telephones, mail, clothing, access to their own physicians, and visits with friends and loved ones.

3

10.     The Defendants in this case forced the Oultons to live at Marlborough Hills under conditions far worse than the conditions under which prison inmates live in The Commonwealth, and the Defendants caused Plaintiff an unbearable amount of grief and distress as she worried about her suffering parents' welfare and attempted to mitigate the damage.

11.     Plaintiff, who was the Oultons' primary caretaker in the last several years of their lives and who is a devisee named under each of the Oultons' alleged Wills, has suffered immeasurably since December 2011.

12.     Although Plaintiff immediately took every legal measure possible to protect her parents she was – against the numerous, professionally-licensed Defendants – ultimately powerless to stop the physical, mental, and financial abuse inflicted on the Oultons while they were alive and the theft from the Oultons' estates both before and after they died.

13.     The Defendants willfully and knowingly:

a)     falsely imprisoned the incapacitated Oultons at Marlborough Hills and isolated them from their physicians, friends, and from Plaintiff, the only Oulton Child who was concerned for the Oultons' welfare;

b)     subjected the Oultons, for more than one year, to physical, emotional, and financial abuse;

c)     forced the incapacitated Oultons, through undue influence and under duress, to execute void Durable Powers of Attorney from the Alzheimer's Unit of Marlborough Hills in the absence of disinterested witnesses;

d)     used the Oultons' void Durable Powers of Attorney to fraudulently mortgage the Oultons' jointly-held home in order to unjustly enrich themselves (Colonial Health Group-Westridge, LLC ["Colonial"] and Mirick O'Connell DiMallie & Lougee LLP ["Mirick O'Connell"]);

4

e) used the Oultons' void Durable Powers of Attorney to fraudulently convey the Oultons' jointly-held home through a <u>$354,864.69 CASH transaction</u> memorialized in an unwitnessed (and therefore invalid) Quitclaim Deed;

f) fraudulently completed the HUD-1 Settlement Statement prepared after the fraudulent conveyance of the Oulton Home;

g) illegally billed the Oultons and the Oultons' estates for work that was done on behalf of the Sibling Defendants (both <u>before</u> and after the Oultons died);

h) used the Oultons' void Durable Powers of Attorney to enter into a fraudulent pre-paid funeral contract;

i) concealed the Oultons' alleged Wills from <u>both</u> the Executors named in the Oultons' alleged Wills and the Middlesex County Probate and Family Court, in violation of M.G.L. c.190B § 2-516;

j) intermeddled in the Oultons' estates as executors de son tort;

k) misappropriated the Oultons' jointly-held assets over which they unlawfully seized control;

l) billed the Estate of Carol for every action that was taken in furtherance of their conspiracy;

m) unjustly enriched themselves with the Oultons' jointly-held assets and Plaintiff's inheritance at every opportunity; and

n) refused to provide statutorily mandated and court-ordered Inventories and Accounts for the Oultons' estates.

14. The Defendants in this complicated case took extraordinary measures to cover up their crimes, thus although Plaintiff has pieced together enough of the facts to reveal a shocking

5

and impermissible pattern of elder abuse, larceny, embezzlement, and fraud, the full scope of the Defendants' criminal scheme will be revealed only through the discovery phase of this lawsuit.

15.     The Defendants in this case shamelessly bilked the Oultons and their estates, looted Plaintiff's inheritance, defrauded Medicare, MassHealth, the Internal Revenue Service, the Massachusetts Department of Revenue, and the U.S. Department of Housing and Urban Development, and – to do so – committed, *inter alia*, conspiracy, deceit and misrepresentation, fraudulent inducement, grand larceny, embezzlement, mail theft, wire fraud, fraudulent conveyance, defamation, public disclosure of private facts, abuse of process, fraud on the court, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the U.S. Constitution, and the Massachusetts Declaration of Rights.

16.     Through a series of outright lies and fraudulent legal documents, Defendants shamelessly defamed Plaintiff and attempted to silence her with threats of physical, financial, and professional harm.  The Defendants have, through the totality of their actions, inflicted severe emotional distress and professional harm on Plaintiff.

17.     Defendants engaged a number of willing officials working for the City of Marlborough and Town of Natick Police Departments to intentionally harass Plaintiff, violate Plaintiff's constitutional rights, defame Plaintiff with administrators at Plaintiff's law school, and then – with the help of unethical funeral home employees – unlawfully block Plaintiff from attending the Oultons' <u>public</u> wakes, funerals, and burials.

18.     Wakes, funerals, and burials are the most sacred rituals in our society.  They are held to provide for the dignified and respectful care of the decedents and they allow mourners to pay special tribute to those who have passed.  Wakes, funerals, and burials are extremely important to the decedents' survivors, and even more so when the decedents and survivors have a parent-child relationship.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

19.     Wakes, funerals, and burials play such an integral and important part of the grieving process that furloughs to attend them are routinely granted to enlisted members of the United States Armed Forces.  Additionally, The Commonwealth grants furloughs to <u>prisoners</u> (including inmates serving a life sentence for murder in the second degree) so that the prisoners may attend the wakes, funerals, and burials of their loved ones.

20.     Plaintiff was, through the Defendants' illegal actions, afforded fewer rights than prisoners incarcerated in The Commonwealth.

21.     Defendants have not only willfully and knowingly violated the Massachusetts Rules of Professional Conduct and the Code of Massachusetts Regulations governing their respective professions, but they also brazenly violated numerous provisions of the Massachusetts General Laws and the United States Code.

22.     Defendants, furthermore, have willfully defied Middlesex County Probate and Family Court Orders and have obstinately refused to honestly account for the Oultons' stolen jointly-held assets.

23.     Given that most of the Defendants in this case are licensed professionals, the Defendants clearly knew or should have known that their reprehensible behavior, discussed below, was wrong.

24.     If the crimes described in this lawsuit could be committed against Donald (a decorated U.S. Air Force JAG Attorney of more than 30 years), Carol (Donald's Tufts University-educated wife of 53 years), and their daughter, Plaintiff, a Western New England University School of Law graduate, then the public at large is clearly in peril.

25.     Defendants so smoothly executed their scheme that they must surely have done this to others in the past, and they will continue to victimize others, in the future, unless they are held accountable for their criminal acts.

26.     The greatest tragedy of this case is that the final year of the Oultons' lives can never be recovered.  The Oultons are dead.  The Oultons died, mere days apart, after suffering inside Marlborough Hills for more than one year.  Plaintiff, who was the Oultons' loving daughter and best friend, was unlawfully, cruelly, and viciously deprived of the last year of the Oultons' lives, much to the detriment of not only Plaintiff but also the Oultons.

27.     For more than four years, Plaintiff has been unimaginably burdened with the knowledge that none of the legal action she took in the Oultons' last year of life was sufficient to prevent the Oultons' needless suffering or the crimes that form the foundation of this lawsuit.

28.     For almost three years Plaintiff has had to vigilantly monitor and challenge the Defendants' fraudulent actions in the Middlesex County Probate and Family Court, both *pro se* and through counsel.

29.     For more than three years, The Middlesex County Probate and Family Court cases related to the Oultons' estates have remained open, and the next hearing in the Estate of Carol matter is set for March 31, 2016.

30.     The criminal enterprise forming the foundation of this lawsuit, from its inception in late 2011 through the cover-up that continues to this present day, is described below, largely in the Defendants' own words which were taken directly from:

    a)     invoices that numerous defendants submitted to the Estate of Carol for payment;

    b)     fraudulent Middlesex County Probate and Family Court pleadings filed by the Defendants;

    c)     transcripts of the five Middlesex County Probate and Family Court hearings held in the matter of Carol's estate thus far;

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

      d)     fraudulent documents filed with the Middlesex County Superior Court, all of which were proffered by the Defendants in furtherance of their criminal conspiracy; and

      e)     Plaintiff's evidence, which she meticulously gathered as the events described herein occurred.

31.     Plaintiff has been irreparably and incalculably damaged by the Defendants' actions.

## II.    JURISDICTION AND VENUE

32.     This Court has jurisdiction over the instant matter pursuant to G. L. c. 212 §§ 3 and 4. Venue is properly laid in Middlesex County pursuant to G. L. c. 223 §§ 1 and 11, and G. L. c. 231A §§ 1 and 2.

## III.    PARTIES

33.     Plaintiff Sarah A. Oulton ("Plaintiff") has a mailing address of P.O Box 888, Agawam, Massachusetts 01001-0888. Plaintiff is the daughter of the late Attorney Donald Paul Oulton ("Donald") (who allegedly died on December 19, 2012) and the late Carol Jane Oulton ("Carol") (who allegedly died on December 25, 2012) (together, "the Oultons"). Plaintiff was named as a devisee under both the Last Will and Testament of Donald Paul Oulton (the "Alleged Will of Donald") (allegedly executed on June 28, 2000) and the Last Will and Testament of Carol Jane Oulton (the "Alleged Will of Carol") (allegedly executed on April 19, 2001).

34.     Defendant Carol B. Hladick ("C. Hladick") resides at 20 Causeway Street in Medway, Massachusetts 02053 and is employed as a Payroll Administrator for the Town of Millis in Millis, Massachusetts. C. Hladick is the daughter of Donald and Carol and was named as a devisee under both the Alleged Will of Donald and the Alleged Will of Carol. C. Hladick is

9

the obligor on contracts fraudulently executed with Marlborough Hills Healthcare Center ("Marlborough Hills"), the nursing home in which the Oultons were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012. C. Hladick conspired with other Defendants in this case to, *inter alia*, illegally abuse the Oultons' Health Care Proxy documents for the benefit of the Defendants, unlawfully interfere with Plaintiff's relationship with the Oultons, steal assets from Donald, Carol, the Estate of Donald, and the Estate of Carol, and constructively disinherit Plaintiff from the Alleged Will of Carol and the Alleged Will of Donald.

35.    Defendant Andrew Hladick ("Capt. Hladick") resides at 20 Causeway Street, Medway, Massachusetts  02053, is the husband of Defendant C. Hladick, and was employed as a Lieutenant with the Town of Natick Fire Department in Natick, Massachusetts when the criminal enterprise forming the foundation of this lawsuit was hatched in late 2011.  Currently Capt. Hladick is employed as a Captain with the Town of Millis, Massachusetts Fire Department. Capt. Hladick conspired with other Defendants in this case to, *inter alia*, unlawfully interfere with Plaintiff's relationship with the Oultons, steal assets from Donald, Carol, the Estate of Donald, and the Estate of Carol, and constructively disinherit Plaintiff from the Alleged Will of Carol and the Alleged Will of Donald.

36.    Defendant Nancy Jane Williams ("N. Williams") resides at 291 Flat Rock Road in Athol, Massachusetts  01331 and is employed by The Commonwealth of Massachusetts (the "Commonwealth") as Assistant Director of the Fitness and Wellness Center at Mount Wachusett Community College.  N. Williams is the daughter of Donald and Carol and was named as a devisee under both the Alleged Will of Donald and the Alleged Will of Carol.  N. Williams conspired with other Defendants in this case to, *inter alia*, unlawfully interfere with Plaintiff's relationship with the Oultons, steal assets from Donald, Carol, the Estate of Donald, and the

10

Estate of Carol, and constructively disinherit Plaintiff from the Alleged Will of Carol and the Alleged Will of Donald.

37.    Defendant David Paul Oulton ("D. Oulton") resides at 61 Crescent Street in Franklin, Massachusetts  02038.  D. Oulton is the self-employed son of Donald and Carol and was named as a devisee under both the Alleged Will of Donald and the Alleged Will of Carol. D. Oulton conspired with other Defendants in this case to, *inter alia*, unlawfully interfere with Plaintiff's relationship with the Oultons, steal assets from Donald, Carol, the Estate of Donald, and the Estate of Carol, and constructively disinherit Plaintiff from the Alleged Will of Carol and the Alleged Will of Donald.

38.    Defendant Keough + Sweeney, Ltd. ("Keough + Sweeney") is a Massachusetts and Rhode Island law firm with offices at 171 Milk Street, Suite 30, Boston, Massachusetts 02109 and 41 Mendon Avenue, Pawtucket, RI  02861.  Said firm is responsible for the illegal actions of Attorneys Sweeney-2, Sweeney-3, Attorney S. Keough, and Attorney J. Keough, and said firm was unjustly enriched at the Oultons' and Plaintiff's expense.

39.    Defendant Attorney Jerome V. Sweeney II ("Attorney Sweeney-2") is a Massachusetts attorney (BBO # 490020) practicing with the law firm of Keough + Sweeney from its Boston, Massachusetts office at 171 Milk Street, Suite 30, Boston, Massachusetts 02109.  Attorney Sweeney-2 authored the substandard Alleged Will of Donald and the Alleged Will of Carol, conspired with the Sibling Defendants and others since at least as early as December 7, 2011, unlawfully revealed the confidential contents of the instruments to his co-conspirators prior to the Oultons' deaths, exploited the very deficiencies he created in the Oultons' "estate plan" in order to steal the assets of the Oultons' estates, defrauded the Middlesex County Probate and Family Court, unjustly enriched himself and others at the Oultons' and Plaintiff's expense, and has worked assiduously, ever since, to cover up his crimes.

11

40.     Defendant Attorney Jerome V. Sweeney III ("Attorney Sweeney-3"), son of
Attorney Sweeney-2,  is a Rhode Island and Massachusetts attorney (BBO # 562119) practicing
as Partner with and the Registered Agent of the law firm of Keough + Sweeney from its
Pawtucket, Rhode Island office at 41 Mendon Avenue, Pawtucket, RI  02861.  Attorney
Sweeney-3 conspired with Attorney Sweeney-2, Attorney S. Keough, the Sibling Defendants,
and others since at least early December 7, 2011, revealed the confidential contents of the
Oultons' substandard estate plan to his co-conspirators prior to the Oultons' deaths, and
exploited the very deficiencies in the Alleged Will of Donald and the Alleged Will of Carol order
to in order to steal the assets of the Oultons' estates and unjustly enrich himself and others at the
Plaintiff's expense.

41.     Defendant Attorney Sean P. Keough ("Attorney S. Keough") is a Rhode Island
and Massachusetts attorney (BBO # 662771) practicing as an Associate with law firm of Keough
+ Sweeney from its Pawtucket, Rhode Island office at 41 Mendon Avenue, Pawtucket, RI
02861.  Attorney S. Keough conspired with Attorney Sweeney-2, Attorney Sweeney-3, the
Sibling Defendants, and others since at least December 7, 2011, in order to unlawfully coach the
Sibling Defendants on how to exploit the deficiencies in the Oultons' inferior estate plan and
unjustly enrich himself and others at Plaintiff's expense.

42.     Defendant Attorney Joseph A. Keough, Jr. ("Attorney J. Keough") is a Rhode
Island and Massachusetts attorney practicing as a Partner with the law firm of Keough +
Sweeney from its Pawtucket, Rhode Island office at 41 Mendon Avenue Pawtucket, RI  02861.
Attorney J. Keough, as Partner, has a duty to supervise Keough + Sweeney Associate Attorney
S. Keough, and he and his firm have, through the criminal enterprise at the heart of this lawsuit,
unjustly enriched themselves at the Oultons' and Plaintiff's expense.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

43.     Defendant Athena Health Care Systems MA III LLC ("Athena") has an address of
Attention:  MCR&P Service Corporation 99 High Street, 20th Floor, Boston, Massachusetts
02110.  Athena is a part-owner of Marlborough Hills, which operates at 121 Northboro Road
East, Marlborough, Massachusetts 01752 ("Marlborough Hills").  Marlborough Hills is the
dangerous nursing home in which Oultons were falsely imprisoned and abused from
November 2011 until the dates of their deaths in December 2012.  Marlborough Hills is also the
obligee on the fraudulently executed Admission Agreements that were used by the Defendants to
falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County
Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate
of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the
Oultons' and Plaintiff's expense.

44.     Defendant James Bove ("Bove") is, upon information and belief, a Director of the
Massachusetts Healthcare Facility Professional Society, Inc. with an address of 2100 Dorchester
Avenue, Dorchester, Massachusetts  02122.  Bove is a part-owner of Marlborough Hills, the
dangerous nursing home in which Oultons were falsely imprisoned and abused from
November 2011 until the dates of their deaths in December 2012.  Marlborough Hills is also the
obligee on the fraudulently executed Admission Agreements that were used by the Defendants to
falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County
Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate
of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the
Oultons' and Plaintiff's expense.

45.     Defendant Valerie Chakalos-Santilli ("Chakalos-Santilli") has an address of
Athena Health Care Systems, 135 South Road Farmington, Connecticut  06032.  Chakalos-
Santilli is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons

13

were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012. Marlborough Hills is also the obligee on the fraudulently executed Admission Agreements that were used by the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

46.     Defendant Diane Curtis ("Curtis") has an address of Athena Health Care Systems, 135 South Road Farmington, Connecticut  06032.  Curtis is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012.  Marlborough Hills is also the obligee on the fraudulently executed Admission Agreements that were used by the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

47.     Defendant Kevin Diehl ("Diehl") has an address of Athena Health Care Systems, 135 South Road Farmington, Connecticut  06032.  Diehl is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012.  Marlborough Hills is also the obligee on the fraudulently executed Admission Agreements that were used by the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

*Oulton v. Hladick, et al. -- Amended Verified Complaint and Demand for Jury Trial*

48.     Defendant Laura DosSantos ("DosSantos") has an address of High Point Hospital,
52 Oak Street, Middleborough, Massachusetts 02346. DosSantos is a part-owner of
Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and
abused from November 2011 until the dates of their deaths in December 2012. Marlborough
Hills is also the obligee on the fraudulently executed Admission Agreements that were used by
the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the
Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons
and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich
itself at both the Oultons' and Plaintiff's expense.

49.     Defendant Michael Mosier ("Mosier") is the Chief Financial Officer at Athena
Health Care Systems and has an address of 135 South Road Farmington, Connecticut 06032.
Mosier is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons
were falsely imprisoned and abused from November 2011 until the dates of their deaths in
December 2012. Marlborough Hills is also the obligee on the fraudulently executed Admission
Agreements that were used by the Defendants to falsely imprison the Oultons during their last
horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare,
steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not
entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

50.     Defendant Karen Petrucelli ("Petrucelli") has an address of Bayview Health Care,
301 Rope Ferry Road, Waterford, Connecticut 06385. Petrucelli is a part-owner of
Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and
abused from November 2011 until the dates of their deaths in December 2012. Marlborough
Hills is also the obligee on the fraudulently executed Admission Agreements that were used by
the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the

15

Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

51.     Defendant Lawrence Santilli ("Santilli") has an address of Athena Health Care Systems and has an address of 135 South Road Farmington, Connecticut 06032. Santilli is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012. Marlborough Hills is also the obligee on the fraudulently executed Admission Agreements that were used by the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

52.     Defendant Debra M. Soucey ("Soucey") has an address of Bayview Health Care, 301 Rope Ferry Road, Waterford, Connecticut 06385. Soucey is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012. Marlborough Hills is also the obligee on the fraudulently executed Admission Agreements that were used by the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol) to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and Plaintiff's expense.

53.     Defendant Thomas Walkuski ("Walkuski") has an address of 704 Mountain Road, Hartford, Connecticut 06111. Walkuski is a part-owner of Marlborough Hills, the dangerous nursing home in which Oultons were falsely imprisoned and abused from November 2011 until

the dates of their deaths in December 2012. Marlborough Hills is also the obligee on the

fraudulently executed Admission Agreements that were used by the Defendants to falsely

imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate

and Family Court, defraud Medicare, steal assets (from the Oultons and from the Estate of Carol)

to which the Defendants were not entitled, and unjustly enrich itself at both the Oultons' and

Plaintiff's expense.

54.     Defendant Colonial Health Group-Westridge, LLC ("Colonial") has an address of

35 Avco Road Haverhill, Massachusetts 01835. Colonial was the owner of Marlborough Hills

for much of time during which the Oultons were falsely imprisoned and abused in Marlborough

Hills from November 2011 until the dates of their deaths in December 2012. Marlborough Hills

is the dangerous nursing home in which Oultons were falsely imprisoned and abused from

November 2011 until the dates of their deaths in December 2012. Marlborough Hills is also the

obligee on the fraudulently executed Admission Agreements that were used by the Defendants to

falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County

Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the

Oultons' estates) to which the Defendants were not entitled, and unjustly enrich itself at both the

Oultons' and Plaintiff's expense.

55.     Defendant Michael Walsh is a Manager of Colonial with and has an address of 35

Avco Road Haverhill, Massachusetts 01835. Colonial was the owner of Marlborough Hills for

much of time during which the Oultons were falsely imprisoned and abused in Marlborough

Hills from November 2011 until the dates of their deaths in December 2012. Marlborough Hills

is the dangerous nursing home in which Oultons were falsely imprisoned and abused from

November 2011 until the dates of their deaths in December 2012. Marlborough Hills is also the

obligee on the fraudulently executed Admission Agreements that were used by the Defendants to

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County

Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the

Oultons' estates) to which the Defendants were not entitled, and unjustly enrich themselves at

both the Oultons' and Plaintiff's expense.

56.     Defendant William Mantzoukas is a Manager of Colonial with and has an address

of 35 Avco Road Haverhill, Massachusetts 01835. Colonial was the owner of Marlborough

Hills for much of time during which the Oultons were falsely imprisoned and abused in

Marlborough Hills from November 2011 until the dates of their deaths in December 2012.

Marlborough Hills is the dangerous nursing home in which Oultons were falsely imprisoned and

abused from November 2011 until the dates of their deaths in December 2012. Marlborough

Hills is also the obligee on the fraudulently executed Admission Agreements that were used by

the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the

Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons

and from the Oultons' estates) to which the Defendants were not entitled, and unjustly enrich

themselves at both the Oultons' and Plaintiff's expense.

57.     Defendant Richard Kravetz is a Manager of Colonial with and has an address of

35 Avco Road Haverhill, Massachusetts 01835. Colonial was the owner of Marlborough Hills

for much of time during which the Oultons were falsely imprisoned and abused in Marlborough

Hills from November 2011 until the dates of their deaths in December 2012. Marlborough Hills

is the dangerous nursing home in which Oultons were falsely imprisoned and abused from

November 2011 until the dates of their deaths in December 2012. Marlborough Hills is also the

obligee on the fraudulently executed Admission Agreements that were used by the Defendants to

falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County

Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the

18

Oultons' estates) to which the Defendants were not entitled, and unjustly enrich themselves at both the Oultons' and Plaintiff's expense.

58.     Defendant John Kain is a Manager of Colonial with and has an address of 35 Avco Road Haverhill, Massachusetts 01835.  Colonial was the owner of Marlborough Hills for much of time during which the Oultons were falsely imprisoned and abused in Marlborough Hills from November 2011 until the dates of their deaths in December 2012.  Marlborough Hills is the dangerous nursing home in which Oultons were falsely imprisoned and abused from November 2011 until the dates of their deaths in December 2012.  Marlborough Hills is also the obligee on the fraudulently executed Admission Agreements that were used by the Defendants to falsely imprison the Oultons during their last horrific year of life, defraud the Middlesex County Probate and Family Court, defraud Medicare, steal assets (from the Oultons and from the Oultons' estates) to which the Defendants were not entitled, and unjustly enrich themselves at both the Oultons' and Plaintiff's expense.

59.     Defendant Michael B. Lincoln ("Lincoln") resides at 12 Howard Avenue in Foxborough, Massachusetts 02035, holds Massachusetts Nursing Home Administrator License No. NH2122, is currently the Regional Director of Operations at HealthBridge Management in Concord, Massachusetts with a business address of HealthBridge Management, 9 Carr Road, Concord, Massachusetts 01742, and is the former Administrator of Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012.

60.     Defendant Gina M. Queiros ("Queiros"), residence unknown at the time of filing this lawsuit, is the former Senior Administrator of Marlborough Hills who resides, upon information and belief, in New Hampshire, holds Nursing Home Administrator License No. NH3001, is employed by Evergreen Health Group, 442 Main Street, Fremont, NH 03044,

19

and is the former Senior Administrator of Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012..

61.     Defendant Andrea B. Edwards ("Edwards"), residence unknown at the time of filing this lawsuit, holds Massachusetts Licensed Independent Clinical Social Worker License No. 114473, is a former Social Worker for Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012, and currently is employed by Golden Living Center located at 1199 John Fitch Highway in Fitchburg, Massachusetts 01420.

62.     Defendant Donna DelCid ("DelCid") resides at 26 Washburn Street in Northborough, Massachusetts 01532, is the former Director of Nursing for Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012, and holds Registered Nurse License No. RN213787 issued by The Commonwealth.

63.     Defendant Karen M. Speroni ("Speroni") resides at 19 John Robert Drive in Rutland, Massachusetts 01543, is a former nurse at Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012, and holds Licensed Practical Nurse License No. LN85797 issued by The Commonwealth.

64.     Defendant Christine A. French ("French") resides at 42 Roosevelt Street in Maynard, Massachusetts 01754, is a former nurse at Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012, and holds Licensed Practical Nurse License No. LN24343 issued by The Commonwealth.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

65.    Defendant Denise Stephenson ("Stephenson") resides at 14 Harriman Road, Hudson, Massachusetts  01749 and is a former Unit Clerk who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012.

66.    Defendant Sauda Matovu ("Matovu") resides at 15 Houghton Street, Apartment 9, Worcester, Massachusetts  01604, is a former nurse at Marlborough Hills who was employed by Marlborough Hills while Carol and Donald were falsely imprisoned and abused in the facility in 2011 and 2012, and holds Licensed Practical Nurse License No. LN70113 issued by The Commonwealth.

67.    Defendant Vinay Kumar, M.D. ("Kumar") a Massachusetts physician holding License Number 57255.  Kumar currently practices at 246 Maple Street, Marlborough, Massachusetts and was the Medical Director of Marlborough Hills during the period of time that the Oultons were falsely imprisoned and abused at the facility.

68.    Defendant Dennis R. Brown, P.C. is a Massachusetts law firm with an address of 869 Concord Street, Framingham, Massachusetts  01701.  Said firm is responsible for the illegal actions of Attorney Dennis R. Brown and Attorney Lisa A. Vecchio.

69.    Defendant Attorney Dennis R. Brown ("Attorney D.R. Brown") is a Massachusetts attorney (BBO # 059980) practicing with the law firm of Dennis R. Brown, P.C. from its Framingham, Massachusetts office at 869 Concord Street, Framingham, Massachusetts  01701. Attorney D.R. Brown was retained by Plaintiff to in March 2012 to assist in the pursuit of a Conservator for the Oultons, however Attorney D.R. Brown failed to disclose that he was impermissibly conflicted (as he already represented D. Oulton and Capt. Hladick in other matters) and failed to procure informed consent from all three impermissibly conflicted parties. Attorney D.R. Brown worked, instead, to assist the Sibling Defendants and Mirick O'Connell

21

attorneys to fraudulently induce Plaintiff to dismiss the Petitions for Conservator, thus leaving

the Oultons and Plaintiff vulnerable to the theft, fraud, and abuse at the heart of this lawsuit.

70.     Defendant Attorney Lisa A. Vecchio ("Attorney Vecchio") is a Massachusetts

attorney (BBO  670869) currently practicing with MacDougall Biomedical Communications at 888

Worcester Street, Wellesley, Massachusetts  02482.  Attorney Vecchio was employed as an

Associate at the law firm of Dennis R. Brown, P.C. and, like Attorney D.R. Brown, Attorney

Vecchio failed to disclose that she was impermissibly conflicted (as the firm already represented

D. Oulton and Capt. Hladick in other matters) and failed to procure informed consent from all

three impermissibly conflicted parties.  Attorney Vecchio worked, instead, to assist the Sibling

Defendants and Mirick O'Connell attorneys to fraudulently induce Plaintiff to dismiss the

Petitions for Conservator, thus leaving the Oultons and Plaintiff vulnerable to the theft, fraud,

and abuse at the heart of this lawsuit.

71.     Defendant Mirick O'Connell DiMallie & Lougee LLP ("Mirick O'Connell") is a

Massachusetts law firm with offices at 100 Front Street, Worcester, Massachusetts 01608 and

1800 West Park Drive, Suite 400, Westborough, Massachusetts 01581.  Said firm is responsible

for the illegal actions of Attorney Jason A. Port and Attorney Arthur P. Bergeron and said firm

conspired with other Defendants to, *inter alia*, defraud the Middlesex County Probate and

Family Court, unlawfully divert assets from the Oultons' estates to Marlborough Hills, unjustly

enrich itself and others in this case at the expense of Plaintiff, and work assiduously, ever since,

to cover up the crimes committed in this case.

72.     Defendant Attorney John O. Mirick ("Attorney Mirick") is a Massachusetts

attorney (BBO # 349240) practicing as Partner at the law firm of Mirick O'Connell.  Mirick is a

partner of Mirick O'Connell who took responsibility for this case after Plaintiff's Counsel,

Attorney Goodwin, sent a Chapter 93A Demand Letter to Attorney Paul W. Carey, a Partner who

22

is "who is authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect any interest in real property." The Secretary of The Commonwealth of Massachusetts website lists the name and address of the Firm's Registered Agent as "UNKNOWN."

73.     Defendant Attorney Jason A. Port ("Attorney Port") is a Massachusetts attorney (BBO # 672952) practicing as an Associate of the law firm of Mirick O'Connell with a business address of 100 Front Street, Worcester, Massachusetts 01608. After the Oultons were unlawfully confined to Marlborough Hills through void Admission Agreements executed by C. Hladick and Marlborough Hills, Attorney Port was retained by the Sibling Defendants to contest the Petitions for Conservator that Plaintiff filed in January 2012. Attorney Port fraudulently induced Plaintiff to dismiss the Petitions for Conservator and then aided the Sibling Defendants and others – through the use of invalid Durable Powers of Attorney that the incapacitated Oultons were forced to sign from the locked Alzheimer's Unit of Marlborough Hills in the absence of disinterested witnesses – in the theft of the Oultons' jointly-held assets. Attorney Port also, *inter alia*, conspired with the Sibling Defendants, Marlborough Hills, Keough + Sweeney, and others to defraud the Middlesex County Probate and Family Court, unlawfully divert assets from the Oultons' estates to Marlborough Hills, and unlawfully attempt to seize control of the Oultons' estates in order to cover up the theft of the Oultons' jointly-held assets and theft of Plaintiff's one-quarter interest in the Oultons' estates.

74.     Defendant Attorney Arthur P. Bergeron ("Attorney Bergeron") is a Massachusetts attorney (BBO # 038960) practicing as Of Counsel of the law firm of Mirick O'Connell with a business address of 1800 West Park Drive, Suite 400, Westborough, Massachusetts 01581. Attorney Bergeron was retained by the Sibling Defendants to contest the Petitions for Conservator that Plaintiff filed in 2012 and Attorney Bergeron aided Attorney Port, the Sibling

23

Defendants, and others – through the use of invalid Durable Powers of Attorney that the incapacitated Oultons were forced to sign from the locked Alzheimer's Unit of Marlborough Hills in the absence of disinterested witnesses – in the theft of the Oultons' jointly-held assets. Attorney Bergeron also, *inter alia*, conspired with the Sibling Defendants, Marlborough Hills, Keough + Sweeney, PBMM, Attorney Masterson, Winston Law Group, and others to defraud the Middlesex County Probate and Family Court, unlawfully divert assets from the Oultons' estates to Marlborough Hills, and unlawfully attempt to seize control of the Oultons' estates in order to cover up the theft of the Oultons' jointly-held assets and theft of Plaintiff's one-quarter interest in the Oultons' estates.

75.     Defendant The Jowdy Group, Inc. (the "Jowdy Group") is a Massachusetts corporation with and address of 24 Wellington Drive, Westwood, Massachusetts 02090.  The Jowdy Group employs and employed Defendant Alexander R. Jowdy during all times relevant to this lawsuit, conspired with the Sibling Defendants and others to fraudulently convey the Oulton Home, and unjustly enriched itself at the Oultons' and Plaintiff's expense.

76.     Defendant Alexander R. Jowdy ("Jowdy") resides at 16 Pleasant Street, Medfield, Massachusetts  02052, works at RE/MAX Distinct Advantage of 736 High Street in Westwood, Massachusetts 02090, and holds Massachusetts Real Estate Sales & Brokers Salesperson License No. 9042583.  Jowdy was retained by the Sibling Defendants and others to fraudulently convey the Oulton Home, and unjustly enriched himself at the Oultons' and Plaintiff's expense.

77.     Defendant Freedom Homes Realty (the "Freedom Homes") is a Massachusetts real estate agency with and address of 60 Harvard Street, Natick, Massachusetts  01760. Freedom Homes employs and employed Defendant Paul Piccioli during all times relevant to this lawsuit, conspired with the Sibling Defendants and others to fraudulently convey Oulton Home, and unjustly enriched itself at the Oultons' and Plaintiff's expense.

24

78.     Defendant Paul R. Piccioli ("Piccioli") resides at 60 Harvard Street Extension, Apartment #2, Natick, Massachusetts 01760, owns Freedom Homes, and holds Massachusetts Real Estate Sales & Brokers Salesperson License No. 9087762. Piccioli aided the Sibling Defendants and others to transact the fraudulent conveyance of the Oulton Home and unjustly enriched himself at the Oultons' and Plaintiff's expense.

79.     Defendant Law Office of Philip C. Brown, Esq. is a Massachusetts law firm with an address of 615 Concord Street, Framingham, Massachusetts 01702. Said firm is responsible for the illegal actions of Attorney Philip C. Brown and unjustly enriched itself at the Oultons' and Plaintiff's expense.

80.     Attorney Philip C. Brown ("Attorney P.C. Brown") is a Massachusetts attorney (BBO # 648646) practicing with the Law Office of Philip C. Brown, Esq. at 615 Concord Street, Framingham, Massachusetts 01702. Attorney P.C. Brown represented the purported purchaser of the Oulton Home in the fraudulent conveyance of the property, is the Settlement Agent listed on the fraudulent HUD-1 Settlement Statement prepared in connection with the fraudulent conveyance of the Oulton Home, was paid by the Oultons, even though he represented the purported purchaser of the Oulton Home, and unjustly enriched himself at the Oultons' and Plaintiff's expense.

81.     Defendant Cynthia Bracciale ("Bracciale") is the purported purchaser of the Oulton Home, has a mailing address of 54 MacArthur Road, Natick, Massachusetts 01760 and conspired with the Sibling Defendants, Jowdy, and others to fraudulently convey the Oulton Home in September 2012.

82.     Defendant John Everett & Sons Funeral Home ("Everett Funeral Home") is the funeral home out of which the Oultons' public wakes, funerals, and burials were held and has an address of 4 Park Street Natick, Massachusetts 01760. Everett Funeral Home conspired with the Sibling Defendants, officials from the Natick Police Department, and others to, *inter alia*,

25

unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012, and has unjustly enriched itself at the Oultons' and Plaintiff's expense.

83.     Defendant Joseph T. Everett ("Everett") is the owner and Registered Agent of Everett Funeral Home and has an address of 4 Park Street Natick, Massachusetts 01760. Everett conspired with his Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012.

84.     Defendant Dennis Cunningham ("Cunningham") is the holder of Type 6 Funeral Director & Embalmer License No. 6258 issued by The Commonwealth of Massachusetts, is employed as a Funeral Director at Everett Funeral Home, and has an address of 4 Park Street Natick, Massachusetts 01760. Cunningham conspired with his Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012.

85.     Defendant Susan Davis ("Davis") is the holder of Type 6 Funeral Director & Embalmer License No. 50567 issued by The Commonwealth of Massachusetts, is employed by Everett Funeral Home, and has an address of 4 Park Street Natick, Massachusetts 01760. Davis conspired with her Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012, and Davis unlawfully disseminated the confidential details of the Oultons' public wakes, funerals, and burials via telephone in February 2013.

86.     Defendant Maureen Reeve ("Reeve") is employed by Everett Funeral Home, and has an address of 4 Park Street Natick, Massachusetts 01760. Reeve conspired with her Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in

26

December 2012., and then Reeve unlawfully disseminated confidential details of the Oultons' public wakes, funerals, and burials via telephone in February 2013.

87.     Defendant Brian Falvey ("Falvey") is a former employee of Everett Funeral Home and holder of Type 6 Funeral Director & Embalmer License No. 7521 issued by The Commonwealth of Massachusetts.  Falvey is currently employed by Brezniak Rodman Funeral Directors with an address of 1251 Washington Street, West Newton, Massachusetts 02465. Falvey conspired with his Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012, and Falvey unlawfully disseminated confidential details of the Oultons' public wakes, funerals, and burials via telephone in February 2013.

88.     Defendant Luke Simpson ("Simpson") is employed by Everett Funeral Home and has an address of 4 Park Street Natick, Massachusetts 01760.  Simpson was a dress man for the Oultons' public wakes, funerals, and burials who conspired with his Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012.

89.     Defendant Richard Kelly ("Kelly") is a former employee of Everett Funeral Home who is currently employed by George F. Doherty & Sons Funeral Homes of 477 Washington Street, Wellesley, Massachusetts 02482.  Kelly was a dress man for the Oultons' public wakes, funerals, and burials who conspired with his Everett Funeral Home colleagues, the Sibling Defendants, officials from the Natick Police Department, and others to unlawfully bar Plaintiff from the Oultons' public wakes, funerals, and burials in December 2012.

90.     Defendant Plourde Bogue Moylan & Marino, LLP ("PBMM") is a Massachusetts and Rhode Island law firm with offices at 171 Milk Street, Suite 32, Boston, Massachusetts

27

02109 and 55 Pine Street, 5th Floor, Providence, RI 02903. Said firm is responsible for the illegal actions of Attorney Thomas Moylan and Attorney Melissa Curley and said firm has unjustly enriched itself at the Oultons' and Plaintiff's expense.

91.     Defendant Attorney Thomas J. Moylan ("Attorney Moylan") is a Massachusetts attorney (BBO # 564781) practicing with PBMM and has offices at 171 Milk Street, Suite 32, Boston, Massachusetts 02109. Attorney Moylan conspired with the Sibling Defendants, Keough + Sweeney, Mirick O'Connell, Attorney Masterson, Winston Law Group, and others in attempting to seize control of the Oultons' estates in order to cover up the theft of the Oultons' jointly-held assets and theft of Plaintiff's one-quarter interest in the Oultons' estates, and in order to unjustly enrich himself at Plaintiff's expense.

92.     Defendant Attorney Melissa L. Curley ("Attorney Curley") is a Massachusetts attorney (BBO #655826) practicing with PBMM and has offices at 55 Pine Street, 5th Floor, Providence, RI 02903. Attorney Curley conspired with the Sibling Defendants, Keough + Sweeney, Mirick O'Connell, Attorney Masterson, Winston Law Group, and others in attempting to seize control of the Oultons' estates in order to cover up the theft of the Oultons' jointly-held assets and theft of Plaintiff's one-quarter interest in the Oultons' estates, and in order to unjustly enrich himself at Plaintiff's expense.

93.     Defendant Law Office of Deborah C. Masterson is a Massachusetts law firm with offices at 675 Massachusetts Avenue Fifth Floor, Cambridge, Massachusetts 02139. Said firm is responsible for the illegal actions of Attorney Deborah Masterson.

94.     Defendant Attorney Deborah C. Masterson ("Attorney Masterson") is a Massachusetts attorney (BBO # 546340) practicing with The Law Firm of Deborah C. Masterson, with an address of 675 Massachusetts Avenue Fifth Floor, Cambridge, Massachusetts 02139. Attorney Masterson conspired with the Sibling Defendants, Marlborough Hills, Keough

28

97-a.    Defendant A.A. Dority, Inc. ("A.A. Dority") is a Massachusetts corporation

dealing in surety bonds, located at 262 Washington Street, Suite 99, Boston, Massachusetts

02108.  Although A.A. allegedly issues bonds only after receiving payment, A.A. Dority issued

Bond # 1000962445 to Attorney Couture on July 19, 2013, so that Attorney Couture would

"qualify," pursuant to G.L. c. 190B § 3-601, for his fraudulent appointment as fiduciary of the

Estate of Carol.  A.A. Dority conspired with Attorney Couture in issuing the Bond without

payment and the initial premium for Attorney Couture's "qualifying" bond was made by

Attorney Couture (as Special Personal Representative), 55 days after issuance of the Bond, using

funds paid from the Estate of Carol without leave of court, in violation of G.L. c. 190B § 3-715.

Notably, the Bond was issued on an annually renewable and, the premium continues to be billed

to the Estate of Carol indefinitely.

97-b.    Defendant Jeffrey W. Crawford ("Crawford") is an employee of A.A. Dority who

works in the A.A. Dority office at 262 Washington Street, Boston, Massachusetts  02108.

Crawford is the A.A. Dority employee who issued the Bond that Attorney Couture was required

to present to the Middlesex County Probate and Family Court prior to his fraudulent appointment

as Special Personal Representative of the Estate of Carol on July 25, 2013, in order to "qualify"

for his fraudulent appointment as fiduciary.  Crawford did not seek payment from Attorney

Couture prior to issuing this bond but waited until after Attorney Couture fraudulently seized

control of the Estate of Carol to institute the automatic deduction of the annually recurring

premium payments from the Estate of Carol's bank account.  Notably, Crawford is also the A.A.

Dority employee with whom Attorney Couture discussed "bond discrepancy" on January 31,

2014.

+ Sweeney, Mirick O'Connell, Winston Law Group, and others in attempting to unlawfully seize control of the Oultons' estates in order to cover up the theft of the Oultons' jointly-held assets and theft of Plaintiff's one-quarter interest in the Oultons' estates, and in order to unlawfully divert the assets of the Oultons' estates to Marlborough Hills.

95.     Defendant Winston Law Group, LLC ("Winston Law") is a Massachusetts law firm with offices at 440 Broadway, Somerville, Massachusetts 02145. Said firm is responsible for the illegal actions of Attorney Neal Winston and Attorney Michael Couture and said firm has unjustly enriched itself at Plaintiff's expense.

96.     Defendant Attorney Neal Winston is a Massachusetts attorney (BBO # 531000), the Registered Agent of Winston Law with offices at 440 Broadway, Somerville, Massachusetts 02145, and the Winston Law Partner supervising Winston Law Associate Attorney Michael Couture. Attorney Winston, as supervising partner, is responsible for the illegal actions of Attorney Michael Couture and has unjustly enriched himself at Plaintiff's expense.

97.     Defendant Attorney Michael Couture is a Massachusetts attorney (BBO # 674046) practicing as an Associate at Winston Law with offices at 440 Broadway, Somerville, Massachusetts 02145. Attorney Couture conspired with the Sibling Defendants, Marlborough Hills, Keough + Sweeney, PBMM, Attorney Masterson, Mirick O'Connell, and others in attempting to unlawfully seize control of the Oultons' estates in order to conceal the theft of the Oultons' jointly-held assets and theft of Plaintiff's one-quarter interest in the Oultons' estates, and in order to unlawfully divert the assets of the Oultons' estates to Marlborough Hills and his co-defendants. Attorney Couture has, through his illegal acts, unjustly enriched himself at Plaintiff's expense.

## IV.   FACTS

98.      Carol and Donald Oulton ("Carol," and "Donald," together, "the Oultons") had
four children: David Oulton ("D. Oulton"), Nancy Williams ("N. Williams"), Sarah Oulton
("Plaintiff"), and Carol Hladick ("C. Hladick") (together the "Oulton Children").

99.      Donald, a graduate of Boston University and Suffolk University School of Law,
was a veteran of the Korean War, having served in the United States Army as an intelligence and
reconnaissance scout with the Seventh Infantry Division in the Chorwon Valley.

100.     Carol, a graduate of Tufts University and a talented pianist and church organist,
was devoted to Donald and her children and, like Donald, wanted only the best for them.

101.     Donald and Carol worked, for years, at Hanscom Air Force Base in Bedford,
Massachusetts.  Carol was employed in the Electronic Systems Center and Donald worked as an
attorney in the United States Air Force Judge Advocate General's office.

102.     Completely vulnerable and at the mercy of the Defendants for the last year of
their lives, however, the Oultons were tragically defenseless.

103.     The Oultons loved their daughter, Plaintiff.  Plaintiff and her parents enjoyed a
close and mutually supportive relationship.  Together they shared frequent lunches out, played
cards, visited often at the Oulton Home, and looked forward to Plaintiff's graduation from law
school in 2012.  The Oultons were thrilled because Donald had become a late-life attorney in
1970 and Plaintiff, at age 46, followed in Donald's footsteps in 2009.

104.     The Oultons not only socialized frequently with Plaintiff but also depended on
Plaintiff for their care (e.g., for rides to medical appointments, help with housework, grocery
shopping, help organizing and paying bills, etc.).  Up until the Oultons' physical decline,
Plaintiff and her siblings maintained a close relationship, getting together often for family events
and holidays.

30

105.     The Oultons were supportive and very generous to all of their children.  In fact, so accustomed were the Oultons to financially assisting their children that three of the Oulton Children's personal checking account numbers were listed on the front page of the Oultons' checkbook (the "Oultons' Checkbook") (**Exhibit 1**).  Carol Oulton kept the account numbers of three of her four children – Plaintiff, D. Oulton, and C. Hladick – on the front page of the Oultons' Checkbook so that Carol and Donald could deposit money in these accounts whenever the Oultons wished to help those three of the four Oulton Children.  Notably, sibling N. Williams's name was not listed.

106.     It is noteworthy that over the years the Oultons were generous to their children.  A sampling of checks freely written by Carol and/or Donald to the Oulton Children between 2001 and 2011 is found in **Exhibit 2**.  The following amounts of money were given to the Oulton Children:

| | | |
|---|---|---|
| David Oulton | January 2007 through November 2011 | $47,235.00; |
| Carol Hladick | January 2001 through August 2011 | $38,398.19; |
| Sarah Oulton | November 2001 through July 2011 | $22,398.34; |
| Nancy Williams | April 2007 through August 2008 | $4,300.00 |

107.     On August 12, 1994, after a serious discussion about Plaintiff switching her career plans from veterinary medicine to law, Donald sent a letter to Plaintiff (on behalf of himself and Carol) (**Exhibit 3**) in which he wrote:



8/12/94

Dear Sarah,

31

I'm sorry if I was short with you on the phone.
It's just that I'm frustrated for you. We love you so!
There isn't anything we would prefer doing than you as the
astounding successful person we know you can be.

If you don't mind here a few suggestions.
1. As Red Auerbach once said, it isn't how much money
you make that's important, it's how much you spend. On
that theory it's important to save a little from each
paycheck and you'll be surprised how your money
worth will increase. The time value of money (i.e.
earning interest in a subtle way to save.)

2. With your analytical mind you are not limited to the
field of animal medicine. As we discussed, become active
in business & utilize such things as your computer skills
for quick interest.

3. Consider work in a legal firm, if not a drive to be
a paralegal. (Ultimately, I couldn't be happier - if as you
said, you follow in my footsteps and become a lawyer.
(I was 40 years old when I was sworn in. + know others
over 50.) Set reasonable, achievable short term goals
(including saving money) and you'll get there.

4. If you meet some nice guy along the way don't hesitate to
get married. With good planning and mutual understanding
you can do both.

*5. Finally, always remember Mom and Dad behind all
your efforts. There is nothing we wish more than to
see you successful. We are behind you always, ---
we love you so!*

*With Love,*
*Dad & Mom*

*P.S. Call us collect whenever you wish (to cut down
on your expenses)*

108.    In 2000 and/or 2001 (indeterminable because dates and initials on documents appear to have been altered), Attorney Jerome V. Sweeney II of Keough + Sweeney Ltd. ("Attorney Sweeney-2") prepared an "estate plan" for the Oultons, which failed to protect the Oultons' financial interests adequately and resulted in a frustration of the Oultons' expressed intent. The "estate plan" created by Attorney Sweeney-2 contained no estate planning documents at all, other than the Last Will and Testament of Donald Paul Oulton (the "Alleged Will of Donald") and the Last Will and Testament of Carol Jane Oulton (the "Alleged Will of Carol").

109.    Notably absent from the estate plan created by Attorney Sweeney-2 were protective documents typically found in a well-crafted estate plan. Specifically, Attorney Sweeney-2 failed to prepare an Estate Inventory, Durable Powers of Attorney for each of the Oultons, Health Care Proxy documents, Health Care Directives, Living Wills and HIPAA Releases.

110.    The failure of Attorney Sweeney-2 to prepare a well-crafted, protective estate plan forms the foundation of all issues brought forth in this Amended Complaint. Attorney Sweeney-2, through his negligence or malpractice, is responsible for the deficient estate plan that left:

a) the Oultons vulnerable to physical, mental, and financial abuse;

b) the Oultons' jointly-held assets vulnerable to conversion; and

c) the Estate of Donald Paul Oulton and the Estate of Carol Jane Oulton vulnerable to conversion, embezzlement, fraud, and unnecessarily time-consuming and expensive litigation.

111.    Not only did Attorney Sweeney-2 create the Oultons' woefully substandard estate plan, but, after leaving the Oultons in the most vulnerable of conditions with their shoddy Wills, he willfully and knowingly exploited the Oultons' vulnerability and orchestrated the criminal enterprise underlying this lawsuit.

112.    The Alleged Will of Donald was allegedly executed on June 28, 2000 (**Exhibit 4**).

113.    It is quite noteworthy that the dates and initials shown on all Will-related documents prepared for Donald by Attorney Sweeney-2 and later introduced as evidence in the Middlesex County Probate and Family Court (Docket No. MI13P2282EA) appear to have been altered.

EIGHTH:  For all purposes of this WILL, I have hereunto signed my name to this, my LAST WILL AND TESTAMENT consisting of two (2) typewritten pages, and have also signed my name in the margin of all other pages, at Bedford, Massachusetts this _28_ day of _June_   2000.

_Donald P. Oulton_
DONALD PAUL OULTON

114.    The Alleged Will of Donald was witnessed by Edward L. Fiztmaurice, Jr. of Milton, Massachusetts, John K. Harms of Fitchburg, Massachusetts, and Cynthia A. Keefe of Lowell, Massachusetts.

DONALD PAUL OULTON declared to us, the undersigned, that the foregoing instrument was his LAST WILL AND TESTAMENT and requested us to act as witnesses to it. He thereupon signed this WILL in out presence. We declare that we believe DONALD PAUL OULTON to be of sound mind and under no constraint or undue influence. We now at his request in his presence, and in the presence of each other, sign our names as witnesses.

*Edward L. Fitzmaurice, Jr* OF _Milton, MA_

*Edward L. Fitzmaurice, Jr* SSAN _____
PRINT

*John R. Harms* OF _Fitchburg, MA_

*John R. Harms* SSAN _____
PRINT

*Cynthia A. Keefe* OF _Lowell, Mass._

CYNTHIA A. KEEFE SSAN _____
PRINT

115.    The Alleged Will of Donald was notarized by Elizabeth A. Maslbas, whose commission expired on November 19, 2004, however Ms. Maslbas failed to apply a Notary Seal to the documents, either ink or embossed.

Subscribed and sworn to before me by the said testater/testatrix and witnesses, this _28th_ day of _June~~same~~_ 2000

*Elizabeth A. Maslbas*
NOTARY PUBLIC

SEAL

My Commission Expires:    _19 November 2004_

116.    Both the alleged month ("June") and the alleged year ("2000") on which the Notary Public allegedly signed the Alleged Will of Donald have been altered. The <u>month</u>

35

("June") has been altered in handwriting.  Moreover, the <u>last two digits</u> listed in the year ("00")

were hand-written, but the <u>first two digits</u> listed in the year ("20") were typed.

117.   The FIRST paragraph of the Alleged Will of Donald gives and bequeaths:

> . . . all of my personal property to my spouse, Carol Jane Oulton, if
> my spouse survives me.  **If my spouse predeceases me, I give and
> bequeath all my personal property to my children who survive
> me in equal shares as they shall agree, but if they cannot agree,
> then as the Executor shall decide, and his decision shall be
> final**.
> [emphasis added]

118.   The FIRST paragraph of the Alleged Will of Donald further states:

> [r]eferences in this Will to my children include: my son David Paul
> Oulton, and my three daughters Nancy (Oulton) Gambone, Sarah
> Ann Oulton, and Carol (Oulton) Hladick, and other lawful children
> born to or adopted by me subsequent to the execution of this Will.

119.   The SECOND paragraph of the Alleged Will of Donald states:

> I give, devise, and bequeath all the rest, residue and remainder of
> my property, tangible or intangible, personal or real, owned by me
> at my death and which is not otherwise disposed of by the
> provisions of this Will, to my spouse, if my spouse survives me.  **If
> my spouse predeceases me, I then give, devise and bequeath all
> the rest, residue and remainder of my estate in equal shares to
> my children who survive me**.
> [emphasis added]

120.   The FOURTH paragraph of the Alleged Will of Donald appointed Donald's

spouse, Carol, as Executor.  It further named Attorney John Mahaney of Natick, Massachusetts

to serve as successor Executor in place of Carol if Carol should predecease Donald or fail to act

for any reason.

121.   The FOURTH paragraph of the Alleged Will of Donald also named **Attorney

Alan Lehman** (of Peabody, Massachusetts) to serve as second successor Executor if Carol and

Attorney John Mahaney should predecease Donald, fail to qualify, or refuse or cease to act as

36

Donald's Executor.  Attorney Alan Lehman was intentionally bypassed by the Defendants (the

Sibling Defendants, Marlborough Hills, Mirick O'Connell Attorneys Port and Bergeron,

Attorney Sweeney-2, PBMM Attorneys Moylan and Curley, Attorney Masterson, and Attorney

Couture) and therefore, never assumed his role of Executor of the Estate of Donald.

122.   The SEVENTH paragraph of the Alleged Will of Donald contains a 30-day

survivorship clause (the "30-Day Survivorship Clause of the Alleged Will of Donald") that

states:

> **[N]o beneficiary, devisee or legatee shall take under my Will**
> **unless such beneficiary, devisee or legatee shall survive me by**
> **thirty (30) days not including the day of my death.**
> [emphasis added]

123.   **Attorney Alan Lehman** is the named Executor of the Estate of Donald but the

Alleged Will of Donald was concealed and Attorney Lehman was intentionally bypassed by the

Defendants, in violation of G. L. c. 190B § 2-516[1].  In both sworn statements and testimony

(discussed below) the Defendants (the Sibling Defendants, Marlborough Hills, Mirick O'Connell

Attorneys Port and Bergeron, Attorney Sweeney-2, PBMM Attorneys Moylan and Curley,

Attorney Masterson, and Attorney Couture) have repeatedly defrauded the Middlesex Probate

and Family Court, claiming that Attorney Sweeney-2 (the author of the Alleged Will of Donald)

is the Executor/Personal Representative ("PR") named in the Alleged Will of Donald.

124.   Moreover, after bypassing Donald's named Executor, Attorney Alan Lehman,

Mirick O'Connell attorneys and others have unlawfully intermeddled in the Oultons' estates, as

---

[1] **M.G.L. c.190B § 2-516:  Duty of Custodian of Will; Liability**.  After the death of a testator a person having
custody of the will of the testator shall deliver it within thirty days after notice of the death to a person able to secure
its probate and if none is known, to an appropriate court.  A person who willfully fails to deliver a will is liable to
any person aggrieved for any damages that may be sustained by the failure.  A person who willfully refuses or fails
to deliver a will after being ordered by the court in a proceeding brought for the purpose of compelling delivery is
subject to penalty for contempt of court.  [emphasis added]

37

executors de son tort, and misappropriated thousands of dollars from both the Estate of Donald
and the Estate of Carol.

125.    In 2000 or 2001 (indeterminable due to the altered dates described above),

Attorney Sweeney-2 prepared the Alleged Will of Carol, allegedly executed on April 19, 2001

(Exhibit 5).

126.    It is quite noteworthy that the dates and initials shown on all Will-related

documents prepared for Carol by Attorney Sweeney-2 and later introduced as evidence in the

Middlesex County Probate and Family Court (Docket No. MI13P1828EA) appear to have been

altered.

> NINTH: For all purposes of this WILL, I have hereunto signed my name to this, my
> LAST WILL AND TESTAMENT consisting of two (2) typewritten pages, and have also
> signed my name in the margin of all other pages, at Bedford, Massachusetts this
> _19th_ day of _April_ 2000.
>
>                                            CAROL JANE OULTON

127.    The Alleged Will of Carol was witnessed by Alan F. Lehman of Peabody,

Massachusetts, Cynthia A. Keefe of Lowell, Massachusetts, and Edward L. Fiztmaurice, Jr. of

Milton, Massachusetts.

> CAROL JANE OULTON declared to us, the undersigned, that the foregoing instrument
> was her LAST WILL AND TESTAMENT and requested us to act as witnesses to it. She
> thereupon signed this WILL in out presence. We declare that we believe CAROL JANE
> OULTON to be of sound mind and under no constraint or undue influence. We now at
> his request in his presence, and in the presence of each other, sign our names as
> witnesses.
>
>                                            of Peabody, MA
>
> _ALAN F. LEHMAN_    SSAN _____
>     PRINT

38

*Cynthia A. Keefe* OF *Lowell, Mass.*

CYNTHIA A. KEEFE SSAN _____
PRINT

*Edward L. Fitzmaurice Jr* OF *Milton, MA*

Edward L. Fitzmaurice, Jr. SSAN _____
PRINT

128.     The Alleged Will of Carol was notarized by Elizabeth A. Maslbas, whose

commission expired on November 19, 2004, however Ms. Maslbas failed to apply a Notary Seal

to the documents, either ink or embossed.

Subscribed and sworn to before me by the said testater/testatrix and witnesses, this
*19th* day of *April*     2001    *Elizabeth A. Maslbas*

                                                    NOTARY PUBLIC

                                                                    SEAL

My Commission Expires:     *19 November 2004*

129.     Notably, the alleged year ("2001") on which the Notary Public allegedly signed

the Alleged Will of Carol has been altered.  The last two digits listed in the year ("01") were

hand-written, however the first two digits listed in the year ("20") were typed.

130.     The dates and initials shown on all Will-related documents prepared for Carol by

Attorney Sweeney-2 and later introduced as evidence in the Middlesex County Probate and

Family Court (Docket No. MI13P1828EA) appear to have been altered.

131.     The FIRST paragraph of the Alleged Will of Carol gives and bequeaths:

> . . . all of my personal property to my spouse, Donald Paul Oulton,
> if my spouse survives me.  **If my spouse predeceases me, I give
> and bequeath all my personal property to my children who
> survive me in equal shares as they shall agree, but if they
> cannot agree, then as the Executor shall decide, and his**

39

**decision shall be final**.
[emphasis added]

132.    The FIRST paragraph of the Alleged Will of Carol further states:

[r]eferences in this Will to my children include: my son David Paul
Oulton, and my three daughters Nancy (Oulton) Gambone, Sarah
Ann Oulton, and Carol (Oulton) Hladick, and other lawful children
born to or adopted by me subsequent to the execution of this Will.

133.    The SECOND paragraph of the Alleged Will of Carol states:

I give, devise, and bequeath all the rest, residue and remainder of
my property, tangible or intangible, personal or real, owned by me
at my death and which is not otherwise disposed of by the
provisions of this Will, to my spouse, if my spouse survives me. **If
my spouse predeceases me, I then give, devise and bequeath all
the rest, residue and remainder of my estate in equal shares to
my children who survive me**.
[emphasis added]

134.    The FOURTH paragraph of the Alleged Will of Carol appointed Carol's spouse,

Donald, as Executor.  It further named Attorney John Mahaney of Natick, Massachusetts to serve

as successor Executor in place of Donald if Donald should predecease Carol or fail to qualify,

refuse, or cease to act for any reason.

135.    The FOURTH paragraph of the Alleged Will of Carol named **Attorney Gerard

Mahaney** of Natick, Massachusetts to serve as second successor Executor if Donald and

Attorney John Mahaney should predecease Carol, fail to qualify, or refuse or cease to act as

Carol's Executor.  Attorney Gerard Mahaney was intentionally bypassed by the Defendants and

therefore never assumed his role of Executor of the Estate of Carol.

136.    The EIGHTH paragraph of the Alleged Will of Carol contains a 30-day

survivorship clause (the "30-Day Survivorship Clause of the Alleged Will of Carol") which

states:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

**[N]o beneficiary, devisee or legatee shall take under my Will**
**unless such beneficiary, devisee or legatee shall survive me by**
**thirty (30) days not including the day of my death.**
[emphasis added].

137.     **Attorney Gerard Mahaney** is the named Executor of the Estate of Carol but the

Alleged Will of Carol was concealed and Attorney Mahaney was intentionally bypassed by the

Defendants, in violation of G. L. c. 190B § 2-516.  In both sworn testimony and in written

documents signed under the penalties of perjury (discussed below) the Defendants (the Sibling

Defendants, Marlborough Hills, Mirick O'Connell Attorneys Port and Bergeron, Attorney

Sweeney-2, PBMM Attorneys Moylan and Curley, Attorney Masterson, and Attorney Couture)

have repeatedly defrauded the Middlesex Probate and Family Court, claiming that Attorney

Sweeney-2 (the author of the Alleged Will of Carol) is the Executor named in the Alleged Will

of Carol.

138.     In December 2001 Plaintiff rented an apartment in Framingham, Massachusetts

and remained in that residence through July 2009.  During this time Plaintiff lived only 6.3 miles

from the Oultons.

139.     In July 2009 Plaintiff moved to Agawam, Massachusetts to attend law school.

During this time Plaintiff lived 81.1 miles away from the Oultons.  Regardless of whether

Plaintiff was the Oulton Child living in closest or farthest proximity to the Oultons, Plaintiff was

very involved in the Oultons' daily lives and became their primary caretaker for the last few

years of their life at home.

140.     Plaintiff enjoyed good relations with all members of the Oulton family after

moving to Framingham in December 2001.  For example:

          a)     Plaintiff, Donald, and Carol enjoyed multiple visits each week and lunches

     at various restaurants in the MetroWest area or Boston each weekend;

41

      b)      several times each year, Plaintiff drove the Oultons to the home of

C. Hladick and Capt. Hladick, N. Williams, and D. Oulton for holidays that the family

celebrated together, including Christmas, Easter, and Thanksgiving;

      c)      in April 2002, C. Hladick and Capt. Hladick invited Plaintiff to their

daughter's dance recital (Exhibit 6);

      d)      for Christmas 2002, Plaintiff promised to purchase a Dell computer for

D. Oulton and completed the transaction, for $320.23, on December 28, 2002

(Exhibit 7);

      e)      in 2008 Plaintiff gave D. Oulton a new kitten after D. Oulton's elderly cat

died, and

      f)      on July 4, 2009, Plaintiff drove Carol and Donald to N. Williams's

wedding, which was also attended by the Hladicks and D. Oulton, and Plaintiff

photographed and videotaped portions of Defendant N. Williams's wedding for

N. Williams.

141.     In the Spring of 2004, Donald invited Plaintiff to attend a luncheon at the Union

Oyster House with Defendant Attorney Sweeney-2. Donald and Attorney Sweeney-2 had been

law school classmates in the Suffolk University School of Law Class of 1969, and Plaintiff and

Attorney Sweeney-2 had known each other since the late 1960s, when Plaintiff was a child.

142.     During the luncheon, Plaintiff and Attorney Sweeney-2 discussed Plaintiff's

hopes and plans to attend law school. Attorney Sweeney-2 told Plaintiff that he would help if

Plaintiff needed any assistance in preparing to apply to law school.

143.     In early 2005 Plaintiff contacted Attorney Sweeney-2 for legal help in

rehabilitating an outstanding student loan and filing outstanding tax returns. Attorney

Sweeney-2 instructed Plaintiff to meet with him at his office (Keough + Sweeney, Ltd., 171 Milk Street, Suite 30, Boston, Massachusetts 02109).

144.    Attorney Sweeney-2 verbally agreed to represent Plaintiff in both Plaintiff's tax and outstanding student loan matters.  Attorney Sweeney-2 did not execute an Engagement Letter or a Fee Agreement with Plaintiff.  Instead, Attorney Sweeney-2 asked Plaintiff to assist Attorney Sweeney-2 with some technological issues that Attorney Sweeney-2 and his wife were having with their cellular telephones' "Contacts" files.

145.    In order to resolve Attorney Sweeney-2's "Contacts" issues, Plaintiff met several times with Attorney Sweeney-2 at his office, which is located across the hall from the Boston office of Plourde Bogue Moylan & Marino LLP ("PBMM").

146.    In March 2005 Plaintiff met Defendant Attorney Thomas Moylan ("Attorney Moylan") for the first time in the PBMM office during one of her visits to see Attorney Sweeney-2.  The attorneys from both firms – PBMM and Keough + Sweeney – were on very friendly terms and had an "open door policy" under which they interacted freely while sharing the second floor of 171 Milk Street in Boston, Massachusetts.

147.    At Attorney Sweeney-2's office, Attorney Sweeney-2 gave Plaintiff his Rolodex containing all contact information Attorney Sweeney-2 wanted Plaintiff to include on both his and his wife's cellular telephones and in the Sweeneys' home computer.  Over the course of approximately two weeks (including a Sunday spent at Attorney Sweeney-2's home in Wakefield, Massachusetts), Plaintiff painstakingly entered the "Contacts" data into both telephones for Attorney Sweeney-2 and his wife, and into the "Contacts Listing" on Attorney Sweeney-2's home computer.

43

148.    Attorney Sweeney-2 filed Powers of Attorney with the Massachusetts Department of Revenue ("MDOR") and the Internal Revenue Service ("IRS") which granted Attorney Sweeney-2 the authority to communicate with the MDOR and IRS on behalf of Plaintiff.

149.    Attorney Sweeney-2 filed several outstanding tax returns in his capacity as attorney for Plaintiff, including a return for Tax Year 2004, which listed Attorney Sweeney-2 (and his Social Security Number) in the sections listing "Paid Preparer's Name" and "Preparer's SSN" (Exhibit 8).

150.    Subsequent to the cessation of Attorney Sweeney-2's legal representation of Plaintiff, Attorney Sweeney-2 owed Plaintiff the duties owed to former clients set forth in the Rule 1.9 of the Massachusetts Rules of Professional Conduct.

151.    In May 2006, a fire broke out under the kitchen sink of the Oulton Home.  As a result of smoke inhalation, the Oultons were transported via ambulance to Leonard Morse Hospital in Natick, Massachusetts ("LMH").  All four Oulton Children cooperatively worked together to help the Oultons recover from this very difficult event.

152.    In the summer of 2007, the effects of the Oultons' chronic alcoholism took a tremendous toll on their health and marriage.  Donald engaged in a particularly bad drinking binge, which ended in an admission to LMH for detoxification.  At the time, Carol was also hospitalized in LMH.  Carol demanded that Donald leave the Oulton Home when he was discharged from LMH.  Carol also demanded a separation from Donald.

153.    Donald was discharged from the detoxification unit of LMH within approximately one week of his admission.  Because Carol demanded a separation, Donald was transported from LMH to The Hampton Inn in Natick by Donald's brother, Andrew Oulton.  None of the Sibling Defendants would allow Donald to reside with them post-hospital discharge, so Donald checked into the hotel with a suitcase.

154. Plaintiff visited Donald on his first night in the hotel, and Plaintiff noticed that Donald had a fresh supply of Smirnoff's Vodka (which had been delivered from a local package store). Plaintiff realized that Donald would likely drink himself to death in the hotel, so Plaintiff asked Donald to stay with her in Framingham while the Oultons worked out their marital and alcohol-related issues.

155. Donald agreed it would be best to live with Plaintiff during the separation because Donald and Plaintiff were close and also because Donald had no other options at the time.

156. The following morning Capt. Hladick and Plaintiff met at The Hampton Inn to move Donald into Plaintiff's apartment in Framingham.

157. Plaintiff communicated often with Carol during this difficult transition in order to set up Donald's medicine list and arrange for Donald's visiting nurses to visit Donald at Plaintiff's apartment. Plaintiff also coordinated with her Framingham neighbors and friends to keep Donald company during the day while Plaintiff worked at her job in a Boston law firm.

158. Donald lived with Plaintiff in her Framingham apartment for approximately two months. Plaintiff does not drink or take drugs, and she did not allow Donald to have any alcohol in the apartment. Donald, who was eager to repair his fractured relationship with Carol and return to the Oulton Home, complied with Plaintiff's "NO ALCOHOL" rule, and Donald maintained his sobriety while residing at Plaintiff's residence.

159. Plaintiff provided a key to Donald's Visiting Nurses and Physical Therapists so that they could continue treating Donald. Plaintiff cooked, shopped for Donald, did Donald's laundry, and made numerous trips to see Carol. Plaintiff's siblings often contacted Donald (via telephone and in person).

160. On August 16, 2007, a process server visited Donald at Plaintiff's apartment and served a Complaint for Divorce filed by Carol (Exhibit 9).

45

161.   Plaintiff was stunned to learn that the Oulton divorce case filed by Carol against Donald was prepared by <u>Donald's own attorneys</u>, i.e., by the lawyers of the law firm of <u>Keough + Sweeney</u>, who ultimately billed Donald for their representation of Carol. The documents for Carol's Complaint for Divorce were prepared by Attorney Sweeney-3.

The Commonwealth of Massachusetts
The Trial Court

| MIDDLESEX | Division | Probate and Family Court Department | Docket No. |

Complaint For Divorce

CAROL OULTON _____, Plaintiff

v.

DONALD OULTON _____, Defendant

162.   Attorney Sweeney-3 did not list the Oultons' correct marriage date on his Complaint for Divorce. The Oultons were married on April 12, 1958.

1.   Plaintiff, who resides at   54 MacArthur Road   Natick   Middlesex   MA   01760
     (Street and No.)   (City or Town)   (County)   (State)   (Zip)
     was lawfully married to the defendant who now resides at   54 MacArthur Road
     (Street and No.)
     Natick   Middlesex   MA   01760
     (City or Town)   (County)   (State)   Zip)

2.   The parties were married at   Brookline, MA   on   April 8, 1958
     and last lived together at   Natick   on   August 8, 2007

3.   The minor child _____ of this marriage, and date(s) of birth is/are:
     N/A

4.   Plaintiff certifies that no previous action for divorce, annulling or affirming marriage, separate support, desertion
     living apart for justifiable cause, or custody of child _____ has been brought by either party against the other except.
     N/A

5.   On or about   August 8, _____ , 20   07 , the defendant   And plaintiff suffered an
     Irretrievable breakdown of their marriage pursuant to M.G.L. c.208, §1B.

6.   Wherefore, plaintiff requests that the Court:
     X   grant a divorce for   M.G.L. c. 208, §1B
     ☐   prohibit defendant from imposing any restraint on plaintiff's liberty.
     ☐   grant him/her custody of the above-named child _____
     ☐   order a suitable amount for support of the plaintiff and said minor child
     ☐   order conveyance of the real estate located at _____

46

standing in the name of _____
as recorded with. _____

Registry of Deeds, Book _____   Page _____

☐ allow plaintiff to resume her former name of

X   Equitably divide the net marital estate pursuant to M.G.L. c. 208, §34.

Date   August 9, 2007

Signature of Attorney or Plaintiff, if pro se

Print name and address   Jerome V. Sweeney, III

100 Armistice Boulevard, Pawtucket, RI 02860

Tel. No.   401   724-3600   B.B.O.#   562119

163.    Despite Keough + Sweeney's impermissible conflict of interest (a breach of

Rule 1.7 of the Massachusetts Rules of Professional Conduct), Keough + Sweeney filed for

divorce on behalf of Carol and, in a manner consistent with the illegal billing practices on

display in the instant case, they billed <u>Donald</u> for Keough + Sweeney's representation of <u>Carol</u> in

the divorce proceedings (in violation of Rule 1.5 of the Massachusetts Rules of Professional

Conduct).

164.    Attorney Sweeney-3's Motion for Temporary Orders states that the Oultons had

three sources of income (two retirement accounts and Social Security).

## COMMONWEALTH OF MASSACHUSETTS
### The Trial Court
### Probate and Family Court Department

Middlesex Division                                    Docket No. 07D2739DV1

CAROL OULTON                          :
                                      :
VS.                                   :
                                      :
DONALD OULTON                         :


### MOTION FOR TEMPORARY ORDERS


Now comes Carol Oulton in the above-entitled matter and moves this Honorable Court
enter Temporary Orders in the above-entitled matter. As reasons therefore, and more particularly,
Carol Oulton requests the following:


1)    That plaintiff be awarded exclusive use and control of the former marital home
located at 54 MacArthur Road, Natick, Massachusetts;

47

2)       That the parties have three sources of income (two retirement accounts and social security) and that those three sources remain untouched and that the direct deposit of these monies into the Middlesex Savings Bank account (joint) remain in full force and effect and that neither plaintiff nor defendant disturb this direct deposit of these amounts so that the normal and necessary marital expenses can be paid by plaintiff;   -

3)       That defendant be afforded the ability to take a fair and reasonable amount of money from the aforesaid joint account each and every week so as to meet his normal and necessary expenses;

4)       That each party be solely responsible for their own credit card debt;

5)       That the parties file joint Federal and State income tax returns for calendar year 2007 and divide evenly any refunds or deficits (Federal and State).

WHEREFORE, plaintiff, pursuant to Chapter 208, §34B, requests that this Honorable Court grant to her certain Temporary Orders and for any other further relief this Honorable Court deems meet and just.

Plaintiff,
By her Attorney,

Jerome V. Sweeney, III   #562119
KEOUGH & SWEENY, LTD.
100 Armistice Boulevard
Pawtucket, RI   02860
(401) 724-3600

## CERTIFICATE OF SERVICE

I, JEROME V. SWEENEY, III, attorney for the plaintiff, in the above-captioned matter, hereby certify that I served the within Motion for Temporary Orders on the defendant via a Constable; together with notice that said motion has been marked for hearing in the Middlesex Probate Court sitting at 121 Third Street, Courtroom 4, Cambridge, Massachusetts on September 17, 2007 at 8:30 a.m.

48

Signed under the pains and penalties of perjury this ⟨⟨⟨⟨day of August, 2007.

Jerome V. Sweeney, III  #56219
KEOUGH & SWEENEY
100 Armistice Boulevard
Pawtucket, RI  02860
(401) 724-3600

165.    On August 22, 2007, at Donald's request, Plaintiff emailed to N. Williams the entire Complaint for Divorce packet that Attorney Sweeney-3 had served on Donald at Plaintiff's apartment on August 16, 2007 (**Exhibit 10**).

166.    After residing with Plaintiff for approximately two months, Donald moved from Plaintiff's home to N. Williams's home in Winchendon, Massachusetts.

167.    However, Donald's health declined precipitously and he was hospitalized several times after moving to N. Williams's home.

168.    By the fall of 2007, the Oultons had resolved their differences and they declined to pursue the Complaint for Divorce.  Donald moved back into the Oulton Home and the Oultons resumed their daily routine of consuming large quantities of vodka.  The Oultons remained in their residence (with intermittent periods of hospitalization) until the end of November and early December 2011.

169.    On April 17, 2008, upon information and belief, C. Hladick accompanied the Oultons to a medical procedure performed at Newton-Wellesley Hospital ("Newton-Wellesley") in Wellesley, Massachusetts.  There, the Oultons executed Newton-Wellesley's standard, boilerplate "Massachusetts Health Care Proxy" documents appointing C. Hladick as Health Care Agent for Donald (**Exhibit 11**) and Carol (**Exhibit 12**).

49

170.   By 2008, Plaintiff had become the Oultons' primary helper around the house, regularly doing chores and running errands for the Oultons as needed.  Given Plaintiff's close proximity to the Oulton Home, and given that the Oultons were very supportive of Plaintiff's desire to attend law school, the frequent visits between Plaintiff and the Oultons at the Oulton Home and elsewhere were enjoyed by all three.

171.   The Oultons' alcoholism affected the entire family for decades, however by 2009, the Oultons' declining health was far worse than it had ever been.  The Oultons' reliance on Plaintiff grew in 2009, and the Oultons depended on Plaintiff until she was unlawfully barred, on December 25, 2011, from having any contact with her parents by the Defendants in this action.

172.   In March 2009, for example, the Oultons' water and sewer service was scheduled for disconnection due to the Oultons' non-payment of a costly water bill issued by the Town of Natick.  This unusually large Water & Sewer bill was due to a water leak in the Oultons' upstairs bathroom of which the Oultons were completely unaware, despite receiving two extraordinarily large bills.  The Oultons requested that Plaintiff assist them in resolving their Water & Sewer bill issue with the Town of Natick.

173.   In the Spring of 2009, Plaintiff corresponded several times with Town of Natick officials (both in writing and over the phone) in order to resolve the Oultons' Water & Sewer bill problem.  On behalf of the Oultons, Plaintiff spoke with Natick Selectman John Connelly ("Selectman Connelly") about the matter.

174.   On April 17, 2009, Selectman Connelly sent a note to the Oultons (Exhibit 13) informing them that their Water & Sewer Problem inspired the Natick Board of Selectmen to adopt a new policy authorizing a reduction the interest rate applicable to outstanding Water & Sewer charges incurred, like the Oultons' were, as the result of a plumbing malfunction:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Mr. & Mrs. Oulton,                                4/1/09

        I hope this note finds you well,
enclosed is a copy of a _new_ policy
which was recently adopted by the board
of selectmen. A payment plan for high
water bills in certain instances. Your
situation helped inspire this idea (along
with Sarah's efforts, who is wonderful
by the way.) I would suggest you
call to Bob Palmer the towns finance
director to set up a payment plan
that you are comfortable with.
Please feel free to call on me if
I can be of any assistance.

Bob Palmer                          God Bless,
(508) 647-6420                      John Connelly

175.    In response to Selectman Connelly's note, Carol tried on several occasions to

meet with Robert Palmer, the Town of Natick Finance Director ("Mr. Palmer") who had

authority to approve the payment plan reference in Selectman Connelly's note.  Carol was in bad

health at the time and Mr. Palmer, for unknown reasons, was unresponsive to Carol.

176.    At Carol's and Donald's request, Plaintiff attempted to correspond with Mr.

Palmer regarding the Oultons' Water & Sewer problem, but Mr. Palmer remained unresponsive.

177.    On June 22, 2009, at the Oultons' request, Plaintiff appeared before the Town of

Natick Board of Selectmen to request help in implementing the Oultons' payment plan.  The

Board of Selectmen Meeting Minutes (**Exhibit 14**) state:

51

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

⊕ Water Bill – Donald Oulton

Sarah Oulton thanked the Board for the response to her March 2009 letter on behalf of her parents Donald and Carol Oulton of MacArthur Road. She requested that the Board take steps so that no other residents had to go through what they (the Oulton's) were going through. She would like to put closure on the matter by writing a check in an amount determined in the March 2009 letter describing a situation her elderly parents had to go through.

Ms. Oulton noted that her parents were excellent taxpayers who fulfilled all their obligations. Their last water & sewer bill in '08 experienced a tremendous spike in water and sewer use and shocked them. Her parents were experiencing some horrific health problems and felt bad that they had let the water leakage go on for so long.

In March 2009 she asked about pursuing an abatement and Mr. Connolly wrote back attaching a memo from Treasurer/Collector Robert Palmer whereby the Board adopted a new policy to allow people in a similar situation to get out from under a water bill. She was very grateful and thought it would relieve some of the pressure her parents were feeling. These were elderly people who were never in trouble and they want to get this bill cleared up.

When she received the letter from Mr. Connolly she called Mr. Palmer's office and spoke with a secretary, but she wouldn't put Mr. Palmer on the phone. She thought that was odd because Mr. Palmer was the author of the memo. Since she was acting as her parents' agent, Beth Kelley asked that she (Ms. Oulton) draft an agreement that was comfortable for her parents and Mr. Palmer would review it. Mr. Connolly made it clear that the Board had set up the policy as a result of the issues she raised.

Ms. Oulton continued that she sent a letter saying her parents would like to pay $50. Most likely they could pay more than $50 but since it was the first case under this policy, she thought they could establish an agreement they could live with in the future. Mr. Palmer was not willing to meet with her or her family and he has been difficult. This was a nightmare for her family.

Living in Framingham, a Town that has been nothing but wonderful, Ms. Oulton said she crafted the letter dated May 28 and believed she could send her naive mother down.

Mr. Ciccariello inquired if the Board had ever taken this up, but Ms. White advised that the Board did not. Because the water went through the system the bill wasn't abated. This wasn't a matter for the Board's vote. The concern was a payment plan that hadn't been satisfactorily worked out. Mr. Palmer had the authority to enter into a payment plan and she thought effectively what the Board was hearing was a complaint against an employee.

Ms. Oulton clarified that her complaint was with two employees – Mr. Palmer and Ms. Kelley.

Mr. Ciccariello inquired if Mr. Palmer had accepted Ms. Oulton's agreement. Ms. White had no idea as this was the first she was hearing of this.

Mr. Connolly stated that Ms. Oulton was a friend of his and when Ms. White brought the change in policy to the Board's attention he forwarded it to Ms. Oulton. He pointed out that the Oulton's could have said there wasn't a leak but they did the straight up thing. He also pointed out that on one had the agreement wasn't acknowledged but the check with it was. He didn't see why it was so difficult to acknowledge the letter.

Ms. White responded that she would speak with Mr. Palmer tomorrow and work it out with Ms. Oulton.

Ms. Gloff noted that the issues were that the Oulton's hadn't heard from Mr. Palmer and interest was added.

With respect to the interest, Ms. White noted that there wasn't a payment plan in place so absent a payment plan the letter was dated May 28 and the interest was applied June 1. There was an obligation to put the interest on at that time.

Mr. Ciccariello thought the Board had a policy for a payment plan, but Ms. White noted that was the authority of the Finance Director. The Board allowed him some flexibility not to apply interest and penalties.

Ms. Gloff thought the Town Administrator needed to follow-up with Mr. Palmer and understand the status. She then made a motion to remove the $61.59 in interest. Seconded by Ms. Van Amsterdam and unanimously voted.

Based on what was presented to the Board tonight, Mr. Ostroff felt Ms. Oulton deserved an apology.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

178.    After Plaintiff's move in July 2009 until the end of 2011, Plaintiff called her

parents twice daily on most weekdays, at approximately 7:30 a.m. and at approximately 7:00

p.m., and took bi-weekly trips to the Oulton Home (with her pets).

179.    On October 18, 2009, the four Oulton Children held a meeting at McDonald's on

Worcester Road in Natick, Massachusetts to discuss the deleterious effects of the Oultons'

chronic alcoholism.  During the meeting, the Oulton Children wrote and signed a letter

(**Exhibit 15**) (the "Oulton Children's Letter") to the Oultons stating:

October 18, 2009

Dear Mom and Dad,

This is the most difficult decision we have had to make as your children. For over thirty
years the alcohol in your lives has negatively impacted our lives.  To your credit Dad, at
the end of 2005 you did stop drinking. In 2007, Mom – you made a stand about Dad's
drinking when he relapsed while you were in the hospital and we all hoped that his
renewed commitment to sobriety would allow our family to function normally.

This past week, Mom's hospitalization for her broken ankle has brought to light the extent
of alcoholism in this family. We found the three vodka bottles that were hidden.  On
Wednesday night and Thursday we spoke with you, Dad, and you were the angry and
brutish man that you become when you are drinking, although you deny it. On Thursday
there was another hidden bottle of vodka behind the cushions of the couch in the living
room. Friday, when separately we visited Mom in the hospital, we saw her shaking and
disoriented and we were told that she is in severe alcohol withdrawal. You, Dad, have
been telling us not to visit her because she's medicated for ankle pain. Unfortunately,
because we watched you withdraw and detox, most recently in 2007, we know what we
are dealing with here.

As your kids we understand that we can't make you do anything. We are therefore letting
you know that as long as alcohol is a part of your lives, we will not be. We will not receive
calls, we will not respond to requests. For us this is a heartbreaking choice that we must
make because we each are done with the bedlam that your choices cause in our lives.

53

We believe that each of you needs to go to an alcohol rehabilitation program, and to that end we have discovered that there is a program at Leonard Morse Hospital called Metrowest Medical Center Behavioral Health Services. The phone number is 508-650-7380.

We love you both and we hope and pray that you choose accountability and sobriety.

Love,

180.     Sometime after the delivery of the Oulton Children's Letter, the Oultons were in need of assistance at the Oulton Home. Upon information and belief, D. Oulton had resumed paying periodic visits to the Oultons; eventually, Plaintiff, at the Oultons' request, also resumed making visits to the Oulton Home and resumed helping the Oultons on a regular basis.

181.     In 2010 the Oultons had experienced numerous, repeated problems with bill-paying. The Oultons requested Plaintiff's help in creating a system through which the Oultons could better keep track of the bills that came to the house.

182.     In response to the Oultons' request, Plaintiff established an "Oulton File Folder List" (**Exhibit 16**) and created folders for the Oultons to use to sort their mail. As requested by the Oultons, Plaintiff would visit more frequently to help with special projects (e.g., cleaning carpets, flipping the Oultons' mattress, painting the Oultons' hallway and back stairs, etc.). Plaintiff helped the Oultons pay their bills by simply organizing the bills that came in. At the Oultons' request, Plaintiff wrote out the details of checks to be paid to various creditors and Carol or Donald would sign them.

183.     Quite notably, all checks written by Plaintiff and paid by the Oultons were signed by either Carol or Donald. All checks were written directly for the payment of the Oultons' bills and expenses ONLY.

54

184.    During the 2009-2010 Winter Break from law school, Plaintiff discovered that her vehicle's frame had rusted and the car was no longer safe to drive. Because Plaintiff was the Oultons' primary caregiver and frequent visitor, the Oultons offered to purchase a used vehicle for Plaintiff. On January 12, 2010, the Oultons paid $12,900.00 for a 2004 Jeep Wrangler, chosen for its four-wheel drive capability so that Plaintiff would be able to get to the Oultons in all types of weather (**Exhibit 17**).

185.    On March 5, 2011, Plaintiff created a "Medication List" for Carol (**Exhibit 18**). Plaintiff, Carol, and Donald had previously discussed the utility of keeping such lists on hand at the Oulton Home so that the Oultons' many home health aides could readily access the lists, and so the lists could be taken to hospitals when the Oultons were admitted, as they were, on increasingly frequent occasions.

186.    On May 25, 2011, approximately one year before Plaintiff was scheduled to graduate from law school, Plaintiff booked a hotel room for the Oultons at the Sheraton Springfield Monarch Place in anticipation of Plaintiff's graduation (**Exhibit 19**). Plaintiff, Donald, and Carol were extremely excited that Plaintiff's graduation from law school was less than one year away, and all three were excited to celebrate the event together. To ensure that the Oultons would have a handicap-accessible place to stay, Plaintiff booked the hotel in May 2011 for the dates of May 18 – May 20, 2012.

187.    On June 7, 2011, Plaintiff was unable to reach her parents by telephone. The Oultons' phone went straight to a recorded message that said the Oultons' telephone number was not accepting calls at that time. Very concerned, Plaintiff sent an email to the Oultons' neighbor, Kristen Maichen ("Mrs. Maichen"), who was the person whom Plaintiff frequently contacted to inquire about the Oultons' well-being. Plaintiff asked Mrs. Maichen to knock on the Oultons' door and check on Donald and Carol (**Exhibit 20**).

188.    Because, by 2011, the Sibling Defendants were not checking in on or helping the Oultons on a regular basis, Plaintiff was very worried for her parents' ability to get help in an emergency.  Plaintiff contacted Comcast and persuaded an agent to reveal that the Oulton's phone had been disconnected for non-payment and to accept payment from Plaintiff in order to restore phone service.  Once the service was restored, Plaintiff immediately called the Oultons.  Carol was delighted to hear from Plaintiff and was also surprised to learn that her phone had even been disconnected for a few days, telling Plaintiff, "Oh, I thought it was a little quite around here."

189.    On June 15, 2011, Plaintiff updated Donald's Medication List (Exhibit 21) for Donald and Carol.

190.    On July 9, 2011, Plaintiff updated Carol's Medication List (Exhibit 22) for Donald and Carol.

191.    On August 12, 2011, Plaintiff was about to enter her third and final year of law school.  Plaintiff had completed her requisite FAFSA paperwork earlier in 2011, but in August Plaintiff was notified of a delay in the disbursement of funding.

192.    The Oultons were so excited for Plaintiff to become an attorney and so invested in Plaintiff's law school success that, upon learning of the FAFSA problem, Carol volunteered to complete Federal Form OMB No. 1845-0068, a "Direct Loans Endorser Addendum – Federal Direct PLUS Loan Application and Promissory Note" on behalf of Plaintiff (Exhibit 23).  The Oultons agreed to guarantee Plaintiff's final year of law school loans in the event that Plaintiff's FAFSA issues were not resolved in time.

193.    In late August 2012 Plaintiff's FAFSA issues were, in fact, resolved, and Plaintiff subsequently completed her 2011-2012 FAFSA without making use of Carol's Direct Loans Endorser Addendum.

194.    In August 2011 Donald received a "Motion by Board of Bar Overseers ("BBO")

for Suspension of Attorneys" (the "BBO Motion") (**Exhibit 24**).  The BBO Motion indicated

that "IF [DONALD DID] NOT RESPOND TO THIS LETTER WITHIN 31 DAYS, [DONALD

WOULD] BE ADMINISTRATIVELY SUSPENDED FROM THE PRACTICE OF LAW." Four

attempts had been made by the BBO to obtain the information.  Despite not actively practicing

law, it was very important to Donald Oulton that he remain a member in good standing with the

BBO.

195.    At the Oultons' request Plaintiff contacted Francis Kenneally, First Assistant

Clerk of the Supreme Judicial Court for Suffolk County and took steps to resolve the BBO

Motion completely (**Exhibit 25**).

196.    On September 12, 2011, Plaintiff updated Donald's Medication List for Donald

and Carol (**Exhibit 26**).

197.    On October 1, 2011, Plaintiff updated Carol's Medication List (**Exhibit 27**) for

Carol.

198.    On Saturday, October 29, 2011, The Commonwealth of Massachusetts suffered

an historic ice storm (Storm Alfred).  During the storm, the roads in Massachusetts were closed

temporarily due to a state of emergency.  Plaintiff lost power at her Agawam home, as did the

Oultons.

199.    During the storm, Plaintiff made contact with Mrs. Maichen, who offered to

check on the Oultons until Plaintiff could arrive.  Notably, none of the other Oulton Children,

who lived in much closer proximity to the Oultons, checked on the Oultons during the historic

ice storm.

200.    On Sunday, October 30, 2011, when the state of emergency had been lifted,

Plaintiff drove from Agawam, to the Oultons' home.  Upon Plaintiff's arrival, Plaintiff

57

discovered that the Oultons were without electricity, heat, and telephone service. In addition, the Oultons' cell phone battery was completely depleted. Plaintiff found the Oultons huddled together, shivering, under the covers in bed. The Oultons had not eaten all day and Donald, a diabetic, had not taken his necessary insulin. Plaintiff, shocked to discover the condition her parents had been in for over two days, informed the Oultons that they could not stay here like that because it was too dangerous. The Oultons responded, "We're okay, Sah, we knew that you'd come here."

201.    Plaintiff immediately offered to take the Oultons to a hotel in Natick. The Oultons, however, insisted on staying home. Therefore, Plaintiff set them up at the house with some emergency provisions.

202.    Plaintiff drove to Walmart and purchased blankets, coffee, flashlights, food, and other items for the Oultons. Plaintiff charged Carol's cell phone battery in Plaintiff's vehicle.

203.    On Monday, October 31, 2011, Plaintiff, who had to return to Agawam in order to attend her law school classes, asked the Oultons' neighbors to keep checking on the Oultons. Plaintiff sent an email to Mrs. Maichen (Exhibit 28):

> Thanks so much for checking on my parents…
>
> **My father's not eating and drinking much at all, and he's diabetic, so it's just a matter of time before he really crashes. My mom's weak as heck, too, as you know.** I drove there and tried getting them to go to a hotel refused. So I left them with a cell phone (508-654-6266), some new blankets, a new flashlight, and some coffee and food.
>
> **I shudder to think of them in there alone but they insisted.** So what can I do?
>
> If you'd be willing to please knock on the door, I'd appreciate it. **I tried calling David but he never got back to me. Carol and Nancy don't go around there anymore.**
> [emphasis added]

204.    Plaintiff kept checking on the Oultons with twice-daily telephone calls, and the

Oultons' health continued to decline.  Shortly after the storm, Donald was admitted, once again,

to LMH.

205.    On Thursday, November 17, 2011, at approximately 8:15 p.m., Plaintiff received

a telephone call from the Oultons' neighbor, Michael Maichen ("Mr. Maichen").

206.    Mr. Maichen informed Plaintiff that Carol had fallen and broken her leg.  Carol

was wearing a "Lifeline" button and managed to call for help.  Mr. Maichen advised that

Plaintiff should drive to the Oulton Home immediately to secure the house (into which Natick

Fire Department personnel had broken into in order to rescue Carol) and to check on Carol at the

LMH Emergency Room.

207.    Notably, Mr. Maichen did not call Capt. Hladick or any of the other Sibling

Defendants after Carol fell and broke her leg, even though Capt. Hladick was a Lieutenant with

the very fire Department that broke into the Oulton Home to rescue Carol.  Although all of the

Sibling Defendants were located closer in proximity to the Oulton Home than Plaintiff,

Mr. Maichen contacted Plaintiff, 72 miles away at the time, to come to the Oultons' aid.

208.    The Natick emergency dispatch log entry for this call to the Oulton Home on

November 17, 2011, ("Natick Incident No. 11-17040") is attached hereto (**Exhibit 29**).

<div align="center">

Natick Police Department

Dispatch Log  From: 11/17/2011  Thru: 11/17/2011

</div>

```
-17040        2006    F - Medical Emergency      F - Transport-Hospital
Location/Address:     54 MACARTHUR RD
       Fire Unit:     E3-Pumper-Engine 3
   Manned By ID's:    42992 41023 1982
       EMS Unit:      A1-Ambulance 1
   Manned By ID's:    41606 41608
```

209.    In response to Mr. Maichen's telephone call, Plaintiff immediately drove to the

Oulton Home.  Plaintiff secured the broken window to the best of her ability, removed three

empty Smirnoff Vodka bottles, gathered Carol's pocketbook (containing wallet), packed a small

<div align="center">59</div>

bag with clothing, slippers, toiletries, and Carol's medicines, and also retrieved the current copy of Carol's "Medicine List."

210.    Plaintiff stayed with Carol in the Emergency Room of Leonard Morse for several hours and then, at approximately midnight, Plaintiff drove to Agawam in order to catch an early flight to Denver, Colorado the following morning.

211.    From November 18, 2011, through the end of the month, Carol remained hospitalized at LMH in Natick.  During the week of Thanksgiving, Carol went into a comatose state while hospitalized in the LMH Intensive Care Unit ("LMH ICU").

212.    On November 23, 2011, all four of the Oulton Children made plans for the entire family to gather at the hospital, met with Carol's doctors and a priest, and prepared to say "goodbye" to Carol, because Carol's condition was so grave.  Donald was already hospitalized inside LMH, so Plaintiff planned to visit with Donald after attending the vigil at Carol's LMH ICU bedside.

213.    Plaintiff drove from Agawam, Massachusetts to Natick, Massachusetts to attend the family gathering at the hospital.  On the way to Natick, the brakes on Plaintiff's vehicle failed.  Plaintiff telephoned N. Williams, who was already at LMH, and informed N. Williams that the brakes on Plaintiff's vehicle had failed.

214.    N. Williams conferred with other family members who were also already at the hospital, and a consensus was reached among the Sibling Defendants (and, later, Donald) that Plaintiff should put her vehicle in the shop and borrow the Oultons' Ford 500 (the "Oultons' Car").

215.    After visiting with Carol and then Donald,  Plaintiff drove her vehicle to the Oulton Home, stayed overnight, and arranged to drop the car off to Brigham-Gill Chrysler Jeep, in Natick, for repairs.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

216.    On Thanksgiving morning, November 24, 2011, Plaintiff drove the Oultons' Car and visited the comatose Carol, once again, at the Intensive Care Unit of LMH.

217.    Plaintiff found Carol's "Lifeline" call button on the floor underneath Carol's hospital bed. Plaintiff asked one of the nurses to please put the call button with Carol's pocketbook. A nurse stationed at the Intensive Care Unit informed Plaintiff that Carol's "son" had checked the pocketbook out and took it home. The nurse showed Plaintiff the form signed by "Carol's son" when he took Carol's pocketbook out of the Intensive Care Unit, and Plaintiff noted that the name on the form was that of Capt. Hladick, Carol's son-in-law.

218.    Plaintiff called D. Oulton (Carol's son) to see if he had checked Carol's pocketbook out of the Intensive Care Unit. D. Oulton informed Plaintiff that he had not, in fact, removed Carol's belongings from the LMH ICU and that Capt. Hladick had done so.

219.    Over the next several days, Plaintiff called the Hladick residence and conferred with C. Hladick, who denied having any knowledge of the location of Carol's pocketbook. All three of Plaintiff's siblings subsequently denied having any knowledge of the location of Carol's pocketbook.

220.    Unbeknownst to Plaintiff at the time, C. Hladick and Capt. Hladick had also taken the Oultons' Checkbook from the Oulton Home while Carol and Donald were hospitalized at LMH, and they became quite upset when they recognized Plaintiff's handwriting in the checkbook ledger.

221.    Plaintiff, still unaware that C. Hladick and Capt. Hladick were in possession of the Oultons' missing checkbook and wallets, suggested filing a report about Carol's stolen pocketbook with the Natick Police Department, but Plaintiff's siblings did not agree.

222.    In late November 2011, Donald was discharged from LMH and, of the four siblings, only Plaintiff was willing to care for Donald after his release from the hospital.

61

223.     On November 29, 2011, Plaintiff retrieved Donald from LMH and stayed with him at the Oulton Home while also commuting to Springfield in order to attend law school. During this difficult time, Plaintiff also made arrangements for Donald to stay in touch with Mrs. Maichen, his neighbor across the street.

224.     On the evening of November 29, 2011, Carol, who had unexpectedly recovered from her coma, was released from LMH and transferred to Marlborough Hills Healthcare Center in Marlborough, Massachusetts ("Marlborough Hills").  Plaintiff arrived at the Oulton home at approximately 10:00 p.m. and stayed up visiting with Donald.

225.     On the morning of November 30, 2011, Donald was in dire need of insulin and other medications.  Plaintiff had arranged for Donald's prescriptions to be filled at CVS Pharmacy on West Central Street in Natick, Massachusetts.

226.     Donald asked Plaintiff to buy groceries and other items that he needed while Plaintiff was picking up Donald's medications, and Donald said he would pay for the items he needed.  Plaintiff and Donald (who still had not located Carol's pocketbook) were unable to find Donald's wallet anywhere in the Oulton Home.

227.     Plaintiff made a number of telephone calls from the Oulton Home to C. Hladick in an attempt to get Carol's pocketbook and now likely Donald's wallet back from C. Hladick and Capt. Hladick so that Plaintiff could pick up the insulin and supplies that Donald so desperately needed.

228.     Each time Plaintiff spoke to C. Hladick, C. Hladick denied that Carol's missing pocketbook and Donald's missing wallet were in the possession of either C. Hladick or Capt. Hladick.

229.    Donald suggested to Plaintiff that Plaintiff simply take a blank check (which Donald offered to sign) to the CVS Pharmacy in order to pay for the items, only to discover that the Oultons' Checkbook was also missing from the Oulton Home.

230.    With Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook missing, Plaintiff and Donald had no way for Donald to purchase the essential medicines and items that he needed on November 30, 2011.

231.    Worried about Donald's low blood sugar, Plaintiff informed C. Hladick that if Donald's wallet and Carol's pocketbook were not returned to Donald at the Oulton Home, Plaintiff would be left with no other choice but to call the Natick Police and report the items as having been stolen by C. Hladick and Capt. Hladick.

232.    C. Hladick's response to Plaintiff was "F*CK YOU, SARAH!"

233.    Plaintiff informed Donald that C. Hladick and Capt. Hladick were in possession of the missing items.

234.    Donald, quite upset that C. Hladick and Capt. Hladick had stolen Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook made several telephone calls to C. Hladick and Capt. Hladick.  Donald begged the Hladicks to please return the items so that Plaintiff could run to CVS and purchase Donald's medicines and other needed items.  The Hladicks again denied being in possession of Carol's missing pocketbook, Donald's missing wallet, and the Oultons' Checkbook.

235.    Plaintiff and Donald contacted Carol at Marlborough Hills to inform her of the missing Oultons' Checkbook, pocketbook, wallet, and to see if Carol could please convince C. Hladick and Capt. Hladick to return the items to Donald.

236.    At 9:21 a.m. on November 30, 2011, N. Williams left the following voice mail message for Plaintiff:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Hey Sarah, it's me (Nancy Williams).

**<u>I understand that you're calling the police</u>**. Um, **<u>you need to really re-think that</u>** and obviously you'll do whatever you want to do, but, um, my understanding is there's some stuff about that checkbook that, um, **<u>you're the one that's been writing the checks</u>**, and, I don't understand why you're doing this. [emphasis added]

You can do whatever you want with Dad but it's just wrong, Sarah, it's wrong. And, uh, it's lies. And so, I know you're pissed off. I know the stuff you've been saying bye you need to call me, all right?

237.     Plaintiff and Donald were left with no other option but to contact the Natick Police and report the pocketbook, wallet, and checkbook stolen.

238.     At 9:47 a.m. on November 30, 2011, Natick Police Officer Robert Murphy ("Officer Murphy") was dispatched to the Oulton Home.

239.     Officer Murphy informed Plaintiff and Donald that he was personal friends with Capt. Hladick, and Officer Murphy offered to try to resolve the situation.

240.     Officer Murphy pulled out his cell phone and called Capt. Hladick on a phone number that Officer Murphy had in his "Contacts" list. Officer Murphy asked Capt. Hladick to please return the missing wallet, pocketbook, and checkbook to Donald.

241.     Officer Murphy ascertained that C. Hladick and Capt. Hladick were, indeed, in possession of Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook.

242.     The log entry referencing Officer Murphy's call to the Oulton Home to resolve the theft of Carol's pocketbook, Donald's wallet, and the Oultons' Checkbook ("Natick Incident No. 11-17793") is attached hereto as (**Exhibit 30**).

```
            Natick Police Department
       Dispatch Log  From: 11/30/2011  Thru: 11/30/2011
-17793      0947    COMPLAINT                   P - Services Rendered
Location/Address:   54 MACARTHUR RD
            Unit:   9441  OFFICER ROBERT F MURPHY
```

64

243.    Plaintiff, frustrated by C. Hladick's and Capt. Hladick's willful refusal to help

Donald get his insulin until the Natick Police were called, encouraged Donald to press charges

against C. Hladick and Capt. Hladick for the theft of Carol's pocketbook, Donald's wallet, and

the Oultons' Checkbook.  Donald declined to press charges against C. Hladick and

Capt. Hladick, telling Plaintiff that he did not want criminal charges to interfere with

Capt. Hladick's employment with the Town of Natick Fire Department.

244.    At approximately 11:00 a.m. on November 30, 2011, following a number of

telephone calls among Plaintiff, C. Hladick, N. Williams, Carol, and Donald, C. Hladick burst

into the living room of the Oulton Home, and threw Carol's pocketbook at Plaintiff's head.

C. Hladick screamed, "F*CK YOU, SARAH! F*CK YOU, SARAH! F*CK YOU, SARAH!"

and stormed out.

245.    C. Hladick returned Carol's stolen pocketbook, however C. Hladick did not return

Donald's wallet or the Oultons' Checkbook on November 30, 2011.

246.    The following morning, December 1, 2011, Plaintiff and Donald visited with at

Middlesex Savings Bank officials, Branch Manager Wayne Hawkins and Assistant Manager

Marjorie Cappucci, to discuss the missing Oultons' Checkbook and take steps to prevent theft

from the Oultons' checking account at Middlesex Savings Bank.

247.    At Donald's request, Mr. Hawkins printed a statement of the Oultons' Middlesex

Bank checking account on the morning of December 1, 2011 (**Exhibit 31**).

248.    Given that N. Williams had alleged financial abuse by Plaintiff in N. Williams's

voice mail message to Plaintiff on November 30, 2011, Donald and Plaintiff asked Mr. Hawkins

to review the history of checks and determine if any fraud or abuse had occurred.

249.    Mr. Hawkins spent approximately 30 minutes reviewing the Oultons' bank

account history and cancelled checks from the Oultons' checking account and confirmed for

65

Donald and Plaintiff that as of that date, December 1, 2011, everything related to the Oultons' checking account looked to be in completely proper order. There was no evidence that Plaintiff committed financial fraud or abuse because Plaintiff had not, in fact, ever committed financial fraud or abuse.

250.    Mr. Hawkins suggested that Donald should close the Oultons' jointly held checking account but Donald declined to do so, opting instead to closely monitor the account's activity for fraud and/or theft.

251.    Mr. Hawkins generated a number of "starter checks" for Donald, ordered new checks for the Oultons, and told Donald that the Middlesex Savings Bank "fraud team" would keep a close eye on the Oultons' checking account in order to prevent any fraud in the future.

252.    After returning to the Oulton Home, Plaintiff, who was worried about being falsely accused of financial wrongdoing by her siblings, asked Donald to sign a statement giving his permission for Plaintiff to drive the Oultons' Ford 500. The "Statement of Donald P. Oulton" dated December 1, 2011, is attached hereto (**Exhibit 32**) and stated:

> STATEMENT OF DONALD P OULTON
>
> By my signature below I hereby attest and affirm that I have freely and voluntarily given financial and other assistance to my daughter, Sarah Oulton, and to my other children.
>
> At the present time and for the immediate future I give Sarah permission to drive my car, as needed, and assist me in the maintenance of my home (bills, etc) and health.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Signed:  _Donald P. Oulton_
                      Donald  P.  Oulton

Date :           December 1, 2011

253.    At approximately 11:00 p.m. on December 1, 2011, a Marlborough Hills

representative called the Oulton Home to alert Donald that Carol had been found "unresponsive"

in her bed at Marlborough Hills, and that, as a result, Carol was rushed to UMass Memorial

Hospital in Worcester ("UMass Memorial Hospital").

254.    Donald was extremely upset by the news and he immediately asked Plaintiff to

drive him to see Carol at UMass Memorial Hospital.

255.    At approximately 11:30 p.m. on December 1, 2011, Plaintiff drove Donald to

UMass Memorial Hospital so that Donald could be with Carol in the Emergency Room.

256.    When Plaintiff and Donald arrived at the UMass Memorial Hospital they found

Carol, in the Emergency Room, in a comatose state.

257.    A physician on staff of the UMass Memorial Hospital informed Donald and

Plaintiff that Carol had been overdosed on Ativan (Lorazepam) by the staff at Marlborough

Hills.  The physician told Donald and Plaintiff that Carol's condition was extremely fragile and

that Carol would likely not survive the overdose.

258.    In all billing-related records (discussed below), Marlborough Hills has omitted all

reference to the dates of service during which the staff at Marlborough Hills overdosed Carol

within 24 hours of Carol's admission to Marlborough Hills.

259.    At Plaintiff's request, the staff of the UMass Memorial Hospital Emergency

Room wheeled an extra bed into Carol's Emergency Room suite so that Donald could recline

while he and Plaintiff stayed at Carol's Emergency Room bedside.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

260.    On December 2, 2011, at approximately 2:00 a.m., N. Williams arrived at the Emergency Room of UMass Memorial Hospital.  N. Williams, who was still very angry that Plaintiff involved the Natick Police in order to get Donald his much-needed insulin, uttered several threats to Plaintiff and irrationally expressed rage to both Plaintiff and Donald.

261.    Donald, upset by N. Williams's irrational outburst at the Emergency Room, asked Plaintiff to take him to the Oulton Home.  Plaintiff drove Donald home.

262.    Amidst the sudden stress brought on by the theft of the Oultons' Checkbook, pocketbook, wallet, coupled with the other Oulton Family issues unfolding and Marlborough Hills's overdose of Carol, Donald's health took a drastic turn for the worse.

263.    On the morning of December 3, 2011, Plaintiff contacted one of Donald's visiting nurses, Nurse Patti Supple, who agreed to immediately visit to the Oulton Home in order to check on Donald's condition.

264.    Nurse Supple found Donald dehydrated, unstable, and in a state of low blood sugar, so she recommended that Donald be admitted to the hospital immediately.  Donald refused to go to the hospital in an ambulance, so Plaintiff and Nurse Supple packed a bag and helped Donald get into the Oultons' Car.

265.    On December 3, 2011, at approximately noon, Plaintiff checked Donald into LMH and was given a letter signed by Deborah McBride, the Admitting Supervisor of MetroWest Medical Center stating, "Dear Ms. Oulton, [y]ou have been identified as the patient representative for Mr. Donald Oulton" (Exhibit 33).

266.    With Donald admitted to LMH and Carol fighting for her life at UMass Memorial Hospital, Plaintiff returned to her home in Agawam.

267.    At some point in early December 2011, Carol made a recovery from Marlborough Hills's drug overdose and was discharged from UMass Memorial Medical Center.

268.   Carol was returned to Marlborough Hills against Plaintiff's wishes.  Plaintiff was

extremely concerned for Carol's well-being because the staff at Marlborough Hills had

overdosed Carol within 24 hours of Carol's admission to Marlborough Hills.  At Donald's

request, Plaintiff started looking for alternative healthcare facilities into which Carol could be

transferred.

269.   In mid-December 2011, against Plaintiff's wishes, Donald was transferred from

LMH to Marlborough Hills.  Given that Marlborough Hills had overdosed Carol, Plaintiff did not

want the Oultons anywhere near the substandard and dangerous Marlborough Hills facility.

270.   On December 7, 8, and 9, 2011, C. Hladick consulted with Attorney Sweeney-2

(who worked with Attorney Sweeney-3 and Attorney S. Keough) for help in taking control of the

incapacitated Oultons' financial affairs, and the criminal enterprise underlying this lawsuit was

hatched by C. Hladick and the attorneys of Keough + Sweeney.

271.   On December 7, 2011, Attorney Sweeney-2 or Attorney Sweeney-3 (unclear at

this time) had the first known conversation with C. Hladick about this case and billed the

Oultons, on January 4, 2012, $480.00 for services rendered to C. Hladick (Exhibit 34):

| 12/07/2011 | | | |
|---|---|---|---|
| JVS | Telephone call to client re status | | 0.40 |

272.   On December 8, 2011, unbeknownst to Plaintiff at the time, Attorney Sweeney-2

or Attorney Sweeney-3 (unclear at this time) had discussions with both Sweeney-2 or Attorney

Sweeney-3 (unclear at this time) and C. Hladick regarding "guardianship of mother" and billed

the Oultons, on January 4, 2012, $480.00 for services rendered to C. Hladick (Exhibit 34):

| 12/08/2011 | | | |
|---|---|---|---|
| JVS | Telephone call with JVS re guardianship of mother and telephone call to client re same | | 0.40 |

273.   On December 8, 2011, Marlborough Hills fraudulently executed a void

"Admission Agreement" for Donald (Exhibit 35) at a time when Donald (who suffered from

69

dementia) was, upon information and belief, still a patient at LMH.

THE PARTIES HEREBY EXECUTE THIS RESIDENT ADMISSION AGREEMENT

12/8/11
Date

K. Fotches
Representative of Marlborough Hills Healthcare Center

274.    Notably, the admission date on the Fraudulent Marlborough Hills Admission

Agreement of Donald conflicts with the admission date stated in a lawsuit subsequently filed on

August 5, 2013, against the Estate of Carol by Attorney Deborah M. Masterson ("Attorney

Masterson") (discussed below).

275.    Attorney Masterson, a co-conspirator masquerading as Marlborough Hills's

"collections attorney" in order to aid in the Defendants in stealing funds from the Oultons'

estates, wrote in her lawsuit filed by Marlborough Hills' parent company against the Estate of

Carol that:

> 15. Donald Oulton was admitted to Marlborough Hills on December
>
> 14, 2011.

276.    Quite notably, the void Marlborough Hills Admission Agreement of Donald states the

following:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

<u>ADMISSION AGREEMENT</u>

<u>Introduction</u>

This is a Nursing Facility Admission Agreement for Marlborough Hills Healthcare Center. <u>This is a legal document creating rights and obligations for each person or party signing the Agreement.</u> Please read the Agreement carefully before you sign it. If you do not understand any provision of this Agreement, you should not sign the Agreement until you obtain clarification of the provision you do not understand. <u>You are encouraged to have this Agreement reviewed by your legal representative or by any other advisor you may have <b>before</b> you sign the Agreement.</u>

<u>Legal Representative is an individual who, under independent legal authority such as a court order, has authority to act on the Resident's behalf.</u> Examples of a Legal Representative include a guardian, a conservator, and the holder of a Durable Power of Attorney executed by the Resident. <u>Documents evidencing a person's Legal Representative status must be provided to us.</u> If you have a court appointed guardian or conservator he or she must sign this Agreement for it to be valid.

 277. The void Marlborough Hills Admission Agreement also states:

**M. Miscellaneous**

1. This Agreement shall be interpreted and enforced in accordance with the laws of the Commonwealth of Massachusetts.

 278. On December 9, 2011, Attorney Sweeney-2 or Attorney Sweeney-3 (unclear at this time) had a conference with Attorney S. Keough regarding "guardianship" and billed the Oultons, on January 4, 2012, $480.00 for services rendered to <u>C. Hladick</u> (<u>Exhibit 34</u>):

| | | |
|---|---|---|
| 12/09/2011 JVS | Conference with SK re guardianship | 0.30 |

 279. On December 13, 2011, Audra Collins, Director of the Marlborough Hills Social Services Department, invited Plaintiff to attend a "Comprehensive Planning Conference on December 27, 2011 (<u>Exhibit 36</u>).

 280. Plaintiff subsequently did not attend the Care Planning Conference because Marlborough Hills unlawfully banned her from premises on Christmas Day 2011.

 281. On several occasions between mid-December 2011 and December 24, 2011, Plaintiff visited Carol and Donald at Marlborough Hills and maintained communication with both Carol and Donald by telephone.

<div align="center">71</div>

282.    Carol requested Plaintiff to continue to collect the Oultons' mail at the Oulton

Home, and continue to help the Oultons write checks to pay their monthly bills.

283.    On December 17, 2011, at 9:23 a.m., Plaintiff received an email (Exhibit 37)

from Mrs. Maichen which read: "We still have all the mail so you can stop by any time."

284.    On December 21, 2011, Attorney Sweeney-2 or Attorney Sweeney-3 (unclear at

this time) placed a telephone call to C. Hladick, drafted a Power of Attorney for one or both of

the Oultons, and then billed the Oultons, on January 4, 2012, $480.00 for services rendered to C.

Hladick (Exhibit 34):

| | | |
|---|---|---|
| 12/21/2011 JVS | Telephone call to Hladick and drafted Power of Attorney | 0.50 |
| | For Current Services Rendered | 1.60 |

285.    Notably, the Oultons were charged for the drafting power of attorney but those

drafts were never completed, produced, signed by the Oultons, or used.

286.    On December 24, 2011, Carol left a voice mail message for Plaintiff:

Give me a call.  I've already had OT.  They grabbed me quick.
Okay.  I'll talk to you.
Call me, please.
Bye.
Hello?  Hello?

287.    Plaintiff visited with Carol at Marlborough Hills on the evening of December 24,

2011, for the purpose of taking the Oultons' mail to Carol and helping Carol pay the Oultons'

bills.  Plaintiff brought the mail to Carol's room at Marlborough Hills along with the Oultons'

new checkbook.

288.    At Carol's request, Plaintiff brought a blue lockbox and cable so that Carol could

keep her checkbook and other personal items locked to her bed in Marlborough Hills.  Plaintiff

set this up for Carol, and locked the blue lockbox to Carol's bed with a heavy-duty cable and a

padlock.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

289.     On December 24, 2011, Plaintiff and Carol paid the Oultons' bills.  Plaintiff's

brother, D. Oulton, joined them and visited with Carol and Plaintiff for approximately one hour.

D. Oulton asked why Plaintiff was helping Carol pay bills and Plaintiff explained that she had

been helping the Oultons since approximately 2010 because they were having difficulty paying

them on their own.

290.     On December 25, 2011, Plaintiff tried calling Carol several times at Marlborough

Hills to arrange for a visit with the Oultons on Christmas Day, but discovered that Carol's

telephone number at Marlborough Hills was not in service.

291.     On December 25, 2011, Donald was residing in a room in the Marlborough Hills

Alzheimer's' Unit and did not have a telephone in his room.  A nurse refused to get Donald for

Plaintiff.

292.     On December 25, 2011, Plaintiff called the Nurse's Station at Marlborough Hills

and asked to be connected to Carol, but was told that Plaintiff was no longer allowed to talk with

either Carol or Donald.

293.     On December 25, 2011, **26 days AFTER** Plaintiff reported the Hladicks' theft of

the Oultons' Checkbook, pocketbook, and wallet to the Natick Police Department, and **25 days**

**AFTER** Marlborough Hills administered a near-lethal, coma-inducing overdose of Lorazepam

on Carol, Marlborough Hills staff informed Plaintiff that she was no longer allowed to have any

contact with her parents – either by telephone nor in person – because "[the Oultons'] Health

Care Proxy documents ha[d] been invoked and all decisions related to the Oultons must go

through Carol Hladick."

294.     Plaintiff knew that Health Care Proxy documents may be invoked only when a

person becomes incapacitated and only when that incapacity is verified in writing by an

independent physician. More important, Plaintiff also knew that Health Care Proxy documents grant the Health Care Agent only the power to make <u>health care</u> decisions.

295.    Plaintiff attempted to reach the Oultons by telephone on multiple occasions after learning that "the Health Care Proxy documents had been invoked" by Marlborough Hills staff on December 25, 2011, but the staff of Marlborough Hills adamantly refused to connect Plaintiff with either Carol or Donald.

296.    At some point between December 25, 2011, and December 30, 2011, the staff at Marlborough Hills conspired with C. Hladick, Capt. Hladick, N. Williams, and others to keep Plaintiff away from the Oultons.

297.    The unlawful separation of Plaintiff from the Oultons was imposed by parties who mutually benefited from the absence of Plaintiff from the Oultons' lives, giving them the opportunity to steal the Oultons' jointly-held assets without any interference from Plaintiff.

298.    Marlborough Hills unlawfully barred Plaintiff from having any contact with the Oultons on December 25, 2011, but – in an extraordinarily cruel move – Marlborough Hills did not inform the Oultons that Plaintiff had been unlawfully barred from having contact with the Oultons.

299.    For several days Donald attempted to reach Plaintiff by telephone (on a community telephone in Marlborough Hills's locked Alzheimer's Unit). Donald grew increasingly upset over the sudden absence of Plaintiff from his life. Eventually Marlborough Hills staff would not allow Donald to have <u>any</u> telephone access, but for the first few days of this unlawful separation Donald was able to leave voice mail messages for Plaintiff from the community phone located in the nursing home. Soon after, Donald was denied even access to the community phone.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

300.     Marlborough Hills did not execute a valid Admission Agreement with Carol upon

her admission on November 29, 2011, because Marlborough Hills staff overdosed Carol on

Lorazepam and put her into a life-threatening coma within Carol's first 24 hours at the facility.

301.     Marlborough Hills did not have a valid contract for services for Donald, either.

302.     On December 29, 2011, C. Hladick fraudulently executed a void Admission

Agreement for the "care" of Donald (which Marlborough Hills executed on December 8, 2011,

discussed above (in **Exhibit 35**).


**THE PARTIES HEREBY EXECUTE THIS RESIDENT ADMISSION AGREEMENT**

12/8/11
Date                                                   K. Fotcher
                                                       Representative of Marlborough Hills Healthcare Center


Date                                                   Resident

12/29/11
Date                                                   Carol B Hladick
                                                       Resident's Legal Representative
                                                       (If Applicable)

Source of Legal Authority:
copy provided)

Execution solely for the purposes of payment using Resident funds

Date                                                   Resident's Responsible Party (If Applicable)


303.     Notably, he "**Source of Legal Authority (copy provided)**" provision in the

Marlborough Hills Admission Agreement of Donald was intentionally left blank.

304.     Also noteworthy is that the "**Daily Rate and Additional Charges**" provision in

the Marlborough Hills Admission Agreement of Donald was also left blank.

1.   Daily Rate and Additional Charges

Our daily rate is $_____.  You agree to pay us our daily rate for each day of nursing facility care and services we provide to you.  Such payment shall be made one month at a time, one month in advance.  Payment for a portion of a month shall be based on the number of days in the month we provide care and services to you.

305.    Marlborough Hills and C. Hladick willfully and knowingly executed the void

Marlborough Hills Admission Agreement of Donald in violation of 105 Code Mass. Regs.

§ 150.003(A) (1994)[2] and 105 Code Mass. Regs. § 150.003(B) (1994)[3].

306.    Despite the lack of valid contracts between the Oultons and Marlborough Hills,

Marlborough Hills sought payment on the Oultons' invalid contracts from C. Hladick,

personally, through August 2013 (discussed below).   Defendants conspired to pay for the "care"

of the Oultons with funds stolen from the Oultons' estates (discussed below).

307.    On December 29, 2011 Plaintiff received a voice mail from Donald:

Hi Sarah.

It's your Dad.

And, uh, if you can find a way to get to the hospital, mom will give you some money.  I told her $50.  Now that's a start.  I know you need more than that.  So does she, I think period.  So we will have to work that out.  But for start, we ought to be able to give you $50.  You hear me?  **I wish I could talk to you in person now**.

I hate this tape but here I am on it.

Ok? Ok. Love. Take care.
[emphasis added]

---

[2] **105 Code Mass. Regs. § 150.003(A) (1994):  Admissions, Transfers and Discharges**.  (A) The admission, transfer and discharge of patients or residents shall be in accordance with written policies and procedures developed by each facility and acceptable to the Department.

[3] **105 Code Mass. Regs. § 150.003(B) (1994):  Admissions, Transfers and Discharges**.  (B) Facilities shall admit and care for only those individuals in need of long term care services for whom they can provide care and services appropriate to the individual's physical, emotional and social needs. Prior to admission, an individual's needs shall be evaluated and alternative care plans considered. This evaluation shall be a joint responsibility of the referring agency or institution, the admitting physician and the receiving facility.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

308.     Plaintiff, with goal of re-establishing visitation with her parents as peacefully as possible, began to seek legal advice to deal with the unlawful restrictions imposed on Plaintiff and the Oultons by the administrators and staff of Marlborough Hills.

309.     On December 30, 2011, Plaintiff, who was still on Winter Break from law school, spent the day doing yard work at her Agawam home.  Plaintiff spent the entire day of December 30, 2011, outside in her yard cleaning shrubs, brush, sticks, and leaves that had fallen in the yard during the October 2011 ice storm.  At approximately 3:00 p.m., officers from the Agawam Police Department showed up in Plaintiff's back yard.

310.     The Agawam Police officers informed Plaintiff that they had been dispatched by staff members at Marlborough Hills.  Marlborough Hills staff members deceptively told the Agawam Police that Plaintiff had locked herself into her house, with a gun, and that Plaintiff was a danger to herself and others.

311.     When the Agawam Police officers arrived at Plaintiff's home, they found her out in the yard, where Plaintiff had been working since early morning.  The Agawam Police officers saw empty soda cans and coffee cups that Plaintiff used throughout the day and they found nothing wrong with Plaintiff when they arrived to check on Plaintiff's welfare.  The Agawam Police noted that Plaintiff was "fine" and "no services were necessary."

312.     The call for a "welfare check" placed by Marlborough Hills staff to the Agawam Police Department was fabricated and malicious in nature.  The Agawam Police Log entry reflecting this call and that "NO POLICE SERVICE NECESSARY" is attached hereto as (Exhibit 38).

```
                        Agawam Police Department              Page:   1
                   Call Number    Printed: 03/28/2012

For Date: 12/30/2011 - Friday

Call Number    Time    Call Reason                   Action           Priority  Duplicate
11-20441       1500    Phone - WELFARE CHECK         NO POLICE SERVICE NECES   2
  Call Taker:          945 - Patrolman John W Kunasek Jr
  Location/Address:    69 AUTUMN ST
  Involved Party:      OULTON, SARAH A @ 69 AUTUMN ST - AGAWAM, MA 01001 413-686-7777
                       SSN: 000024775  DOB: 02/25/1963  Race: W  Sex: F
          Unit:        4B  Patrolman Richard Riccio
                       Disp-15:01:34            Arvd-15:10:23  Clrd-15:13:20
          Unit:        3B  Patrolman Paul Murphy
                       Disp-15:01:47            Arvd-15:10:24  Clrd-15:13:18
      Narrative:
                       comp states subj threated to harm self.
                       subj fine has not spoken with mother in over a week. mother
                       in nursing home.


-20441         1500    Phone - WELFARE CHECK         NO POLICE SERVICE NECESS
  Location/Address:    AUTUMN ST
          Unit:        4D
          Unit:        3B
```

313.    The Defendants claimed that Plaintiff said she would shoot herself, however

Donald left a message seeking contact from Plaintiff on December 29, 2011, and Marlborough

Hills's deceptive and malicious telephone call to the Agawam Police Department was not made

until the next day.

314.    Shortly after Marlborough Hills dispatched the Agawam Police to Plaintiff's

home in bad faith, Plaintiff contacted her friend, Agawam Mayor Rich Cohen, to inform him of

Marlborough Hills's abusive use of the Agawam Police to harass Plaintiff.  Mayor Cohen

arranged for a meeting among himself, Plaintiff, and Agawam Police Lieutenant (now Chief)

Eric Gillis.  Plaintiff and Mayor Cohen informed Lt. Gillis about the details of the Oulton Family

situation, and Lt. Gillis assured Plaintiff that he would not allow the Agawam Police Department

to be used by Marlborough Hills staff, Plaintiff's siblings, or anyone as a tool to harass Plaintiff.

315.    Between December 25, 2011, when Plaintiff was unlawfully banned by staff at

Marlborough Hills from visiting and contacting her parents, and early January 2012, Plaintiff

initiated a search for an attorney who could lawfully assist Plaintiff in resuming contact with the

Oultons.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

316.   On December 31, 2011, Plaintiff received an upsetting voice mail from Donald:

Hi Sarah, It's me, Dad.

**You've got to talk to me, Sah.  Don't leave me like this, please?**

**I need your call.  I need your call now.  Would you call me?  I
need your call.**

**Please call me.**

Hello?  Hello?
[emphasis added]

317.   Clearly Donald was not informed that Marlborough Hills staff and administrators

had unlawfully banned Plaintiff from the facility, and the sudden absence of Plaintiff from

Donald's life was greatly distressing to Donald, in violation of 105 Code Mass. Regs.

§ 150.015(A) (1994)[4].

318.   On January 4, 2012, the law firm of Keough + Sweeney sent an Invoice to Carol

Oulton, at the Oulton Home, (discussed above), which billed the Oultons $480.00 for services

that Attorney Sweeney-2, Attorney Sweeney-3, and Attorney S. Keough rendered to C. Hladick

(Exhibit 34).

319.   A copy of the Invoice for which Keough + Sweeney improperly billed the

Oultons $480.00, for services rendered to C. Hladick (in violation of Mass. R. Prof. C. 1.5, as

amended, 471 Mass. 1304 [2015][5]) appears below:

---

[4] **105 Code Mass. Regs. § 150.015(A) (1994):  Patient Comfort, Safety, Accommodations and Equipment**.  All
facilities shall provide for the comfort, safety and mental and physical well-being of patients or residents.
    (1) The types and amounts of personal services, assistance in daily activities, protection and accommodations
needed by each patient or resident shall be recorded and known to all staff attending that person.
    (2) Patients' and residents' personal needs shall be evaluated periodically and appropriate modifications made in
services, protective measures and accommodations.  In a SNCFC, the patient's personal needs shall be evaluated and
any modifications made in services, protective measures and accommodations shall be reflected in the patient's
Individual Service Plan (ISP).
    (3) All facilities shall be prohibited from applying any Aversive Interventions to a patient or resident.
[5] **RULE 1.5: FEES:** (a) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly
excessive fee or collect an unreasonable amount for expenses. [emphasis added]

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

KEOUGH & SWEENEY, LTD

ATTORNEYS AND COUNSELORS AT LAW
41 MENDON AVENUE
PAWTUCKET, RI 02861
TELEPHONE 401-724-1600
FACSIMILE 401-724-9900

BOSTON OFFICE
171 MILK STREET
SUITE 30
BOSTON, MA 02109
TEL. (617) 574-0054
FAX (617) 451-1914

January 4, 2012

Carol Oulton
54 MacArthur Road
Natick, MA  01760

Case No:
Invoice No:   5376

RE: Estate Planning

Fees

| | | Hours | |
|---|---|---|---|
| 12/07/2011 JVS | Telephone call to client re status | 0.40 | |
| 12/08/2011 JVS | Telephone call with JVS re guardianship of mother and telephone call to client re same | 0.40 | |
| 12/09/2011 JVS | Conference with SK re guardianship | 0.30 | |
| 12/21/2011 JVS | Telephone call to Hladick and drafted Power of Attorney | 0.50 | |
| | For Current Services Rendered | 1.60 | 480.00 |
| | Total Current Work | | 480.00 |
| | Balance Due | | $480.00 |

320.    This Invoice reflects the meetings and consultations between and among

Defendants C. Hladick, Attorney Sweeney-2, Attorney Sweeney-3, and Attorney S. Keough

(who is an Associate at the firm supervised by Attorney J. Keough and Attorney Sweeney-3).  It

is noteworthy that Keough + Sweeney sent the firm's $480.00 Invoice to the Oultons for services

that Keough + Sweeney rendered to C. Hladick.

321.    It is also noteworthy is that the Keogh & Sweeney revealed that C. Hladick,

Attorney Sweeney-2, Attorney Sweeney-3, and Attorney S. Keough had been discussing

"guardianship of MOTHER" on December 8, 2011.

322.    On January 4, 2012, Plaintiff took an unexpected trip to McNeill Veterinary

Clinic in Sudbury, Massachusetts in order to seek emergency care for her dog.  While the dog

80

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

recovered from the anesthesia and radiographs, Plaintiff decided to visit with her parents at Marlborough Hills because Marlborough Hills had no lawful basis for interfering with Plaintiff's relationship with her parents.

323.    Plaintiff drove to Marlborough Hills at approximately 9:15 a.m.  Plaintiff walked to Carol's room, and found Carol's bed empty.  The lockbox was still locked to the bed frame, the linen was stripped, all of Carol's possessions were tied up in plastic bags, and Carol's roommate was alone in the room.  Plaintiff asked Carol's elderly roommate what happened to Carol and the woman replied, "Oh, that lady died."

324.    Plaintiff went to the Nurse's Station and inquired of Unit Clerk Denise Stephenson ("Stephenson") about Carol.  Stephenson, who was quite hostile toward Plaintiff, adamantly refused to tell Plaintiff anything about Carol's condition and informed Plaintiff that Plaintiff was not allowed to visit Carol or Donald anymore because "[t]he Health Care Proxies have been invoked and all decisions on both parents must go through Carol Hladick."

325.    Plaintiff asked Stephenson on what legal basis the decision to bar Plaintiff from visiting had been made, and Stephenson told Plaintiff, "The Health Care Proxy has been invoked, and you are not allowed to visit your parents anymore."

326.    Plaintiff requested that Stephenson please summons a manager to discuss this unlawful barring of visitation between Plaintiff and her parents, and Stephenson summonsed Donna DelCid, the Marlborough Hills Director of Nursing ("DelCid"), and Andrea Edwards, a Social Worker employed by Marlborough Hills at the time ("Edwards").

327.    Notably, both DelCid and Edwards were as hostile and angry toward Plaintiff as Stephenson had been, even though Plaintiff had neither met nor communicated with either DelCid or Edwards prior to January 4, 2012.  None of the three Marlborough Hills employees (DelCid, Stephenson, and Edwards) would inform Plaintiff of Carol's condition, whether Carol

81

was dead or alive, or where Carol was, instead telling Plaintiff that the administrators of the

facility said that Plaintiff was to be told nothing about the Oultons' status (in violation of 105

Code Mass. Regs. § 150.002[E] [1994][6], 244 Code Mass. Regs. § 9.03[46] [2000][7], and 244

Code Mass. Regs. § 9.03[47] [2000][8]).

328.     Plaintiff reminded DelCid, Stephenson, and Edwards that there was no court order

of any kind in effect and the Marlborough Hills had a legal duty to inform Carol's next-of-kin

(Plaintiff) about Carol's condition.

329.     DelCid very reluctantly informed Plaintiff that Carol was not dead, but that Carol

had experienced another major health setback and had been rushed to Marlborough Hospital.

330.     Through all times relevant to this lawsuit DelCid and, indeed, all other

Marlborough Hills nurses charged with the "care" of the Oultons throughout the entire period of

time during which the Oultons were falsely imprisoned in Marlborough Hills willfully and

knowingly violated 244 Code Mass. Regs. § 9.03 (2000)[9], 244 Code Mass. Regs. § 9.03(6)(a)

(2000)[10], 244 Code Mass. Regs. § 9.03(7) (2000)[11], 244 Code Mass. Regs. § 9.03(9) (2000)[12],

---

[6] **105 Code Mass. Regs. § 150.002(E) (1994)**:  (E) The administrator shall establish procedures for the notification of the patient, the next of kin or sponsor in the event of significant change in a patient's or resident's charges, billings, benefit status and other related administrative matters.

[7] **244 Code Mass. Regs. § 9.03(46) (2000):  Responsibilities of Nurse in Management Role**. A nurse licensed by the Board and employed in a nursing management role shall adhere to accepted standards of practice for that role. The responsibilities of the nurse employed in a nursing management role are to develop and implement the necessary measures to promote and manage the delivery of safe nursing care in accordance with accepted standards of nursing practice.

[8] **244 Code Mass. Regs. § 9.03(47) (2000):  Other Prohibited Conduct**. A nurse licensed by the Board shall not engage in any other conduct that fails to conform to accepted standards of nursing practice or in any behavior that is likely to have an adverse effect upon the health, safety, or welfare of the public.

[9] **244 Code Mass. Regs. § 9.03 (2000):  Standards of Conduct for Nurses**.  Each nurse licensed by the Board and engaged in the practice of nursing shall have knowledge and understanding of the Standards of Conduct for Nurses set forth in 244 CMR 9.00, all state laws and Board regulations governing the practice of nursing, and all other state and federal laws and regulations related to such practice.

[10] **244 Code Mass. Regs. § 9.03(6)(a) (2000):  (6) Compliance with Laws and Regulations Related to Nursing**.
   (a) A nurse who holds a valid license shall comply with M.G.L. c. 112, §§ 74 through 81C, as well as with any other laws and regulations related to licensure and practice. Examples of such laws include, but are not limited to, the following:
   1. M.G.L. c. 19A, § 15 (obligation to report elder abuse);
   2. M.G.L. c. 19C, § 10 (obligation to report abuse of disabled person);
   3. M.G.L. c. 38, § 3 (report of death to medical examiner);

244 Code Mass. Regs. § 9.03(10) (2000)[13], 244 Code Mass. Regs. § 9.03(15) (2000)[14], 244 Code

Mass. Regs. § 9.03(17) (2000)[15], 244 Code Mass. Regs. § 9.03(19) (2000)[16], 244 Code Mass.

Regs. § 9.03(21) (2000)[17], 244 Code Mass. Regs. § 9.03(26)(a) (2000)[18], 244 Code Mass. Regs.

§ 9.03(31) (2000)[19], and 244 Code Mass. Regs. § 9.03(32) (2000)[20], as discussed below.

     331.    Plaintiff then informed DelCid that Plaintiff's personal property (the lockbox that

Plaintiff loaned to Carol) was still locked to the frame of Carol's bed, and Plaintiff requested that

someone from Marlborough Hills accompany Plaintiff back to Carol's room to retrieve the

lockbox.

     332.    DelCid and Stephenson reluctantly accompanied Plaintiff back to Carol's former

room.

---

4. M.G.L. c. 46, § 9 (death pronouncement);
. . . .
9. M.G.L. c. 111, § 70E (Patients' or Residents' Rights); and
. . .
11. M.G.L. c. 111, § 72G (obligation to report abuse of patient or resident).

[11] **244 Code Mass. Regs. § 9.03(7) (2000):  Aiding Unlawful Activity**. A nurse licensed by the Board shall not aid any person in performing any act prohibited by law or regulation.

[12] **244 Code Mass. Regs. § 9.03(9) (2000):  Responsibility and Accountability**. A nurse licensed by the Board shall be responsible and accountable for his or her nursing judgments, actions, and competency.

[13] **244 Code Mass. Regs. § 9.03(10) (2000):  Acts within Scope of Practice**. A nurse who holds a valid license and is engaged in the practice of nursing in Massachusetts shall only perform acts within the scope of nursing practice as defined in M.G.L. c. 112, § 80B and 244 CMR 3.00.

[14] **244 Code Mass. Regs. § 9.03(15) (2000):  Patient Abuse, Neglect, Mistreatment, Abandonment, or Other Harm**. A nurse licensed by the Board shall not abuse, neglect, mistreat, abandon, or otherwise harm a patient.

[15] **244 Code Mass. Regs. § 9.03(17) (2000):  Patient Dignity and Privacy**. A nurse licensed by the Board shall safeguard a patient's dignity and right to privacy.

[16] **244 Code Mass. Regs. § 9.03(19) (2000):  Exercise of Undue Influence**. A nurse licensed by the Board shall not exercise undue influence on a patient, including the promotion or sale of services, goods, appliances or drugs, in such a manner as to exploit the patient for financial gain of the nurse or a third party.

[17] **244 Code Mass. Regs. § 9.03(21) (2000):  Undue Benefit or Gain**. A nurse licensed by the Board shall care for, and refer, a patient without undue benefit or gain to the nurse or a third party.

[18] **244 Code Mass. Regs. § 9.03(26)(a) (2000):  Duty to Report to the Board**. A nurse who holds a valid license and who directly observes another nurse engaged in any of the following shall report that nurse to the Board in accordance with Board guidelines:
    (a) abuse of a patient. . . .

[19] **244 Code Mass. Regs. § 9.03(31) (2000):  Falsification of Information**. A nurse licensed by the Board shall not knowingly falsify, or attempt to falsify, any documentation or information related to any aspect of licensure as a nurse, the practice of nursing, and the delivery of nursing services.

[20] **244 Code Mass. Regs. § 9.03(32) (2000):  Fraudulent Practices**. A nurse licensed by the Board shall not engage in any fraudulent practice including, but not limited to, billing for services not rendered or submitting false claims for reimbursement.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

333.    After retrieving the lockbox, Plaintiff visited with Donald in the locked Alzheimer's Unit of Marlborough Hills and then left to go visit Carol at Marlborough Hospital.

334.    Carol was <u>delighted</u> to see Plaintiff after such an unusual and sudden absence. Carol had no idea that Marlborough Hills administrators and staff had unlawfully banned Plaintiff from the facility, and Carol was upset as she questioned Plaintiff about the sudden and recent cessation of communication.

335.    Plaintiff advised Carol that if she wished to continue to communicate with Plaintiff, Carol should inform the administrators and staff of Marlborough Hills of this fact. Carol, who desperately wanted to remain in contact with Plaintiff, agreed.

336.    Plaintiff found a pad of paper in Carol's hospital room and gave it to Carol.  Carol then hand wrote a note on Marlborough Hospital stationery indicating her continued desire to see Plaintiff and receive telephone calls from Plaintiff.  Carol expressed in the note that her desire was to see and hear from Plaintiff without limitation (<u>Exhibit 39</u>).



337.    After procuring the handwritten note from Carol, Plaintiff, for several weeks,

attempted to telephone and visit Carol and Donald at Marlborough Hills.  Although Plaintiff

showed the Marlborough Hills staff and administrators Carol's handwritten note, the

Marlborough Hills staff and administrators refused to allow Plaintiff to have any contact with her

parents.

338.    Throughout the entire tenure of the Oultons' false imprisonment at Marlborough

Hills, the Oultons were not allowed to decide who could telephone them, visit them, leave gifts

for them, or interact with them in any way.  Marlborough Hills restricted all access to the

85

Oultons, despite the Oultons' repeated requests to continue having contact with Plaintiff, their friends, and their physicians.

339.    On January 7, 2012, at 8:08 a.m. Plaintiff sent an email to her legal counsel, Attorney Kelly Koch (Exhibit 40).  The date is important to note because at various times – in a number of court documents signed under the penalties of perjury – Marlborough Hills administrators, Mirick O'Connell attorneys, and others have stated that Marlborough Hills did not ban Plaintiff from the facility until January 18, 2012 (discussed below).  On January 7, 2012, Plaintiff wrote to Attorney Koch:

> I need advice ASAP on **how to proceed so that my parents' overdue bills can be paid ASAP**....The problem is that **since the healthcare facilities have banned me, there is no way to get my parent's checks signed**.  Their homeowners' insurance, auto insurance, and real estate taxes are overdue and must be paid immediately.
>
> **I am currently in possession of their checkbook pursuant to my Dad's instructions to help them run the house**.
>
> The most recent date on which my mom and I wrote out checks to pay bills is December 24, 2011, and we did so in my mother's room at Marlborough Hills nursing home.
> [emphasis added]

340.    On January 8, 2012, Attorney Koch sent the first of two letters to Marlborough Hills (Exhibit 41).  Attorney Koch's January 8, 2011, letter stated the following:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*


**BULKLEY**
**RICHARDSON**

Kelly A. Koch, Attorney
direct: 413-272-6228
kkoch@bulkley.com

January 8, 2012

Marlboro Hills Heathcare Center
121 Northboro Road East
Marlborough, MA 01752

Re: Donald P. and Carol L. Oulton

Dear Sir/Madam:

I represent Sarah Oulton ("Sarah") visitation issues she has recently encountered regarding her parents. I believe what is currently transpiring is something your facility has dealt with on numerous occasions – familial strife during the illness of a loved one.

I am aware that Donald P. and Carol L. Oulton (the "Oultons") have Health Care Proxies ("HCPs") naming Carol B. Hladick as their health care agent. Their HCPs vest decision-making power in Carol if either or both of the Oultons is/are unable to make health care decisions themselves. To be sure, there is no provision in the HCPs that vest power to control visitors or phone calls with the health care agent. There is also no guardian, attorney-in-fact, or court order in place that expressly limits visitation between Sarah and her parents.

To that end, there should be <u>no</u> limitation on visitation between Sarah and her parents, and she should be permitted to visit or call the Oultons during the hours that are set aside for public visitation. Sarah's parents have both expressed a desire to see Sarah and talk to her considering the amount of time she has spent caring for them in the past. Please do not further limit any visitation between Sarah and her parents.

Do not hesitate to contact me if you have any questions or concerns.

Very truly yours,

/s/ Kelly A. Koch

Kelly A. Koch

BULKLEY, RICHARDSON AND GELINAS, LLP, Attorneys at Law
1500 Main Street, Suite 2700, P.O. Box 15507, Springfield, MA 01115-5507 phone: 413-781-2820 fax: 413-272-6802 www.bulkley.com

341.    On January 13, 2012, Kelly Koch sent a <u>second copy of the letter</u> to Marlborough Hills (<u>Exhibit 42</u>) that was originally sent on January 8, 2012.

87



Kelly A. Koch, Attorney
direct 413-272-6228
kkoch@bulkley.com

January 10, 2012

Marlboro Hills Healthcare Center
121 Northboro Road East
Marlborough, MA 01752

        Re: Donald P. and Carol L. Oulton

Dear Sir/Madam:

        I represent Sarah Oulton ("Sarah") with respect to visitation issues she has recently encountered regarding her parents. I believe what is currently transpiring is something your facility has dealt with on numerous occasions – familial strife during the illness of a loved one. This fact was confirmed with Melissa in Admissions on January 11, 2012. After discussions with Melissa, she agreed with my position that a health care proxy does not grant to a health care agent the power to control visitors during normal visiting hours.

        I am aware that Donald P. and Carol L. Oulton (the "Oultons") have Health Care Proxies ("HCP's") naming Carol B. Hladick as their health care agent. Their HCP's vest decision-making power in Carol if either or both of the Oultons is/are unable to make health care decisions themselves. To be sure, there is no provision in the HCPs that vest power to control visitors or phone calls with the health care agent. There is also no guardian, attorney-in-fact, or court order in place that expressly limits visitation between Sarah and her parents.

        To that end, there should be no limitation on visitation between Sarah and her parents, and she should be permitted to visit or call the Oultons during the hours that are set aside for public visitation. Sarah's parents have both expressed a desire to see Sarah and talk to her considering the amount of time she has spent caring for them in the past. Please do not further limit any visitation between Sarah and her parents.

                                        Very truly yours,

                                        Kelly A. Koch

BULKLEY, RICHARDSON AND GELINAS, LLP, Attorneys at Law
1500 Main Street, Suite 2700, P.O. Box 15507, Springfield, MA 01115-5507 phone 413-781-2820 fax 413-272-6804 www.bulkley.com

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

342.    On January 18, 2012, Marlborough Hills administrators, staff, and Social Worker

Edwards conspired with the C. Hladick, to file a "Elder Abuse Mandated Reporter Form" (the

"EAMRF") (**Exhibit 43**) against Plaintiff in furtherance of the criminal scheme forming the

foundation of this lawsuit.

343.    The EAMRF was written and filed in bad faith by Marlborough Hills Social

Worker Edwards, who had been present with DelCid and Stephenson (and just as hostile toward

Plaintiff as Stephenson and DelCid had been) on January 4, 2012.

344.    The EAMRF is a very important piece of evidence because throughout the

criminal enterprise forming the foundation of this lawsuit, the Defendants relied on and proffered

it in furtherance of their criminal conspiracy, in order to defame Plaintiff, inflict emotional

distress and professional harm on Plaintiff, keep Plaintiff away from her parents, manipulate

Plaintiff and others, mischaracterize the situation, and abuse the court system for the Defendants'

maximum advantage.

345.    Notably, pursuant to G. L. c. 19A § 15 [21], mandated reporters (such as

Marlborough Hills) must submit Elder Abuse Mandated Reporter Forms to the Designated

---

[21] **M.G.L. c.19A § 15:  Reports of Abuse; Liability**.

   (a) <u>Any physician</u>, physician assistant, medical intern, dentist, <u>nurse</u>, family counselor, probation officer, <u>social worker</u>, policeman, firefighter, emergency medical technician, licensed psychologist, coroner, registered physical therapist, registered occupational therapist, osteopath, podiatrist, director of a council on aging, outreach worker employed by a council on aging, executive director of a licensed home health agency or executive director of a homemaker service agency <u>or manager of an assisted living residence who has reasonable cause to believe that an elderly person is suffering from or has died as a result of abuse, shall immediately make a verbal report of such information or cause a report to be made to the department or its designated agency and shall within forty-eight hours make a written report to the department or its designated agency</u>. Any person so required to make such reports who fails to do so shall be punished by a fine of not more than one thousand dollars.

   (b) The executive director of a home care corporation, licensed home health agency or homemaker service agency shall establish procedures within such agency to ensure that homemakers, home health aides, case managers or other staff of said agency who have reasonable cause to believe that an elderly person has been abused shall report such case to the executive director of the corporation or agency. The executive director shall immediately make a verbal report of such information or cause a report to be made to the department or its designated agency and shall within forty-eight hours make a written report to the department or its designated agency.

   (c) In addition to a person required to report under the provisions of subsection (a) of this section, any other person may make such a report to the department or its designated agency, if any such person has reasonable cause to believe that an elderly person is suffering from or has died as a result of abuse.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Protective Service Agency (Springwell, of Watertown, Massachusetts) <u>within 48 hours</u> of

hearing the oral report of Elder Abuse.  The EAMRF, which Marlborough Hills Social Worker

Edwards fabricated in bad faith, did not comply with G. L. c. 19A.  Under the "**<u>DATE OF</u>**

**<u>INCIDENT</u>**" section Edwards wrote, "**multiple, ongoing**."

346.     Plaintiff has never abused the Oultons, and had never been accused of Elder

Abuse or any wrongdoing until the Oultons had the misfortune of being admitted to Marlborough

Hills.  Marlborough Hills's EAMRF was completely false, designed to inflict maximum damage

on Plaintiff.

347.     An additional important fact with respect to the date of the EAMRF is that

Edwards wrote her narrative, "**Resident admitted to facility on 11/24/11**," when Carol was, in

fact, <u>still hospitalized at LMH on November 24, 2011</u>.  Carol had been transferred from LMH to

Marlborough Hills on November 29, 2011, overdosed on Lorazepam by Marlborough Hills staff

on November 30, 2011, rushed to UMass Memorial Hospital from Marlborough Hills (comatose)

on November 30, 2011, and hospitalized at UMass Memorial Hospital until mid-December 2011.

348.     Edwards's narrative stated, in full:

> **<u>Resident admitted to facility on 11/24/11</u>.  Resident's daughter
> [C. Hladick] met with writer [Edwards] on 11/25/11 to report
> history of financial exploitation of Resident by daughter, Sarah
> Oulton done with threatening personal welfare and safety of
> HCP [C. Hladick] if they attempted to aid Resident in any way.**
>
> **On 12/30/11, social worker contacted Agawam Police
> Department to complete a welfare check on Resident's**

---

(d) <u>No person required to report pursuant to the provisions of subsection (a) shall be liable in any civil or criminal action by reason of such report; provided, however, that such person did not perpetrate, inflict or cause said abuse. No other person making such a report pursuant to the provisions of subsection (b) or (c) shall be liable in any civil or criminal action by reason of such report if it was made in good faith; provided, however, that such person did not perpetrate, inflict or cause said abuse.</u>  Any person making a report under subsection (a), (b) or (c) who, in the determination of the department or the district attorney may have perpetrated, inflicted or caused said abuse may be liable in a civil or criminal action by reason of such report. No employer or supervisor may discharge, demote, transfer, reduce pay, benefits or work privileges, prepare a negative work performance evaluation, or take any other action detrimental to an employee or supervisee who files a report in accordance with the provisions of this section by reason of such report.  [emphasis added]

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

**daughter, Sarah Oulton**, as resident reported that Sarah Oulton stated she would commit suicide if Resident did not give her money.

In reporting that to Agawam Police, Police Department confirmed that Sarah Oulton has a license to carry a gun. **Family states that they are concerned for their own personal safety and the safety of the Resident as Sarah Oulton's behavior has been erratic**. [emphasis added]

349.   Under the section entitled, "**PERSONS OR AGENCIES INVOLVED OR KNOWLEDGEABLE ABOUT ELDER**" Edwards listed **Carol Hladick**'s name and contact information.

350.   Quite notably, under the section asking, "**DOES REPORTER BELIEVE THE SITUATION CONSTITUTES AN EMERGENCY**" Edwards checked the box for "**YES**."

351.   Edwards's timeline in the EAMRF is quite significant because she alleges that Carol was admitted to Marlborough Hills on **November 24, 2011**, and states that she (Edwards) learned of the "Elder Abuse" on **November 25, 2011**, (a day when Carol was at the Intensive Care Unit of LMH). Carol was not admitted to Marlborough Hills until November 29, 2011, and was overdosed by Marlborough Hills within 24 hours of her admission to Marlborough Hills.

352.   The Elder Abuse Mandated Reporter Form that Edwards completed clearly states,

Per M.G.L. c. 19A this form must be returned within forty-eight (48) hours of the oral report, to the following Designated Protective Service Agency:

and although Edwards stated that she believed "the situation constitutes an emergency," Edwards did not write her EAMRF until January 18, 2012 (**54 days AFTER** the date on which the abuse was allegedly reported to Edwards), i.e., **1,248 hours BEYOND** the 48-hour reporting deadline imposed by G. L. c. 19A. Even more importantly, the "header" on the document indicates that Edwards did not transmit the EAMRF until **January 26, 2012** (**62 days AFTER** the date on which the abuse was allegedly reported to Edwards) i.e., **1,440 hours BEYOND** the 48-hour

91

reporting deadline imposed by G. L. c. 19A.

JAN-26-2012  16:28        MARLBOROUGH HILLS                    508 281 6002      P.009

353.    The EAMRF states that Plaintiff's behavior has been "erratic," that the situation

constitutes an emergency, and that the threats have been "multiple, ongoing," but despite the

allegedly "URGENT" nature of the situation, Marlborough Hills and Edwards waited **62 days** to

report this "emergency" to Springwell.

354.    Plaintiff, in sharp contrast to the false and perjurious statements made about her

by the Defendants throughout their execution of the criminal enterprise forming the foundation

of this lawsuit, was never "erratic" at any time throughout the timeline leading up to the filing of

this lawsuit.

355.    Far from being "erratic," Plaintiff handled the Defendants with great care and

professionalism.  Plaintiff, who was enrolled in her final year of law school at WNE Law when

the criminal enterprise forming the foundation of this lawsuit was hatched by the Defendants,

sought the advice of attorneys from the moment Marlborough Hills unlawfully interfered with

Plaintiff's relationship with the Oultons.  Plaintiff sought legal solutions to every roadblock

erected throughout the course of the events leading up to the filing of this lawsuit.  Marlborough

Hills unlawfully banned from Marlborough Hills on December 25, 2011, and Plaintiff retained

legal counsel, Attorney Koch, in late December 2011.  Attorney Koch sent two letters to

Marlborough Hills:  the first on January 8, 2012, and the second on January 13, 2012.

356.    By the time Marlborough Hills and Edwards transmitted the EAMRF to

Springwell (on January 26, 2011), Plaintiff was represented by counsel, Plaintiff's counsel had

already sent _two letters_ to Marlborough Hills, Plaintiff had already procured the handwritten note

from Carol (indicating Carol's desire to maintain communications and visits with Plaintiff), and

92

Plaintiff had not seen the Oultons or been at Marlborough Hills since the January 4, 2012, visit described above.

357.    The EAMRF crafted by C. Hladick, Edwards, and Marlborough Hills, and then filed with Springwell (an agent of the Massachusetts Department of Elder Affairs) was clearly malicious and defamatory, and obviously filed in bad faith.  The purpose of the EAMRF was to further the Defendants' criminal conspiracy and keep Plaintiff away from the Oultons so that the Defendants could abuse the Oultons and steal the Oultons' jointly-held assets (and, eventually, Plaintiff's inheritance) without interruption from Plaintiff, who wanted only to protect the Oultons.

358.    In willfully and knowingly drafting and submitting the fraudulent and defamatory EAMRF to Springwell, Edwards violated 258 Code Mass. Regs. § 20.01(3) (2003)[22], 258 Code Mass. Regs. § 20.01(8) (2003)[23], 258 Code Mass. Regs. § 20.01(9) (2003)[24], 258 Code Mass. Regs. § 20.01(10) (2003)[25], 258 Code Mass. Regs. § 20.04 (2003)[26], and 258 Code Mass. Regs. § 20.15 (2003)[27].

---

[22] **258 Code Mass. Regs. § 20.01(3) (2003):  Unethical or Unprofessional Conduct In General**.  A social worker shall not engage in unethical or unprofessional conduct. "Unethical or unprofessional conduct" includes, but is not limited to, the following: Engaging in, authorizing, or aiding or abetting fraud, deceit, misrepresentation of material facts, the provision of false or forged evidence, or bribery in the course of his or her professional practice.

[23] **258 Code Mass. Regs. § 20.01(8) (2003):  Unethical or Unprofessional Conduct In General**.  A social worker shall not engage in unethical or unprofessional conduct. "Unethical or unprofessional conduct" includes, but is not limited to, the following: Engaging in any other conduct which violates federal or state law and which reasonably calls into question his or her fitness to practice social work.

[24] **258 Code Mass. Regs. § 20.01(9) (2003):  Unethical or Unprofessional Conduct In General**.  A social worker shall not engage in unethical or unprofessional conduct. "Unethical or unprofessional conduct" includes, but is not limited to, the following: Engaging in any conduct which violates the civil or legal rights 9. of a client.

[25] **258 Code Mass. Regs. § 20.01(10) (2003):  Unethical or Unprofessional Conduct In General**.  A social worker shall not engage in unethical or unprofessional conduct. "Unethical or unprofessional conduct" includes, but is not limited to, the following: Engaging in any course of conduct which is expressly prohibited by, or which constitutes a failure to conform to:

(a) any provisions of the Code of Ethics of the National Association of Social Workers, as adopted by the 1979 NASW Delegate Assembly and amended from time to time hereafter, to the extent that said provision is not inconsistent with federal or state law; or

(b) any other generally accepted standard(s) of professional conduct.

[26] **258 Code Mass. Regs. § 20.04 (2003) (2003):  Negligent or Incompetent Practice**.  A social worker shall not perform any professional function or service in a negligent or incompetent manner. A function or service is performed in a negligent or incompetent manner if:

93

359.     Tellingly, Marlborough Hills and Edwards bolstered their EAMRF with a

fraudulent note (the "Fraudulent Note of "Carol"") that Marlborough Hills claimed was written

by Carol (Exhibit 44).  Unlike the handwritten note that Plaintiff procured from Carol on

January 4, 2012, the Fraudulent Note of "Carol" (attached to the EAMRF) was typewritten, and

the signature on it appears to be a forgery.  The Fraudulent Note of "Carol" was manufactured by

Defendants in a futile attempt to bolster their fraudulent report of "Elder Abuse" filed against

Plaintiff.

360.     Marlborough Hills's EAMRF (Exhibit 43) and the Fraudulent Note of "Carol"

that was appended to it (Exhibit 44) appear below:



# EXECUTIVE OFFICE OF ELDER AFFAIRS
# COMMONWEALTH OF MASSACHUSETTS

## ELDER ABUSE MANDATED REPORTER FORM

Per M.G.L. c. 19A this form must be returned within forty-eight (48) hours of the oral
report, to the following Designated Protective Service Agency:

Springwell
125 Walnut St.
Watertown, MA 02472
617-926-4100

Reporter Information:

Name _Andrea Edwards_        Occupation: _Social worker_
Agency: _Marlborough Hill Healthcare Center_
Address: _121 Northboro Rd E. Marlborough, MA 01752_
Tel. #: _508-485-4040 x694_

---

(1) The social worker, in performing that function or service, failed to exercise that degree of care and skill
which is ordinarily exercised by a reasonably prudent social worker in like circumstances; or
     (2) The social worker performed the function or service in spite of the fact that he or she knew, or had reason to
know, that performance of that function or service was beyond the scope of his or her skills, training or expertise.
[27] **258 Code Mass. Regs. § 20.15 (2003):  Violations Shall Constitute Grounds for Disciplinary Action.**
Violation of any provision of 259 CMR 20.01 through 258 CMR 20.14 may constitute "malpractice" or "gross
misconduct in the practice of the profession" within the meaning of M.G.L. c. 112, § 61, and shall, in any event,
constitute sufficient grounds for disciplinary action by the Board pursuant to 258 CMR 30.03(1).

94

<u>Information about Elder Being Allegedly Abused/Neglected:</u>

Name: _Cecil Oulton_

Address: _54 Mad Astone Rd., Natick, MA  01760_

Permanent: _same as above_

Temporary: _N/A_

Tel.#: _508-650-6346_        Preferred Language: _English_

Approximate Age: _78_        Sex: _F_

Is elder aware report is being made? _yes_        Is English spoken? _yes_

Date of incident: _multiple & ongoing_

Description of alleged abuse incidents and/or condition or neglect: (Include name, dates, times and specific facts and any information regarding prior incidents or abuse/neglect.)

_Resident admitted to facility on 11/24/11. Resident's daughter was interviewed on 11/24/11 to recant history of financial exploitation of resident by daughter. Sarah Oulton. Indicated threatening phone welfare and safety of HCP and wishes of today appointed to aid resident in any way. On 12/1/11, social worker contacted Sagamore Police Dept to complete a welfare check on resident's daughter. Sarah Oulton. Sarah Oulton's resident reported that Sarah Oulton stated she would commit suicide if resident did not give her money. In reporting this to Sagamore police, plus dept confirmed that Sarah Oulton has a license to carry a gun. Family states that they are concerned for their own personal safety and the safety of the resident as Sarah Oulton's behavior has been erratic._

<u>Persons or Agencies Involved or Knowledgeable about Elder:</u>

Name _Carol Hladick_        Age ____        Relationship _daughter/HCP_

Address _____        Phone _508-533-7602 (h)_

                                  _508-314-7772 (c)_

Name _____        Age ____        Relationship _____

Address _____        Phone _____

Name _____ Age _____ Relationship _____
Address _____ Phone _____

Name _____ Age _____ Relationship _____
Address _____ Phone _____

Name _____ Age _____ Relationship _____
Address _____ Phone _____

Is medical treatment required immediately?  Yes ____ No ____ Possibly ____
Describe treatment needed or already received:
_____
_____

Does reporter believe the situation constitutes an emergency?
                    Yes ✓ No ___ Possibly ___
Describe the risk of death or immediate and serious harm:
Resident's daughter has a linantor case (Confirmed by Aquan
Dulia). Shahry Cod Cridint have lagrine (which is
this puisence) rafty a Sarah Oulton (daughter) has
nurcing errors.

Additional information or comments:
_____
_____
_____
_____

_____
Signature of Reporter                    Date

JAN-26-2012  16:26     MARLBOROUGH HILLS          508 481 6002     P.002

Marlborough
Hills Healthcare Center

*Oulton v. Hladick, et al. -- Amended Verified Complaint and Demand for Jury Trial*

1/18/12

I, Carol Oulton, request that my daughter, Sarah Oulton not visit me while I am at Marlborough Hills Healthcare Center. I request this as I am fearful for my personal safety if this individual were to be allowed to visit me.

*Carol J. Oulton*
Carol Oulton

121 Northboro Road, East, Marlborough, MA 01752          1

Phone (508) 485-4040  Fax: (508) 481-5585

361.    As discussed below, the most notable thing about the EAMRF that Marlborough Hills filed against Plaintiff is that Springwell, the investigative entity for the Massachusetts Department of Elder Affairs, immediately determined that the EAMRF was, indeed, unfounded.

362.    Plaintiff was unaware that this fraudulent and malicious false report of Elder Abuse had been filed against her in January 18, 2012.  It wasn't until May 2013, that Plaintiff discovered a report had been filed against her.  Plaintiff then contacted Springwell to inquire as to whether Plaintiff had been accused of Elder Abuse.  Four letters were exchanged by Plaintiff and Marlborough Hills (Exhibit 45):

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

<sub>\*</sub>

SARAH A. OULTON, J.D.

May 22, 2013

<u>Via Certified Mail, Return Receipt Requested</u>
<u>Label Number - 7011 1570 0001 1058 7992</u>
April Evans
Program Manager
Protective Services
Springwell
307 Waverley Oaks Road, #205
Waltham, MA 02452

Re: <u>Record of Reports on Sarah A. Oulton</u>

Dear Ms. Evans:

I am writing to request that you please send me a letter containing the following information:

1. whether I have ever been reported to your office at Springwell for allegedly committing Elder Abuse against any person in The Commonwealth of Massachusetts;

2. the name(s), if any, of the elderly person(s) on behalf of whom complaints against me may have been filed with your office;

3. the dates, if any, on which I allegedly abused the person(s) on behalf of whom complaints against me may have been filed with your office;

4. the name(s), if any, of the part(y/ies) who may have reported me to your office;

5. copies of Police Reports, if any, that accompanied the complaints against me that may have been filed with your office;

6. the steps, if any, that your office took to investigate me; and

7. the results of the investigation, if any, that was conducted by Springwell.

<u>If, in fact, no complaints against me have been filed with your office, please notify me of that, also.</u> For your information, I have never been contacted by anyone in your office (or the Massachusetts Department of Elder Affairs) for any reason at any time in the past.

98

I appreciate your assistance with this simple request. For your convenience, I have provided a self-addressed, stamped envelope to expedite your response to me. If you have any questions or need anything further, please let me know. Thank you very much.

Sincerely,

Sarah A. Oulton, J.D.
cc: State Representative Nicholas A. Boldyga

P.O. Box 888, Agawam, MA 01001-0888
Home: 413-209-8662  Mobile: 413-686-7777  Email: saoulton@gmail.com

 spring*well*

Springwell, Inc.   307 Waverley Oaks Road Suite 205, Waltham, MA 02452 • 617.926.4100 •
Fax 617.926.9897 • TTY 617.923.1562 • www.springwell.com

May 29, 2013

Sarah A. Oulton, J.D.
P.O. Box 888
Agawam, MA 01001-0888

Dear Ms. Oulton,

I received your letter dated May 22, 2013, seeking information on any reports filed with Springwell Protective Services listing you as the alleged perpetrator of elder abuse. As per Executive Office of Elder Affairs Program Instruction (PI-07-01), I am not able to tell you who filed a report of concern, nor am I able to release to you any information except that which you provided to us directly; as we did not interview you as part of our investigation, there is little information that I am able to release to you.

However, I can tell you the following: our office has received only one report, on January 18, 2012, listing you as the alleged perpetrator of elder abuse, against your mother, Carol Oulton. There were no accompanying police reports. We investigated the allegations against you, but they were unsubstantiated.

Sincerely,

April Evans
Protective Services Program Manager

*solutions for seniors and their families*

99

SARAH A. OULTON, J.D.

June 3, 2013

**Via Certified Mail, Return Receipt Requested**
**Label Number – 7011 1570 0001 1058 8036**
April Evans
Program Manager
Protective Services
Springwell
307 Waverley Oaks Road, #205
Waltham, MA  02452

Re: **Investigation of Sarah A. Oulton**

Dear Ms. Evans:

Thank you for your recent response to the letter that I sent to you on May 22, 2013.  Based on the response you sent to me on May 29, 2013, I am writing with three final questions for you.

1. Given that nobody from Springwell contacted me to discuss the complaint that was filed against me, how did Springwell investigate the allegations that were made against me and determine that they were unsubstantiated?

2. Did Springwell notify the Reporting Party ("RP") that the investigation conducted by Springwell concluded that the allegations against me were unsubstantiated?

3. If Springwell did, in fact, notify the RP of the results of the investigation, on what date and through what medium (mail, telephone, email, etc.) were the results of the Springwell's investigation of me transmitted to the RP?

I appreciate your additional assistance with this matter.  For your convenience, I have provided a self-addressed, stamped envelope to expedite your response to me.  If you have any questions or need anything further, please let me know.  Thank you very much.

Sincerely,

Sarah A. Oulton, J.D.
Enclosures
cc: State Representative Nicholas A. Boldyga

P.O. Box 888, Agawam, MA  01001-0888
Home: 413-209-8662  Mobile: 413-686-7777  Email: saoulton@gmail.com

100

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

 **spring*well***

Springwell, Inc.   307 Waverley Oaks Road Suite 205, Waltham, MA 02452 • 617.926.4100 •
Fax 617.926.9897 • TTY 617.923.1562 • www.springwell.com

June 6, 2013

Sarah A. Oulton, J.D.
P.O. Box 888
Agawam, MA 01001-0888

Dear Ms. Oulton,

I received your most recent letter dated June 3, 2013, seeking further information
on your mother's case with Protective Services. Keeping in mind that I am not
able, by law, to release any details to you, I am responding to your three questions
as follows:

1. An investigation was completed in your mother's case; collateral sources of
   information were interviewed and provided information leading to our
   unsubstantiation of the case.
2. Springwell is required to alert mandated reporters to the outcome of the
   investigation that was based on their report. Non mandated reporters may or
   may not receive follow up from Springwell, depending on many factors. I
   am not able to tell you who made the report to Springwell and thus cannot
   tell you whether or not we alerted them to the outcome.
3. I can only answer this question by repeating information above in number
   two. Sometimes we alert reporters to the outcome by phone, sometimes by
   email, sometimes by letter, sometimes in person, and, as stated above,
   sometimes not at all.

Sincerely,

April Evans

*solutions for seniors and their families*

101

363.   It is extremely noteworthy that Springwell deemed Marlborough Hills's EAMRF

"**UNSUBSTANTIATED**" immediately after Springwell received it.

364.   Springwell deemed the EAMRF "**UNSUBSTANTIATED**" even though the

EAMRF contained a copy of a letter that Marlborough Hills claimed was written by Carol, the

falsely alleged "victim" described in the EAMRF.

365.   The EAMRF did not append any Police Reports to it because Plaintiff has never

been in trouble with any Police in any jurisdiction in the United States and, in fact, is licensed to

carry firearms in numerous states.

366.   Despite Edwards and Marlborough Hills's attachment of the Fraudulent Note of

"Carol," Springwell deemed the EAMRF "**UNSUBSTANTIATED**" because "**collateral**

**sources of information were interviewed and provided information leading to**

**[Springwell's] unsubstantiation of the case**."

367.   Springwell notified Marlborough Hills of "**UNSUBSTANTIATED**" finding

immediately, i.e., in January 2012, because Marlborough Hills and Edwards are mandated

reporters.  In the follow-up letter to Plaintiff on June 6, 2013, Springwell wrote, "**Springwell is**

**required to alert mandated reporters of the outcome of the investigation that was based on**

**their report**."

368.   It is especially noteworthy that Springwell was so sure that the allegations were

unfound, that Springwell did not even contact Plaintiff when the report was made.

369.   On January 20, 2012, Plaintiff, answered a phone call and spoke to Marlborough

Police Officer Insani who told Plaintiff that Carol was about to be released from Marlborough

Hills in the next few days and she desired her car back.

370.   Officer Insani informed Plaintiff that he had already telephoned Dean Arthur

Gaudio, the Dean of the WNE Law, and informed Dean Gaudio that Plaintiff had stolen the

Case 1:17-cv-11343-WGY   Document 1-9   Filed 07/20/17   Page 106 of 249

Oultons' Car and that he intended to charge Plaintiff with larceny of a motor vehicle. Officer

Insani's defamatory telephone call to Dean Gaudio was made to maliciously, willfully, and

knowingly inflict as much emotional distress and professional harm on Plaintiff as possible.

371.    Officer Insani demanded that Plaintiff return the Oultons' Car immediately.

Plaintiff then telephoned Attorney Koch for advice on how to proceed.

372.    Plaintiff, after consulting with Attorney Koch, returned the Oultons' Car to their

garage on the night of January 20, 2012. Plaintiff left a copy of a Receipt from George's Service

for maintenance to the Oultons' Car while it was in Plaintiff's possession (**Exhibit 46**). Plaintiff

documented her return of the Oultons' Car by taking photographs of the Oultons' Car in the

garage at the Oulton Home (**Exhibit 47**).

373.    On January 23, 2012, Plaintiff, with great concern for her parent's physical,

emotional, and financial well-being, Plaintiff filed, , *pro se*:

        a)    Petition for the Appointment of Conservator for a Disabled Person or for a

Single Transaction in the interests of Donald Paul Oulton (Middlesex County Probate and

Family Court Docket No. MI12P0268PM) (**Exhibit 48**); and

        b)    Petition for the Appointment of Conservator for a Disabled Person or for a

Single Transaction in the interests of Carol Jane Oulton (Middlesex County Probate and

Family Court Docket No. MI12P0269PM) (**Exhibit 49**).

374.    The Affidavits in support of these Petitions stated the facts that are also presented

in this lawsuit. Plaintiff requested that the court appoint a neutral, disinterested third party

Conservator to oversee the Oultons' financial affairs in order to protect them from the fraud,

abuse, and conversion that now forms the basis of this lawsuit.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

375.     Also on January 23, 2012, Attorney Koch advised Plaintiff to take a friend with her to the Marlborough Police Station when she brought in the Oultons' car keys, so Plaintiff's 75-year old friend, John Baer, accompanied her.

376.     On the morning of January 24, 2012, Plaintiff drove from Agawam, through an ice storm, to meet with Officer Insani at the Marlborough Police Station and deliver the Oultons' Car keys and house key.  At Plaintiff's request, Officer Insani reluctantly signed a Receipt for the keys (Exhibit 50).

377.     Rather than simply take the keys from Plaintiff, Officer Insani Mirandized and then detained Plaintiff at the station for several hours.  Even though Officer Insani knew that Plaintiff had borrowed the Oultons' Car with their permission (evidenced in the Marlborough Police Department's Incident Report, which is discussed at length below), and despite stating that he was in a rush to return the keys to Carol, Officer Insani toyed with Plaintiff at the Marlborough Police Station for several hours and tried, with several sarcastic remarks and comments about Plaintiff's status as a law student, to elicit disorderly conduct from Plaintiff. Plaintiff, however, remained calm, cordial, and courteous.

378.     It was during the malicious detention of Plaintiff that Officer Insani revealed to Plaintiff that he was acting on behalf of and in concert with the Natick Police Department.  The Natick Police, Officer Insani said, were acting on the instructions of the Sibling Defendants.

379.     Capt. Hladick, who was still employed as a lieutenant with the Natick Fire Department at that time, is close personal friends with a number of Natick Police officials.

380.     Officer Insani, the Natick Police officials, and the Sibling Defendants all knew that Plaintiff had borrowed the Oultons' Car with the Oultons' permission, and that Plaintiff was unaware that Carol was being released.

104

381.   During the interview at the Marlborough Police Station, Plaintiff asked Officer Insani several times if she were being arrested but Officer Insani refused to answer.  He would not, however, allow Plaintiff to leave the Marlborough Police Station after being given a Miranda warning.

382.   After several hours of detention, Plaintiff was instructed to return to the Marlborough Police Station with the Oultons' Checkbook, mail, and any other items that Plaintiff had been safekeeping.

383.   Plaintiff returned to the Marlborough Police Station later that day to drop off the Oultons' mail and checkbook that Plaintiff had been safekeeping for the Oultons.

384.   At some point during the interview Officer Insani mentioned to Plaintiff that he, too, had attended Western New England University, the school that Plaintiff was attending at the time.  Officer Insani then sarcastically told Plaintiff that she should be grateful that he did not charge her with Larceny of a Motor Vehicle, and she should thank him for not arresting her that day.  Officer Insani told Plaintiff that he would appreciate a token from his alma mater, now that the name of the school had changed from Western New England College to Western New England University.  Plaintiff realized that Officer Insani's request for a gift was improper, but she chose to comply with it, anyway.  Upon Plaintiff's return to school, Plaintiff dutifully purchased a hooded sweatshirt from the Western New England University Bookstore and had it shipped, via FedEx, to Officer Insani at the Marlborough Police Station.  Plaintiff complied with Officer Insani's improper request because Officer Insani had been rude and hostile during the interview, Plaintiff was scared of him and had been greatly intimidated by him, and because Plaintiff did not want any more trouble with anyone from the Marlborough Police Department.

385.   In the Marlborough Police Incident Report ("Marlborough Incident No. 12-238 OF") subsequently written by Officer Insani and approved by Lieutenant Thomas Bryant ("Lt.

105

Bryant") on January 26, 2012 (<u>Exhibit 51</u>), Officer Insani characterized the incident as one of

**"MOTOR VEH, LARCENY OF, 266 28B[28]"** [emphasis added], named Plaintiff as the

"SUSPECT," and indicated that the incident is still "OPEN."



---

[28] <u>G. L. c. 266 § 28: Motor Vehicle or Trailer; Theft or Concealment; Operation Without Owner's Consent After Revocation of License; Penalty</u>. (b) Whoever conceals any motor vehicle or trailer thief knowing him to be such, shall be punished by imprisonment for not more than ten years or by imprisonment in jail or house of correction for not more than two and one-half years or by a fine of not more than five thousand dollars, or both.

386.    Officer Insani misrepresented that the Oultons' Car had been "STOLEN" (by

Plaintiff), when, in fact, they knew that Plaintiff had been driving the Oultons' Car with

permission of its joint owners, Donald and Carol.

| # | VEHICLE(S) | YEAR | MAKE | STYLE | COLOR1 | COLOR2 | REG | VALUE |
|---|---|---|---|---|---|---|---|---|
| 1 | FIVE HUNDRED | 2006 | FORD | 4D | BLK | BLK | MA 688L56 | $10,000.00 |
| | STATUS: Stolen | | | | | | DATE: 01/20/2012 | |
| | OWNER: OULTON, CAROL JANE | | | | | | | |
| | VIN: 1FAFP23186G116614 | | | | | | | |

387.    Officer Insani began the narrative in the Incident Report with the following:

```
                    Marlborough Police Department            Page: 1
                  NARRATIVE FOR PATROL ROBERT INSANT
          Ref: 12-238-OF
```

On thursday January 19, 2012 I was dispatched to Marlboro Hills on Northboro Rd. to speak with a patient. At
this location I spoke with Carol Oulton who stated that her husband gave their daughter permission to take her car
while the daughters car was being repaired. Carol stated that her Husband has dimensia, therefore prefers if I did
not speak with him. Carol stated that around Thanksgiving, November 24, 2011 her daughter Sarah Oulton need
to use their vehicle due to her car requiring maintenance, brake repair. Carol stated that she allowed their
daughter to use the vehicle with the understanding that she will returned the vehicle to them prior to their release
from Marlboro Hills. Carol stated that she anticipates being released in the near future so she would like her
vehicle returned to her. Carol also stated that their daughter, Sarah Oulton also has her check book, house keys
and their mail, which she would also like returned to her.

388.    Officer Insani purposely omitted all mention of Officer Insani's defamatory

telephone calls to WNE Law Dean Gaudio from the Incident Report.

389.    Officer Insani also purposely omitted the crucial fact that Plaintiff had not yet

returned the Oultons' Car to the Oultons because Plaintiff was unaware of the Oultons'

condition, whether they were dead or alive, and she certainly had no way to know if the Oultons

were being discharged from Marlborough Hills and in need of the Oultons' Car.

390.    Officer Insani also purposely omitted from the Incident Report all mention of

Officer Insani's three-hour detention of Plaintiff, his issuance of a Miranda warning on Plaintiff,

and his intimidating and improper request for a "thank you" gift from the Incident Report.

107

391.   On January 24, 2012, at 2:39 p.m., as Plaintiff and her friend, John Baer, drove home from the interview at the Marlborough Police Station, Plaintiff received a text message from D. Oulton that said:

> YOU BETTER BE LISTENING TO WHAT I'M TELLING YOU.
> PUT EVERYTING BACK IN PLACE OR YOUR WORLD WILL
> CHANGE.  THIS IS YOUR LAST SIDEBAR.

392.   Plaintiff then received a telephone call from D. Oulton. Plaintiff and John Baer listened to D. Oulton through the speaker phone:

> **ALL OF US ARE RIPSH\*T AT YOU FOR FILING IN
> COURT AND GETTING A LAWYER**.  I'M GETTING TEXTS
> AND CALLS FROM **CAROL, NANCY, AND EVERYONE**.  **IF
> YOU DON'T BACK OFF, DROP THIS CASE, GET RID OF
> YOUR LAWYER, PUT YOUR HANDS UP, AND BACK
> AWAY, WE WILL F\*CK YOU UP**.  YOUR WORLD AND
> YOUR LIFE AS YOU KNOW IT WILL END.

393.   Plaintiff asked D. Oulton, ***"Who is threatening me?"***

394.   D. Oulton replied:

> **ALL OF US**.  **JUST DROP THE CASE OR YOUR LIFE AS
> YOU KNOW IT WILL END**.  **WE WILL F\*CK YOU UP
> FOREVER**.  **YOU HAVE NO IDEA WHAT THEY ARE
> PLANNING FOR YOU**.
> [emphasis added]

395.   Plaintiff was extremely intimidated and shaken by D. Oulton's text and telephone call.  Plaintiff took D. Oulton's threats very seriously.

396.   On January 31, 2012, at 7:47 p.m.  Plaintiff received a voice mail from Donald's visiting nurse, Patti Supple.  Nurse Supple was concerned that Plaintiff had been blocked from all access to and contact with her parents.

397.   On February 3, 2012, Plaintiff filed a Motion to Amend Petition for Conservatorship of Donald Paul Oulton and Upgrade the Status of This Petition to Emergency (Docket No. MI12P0268PM) (Exhibit 52) and a Motion to Amend Petition for Conservatorship

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

of Carol Jane Oulton and Upgrade the Status of This Petition to Emergency (Docket

No. MI12P0269PM) (**Exhibit 53**).  These petitions requested a disinterested third party be

appointed conservator and restated the urgent need to involve a disinterested third party to

oversee the Oultons' affairs.

398.    In furtherance of the Defendants' criminal scheme, Marlborough Hills

administrators and staff unlawfully tampered with Plaintiff's and Donald's mail, in violation of

18 U.S.C. § 1703(b)[29] and 18 U.S.C. § 1708[30].

399.    On February 15, 2012, Plaintiff, still desperate to remain in contact with the

Oultons and frustrated by her lack of visits and telephone calls with them, put a package together

for Donald.  The package contained stationery, pens, paper, and ten pre-addressed, postage-paid

envelopes.  Plaintiff also enclosed a card for Donald (**Exhibit 54**).

400.    Plaintiff sent her package for Donald, via United States Certified Priority Mail, to

the following address:

> Mr. Donald P. Oulton
> 2nd Floor
> Marlboro Hills

---

[29] **18 U.S. Code § 1703(b):  Delay or Destruction of Mail or Newspapers.**  (b)  Whoever, being a Postal Service officer or employee, improperly detains, delays, or destroys any newspaper, or permits any other person to detain, delay, or destroy the same, or opens, or permits any other person to open, any mail or package of newspapers not directed to the office where he is employed; or Whoever, without authority, opens, or destroys any mail or package of newspapers not directed to him, shall be fined under this title or imprisoned not more than one year, or both. [emphasis added]

[30] **18 U.S. Code § 1708:  Theft or Receipt of Stolen Mail Matter Generally.**  Whoever steals, takes, or abstracts, or by fraud or deception obtains, or attempts so to obtain, from or out of any mail, post office, or station thereof, letter box, mail receptacle, or any mail route or other authorized depository for mail matter, or from a letter or mail carrier, any letter, postal card, package, bag, or mail, or abstracts or removes from any such letter, package, bag, or mail, any article or thing contained therein, or secretes, embezzles, or destroys any such letter, postal card, package, bag, or mail, or any article or thing contained therein; or
     Whoever steals, takes, or abstracts, or by fraud or deception obtains any letter, postal card, package, bag, or mail, or any article or thing contained therein which has been left for collection upon or adjacent to a collection box or other authorized depository of mail matter; or
     Whoever buys, receives, or conceals, or unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted—
     Shall be fined under this title or imprisoned not more than five years, or both. [emphasis added]

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

121 North Road East
Marlboro, MA 01752.

401.    The <u>second floor</u> of Marlborough Hills is the locked Marlborough Hills

Alzheimer's Unit.



*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

02-15-2012

Dear Dad,
    I miss you! I've tried to call you
and visit you but they won't
let me get through to you.
    Please write on the enclosed
paper, if you'd like. I would
love to stay in touch.
    Graduation is in 94 days.

All the dogs miss you, too!
            Love, Sarah

402.    Only one day later, on February 16, 2012, using a pre-addressed, postage-paid

envelope that Plaintiff sent to Donald at Marlborough Hills, Donald mailed a letter, via United

States First Class Mail, to Plaintiff (**Exhibit 55**).

403.    In his letter to Plaintiff Donald wrote:

> **Of course I want to keep in touch.  Two doctors told me I am
> well enough to go home but neither is my "releasing" doctor.**
> They tell me that **I am all better but I am not released.**  Great
> hearing from you.  My love to you.
>
> "Dear Old Dad."
> [emphasis added]

111

DONALD OULTON
MARLBORO HILLS
121 NORTHBORO ROAD EAST
MARLBORO, MA  01752



SARAH OULTON
69 AUTUMN STREET
AGAWAM  MA  01001

0100142801

02-16-2012

Sarah,

Of course I want to keep in touch.

Two Dr.'s told me I am well enough to go home, but neither is my "releasing" Dr.'s. They tell me I am not released.

Great hearing from you.

My love to you, dear "Old" Dad

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

404.   On a second consecutive day, February 17, 2012, using another of the pre-addressed, postage-paid envelope that Plaintiff sent to Donald at Marlborough Hills, Donald mailed a second letter, via United States First Class Mail, to Plaintiff (**Exhibit 56**).   In his second letter to Plaintiff Donald wrote:

> **Sarah.  I don't know what day it is!**
>
> I'm sending this because I love you!
> **Keep in touch.**
>
> Love, Dad
> [emphasis added]

DONALD OULTON
MARLBORO HILLS
121 NORTHBORO ROAD EAST
MARLBOROUGH, MA 01752



SARAH OULTON
19 AUTUMN STREET
AGAWAM, MA 01001

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

*02-17-2012*

*Sarah,*

*I don't know what day it is! I'm sending this because I love you! (note the double exclamation points!)*

*Keep in touch!*

*Love,*

*Dad*

405.    Quite sadly, Plaintiff never heard from Donald again after receiving those two

letters.  Upon information and belief, the staff at Marlborough Hills unlawfully intercepted the

mail sent between Plaintiff and Donald.

406.    By closing off the U.S. Mail, the final channel through which Donald or Carol

could have remained in contact with Plaintiff, the staff and administrators of Marlborough Hills

violated 105 Code Mass. Regs § 150.001 (1994)[31].

407.    In the locked Marlborough Hills Alzheimer's Unit, Donald was dependent

entirely on Speroni, DelCid, Edwards, Matovu, French, and others, and those nurses had already

informed Plaintiff that they had no intention of allowing Plaintiff to continue to have contact

with her parents ever again.

408.    From the final two letters that Donald mailed to Plaintiff, it is quite clear that

Donald was very eager to remain in contact with Plaintiff.  He sent two notes to Plaintiff

---

[31] **105 Code Mass. Regs. § 150.001 (1994): Aversive Interventions** shall mean any interventive technique based upon behavior modification principles which applies painful, <u>seclusive</u> or intrusive methods, stimuli, or punishments to a patient or resident in order to correct, decrease or eliminate any undesirable behaviors.  [emphasis added]

114

immediately after receiving Plaintiff's package and he expressed his desire to remain in contact with Plaintiff.

409.     Marlborough Hills administrators and staff, who had already unlawfully closed off communications and contact among Plaintiff and the Oultons since December 25, 2011, tampered with the United States Mail in violation of 18 U.S.C. § 1708, in order to prevent the Oultons from having any contact with Plaintiff.

410.     Marlborough Hills administrators and staff, in furtherance of the criminal scheme at the heart of this lawsuit, unlawfully removed the pens, paper and pre-addressed, postage-paid envelopes from Donald's room immediately after learning that Donald was using the items to communicate with Plaintiff.

411.     On February 17, 2012, Plaintiff filed a Motion for Emergency Appointment of Third Party Guardian Ad Litem for Donald Oulton and a Motion for Emergency Appointment of Third Party Guardian Ad Litem for Carol Oulton (**Exhibit 57**).

412.     On February 23, 2012, accompanied by her friend, John Baer, Plaintiff visited with Attorney Robert O'Regan at Burns and Levinson LLP in Boston to discuss the nursing home's unlawful interference with Plaintiff and the Oultons since December 25, 2012.  Although not engaged as Plaintiff's counsel, Attorney O'Regan offered to make a phone call to Michael Lincoln, the Director of Marlborough Hills ("Lincoln"), and inform Lincoln that it was unlawful to bar Plaintiff from visiting with her parents at the facility.

413.     In the presence of Plaintiff and Mr. Baer, Attorney O'Regan placed the call to Lincoln at Marlborough Hills but Lincoln was unavailable to speak.  Attorney O'Regan informed Plaintiff that he would contact her with the outcome of the conversation as soon as Lincoln returned the call to Attorney O'Regan.

414.    Affidavits from Attorney O'Regan (Exhibit 58) and his secretary, Susan Searles (Exhibit 59), which document this telephone call that Attorney O'Regan had with Lincoln, are attached to this Amended Complaint.

415.    The Affidavit of Attorney O'Regan states, in relevant part:

2.    Sarah Oulton was employed at Burns & Levinson for a period of time. I do not recall the dates of her employment. After Sarah left Burns & Levinson, I had no contact with her for some time until we had a chance encounter in February, 2012, at the Middlesex Probate and Family Court in Cambridge. At that time, Sarah mentioned some difficulties she was having in seeing her parents. At some point thereafter, Sarah came to the office for a consultation to explore whether Burns & Levinson or I might represent her in this matter.

3.    Although that initial consultation did not result in her engaging the firm or myself to represent her, having heard the difficulties that she was encountering, I agreed as a personal favor to place a call to an administrator at the nursing home where her parents were staying. Sarah provided me with the administrator's name. I received a return telephone call to a message I left. The topic of the call was whether there were any restrictions placed by the nursing home on contact between Sarah and her parents. I learned from the administrator that there were no such restrictions in place. I do not recall the name of the administrator I spoke with.

4.    Following the call, I requested my assistant, Susan Searles, to let Sarah know that the administrator from the nursing home had told me there were no restrictions on contact between Sarah and her parents.

Signed under the penalties of perjury this _17th_ day of July, 2013.

Robert J. O'Regan

116

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

416. The Affidavit from Attorney O'Regan's secretary, Susan Searles, states in relevant part:

2. On or about February 23, 2012, Attorney O'Regan asked me to call Sarah Oulton.

3. When I called Sarah, she did not answer. I left a message on her answering machine. The message was to the effect that Mr. O'Regan had spoken with an administrator at a nursing home where Sarah's parents were residing, and that there were no restrictions on Sarah's ability to see her parents.

4. I do not recall the name of the administrator.

5. I have reviewed a document from Sarah Oulton that she represented was a transcript of my telephone message (copy attached). I have no reason to doubt Sarah's representation that the attached document is an accurate transcript of my message.

Signed under the penalties of perjury this $\underline{17^{th}}$ day of July, 2013.

Susan Searles

## Transcript of Voice Mail Message Left By Susan Searles

Thursday, February 23rd at 11:36 a.m.

Hi Sarah,

It's Susan from Bob O'Regan's office. Bob wanted me to tell you that he spoke to Michael Lincoln of the nursing home and they said, "Absolutely you can visit your father, your mother . . . whoever you want to visit there, it's perfectly fine."

Um, he straightened it out and you're all set. If you have any questions, give me a call

617-345-3883.

Thanks. Bye-bye.

417.    Three crucial points related to the O'Regan-Lincoln telephone call must be noted:

a)    first, Attorney O'Regan contacted Lincoln on February 23, 2012, to discuss Marlborough Hills's unlawful banning of Plaintiff since December 25, 2012. Lincoln made no mention to Attorney O'Regan of any "unruly" or disruptive behavior or of any problems whatsoever;

b)    second, no mention of banning Plaintiff on January 18, 2012, was made, nor was Marlborough Hills's EAMRF ever mentioned by Lincoln during his conversation with Attorney O'Regan; and

c)    third, Attorney O'Regan ascertained, through his discussion with Lincoln on February 23, 2012, that "**[a]bsolutely, [Plaintiff] can visit [her] father, [her] mother . . . whoever [Plaintiff wants] to visit there, it's perfectly fine.**"

418.    On March 2, 2012, after Attorney O'Regan had apparently cleared the way for Plaintiff to resume contact with the Oultons, Plaintiff purchased $82.87 worth of men's clothing items at Walmart for Donald (**Exhibit 60**) and attempted to deliver them to him.  Plaintiff was allowed inside the facility for the first time since December 25, 2011, however once inside Marlborough Hills, Plaintiff was not allowed by Marlborough Hills staff (Social Worker Andrea Edwards and several nurses on the locked Alzheimer's Unit) to give the items of clothing and snacks to Donald.

419.    Also on March 2, 2012, Plaintiff purchased a cell phone (**Exhibit 61**) for Donald Oulton because the staff of Marlborough Hills had consistently denied Donald access to a telephone, in violation of 111 C.M.R. 72D.  Plaintiff attempted to deliver the phone to Donald but Nurse Karen Speroni, who was in charge of the locked Marlborough Hills Alzheimer's Unit, would not allow Donald to have it.

420.    Speroni told Plaintiff, "[t]he Health Care Proxy has been invoked, and you are not allowed to leave anything for your father."

421.    Speroni, willfully and knowingly conspired with her co-defendants to abuse the Oultons' Health Care Proxy documents for the sole, illegal purpose of keeping Plaintiff away from her parents.

422.    Also on March 2, 2012, Plaintiff filed Motions for Extension of Time by Which to File Medical Certificate in the Petitions for Conservator cases that Plaintiff filed for Donald and Carol (**Exhibit 62**).

423.    At various times in early March 2012, Plaintiff attempted to contact Donald by telephone, however, Lincoln and the staff of Marlborough Hills, did not follow through with Lincoln's statement to Attorney O'Regan that Plaintiff was allowed to visit Donald and Carol.

424.    At various times between February 23, 2012, and April 2012, Plaintiff was repeatedly denied access to Donald and Carol by nurses Donna DelCid, Karen Speroni, Christine French, Sauda Matovu, and Unit Secretary Denise Stephenson. Each of those licensed nursing home staff members knew or should have known that Plaintiff was entitled to visit with her parents, under state law (as discussed above) and federal law (42 U.S.C. § 1395i-3 and 42 U.S.C. § 1396r) , but each one of them stayed loyal to their co-conspirators in furtherance of the criminal enterprise forming the foundation of this lawsuit.

425.    Each time one of the Marlborough Hills employees interfered with Plaintiff's access to her parents (whether in person, over the telephone, or by unlawfully tampering with Plaintiff's and Donald's mail), she made note of the person's name. Telephone calls to the Oultons were not allowed, the Oultons were not allowed to place telephone calls, and Plaintiff was repeatedly told that she was not allowed to visit the Oultons ever again. When questioned by Plaintiff why this was still happening (after Attorney O'Regan's discussion with Lincoln) the

119

staff informed Plaintiff that she should address the issue with Gina Queiros, Senior

Administrator of Marlborough Hills, or Michael Lincoln, Administrator of Marlborough Hills.

Plaintiff placed calls to Queiros and Lincoln but the calls were never returned.

426.     In early March 2012, Plaintiff contacted Attorney Dennis R. Brown ("Attorney

D.R. Brown") and met with him at his office on March 7, 2012, to discuss the background of the

case and seek Attorney D.R. Brown's assistance with the Petitions for Conservator.

427.     Plaintiff was accompanied to Attorney D.R. Brown's office by her friend, John

Baer.  Attorney D.R. Brown asked Mr. Baer to remain in the Waiting Area and Attorney D.R.

Brown invited his associate, Attorney Lisa A. Vecchio ("Attorney Vecchio") to join Plaintiff and

Attorney D.R. Brown in the Conference Room.

428.     At no point in the meeting with Attorneys Brown and Vecchio was Plaintiff

informed that Attorney D.R. Brown had represented Plaintiff's brother, D. Oulton, or Plaintiff's

brother-in-law, Capt. Hladick, as is required under Rules 1.7(a) and 1.7(b) of the Massachusetts

Rule of Professional Conduct.

429.     Moreover, at no time during the initial meeting or at any point thereafter did

Attorneys Brown and Vecchio make any attempt to procure from any of the three impermissibly

conflicted parties (Plaintiff, D. Oulton, or Capt. Hladick) the conflict waiver that attorneys

representing adverse parties are required to procure pursuant to Massachusetts Rule of

Professional Conduct 1.7(a)(2) and 1.7(b)(2).

430.     Had Plaintiff been informed of Dennis R. Brown, P.C.'s impermissible conflicts

of interest Plaintiff would have refused to grant the waiver required under Massachusetts Rule of

Professional Conduct 1.7(a)(2) and 1.7(b)(2) and would have never retained Attorney D.R.

Brown or Attorney Vecchio in the Petitions for Conservator.  Plaintiff would have sought other

legal counsel at that point.

431.    Indeed, had Plaintiff simply continued the Petitions for Conservator *pro se* the Oultons' interests would have been far better protected, as discussed below.

432.    Throughout the course of Attorney D.R. Brown's and Attorney Vecchio's representation of Plaintiff, Plaintiff gave Attorney D.R. Brown and Attorney Vecchio a wealth of information to inform them of how dangerous the Oultons' situation was at Marlborough Hills. Plaintiff, who was unaware of the firm's impermissible conflict, naively thought that Attorney D.R. Brown and Attorney Vecchio would represent Plaintiff (and, by extension, the Oultons, because Plaintiff's Petitions for Conservator were in the Oultons' best interests) but they clearly did not.

433.    On March 8, 2012, Plaintiff, sent an email to Attorneys Brown and Vecchio in which Plaintiff noted the numerous violations that the staff of Marlborough Hills was committing with respect to the Oulton Family and attached the Marlborough Hills Billing and Payor Information Booklet. (**Exhibit 63**).

434.    The Marlborough Hills Billing and Payor Information booklet (**Exhibit 64**) transmitted by Plaintiff to Attorneys Brown and Vecchio contains the following sections that are relevant to this case:

### ACKNOWLEDGMENT OF FAMILY COUNCIL POLICY

**Marlborough Hills Healthcare Center, in accordance with state laws and recent amendments to Mass** [sic] **General Laws, allows resident's** [sic] **families, friends and representative** [sic] **may form and meet as a Family Council.**[sic]
[emphasis added]

**The Facility Family Council can meet any time as requested. The Facility may not interfere with the family council's receipt of outside correspondence addressed to it, and must ensure that the correspondence is delivered unopened to the governing body.**
[emphasis added]

### MEALS

121

...

**<u>Visitors are encouraged to dine with their family members, especially when the facility observes Thanksgiving, Christmas, Easter, and Mother's Day</u>**.
[emphasis added]

...

## TELEVISION AND TELEPHONE SERVICES

**<u>You may establish personal phone service and cable in your room</u>**. Phones, televisions, initiation of service and all charges are the responsibility of the resident. Please check with Social Services for **<u>the telephone vendor and t elephone number to contact them</u>**. There is a public pay phone in the facility for your convenience. Should you require television cable service, please check with Social Services for the cable vendor and telephone number to contact them.
[emphasis added]

## YOUR FAMILY AND FRIENDS

Although residents are our focus, **<u>we believe your family and friends deserve special treatment too</u>**.
[emphasis added]

…

## VISITING

**<u>You may have visits from family members</u>**, physicians **<u>and friends at reasonable times during the day and evening</u>** so long as it does not interfere with the rights of other Residents.
[emphasis added]

…

Subject to your right to deny and withdraw consent at any time, **<u>the Facility must provide access to immediate family or other relatives</u>**. Subject to reasonable restrictions and your right to deny or withdraw consent at any time, the Facility must provide access to others who are visiting with your consent. The Facility will provide reasonable access to any resident by any entity or individual that provides health, social, legal, or other services to the resident, subject to the resident's right to deny or withdraw consent at any time.
[emphasis added]

## RESIDENT'S RIGHTS AND RESPONSIBILITIES

**All residents have the right to a dignified existence and to communicate with individuals and representatives of their choice. The facility will protect and promote your rights.** This guide is a written notification of your rights and responsibilities.
[emphasis added]

...

## OUR RESPONSIBILITIES

**The facility has the following obligations to our residents, their legal representatives and/or next of kin:**

> **-- not to mandate that a third party be responsible for giving authorization and consent on a resident's behalf, unless the resident has been judged incompetent by a court of law**
> [emphasis added]

> **-- not to encourage residents to waive or limit our liability for loss of personal property or any injury a resident may suffer as a result of our negligence**
> [emphasis added]

> **-- to not request or encourage residents to waive any benefit or right conferred by any statute or regulation intended to provide protection to or for residents of any long-term care facility.**
> [emphasis added]

## RESIDENTS' RIGHTS

**Residents have the right to a dignified existence and to communicate with individuals and representatives of their choice**. The facility will protect and promote your rights as outlined below:
[emphasis added]

1. **Each resident is recognized as an individual to be treated with respect by all family, visitors, personnel, volunteers and other caregivers and to be accepted as the person he/she is. Residents have the right to be free from verbal, sexual, physical and mental abuse, corporal punishment and involuntary seclusion.**
[emphasis added]

123

…

6. **Each resident's right to privacy will be respected with** his or her room, bath, records, **personal possessions, and making and receiving telephone calls.  Every resident may send and receive ail unopened.   Stationary, postage and writing implements are available at the facility**.
[emphasis added]

…

11. **Each resident is encouraged to retain and use personal clothing and possessions** as space permits unless to do so would infringe upon the right of other residents.
[emphasis added]

…

19. **Residents and their legal representative or next of kin, if known, will be informed immediately should there be**:
[emphasis added]

> **an accident involving the resident, which results in injury and has the potential for requiring physician intervention**,
> [emphasis added]
>
> **a significant change in the resident's physical, mental, or psychosocial status such as a deterioration in health, mental, or psychosocial status in either life-threatening  conditions or clinical complications**
> [emphasis added] or;
>
> **a need to alter treatment significantly** (e.g., a need to discontinue an existing form of treatment due to adverse consequences, or to commence a new form of treatment).
> [emphasis added]

…

22. A resident may be discharged or transferred when the transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the nursing facility;  the transfer or discharge is appropriate because the resident's health has improved sufficiently so that the resident no longer needs the services provided by the facility.

...

**27. Residents have the right to make choices about aspects of their life in the facility that is important to them. Residents' opinions are valued**.
[emphasis added]

### HEALTH CARE PROXY

**The Health Care Agent may act for our ONLY if your doctor determines in writing that you are unable to make or communicate your own HEALTH CARE decisions (e.g., if you are in coma). Your health Care Agent would then have the legal authority to make all health care decisions for you including decisions regarding life-sustaining treatment**. But the Health Care Proxy Law also allows you to put specific limits on your Agent's authority if you choose to do so.
[emphasis added]

**The purpose of the Health Care Proxy is to make certain that your wishes are respected and carried out if you become unable to decide for yourself**...
[emphasis added]

435.    On March 13, 2012, at 6:37 p.m.  Plaintiff sent an email (**Exhibit 65**) to Attorney

D.R. Brown, which conveyed Plaintiff's continued concerns for the welfare of Donald and the

mistreatment of Donald at Marlborough Hills.  The email said, in part:

> I just spoke to my dad after class got out at 5:30 p.m.  He didn't mention what he calls "The Lawsuit" and he indicated that **he definitely does want to stay in touch with me.  He said that only people who call him are my mother and me**.
> [emphasis added]
>
> **HE DOES NOT WANT TO BE THERE**.  He is always a nervous wreck on the phone because he's out in Grand Central and **there's no privacy, patients run over his feet with their wheelchairs**, etc.
> [emphasis added]
>
> NOTE: **the family could have a phone installed in his room but – thanks to the Health Care Agent from Hell, Carol Hladick – they won't let him have a phone**.  They just want his pension check (roughly $7,000 per month) deposited on the first of every

125

month so they don't have to actually talk with him or interact with
him.
[emphasis added]

**I asked him if he's had visitors lately and he said, "NO." I**
**asked if anyone calls him and he said, "No." I purposely asked**
**twice (in the beginning of the call and then, again, later) and he**
**seemed pretty sharp**.
[emphasis added]

436.    In the same email, at Attorney D.R. Brown's request, Plaintiff then provided to

Attorney D.R. Brown instructions on how to walk through the Marlborough Hills facility <u>without</u>

signing into the Visitor Log.  Attorney D.R. Brown had suggested to Plaintiff that they should

both visit Donald at Marlborough Hills, but Attorney D.R. Brown did not want to leave a record

of his visit to the facility.

437.    On March 15, 2012, at 10:47 a.m., Attorney D.R. Brown in an email to Plaintiff,

Attorney D.R. Brown referred to Plaintiff as "Carol" (Exhibit 66).

438.    The (DRAFT) Motion for Appointment of Guardian Ad Litem that Plaintiff

drafted at the request of Attorneys Brown and Vecchio (for the production of which Dennis R.

Brown, P.C. later billed Plaintiff) contained all the facts that form the foundation of this lawsuit,

through the date on which the draft document was written by Plaintiff for Attorneys D.R. Brown

and Vecchio.

439.    On March 20, 2012, at 6:52 a.m. Plaintiff sent an email to Attorneys Brown and

Vecchio (Exhibit 67) regarding "Parents' Visiting Nurse email and Voice Mail."  Plaintiff

forwarded an email that Plaintiff received from Donald's long-time Visiting Nurse, Patti Supple

on February 8, 2012.  Nurse Supple's emails indicate that Nurse Supple was able to speak with

Donald on the telephone on or around February 8, 2012.  Nurse Supple's emails stated, in part:

**I spoke to your dad yesterday**.  I did not have any trouble getting
through to him.  He was not very talkative.  **He told me he does**
**not belong there**.  Was expecting your mom and Nancy to visit

126

yesterday but it was late afternoon when I spoke to him.  He was
not sure that they were still coming at that point.
[emphasis added]

440.     Fifteen days later, however, on February 23, 2012 (the same date on which

Attorney O'Regan spoke to Lincoln on Plaintiff's behalf), Nurse Supple was unable to reach

Donald on the telephone due to Marlborough Hills' unlawful "invoking" of the Oultons' Health

Care Proxy documents.  Nurse Supple's second email was sent to Plaintiff on February 23, 2012

(**Exhibit 68**).  Nurse Supple wrote:

> Just so you know **I have not been able to reach him, but have
> tried, just tried again a little while ago and he was sleeping
> they said.  They asked who I was and definitely put me thru to
> 3 people each time I called.**
>
> **Hope you made some headway with your attorneys this week.**
> [emphasis added]

441.     Nurse Supple was very concerned for the Oultons and Plaintiff because, she met

all three in 2007 and had become close to them, through visits she made to the Oulton Home,

over the years.

442.     C. Hladick, the Oultons' Health Care Agent and Marlborough Hills was

micromanaging the Oultons' lives and preventing the Oultons from having contact with not only

Plaintiff but also others.  Marlborough Hills staff also restricted access to other people outside of

Marlborough Hills, including his visiting nurse and his long-time friends, Dr. Edward Zullo and

John Baer.

443.     On the evening of March 23, 2012, Plaintiff and Attorney D.R. Brown visited

Donald, together, at Marlborough Hills.  At approximately 7:30 p.m., Plaintiff and Attorney D.R.

Brown walked through the facility without signing into the Visitor Log.  Attorney D.R. Brown

was adamant that he did not want there to be a record of his visit at Marlborough Hills.

444.    While visiting Donald, Plaintiff noticed an opened letter from the Attorney Jason

Port ("Attorney Port") of the law firm of Mirick O'Connell DiMallie & Lougee LLP ("Mirick

O'Connell") on Donald's nightstand.  Plaintiff picked up the envelope and pointed at the name in

the return address to signify to Attorney D.R. Brown that Donald was represented by counsel.

445.    At all times relevant to this lawsuit Attorney Port and his Mirick O'Connell co-

defendants have maintained that they were involved in this case <u>solely</u> as the Oultons' legal

counsel and solely for the purpose of contesting the Petitions for Conservator that Plaintiff filed

in January 2012.

446.    On March 24, 2012, at 9:48 p.m., Plaintiff sent an email to Attorneys Brown and

Vecchio entitled, "Dad's Blue Cross/Blue Shield (<u>Exhibit 69</u>)."  In the email, Plaintiff wrote:

> This may be something to bring up on Monday and it completely
> underscores why I sought to have the court appoint a third-party
> Conservator to oversee my mother's and father's finances.  **I spoke
> to my father on the phone tonight**.
> [emphasis added]
>
> When I first called at 7:00 p.m. **the nurse** named Darlene told me
> that he was asleep and she **didn't want to wake him up**.
> [emphasis added]
>
> **I said, "He gets so few calls and doesn't have a phone that he
> told me it's okay for you to wake him up." That's the truth, for
> sure**.
> [emphasis added]
>
> **Darlene said, "Well, I'd rather not wake him up."**
> [emphasis added]
>
> Note, **they've been balking at cooperating with me at every
> turn** so I didn't know if this was true, **but I didn't want to get
> argumentative so I said, "Okay, then I'll call him when it's
> time for his night-time medicine.  What time will that be?"**
> [emphasis added]
>
> **Darlene said, "We'll wake him up at 9:00 p.m. so yeah, call
> back then and we'll get him up for the phone."**
> [emphasis added]

So I called at 9:00 p.m. and a nurse named Martha went and got him.

**He sounded really, really nervous to be on the phone out there at the desk.** He is never calm and communicative, but that's the way the family wants him because they don't want him pestering them with his phone calls and they don't want to deal with him.

**I said, "Dad, do you remember my visit from last night?"** I didn't mention Dennis at all.
[emphasis added]

**He said, "Of course I do!! It was a great visit last night!"**
[emphasis added]

**I said, "Did you have any visitors or calls today?"**
[emphasis added]

He said, **"You're the only one who calls, other than Mom,** but Mom came and saw me today.  Nancy was with her."

**I asked if they brought him the clock that the nurse (Sauda) told me last night that he needs and he said, "No."**

So I told him I'd bring him a clock next time I see him and that I will see him again soon.

Then **I said, "Dad, you sound awful whenever we talk on the phone.  Nervous.  You don't seem happy there at all."**
[emphasis added]

He said, **"No, of course not.  I want to get out of here more than anything."**
[emphasis added]

**I told him that I agree that he should be allowed to go home (and though I didn't mention it to him, I was thinking, "... especially since you're being detained there without any court order").**
[emphasis added]

**I said, "In a perfect world, what would you want?"**
[emphasis added]

129

He said, "I want to go home and I know that Mom wants to go home, too."
[emphasis added]

I said, "Well, maybe we can arrange for that to happen, Dad. There's nothing to keep you both from living at home with some help there. For what the nursing home is charging, you could be paying for a professional to help you guys out at your own home. Everything I ever did for you, Dad, I did so that you and Mom could stay in Natick and live at your own home. I want you to know that the whole purpose of getting the court involved is to get you in the best position possible for what you want, not what's convenient for the other family members."
[emphasis added]

When I mentioned the helper at home he got very nervous-sounding and said, "Sah, I don't have Blue Cross any more. I can't pay for anything anymore. That's why I am stuck here."
[emphasis added]

He sounded really upset talking about this, like maybe his finances have been decimated by the scumbags at that hell-hole of a nursing home, and I wouldn't be surprised if that's not the case.
[emphasis added]

So just to let you know: I think it's imperative that the court appoint an accountant or someone to give their finances the once-over. This nursing home has violated a number of its own policies (which I will note for you by sending the highlighted document that Dennis read last night before we went into the nursing home.
[emphasis added]

I'm just sick over the whole case. I thought you'd want this new info, for it's making my dad a nervous wreck. This is so sick. They're essentially imprisoning him on that tiny, uncomfortable bed in that rat-hole of a room. They won't let him communicate or wear the new clothes that I brought and am willing to launder personally. They've violated their own policies and surely Mass. General Laws and federal laws in their horrible treatment of me (the separation of us, refusal to let us interact, etc.).
[emphasis added]

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

**Now he tells me that the reason he's stuck there is that there's no more money.**
[emphasis added]

**Whether it's due to negligent account-keeping (which is how I became ensnared in this mess last year when they asked me to write out their checks so they could sign them and pay the bills) or whether it's due to malevolence on the part of the scumbags at the nursing home (which, yes, I do believe is part of this), their finances are in rough shape, according to my Dad, and I hope all this will be addressed with the court.**
[emphasis added]

I'll try to put this sad, gut-wrenching stuff out of my mind for the rest of the weekend. **I do miss them both. I miss my mom before she was brainwashed by my psychotic sister (Jim's ex). I miss the visits, and I miss cheering them up with my dogs. I miss talking to my father about law school, for crying out loud, because despite his age, he does not have dementia worthy of incarceration in the Dementia Ward.**
[emphasis added]

447.    On March 25, 2012, at 12:08 p.m., Plaintiff sent an email entitled "Parents'

Monthly Financial Obligations" to Attorney D.R. Brown (Exhibit 70) transmitting a document

entitled "Parents' File Folder List – 2011-2012" and wrote:

**Attached is the File Folder List that I made last year when my parents asked me to organize their files and help them maintain their bill-paying on a regular basis.** We kept this list in the box full of their files so they would know what was there. The file names that are highlighted in green are files for the accounts that are due monthly. Given that the mail is currently being stockpiled at the Natick Post Office, **I have no doubt that there are a lot of accounts in jeopardy at this point.**
[emphasis added]

**I'm attaching this now so that you can consider it when making your case to the judge about why this screwed-up family needs an overseer.**
[emphasis added]

**Last I heard most things were overdue. The insurance (housing and auto) was cancelled but then I intervened and convinced the agent to reinstate the Homeowners' policy on**

131

> **January 13th.** Since this was the only company that would accept
> my parents after my mother had a fire (ignited by a cigarette in her
> kitchen trash can but miraculously reported as an "electrical fire"
> once Andy Hladick intervened), **no other insurance company
> would have accepted their home if I let this policy lapse in
> January 2012**.
> [emphasis added]

448.    On March 26, 2012, a hearing was held in the Middlesex County Probate and

Family Court before Judge Donnelly.  For reasons discussed in detail below, a justiciable

controversy exists over whether Mirick O'Connell represented the Oultons, the Sibling

Defendants, or Marlborough Hills.

449.    During the March 26, 2012 hearing, Attorney Port stated that Carol Oulton had

been readmitted to Marlborough Hills for anxiety and respiratory problems.

450.    At no point in the hearing did Attorney Port reference the "original" affidavits of

Kumar and Lincoln that he "inadvertently" did not file with the court (discussed below).

451.    On March 26, 2012, at 3:15 p.m., Plaintiff sent an email to Attorney D.R. Brown

(Exhibit 71).  Plaintiff wrote:

> I wonder if we should initiate the Guardian Ad Litem for my dad
> ASAP.
>
> If you'd be kind enough to let me know if I can help you proceed
> with the GAL, I'd be most appreciative.

452.    On March 27, 2012, one day **AFTER** the hearing held before Judge Donnelly,

Attorney Port sent to the Middlesex County Probate and Family Court a letter (Exhibit 72)

transmitting three "Original" Affidavits of Lincoln and Kumar allegedly prepared by

Marlborough Hills Administrator Lincoln and Marlborough Hills Medical Director Vinay

Kumar, M.D. ("Kumar") (the "Fraudulent 'Original' Affidavits of Lincoln and Kumar").

453.    Attorney Port's transmittal letter was prepared by Mirick O'Connell.  The

document footer in Attorney Port's transmittal letter (which was automatically inserted into the

132

letter by Mirick O'Connell's internal document management software) reveals unique, <u>Mirick O'Connell law firm-specific</u> details about the letter:

      a)     <u>Practice Area</u>:  Probate;

      b)     <u>Client Number</u>:  **23982**;

      c)     <u>Matter Number</u>:  000**01**; and

      d)     <u>Document Number</u>:  A1974182.DOC.

454.    An image of the footer contained in Attorney Port's transmittal letter appears below:

                      {Practice Areas\Probate\23982\00001\A1974182.DOC}

455.    Attorney Port's transmittal letter to the Middlesex County Probate and Family Court stated:

> Enclosed for filing in the above-referenced matters are the following:
>
> 1.    Original Affidavit of Vinay Kumar, M.D. in the Conservatorship of Carol Oulton;
>
> 2.    Original Affidavit of Michael Lincoln in the Conservatorship of Carol J. Oulton; and
>
> 3.    Original Affidavit of Michael Lincoln in the Conservatorship of Donald P. Oulton.
>
> Please note these original affidavits were referenced and discussed in the hearing that took place on Monday, March 26, 2012; however, they were inadvertently not filed with the Court.

456.    Upon information and belief, the original affidavits of Lincoln and Kumar were manufactured after the March 26, 2012 hearing and back-dated, as discussed above.

457.    The self-serving, "Original" Affidavits of Lincoln and Kumar, which were signed by Kumar and Lincoln under the pain and penalties of perjury, contain blatant lies.  They are defamatory in nature and were crafted by Defendants solely to inflict as much emotional distress

and professional harm on Plaintiff as possible, in furtherance of the criminal enterprise forming the foundation of this lawsuit.

458.    The "Original" Affidavits of Lincoln and Kumar were completed <u>after</u> Marlborough Hills overdosed Carol, <u>after</u> Marlborough Hills executed its void Admission Agreement for Donald with C. Hladick, and <u>after</u> Marlborough Hills began, upon information and belief, fraudulently billing Medicare for the "care" of both Donald and Carol without having valid contracts for either Donald or Carol and after Marlborough Hills unlawfully denied Plaintiff contact with her parents.

459.    Kumar and Lincoln were highly motivated to do whatever possible to keep Plaintiff, the only Oulton Child concerned for the Oultons' physical, mental, and financial welfare, away from Marlborough Hills.

460.    The "**<u>Original Affidavit</u>**" **<u>of Kumar In Re: Conservatorship of Carol J. Oulton</u>** (the "Fraudulent "Original" Affidavit of Kumar Regarding Carol") (<u>Exhibit 73</u>), which Kumar signed "under the pains and penalties of perjury" on March 22, 2012, is anything but original.

461.    In fact, the "Original" Affidavit of Kumar Regarding Carol was prepared by Mirick O'Connell, not by Marlborough Hills.

462.    The document footer in the "Original" Affidavit of Kumar Regarding Carol (which was automatically inserted into the "Original Affidavit" by <u>Mirick O'Connell's</u> internal document management software) is nearly identical to the document footer contained in Attorney Port's transmittal letter (<u>Exhibit 72</u>).

463.    The document footer in the "Original" Affidavit of Kumar Regarding Carol reveals unique, <u>Mirick O'Connell law firm-specific</u> details:

        a)      <u>Practice Area</u>:  Probate;

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

b) <u>Client Number</u>: **23982**;

c) <u>Matter Number</u>: 00**001**; and

d) <u>Document Number</u>: A1970987.DOC.

464. An image of the footer contained in the "Original" Affidavit of Kumar Regarding Carol appears below:

{Practice Areas\Probate\23982\00001\A1970987.DOC}

465. In the perjurious "Original" Affidavit of Kumar Regarding Carol Kumar makes the following false statements:

3. In my role as the Medical Director of Marlborough Hills Health Care Center, I have had the opportunity to meet with Carol J. Oulton (the "Respondent"), review her medical records, and discuss her overall condition with the staff of Marlborough Hills Health Care Center.

4. The Respondent has been a resident at Marlborough Hills Health Care Center on two separate occasions over the last several months. The Respondent was fist admitted on or about November 29, 2011, following her discharge from Metrowest Medical Center. The Respondent was admitted for post-surgery care and rehab following surgery on a broken leg. The Respondent was discharged from Marlborough Hills Health Care Center on or about the beginning of February following the conclusion of her post-surgery care and rehab.

466. Kumar willfully and knowingly omits all reference to the near-fatal overdose inflicted on Carol by Marlborough Hills staff on November 30, 2011, which put Carol in her second life-threatening coma, and which resulted in Carol's hospitalization at UMass Memorial Hospital.

467.   In purposely omitting all reference to the overdose that the Marlborough Hills staff inflicted on Carol on November 30, 2011, Kumar willfully and knowingly violated 243 Code Mass. Regs. § 2.14(4)(d) (2012)[32].

468.   Also noteworthy is that the Marlborough Hills Invoices seeking payment from C. Hladick on the Oultons' Admission Agreements through August 2013 do not bill for Carol's admission on November 29, 2011.

469.   Kumar further states:

6.   At no time has the Respondent exhibited any traits or symptoms that what lead me to believe that the Respondent has a clinically diagnosed condition that results in the incapacity of the Respondent.

7.   The staff at Marlborough Hills Health Care Center has never reported to me that the Respondent has exhibited symptoms of a clinically diagnosed condition that results in the incapacity of the Respondent.

8.   The Respondent's medical records while at Marlborough Hills Health Care Center due not indicate that the Respondent has a clinically diagnosed condition that results in incapacity.

470.   It is noteworthy that Kumar states three times in the "Original" Affidavit of Kumar Regarding Carol that Carol did not have any "clinically diagnosed condition that results in . . . incapacity."

---

[32] **243 Code Mass. Regs. § 2.14(4)(d) (2012): Mandated Reporting. Report on Certain Adverse Events Occurring in a Licensee's Office.** Pursuant to M.G.L. c. 112, § 5, a licensee must report to the Board the following events, if precipitated by a treatment administered or a procedure performed in a licensee's office setting:
   (1) an unplanned patient transfer to a hospital; or
   (2) a patient's death, when this death was unexpected and not related to the natural course of the patient's illness or underlying condition.
The report shall be filed by the licensee as soon as possible, but in no event later than 30 days following the event.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

471.     Kumar was well aware of Carol's overdose at Marlborough Hills and was well aware that Marlborough Hills had "invoked" the Oulton's health care proxies.

472.     Despite Kumar's repeated claims that Carol did not lack capacity, Marlborough Hills staff, nevertheless, unlawfully used Carol's Health Care Proxy to deny Carol the right to freely place telephone calls and receive visits from Plaintiff, the Oulton Child with whom Carol had been closest prior to Carol's false imprisonment at Marlborough Hills.

473.     Kumar also falsely states:

9.     Prior to January 18, 2012, the Petitioner, Sarah A. Oulton (the "Petitioner") was never banned or restricted from accessing the Respondent or Marlborough Hills Health Care Center.

474.     As described in detail above, Plaintiff _was_ unlawfully banned from Marlborough Hills on December 25, 2012.  In response to the unlawful ban of Plaintiff from the Oultons' lives on December 25, 2012, Plaintiff immediately: (a) retained legal counsel, (b) procured, on January 4, 2012, a handwritten note from Carol stating that Carol wished to continue to see and hear from Plaintiff without limitation, and (c) had her attorney, Attorney Koch, send Marlborough Hills two letters regarding Marlborough Hills's unlawful interference with Plaintiff and the Oultons on January 8, 2012, and January 13, 2012.

10.     On or about January 18, 2012, the Respondent requested in writing that the Petitioner not be allowed to visit her because the Respondent was "fearful for her personal safety." A copy of the signed request is attached hereto as **Exhibit A.**

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

11.     Based on information and belief, Andrea Edwards, a social worker employed by Springwell, a Designated Protective Service Agency, completed an Elder Abuse Mandated Reporter Form on or about January 18, 2012, confirming the Respondent's fears and reporting possibly financial exploitation by the Petitioner.  A copy of the Elder Abuse Mandated Reporter Form is attached hereto as Exhibit B.

475.     As discussed above in detail, the EAMRF completed "on or about January 18, 2012," was completely fabricated, in bad faith, by Edwards and Marlborough Hills.  The document was replete with malicious, false statements made by Edwards.  It referenced a period of time during which Carol was hospitalized at LMH in Natick (not Marlborough Hills), and it was submitted to Springwell <u>only</u> after Marlborough Hills received two letters from Plaintiff's legal counsel indicating that Plaintiff intended to contest Marlborough Hills's unlawful banning of Plaintiff from the Oultons' lives on December 25, 2012.

476.     Most significantly the EAMRF was immediately ruled "UNSUBSTANTIATED" by Springwell.

477.     Kumar purposely omitted all reference to the outcome of the EAMRF in the "Original" Affidavit of Kumar Regarding Carol, solely to defame Plaintiff and paint Plaintiff in the worst light possible.

478.     It is quite significant that as Springwell completed an investigation into the EAMRF filed against Plaintiff, Springwell interviewed collateral sources of information, reviewed information provided to Springwell by those collateral sources, and still, nevertheless, <u>unsubstantiated</u> the EAMRF without even attempting to contact Plaintiff.

479.     Equally significant is the fact that because the EAMRF was filed by Marlborough Hills, a mandated reporter, and Springwell is "required to alert mandated reporters to the

138

outcome of the investigation that was based on their report," Marlborough Hills learned of Springwell's unsubstantiation of the EAMRF immediately, i.e., in January 2012.

480.    Despite knowing that the EAMRF was unsubstantiated by Springwell, Marlborough Hills relied on the document at every opportunity in order to inflict as much emotional distress and professional harm on Plaintiff as possible, and in order to strengthen its position in the criminal scheme underlying this lawsuit for maximum pecuniary gain.

481.    Kumar also states, "under the pains and penalties of perjury":

12.    Based on information and belief, the Petitioner has been rude and unruly with my staff on multiple occasions when she has visited the Respondent.

482.    The above self-serving statement is an outright lie, included in the "Original" Affidavit of Kumar Regarding Carol solely to defame Plaintiff and inflict as much injury on Plaintiff as possible.

483.    In addition, Kumar states:

13.    Based on information and belief, the Petitioner's actions in regard to the Respondent's care at Marlborough Hills Health Care Center. the Respondent's personal and financial needs, and relationships with other family members appear to be more of a family squabble than due the incapacity of the Respondent.

484.    Kumar makes no mention of the fact that Carol was being falsely imprisoned at Marlborough Hills in the absence of a valid contract for services, or that Carol was being denied access to visits and telephone calls from Plaintiff, her physicians, and her long-time friends. Kumar does, however, clearly align himself with his co-conspirator, C. Hladick, and he was willing to do whatever possible to conceal the fact that Marlborough Hills and C. Hladick conspired to unlawfully hold the Oultons at Marlborough Hills.

485.    Kumar states for the <u>fourth</u> time in his "Original" Affidavit of Kumar Regarding Carol:

   14.    Based on information and belief, the Respondent does not suffer from a clinically diagnosed condition resulting in incapacity.

486.    Significantly, Kumar signed this, self-serving and perjurious "Original" Affidavit of Kumar Regarding Carol "under the pains and penalties of perjury."

Signed under the pains and penalties of perjury this 22 day of March, 2012.

                                        Vinay Kumar, M.D.

487.    Quite notably, Kumar <u>did not</u> prepare an Affidavit attesting to Donald's <u>capacity</u>.

488.    Lincoln's "Original Affidavits" are just as disturbing as that of Kumar.

489.    The "**<u>Original Affidavit" of Lincoln In Re: Conservatorship of Carol J. Oulton</u>**" (the "Fraudulent "Original" Affidavit of Lincoln Regarding Carol") (<u>Exhibit 74</u>), which Lincoln signed "under the pains and penalties of perjury" on March 23, 2012, is, like the "Original" Affidavit of Kumar Regarding Carol, anything but original.

490.    The "Original" Affidavit of Lincoln Regarding Carol was prepared by Mirick O'Connell, not by Marlborough Hills.

491.    Notably, the document footer in the "Original" Affidavit of Lincoln Regarding Carol (which was automatically inserted into the "Original Affidavit" by <u>Mirick O'Connell's</u> internal document management software) is nearly identical to the document footer contained in Attorney Port's transmittal letter (<u>Exhibit 72</u>).

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

492.    The document footer in the perjurious "Original" Affidavit of Lincoln Regarding Carol reveals unique <u>Mirick O'Connell law firm-specific</u> details about Lincoln's "Original Affidavit":

      a)     <u>Practice Area</u>:  Probate;

      b)     <u>Client Number</u>:  **23982**;

      c)     <u>Matter Number</u>:  00**001**; and

      d)     <u>Document Number</u>:  A1971151.DOC.

493.    An image of the footer contained in the "Original" Affidavit of Lincoln Regarding Carol appears below:

**{Practice Areas\Probate\23982\00001\A1971151.DOC}**

494.    In this "Original Affidavit" prepared by Mirick O'Connell, Lincoln makes the following perjurious statements:

1.    My name is Michael Lincoln and I am the Administrator at Marlborough Hills Health Care Center.

3.    The Respondent has been a resident at Marlborough Hills Health Care Center on two separate occasions over the last several months. The Respondent was fist admitted on or about November 29, 2011, following her discharge from Metrowest Medical Center. The Respondent was admitted for post-surgery care and rehab following surgery on a broken leg. The Respondent was discharged from Marlborough Hills Health Care Center on or about the beginning of February following the conclusion of her post-surgery care and rehab.

495.    Quite notably, Lincoln, like Kumar, willfully and knowingly omits all reference to the overdose inflicted on Carol by Marlborough Hills staff on November 30, 2011, which put

141

Carol in her second life-threatening coma since November 2011, and which resulted in Carol's hospitalization at UMass Memorial Hospital.

496.    Also noteworthy is that the Marlborough Hills Invoices seeking payment from C. Hladick on the Oultons' fraudulent Admission Agreements through August 2013 (discussed below) do not bill for Carol's admission on November 29, 2011.

497.    Lincoln continues with:

> 5.    At no time has the Respondent exhibited any traits or symptoms that what lead me to believe that the Respondent has a clinically diagnosed condition that results in the incapacity of the Respondent.

498.    It is noteworthy that Lincoln states that Carol did not have any "clinically diagnosed condition that results in . . . incapacity," because this confirms that Marlborough Hills's illegal abuse of the Oultons' Health Care Proxy documents was willful and knowing, done solely to unlawfully block Plaintiff from the Oultons so that Marlborough Hills could continue its criminal activities without interference from Plaintiff.

499.    Lincoln further deceitfully states:

> 6.    Prior to January 18, 2012, the Petitioner, Sarah A. Oulton (the "Petitioner") was never banned or restricted from accessing the Respondent or Marlborough Hills Health Care Center.

500.    As described in detail above, Plaintiff <u>was</u> unlawfully banned from Marlborough Hills on December 25, 2012.

501.    As described in detail above, Plaintiff immediately, in response to the unlawful ban of Plaintiff from the Oultons' lives, retained legal counsel and procured a handwritten note from Carol stating that Carol wished to continue to see and hear from Plaintiff without limitation.

502.    Lincoln continues the "Original" Affidavit of Lincoln Regarding Carol with:

142

7.   On or about January 18, 2012, the Respondent requested in writing that the Petitioner not be allowed to visit her because the Respondent was "fearful for her personal safety." A copy of the signed request is attached hereto as **Exhibit A**.

8.   Based on information and belief, Andrea Edwards, a social worker employed by Marlborough Hills Health Care Center, completed an Elder Abuse Mandated Reporter Form on or about January 18, 2012, confirming the Respondent's fears and reporting possibly financial exploitation by the Petitioner. A copy of the Elder Abuse Mandated Reporter Form is attached hereto as **Exhibit B**.

503.   As discussed above in detail, the EAMRF was fabricated by Edwards (and others), was maliciously designed to inflict as much emotional distress and professional harm on Plaintiff as possible, and was filed by Edwards and others at Marlborough Hills in bad faith.

504.   Lincoln continues his fraud with:

9.   Based on information and belief, the Petitioner has been rude and unruly with my staff on multiple occasions when she has visited the Respondent.

505.   The above self-serving statement is an outright lie, included in the Affidavit solely to defame Plaintiff and inflict as much injury on Plaintiff as possible.

506.   Importantly, Lincoln also states:

10.   Based on information and belief, the Petitioner's actions in regard to the Respondent's care at Marlborough Hills Health Care Center, the Respondent's personal and financial needs, and relationships with other family members appear to be more of a family squabble than due the incapacity of the Respondent.

507.   Lincoln willfully and knowingly omits all reference to Marlborough Hills's overdose of Carol and the dangerous conditions at Marlborough Hills. Moreover, Lincoln makes

143

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

no mention of the fact that Carol was being falsely imprisoned at Marlborough Hills in the absence of a valid contract for services, or that Carol was, through Marlborough Hills's unlawful use of Carol's Health Care Proxy, being denied access to visits and telephone calls from Plaintiff, her physicians, and her long-time friends. Lincoln does, however, clearly align himself with his co-conspirator, C. Hladick, and he was willing to do whatever possible to conceal the fact that Marlborough Hills and C. Hladick conspired to unlawfully hold the Oultons at Marlborough Hills.

508. The "Original" Affidavit of Lincoln Regarding Carol contains the same language – verbatim – contained in the "Original" Affidavit of Kumar Regarding Carol.

509. Quite notably, Lincoln attests to his unoriginal work of fiction "under pains and penalties of perjury."

Signed under the pains and penalties of perjury this 23 day of March, 2012.

_Michael Lincoln_
Michael Lincoln

510. The "**Original Affidavit**" **of Lincoln In Re: Conservatorship of Donald P. Oulton** (the "Fraudulent "Original" Affidavit of Lincoln Regarding Donald") (Exhibit 75), which Lincoln signed "under the pains and penalties of perjury" on March 23, 2012, is, like the other two "Original Affidavits," anything but original.

511. The "Original" Affidavit of Lincoln Regarding Donald was prepared by Mirick O'Connell, not by Marlborough Hills.

512. Notably, the document footer in the "Original" Affidavit of Lincoln Regarding Donald (which was automatically inserted into the "Original Affidavit" by Mirick O'Connell's internal document management software) is nearly identical to the document footer contained in Attorney Port's transmittal letter (Exhibit 72).

144

513.    The document footer also reveals the following unique, <u>Mirick O'Connell law</u>
<u>firm-specific</u> details about Lincoln's "Original Affidavit":

      a)    <u>Practice Area</u>:  Probate;

      b)    <u>Client Number</u>:  **23982**;

      c)    <u>Matter Number</u>:  000**01**; and

      d)    <u>Document Number</u>:  A1971178.DOC.

514.    An image of the footer contained in Lincoln's perjurious "Original Affidavit In
Re: Conservatorship of Donald P. Oulton" appears below:

**(Practice Area\Probate\23982\00001\A1971178.DOC)**

515.    In the "Original" Affidavit of Lincoln Regarding Donald prepared by Mirick
O'Connell, Lincoln makes the following perjurious statements:

    4.    Prior to January 18, 2012, the Petitioner, Sarah A. Oulton (the "Petitioner") was
never banned or restricted from accessing the Respondent or Marlborough Hills Health Care
Center.

516.    As described in detail above, Plaintiff <u>was</u> unlawfully banned from Marlborough
Hills on December 25, 2012.  In response to the unlawful ban of Plaintiff from the Oultons' lives
on December 25, 2012, Plaintiff immediately (a) retained legal counsel, (b) procured, on January
4, 2012, a handwritten note from Carol stating that Carol wished to continue to see and hear from
Plaintiff without limitation, and (c) had her attorney, Attorney Koch, send Marlborough Hills
two letters regarding Marlborough Hills's unlawful interference with Plaintiff and the Oultons on
January 8, 2012, and January 13, 2012.

517.    The "Original" Affidavit of Lincoln Regarding Donald continues:

5.    On or about January 18, 2012, the Respondent's wife, Carol J. Oulton, requested in writing that the Petitioner not be allowed to visit her because the Carol was "fearful for her personal safety." A copy of the signed request is attached hereto as **Exhibit A**.

6.    Based on information and belief, Andrea Edwards, a social worker employed by Marlborough Hills Health Care Center, completed an Elder Abuse Mandated Reporter Form on or about January 18, 2012, confirming the Respondent's fears and reporting possibly financial exploitation by the Petitioner. A copy of the Elder Abuse Mandated Reporter Form is attached hereto as **Exhibit B**.

518.    As discussed above in detail, the EAMRF was fabricated in bad faith, was malicious and was immediately determined to be unsubstantiated.

519.    Lincoln continues with his lies in his effort to inflict the maximum amount of emotional distress and professional harm on Plaintiff as possible:

7.    Based on information and belief, the Petitioner has been rude and unruly with my staff on multiple occasions when she has visited the Respondent.

520.    Lincoln continues his perjury with the following statement:

9.    Based on information and belief, the Respondent is receiving beneficial and appropriate care from his wife, Carol J. Oulton, and his daughter and designated Health Care Agent, Carol B. Hladick, who was nominated in a Massachusetts Health Care Proxy dated April 17, 2008.

10.    Based on information and belief, the Petitioner's actions in regard to the Respondent's care at Marlborough Hills Health Care Center, the Respondent's personal and financial needs, and relationships with other family members appear to be part of a family squabble.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

521.     Lincoln makes no mention of the fact that Donald was being falsely imprisoned at
Marlborough Hills in the absence of a valid contract for services, or that Marlborough Hills
abused Donald's Health Care Proxy in order to deny Donald access to visits and telephone calls
from Plaintiff, his physicians, and his long-time friends.

522.     Lincoln also fails to state that Donald's and Plaintiff's United States Mail had
been tampered with by Marlborough Hills administrators and staff, who controlled every facet of
the last year of the Oultons' miserable lives in the locked Alzheimer's Unit.

523.     Lincoln does, however, clearly align himself with his co-conspirator, C. Hladick,
and he was willing to do whatever possible to conceal the fact that Marlborough Hills and
C. Hladick conspired to falsely imprison the Oultons and steal the Oultons' jointly-held assets.

524.     Quite notably, Lincoln <u>did not</u> attest to Donald's <u>capacity</u> in his Affidavit,
because Donald lacked capacity and was being falsely imprisoned in the locked Marlborough
Hills Alzheimer's Unit.  Lincoln, instead, focused solely on defaming Plaintiff with references to
the EAMRF which was, in itself, yet another of the Defendants' fraudulent documents.

525.     Lincoln signed his Affidavit "under the pains and penalties of perjury:"

Signed under the pains and penalties of perjury this 28 day of March, 2012.

*Michael Lincoln*
Michael Lincoln

526.     The majority of paragraphs contained in the "Original" Affidavits of Lincoln and
Kumar were written identically.  The language in all three "Original" Affidavits. all of which
were prepared by Mirick O'Connell, is the same.

527.     On March 27, 2012, at 6:14 p.m., in reference to the Fraudulent "Original"
Affidavits of Lincoln and Kumar, Attorney D.R. Brown sent an email to Plaintiff (<u>Exhibit 76</u>)
stating:

147

Take a real deep breath.  None of this is actually unexpected.  **We knew they were lying some time ago**.  This material just confirms it.  **From my perspective, the main culprits are your sister, Carol, and Marlborough Hills** but, again, we already knew that. [emphasis added]

528.    On March 29, 2012, Attorney Vecchio sent an email to Attorney Port (Exhibit 77) regarding Mediator suggestions.

529.    On March 30, 2012, at 10:11 a.m. Plaintiff sent an email (Exhibit 78) to Attorney D.R. Brown stating, "My dad is suffering in that place.  I'd like to pursue GAL."

530.    On March 30, 2012, Attorney Vecchio sent an email to Attorney Port (Exhibit 79):

[i]n light of the new deadlines, it is important that we move forward with the mediation without delay.  My client is concerned regarding the court-ordered deadlines and she will not hold out much longer on scheduling the independent medical exams and pursuing conservatorships and guardianships for your clients.

531.    On March 31, 2012, at 10:19 a.m. Plaintiff sent an email to Attorneys Brown and Vecchio (Exhibit 80) in which she stated "**I'm gravely concerned about the safety of my parents at Marlborough Hills**.  This was one of many instances in which Plaintiff made her concerns for the Oultons' well-being quite clear to Attorneys D.R. Brown and Vecchio.

532.    Attorneys Brown and Vecchio were unresponsive to Plaintiff's repeated expressions of dire concern for the Oultons.

533.    On April 2, 2012, Plaintiff sent an email to Attorneys Brown and Vecchio (Exhibit 81):

**Yesterday a friend of my father's (Jack Baer) tried to call him 5 times and the staff refused to connect him**. . . . **Another friend, Dr. Ed Zullo, also tried to call.  The staff let him speak.... Dr. Zullo said my dad knows that we are working to get him into a better place but he is very sad and despondent**. [emphasis added]

148

...

> May we please just file emergency motions for appointments of GAL?"

534.    On April 3, 2012, at 5:33 p.m. Plaintiff received an email (**Exhibit 82**) from Attorney Vecchio in which Vecchio said, "Attorney Port and I plan to meet tomorrow to discuss the scope of the mediation, select a mediator, and discuss things."

535.    Attorney D.R. Brown and Attorney Vecchio were not working to advance the best interests of Plaintiff and took no action on behalf of Plaintiff to pursue Plaintiff's Petitions for Conservator in order to protect the vulnerable Oultons.

536.    On April 9, 2012, at 12:05 p.m. Plaintiff received an email (**Exhibit 83**) from Attorney Vecchio stating

> I am still waiting to hear from Port on certain issues... For the mental health/neurological exam, I have engaged Dr. McGinnis. Attorney Port indicated he did not have a problem with Dr. McGinnis. I am still trying to find doctor to do physical exams. I have contacted many doctors and all have declined. Attorney Port indicated he does not believe it was appropriate for the court to order Physical Exams in a Conservatorship proceeding a Conservatorship, unlike a guardianship, involvement of a fiduciary to make financial decisions.
>
> Based on these facts, **Attorney Port indicated that he planned to advise his clients that he believes that there is a basis for challenging the portion of the order allowing for the independent physical examinations**. I asked him if he plans to file a Motion for Reconsideration and he indicated that he will only do so if that's what his clients want. He also told me that when he last spoke to your parents, they had no problem submitting to your requested examinations. He believes they will likely tell him not to challenge the Order.
> [emphasis added]
>
> When we discussed the issue of extending the deadline for the exams, Attorney Port told me he does not have a problem agreeing to extending the deadline, as long as his clients don't elect to challenge the Order for the Physical Exam.
>
> Dennis and I suggest that we agree with Attorney Port to forgo the

149

physical examinations and to proceed with the mental health/neuro exams.

Port also indicated that he does not believe that your parents should travel alone and that he will likely have to accompany them.

We left it that he would speak with his clients (he was having trouble getting in touch with them) regarding submitting to the physical exams.

We left it that he would speak to his clients (he was having trouble getting touch with them.

537.   On April 9, 2012, at 2:57 p.m. Plaintiff received an email (Exhibit 84) from

Attorney Vecchio:

I've spoken with Jason Port.  Your parents will not agree to an extension of time even if we agree to forego the physical exams. Attorney Port stated that although he sees the advantages to agreeing to extions [sic] to save time/money, his clients are not in an agreeable mood, and he cannot them of this.  So, we will have to go back into court to ask for an extension.

I spoke with Judge Donnelly's clerk this afternoon about getting an emergency motion on the docket.  I am trying to get us into Judge Donnelly's session in Marlborough on Wednesday, but it doesn't look likely.

538.   Upon information and belief, Attorney Port was representing either the interests

of Marlborough Hills or C. Hladick and N. Williams – not Donald or Carol – in his attempts to

block the appointment of a disinterested, third-party Conservator to oversee the Oultons'

financial affairs.

539.   On April 10, 2012, at 7:01 p.m. Plaintiff sent an email (Exhibit 85) to Attorney

Vecchio stating:

For the first time ever, **I've developed asthma**.  Go figure.  My pulmonologist had me undergo extensive testing, including pulmonary function tests at UMass Health Alliance Hospital and the results said 'asthma.'  I've been feeling extremely crummy lately – bad chest pain, persistent cough, and a lot of trouble

150

breathing.
[emphasis added]

540.    On April 10, 2012, before Attorney D.R. Brown executed a Fee Agreement with Plaintiff, Plaintiff received an Invoice from Attorney D.R. Brown in the amount of $4,326.00 (Exhibit 86).

541.    The Invoice billed for a period from March 5, 2012, through March 30, 2012.

542.    The Invoice listed tasks allegedly performed by Attorneys D.R. Brown and Vecchio however there was no indication of how much time each attorney allegedly spent performing each task.

543.    Notably, the Dennis R. Brown, P.C. Invoice in the amount of $4,326.00 was generated before Plaintiff and Attorney D.R. Brown executed a Fee Agreement.

544.    Plaintiff did not sign a Fee Agreement with Attorney D.R. Brown until April 11, 2012.

545.    On April 11, 2012, Attorney D.R. Brown presented Plaintiff with a back-dated Fee Agreement (Exhibit 87) and attempted to coerce Plaintiff into signing the back-dated Fee Agreement with a March 2013 date, rather than the date on which Plaintiff signed the Agreement.  Plaintiff refused and, instead, handwrote and initialed "the 11th day of April" in order to honestly reflect the date on which she executed the Fee Agreement with Dennis R. Brown, P.C.

THIS IS A LEGALLY BINDING CONTRACT.  IF NOT UNDERSTOOD,
SEEK INDEPENDENT COUNSEL.

We, the Client and the Attorney, have read the above Fee
Agreement on this 11ᵗʰ day of March, 2012 and understand its terms
and both have signed it as our free act and deed.  In signing this
Agreement, both parties acknowledge that a copy of the Agreement
has been received.

DENNIS R. BROWN, P.C.

SARAH OULTON - CLIENT

BY: _____
DENNIS R. BROWN, ESQUIRE
869 Concord Street
Framingham, MA 01701

546.    On April 11, 2012, Attorney Port filed with the Middlesex County Probate and

Family Court an Opposition to Petitioner's Motion for [sic] Extension of Time to Medical

Certificate and Motion to Dismiss Petition for Conservatorship on behalf of Donald (Docket No.:

MI12P0268PM) (the "Opposition of Donald") (Exhibit 88) and an Opposition to Petitioner's

Motion for [sic] Extension of Time to Medical Certificate and Motion to Dismiss Petition for

Conservatorship on behalf Carol (Docket No.: MI12P0269PM) (the "Opposition of Carol")

(Exhibit 89) (together, the "Oppositions of Mirick O'Connell").

547.    The document footers in both of the Oppositions of Mirick O'Connell (which

were automatically inserted into the documents by Mirick O'Connell's internal document

management software) are nearly identical to the document footers in the perjurious "Original

Affidavits" of Marlborough Hills employees Kumar (Exhibit 73) and Lincoln (Exhibit 74 and

Exhibit 75).

548.    The footer in the Opposition of Donald (Exhibit 88) reveals unique, Mirick

O'Connell law firm-specific details:

a)      Practice Area:  Probate;

b)      Client Number:  **23982**;

c)      Matter Number:  **00001**; and

152

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

d)      Document Number:  A1982372.DOC.

549.    An image of the footer contained in the Opposition of Donald appears below:

{Practice Areas\Probate\23982\00001\A1982372.DOC}

550.    The footer in the Opposition of Carol (**Exhibit 89**) also reveals unique, <u>Mirick</u>
<u>O'Connell law firm-specific</u> details:

a)      Practice Area:  Probate;

b)      Client Number:  **23982**;

c)      Matter Number:  00**001**; and

d)      Document Number:  A1982371.DOC.

551.    An image of the footer contained in the Opposition of Carol appears below:

{Practice Areas\Probate\23982\00001\A1982371.DOC}

552.    The Oppositions of Mirick O'Connell recycle the Fraudulent "Original"
Affidavits of Lincoln and Kumar of Kumar and Lincoln (which were, as described in detail
above, manufactured by Mirick O'Connell), and they append the Marlborough Police Incident
Report manufactured by Officer Insani (described above).

553.    The Oppositions of Mirick O'Connell filed by Attorney Port contain deliberate
mischaracterizations of Plaintiff, concocted to hide the true state of the Oultons' health and
financial affairs, and purposefully deflect attention from Marlborough Hills's unlawful detention
of the Oultons and the inferior quality of care being given to the Oultons at Marlborough Hills.

554.    The following are the relevant portions of the Oppositions of Mirick O'Connell
written and filed by Attorney Port:

Paragraph 6. **The petitioner's claims in the Affidavit are**
**nothing more than self-serving statements based on conjecture,**
**hearsay, and complete fabrications in order to bolster her**
**version of events that essential boil down to nothing more than**

153

**a family feud.**
[emphasis added]

Paragraph 8:  In fact, the petitioner's primary reason for extending time to obtain the medical certificate was that she was "banned" from Marlborough Hills Nursing Home.

Paragraph 9.  **At no time has the Petitioner ever been banned from visiting the respondent.**  See Affidavit of Michael Lincoln.|
[emphasis added]

Paragraph 10.  **Michael Lincoln, the Administrator of that facility, states in his Affidavit filed with this court that the petitioner was never "banned" until the Respondent's wife requested in writing that the Petitioner not be admitted because the Respondent was "fearful for her personal safety". See Letter from Carol Oulton**..... However, **Marlborough Hills never banned the petitioner from visiting the respondent**, it only followed the orders of respondent's wife as to visits with the respondent's wife.  The petitioner has continued to visit with the respondent over the last several months.
[emphasis added]

555.    As stated above, Plaintiff <u>was</u> unlawfully banned from her parents' lives by Marlborough Hills staff on December 25, 2012.  Attorney Koch was representing Plaintiff as of early January 2012, solely because the staff at Marlborough Hills had unlawfully banned Plaintiff from the premises on December 25, 2011, at the request of the Sibling Defendants.

556.    Moreover, on February 23, 2012, Attorney O'Regan telephoned Lincoln precisely because Plaintiff had been unlawfully banned from Marlborough Hills on December 25, 2011.

557.    Attorney Port continues in the Oppositions of Mirick O'Connell:

Paragraph 12.  Although the Petitioner makes claims that the Respondent's property was stolen by the other children, **it was Respondent** [sic] **who was investigated by the Marlborough Police regarding theft of the Respondent's belongings.**
[emphasis added]

558.    Attorney Port conveniently failed to mention the truth about the Oultons' Car, despite being aware of the true facts.  Upon information and belief, at some time in early April 2012, Attorney Port consulted with Attorneys Brown and Vecchio and convinced Attorneys

*Oulton v. Hladick, et al. -- Amended Verified Complaint and Demand for Jury Trial*

Brown and Vecchio to do whatever they could to make the Petitions for Conservatorship go away. As discussed below, Attorneys Port, Brown and Vecchio induced Plaintiff, to the detriment of the Oultons and ultimately Plaintiff, to dismiss the Petitions for Conservator.

559.   On April 12, 2012, at 1:25 p.m. Plaintiff sent an email to Attorney Vecchio (**Exhibit 90**) transmitting the message Plaintiff received from her sister Nancy Williams after her brother-in-law Andy Hladick took the Oultons' Checkbook.

560.   On April 18, 2012, at 9:39 a.m. Plaintiff received an email from Attorney Vecchio (**Exhibit 91**) in which Attorney Vecchio wrote, "I spoke with Attorney Port this morning and I'd like to discuss that conversation with you."

561.   On April 20, 2012, Plaintiff received an email from Attorney Vecchio (**Exhibit 92**) transmitting the following letter from Attorney D.R. Brown and herself (the "Inducement Letter" (**Exhibit 93**):

<div align="center">

## DENNIS R. BROWN, P.C.
ATTORNEYS AT LAW
</div>

DENNIS R. BROWN
LISA A. VECCHIO

869 CONCORD STREET • FRAMINGHAM, MA 01701
TEL. (781) 431-1340      FAX (781) 237-8906

BY APPOINTMENT
12 WASHINGTON STREET
WELLESLEY, MA 02481

April 20, 2012

**VIA E-MAIL: SAOULTON@GMAIL.COM**
**AND FIRST CLASS MAIL**
Sarah Oulton
69 Autumn Street
Agawam, Massachusetts 01001

Dear Sarah,

I've recently spoken with Attorney Jason Port in the above-captioned matter. He indicated that your parents are agreeable to granting power of attorney to a third party in order to assist them with managing their finances. Your parents are agreeable to selecting a third party who is not one of your siblings or an attorney from the law firm they previously engaged for estate planning attorney's firm. Your parents' agreement to grant such powers of appointment is contingent upon your agreement to withdraw your petitions for conservatorship.

<div align="center">155</div>

With regard to your request that your parents remove Carol Hladick ("Carol") as their health care agent and appoint a new person (who is not one of your siblings), Attorney Port indicates they are adamantly unwilling to do so. As Attorney Port explained it to me, your parents are very happy with Carol's service as their health care agent thus far and there is no other person they believe would be more suitable than Carol. Your mother stated to Attorney Port that Carol has acted exactly as she would have acted herself and that she is pleased with her service.

562.    By this point in their "representation" of Plaintiff, Attorney D.R. Brown and

Attorney Vecchio were well-informed by Plaintiff that the Oultons were in peril at Marlborough

Hills and that Marlborough Hills had abused the Oultons' Health Care Proxy documents for its

own benefit.

563.    The Inducement Letter continues:

Although your parents are not willing to appoint a new health care agent, Attorney Port indicates that, in order to address your concerns regarding access to them in the event of their incapacity, they are willing to consider making a written directive such that, in her service as their health care agent, Carol Hladick is not permitted to prevent visitation between you and your parents.

At this time, based on the facts of this matter as we understand them and the applicable law, Dennis and I suggest you agree to withdraw the petitions for conservatorship in exchange for your parents voluntarily granting power of attorney to a third party. We believe this arrangement will accomplish your goal of ensuring that your parents' finances and assets are competently managed by a person outside of their immediate family. Such an arrangement is also similar to the most likely outcome of this matter were you to pursue the conservatorship petitions.

564.    Upon information and belief, the Sibling Defendants – none of whom had legal

authority to sign checks on the Oultons' behalf – had been converting the Oultons' jointly-held

assets since the Oultons' admission to Marlborough Hills. Attorney Port's Motion to Dismiss

the Petitions for Conservator was proffered in order to prevent independent, lawful oversight of

the Oultons' jointly-held assets.

565.     On April 25, 2012, at 9:40 a.m. Plaintiff received an email (**Exhibit 94**) from

Attorney Vecchio in which Attorney Vecchio wrote, in continuance of the efforts to fraudulently

induce Plaintiff to dismiss the Petitions for Conservator:

> On Wed, Apr 25, 2012 at 9:40 AM, Lisa Vecchio <lisa@drblaw.com> wrote:
>
> Thank you Sarah. I was able to reach Attorney Port yesterday afternoon. He is going to ask you parents about a possible meeting this Friday. I will let you know as soon as I hear back from him.
>
> Thank you,
>
> Lisa

566.     On April 26, 2012, at 4:10 p.m. Plaintiff received another email (the "Quid Pro

Quo Email") (**Exhibit 95**) from Attorney Vecchio in which Attorney Vecchio continued her

inducement of Plaintiff to dismiss the Petitions for Conservator:

> Lisa Vecchio <lisa@drblaw.com>                                    Thu, Apr 26, 2012 at 4:10 PM
> To: Sarah Oulton <saoulton@gmail.com>
>
> Sarah,
>
> I heard back from Jason Port this afternoon. Your parents have agreed to meet with you after the petitions have been dismissed.
>
> Once you have finished the draft of the response we discussed, I will edit it and file it along with a stipulation of dismissal. Once that's been filed, we can pick a date for the meeting.
>
> Let me know if you have any questions.
>
> Thank you,
>
> Lisa

567.     Defendants exploited Plaintiff's relationship with the Oultons to fraudulently

induce Plaintiff to dismiss her Petitions for Conservator.  Plaintiff would have done <u>anything</u> for

the chance to see her parents again, and the Defendants knew that.  Attorney Port, Attorney D.R.

Brown, and Attorney Vecchio, all of whom were working to advance the Sibling Defendants'

interests, rather than Plaintiff's and the Oulton's interests.

568.     On May 11, 2012, Plaintiff received an email (**Exhibit 96**) from Attorney

Vecchio:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Although you have decided not to pursue conservatorships for your parents, I just want to remind you that the deadline for filing any medical certificates is approximately two weeks away.  We should be prepared to file any responsive pleadings you wish to file before that deadline.  When no medical certificates have been filed following the deadline, Attorney Port will likely quickly mark up his motions to dismiss the petitions and once dismissed we will not have the opportunity to file further pleadings.

569.    The Petitions for Conservator were dismissed solely because Plaintiff had unknowingly been manipulated to dismiss the Petitions for Conservator through the misrepresentations made to Plaintiff by Attorneys Port, Vecchio, and D.R. Brown.

570.    On May 22, 2012, Lincoln executed a "NO TRESPASS ORDER" (Exhibit 97) barring Plaintiff from the Marlborough Hills premises.  Defendants have repeatedly falsely claimed that this trespass order was executed on March 23, 2016.

## TRESPASS STATUTE

Section 120, Chapter 266 of the Massachusetts General Law provides that whoever, without right, enters or remains in the building of another, after having been forbidden to do so by the person who has lawful control of said premises, shall be punished by a fine of up to $100.00, or 30 days imprisonment.

I, _Michael B. Lincoln_ (Name of
Asset Protection Associate) have informed
_Sarah M Oulton_ (Name of Subject)
of _69 Autom Street Agawam MA_ (Address),
that from this date on or for a period of _1 Year_ he /
she is prohibited from entering _Marlborough Hills Healthcare 121 Northborough Road_
_____, and that if he / she violates this prohibition, he / she will be _Marlborough_ _East_
subject to arrest for trespassing. _MA_

_5/22/12_
DATE

_Michael B. Lincoln_
SIGNED

WITNESS

571.    On May 23, 2012, at 10:35 a.m. Plaintiff received an email (**Exhibit 98**) from

Attorney Vecchio to inform Plaintiff that her mother, Carol Oulton, had been admitted to

Marlborough Hospital and the emergency room and her doctors estimate she had less than 24

hours to live.  Her email noted:

> Subject:  URGENT – CALL ASAP!:
>
> **Please call me ASAP** when you receive this message. Attorney
> Port called to let me know that **your mother has been admitted to
> Marlborough Hospital**. She is in the emergency room and **her
> doctors do not believe she has long to live. I believe the
> estimate is less than 24 hours. Your family, including your
> father, would like you to be there**.
> [emphasis added]

572.    After receiving several friendly text messages from N. Williams, informing

Plaintiff that Carol was near death and that the family desired her there with them, Plaintiff

arrived at the Marlborough Hospital to see Carol in the Intensive Care Unit.  Donald was present,

sitting in a chair in the corner, but Donald was in a heavily drugged state.  Donald did,

159

nevertheless, recognize Plaintiff and he expressed delight at seeing her.  Plaintiff and Donald

exchanged hugs but they were interrupted by the Sibling Defendants, who tape recorded the

entire visit without Plaintiff's consent.  Notably, the tape recording has never been used against

Plaintiff in any way nor produced to any third party.

573.    Carol was lying in the bed, her face was swollen, her eyes were closed and would

not open.  The following conversation transpired between Plaintiff and Carol:

> **PLAINTIFF**:  Hi Mom, its Sarah.
>
> **CAROL**:  Hi Sarah, which Sarah?
>
> **PLAINTIFF**:  Your daughter.  Sarah your daughter.
>
> **CAROL**:  SARAH!  Hi Love.  I love you.  Did you Graduate on Saturday?  I thought of you all day.
>
> **PLAINTIFF**:  Yup, Mom I graduated.  Shawn was here.
>
> **CAROL**:  I love you, Sarah.
>
> **PLAINTIFF**:  I love you Mom.

574.    Plaintiff's conversation with Carol was interrupted when C. Hladick pushed

Plaintiff across the room.  Plaintiff summonsed a nurse from the Intensive Care Unit and

requested a Security Guard escort her out of the building so that the Sibling Defendants would

not come after her.

575.    Plaintiff summarized the attack on her at Marlborough Hospital in an email to

WNE Law Dean Beth Cohen that Plaintiff sent shortly after arriving home (Exhibit 99):

> After being implored by everyone (my attorneys, my parents'
> attorney, and even my sister, who wrote me a series of very nicely-
> worded and encouraging text messages yesterday) yesterday
> morning, I zipped to the Marlborough Hospital where my mom's
> in organ failure and, much to my surprise, I had a horrible time at
> the Intensive Care Unit.  It felt like a bit of a setup, for as soon as I
> arrived I was pounced on (verbally and physically) by my siblings
> and their spouses and children when I arrived at the I.C.U.
> Everyone there yelled at me to "Get the eff out" (even the sister

160

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

who sent me the sweet texts telling me exactly where to find my mom), and my younger sister ran up to me and pushed me for no reason at all.  Perhaps her breast cancer may have metastasized to her brain.

…

So the visit lasted only about 5 minutes, but my mom told me she loved me and missed, much to the chagrin of my siblings, and she told me that she'd been thinking of me all day on Saturday.  She and my father were delighted to hear that I graduated, although all three of us are just sick over the way it happened and the turns that life took this year.

576.     Although the Sibling Defendants were the aggressors in the May 23, 2012, attack on Plaintiff at Carol's Intensive Care Unit hospital the Sibling Defendants, once again, engaged the Marlborough Police to aid them in furtherance of the conspiracy underlying this lawsuit.

577.     On May 23, 2012, at 5:01 p.m. Plaintiff receive an email (**Exhibit 100**) from Attorney Vecchio stating:

> **I just received a phone call from Jason Port indicating that a restraining order has issued against you for Marlborough Hills Nursing Home and Marlborough Hospital** due to your conduct (which he characterized as threatening) at Marlborough Hospital earlier today.  Attorney Port stated that my office will be faxed a copy of the order sometime today.  I have not received any such fax at this time.  **Attorney Port indicated that you will be arrested if you enter the property at Marlborough Hills or Marlborough Hospital while the order is in effect.**
> [emphasis added]

578.     On May 23, 2012, at 5:49 p.m. Plaintiff received an email (**Exhibit 101**) from Attorney D.R. Brown stating,

> As discussed, attached is a no trespass notice.  **IT IS NOT A RESTRAINING ORDER**.  It's simply a notice from Marlborough Hills under a specific statute telling you to stay off their property.  Violation of the notice is a criminal penalty.  We'll obviously talk later.
> [emphasis added]

161

579.   On May 23, 2012, at 10:14 p.m. Plaintiff sent an email to Attorney Vecchio

(Exhibit 102) in which Plaintiff states,

> 1.  **No police were called at the hospital today**.
> [emphasis added]
>
> 2.  **If Nancy was, in fact, recording things, I made it clear that Carol pushed me.  Only when I protested about Carol committing assault and battery did the bunch of them start saying, "No. you pushed Carol."**
> [emphasis added]
>
> 3.  **If I had been the instigator of problems then you would have heard them protesting first on the tape if there is one and they would have most assuredly called the Marlborough Police to report the incident and the Marlborough Hospital Security Guard whose presence I requested would have detained me**.
> [emphasis added]

580.   On May 24, 2012, at 2:58 p.m. Plaintiff received an email (Exhibit 103) from

Attorney Vecchio in which she states,

> **I spoke with Attorney Port.  He received an update today that your mother's condition has improved since yesterday.**
> Apparently she received an infusion (transfusion) of plasma which has helped her condition to stabilize.  **He has been informed that she is not in good condition, simply stable.  He explained her doctors are not optimistic,** but they stated that she could have these "ups and downs" for a period.  **They expect her heart will not be able to withstand this for long**.
> [emphasis added]

581.   On May 29, 2012, at10:47 a.m. Plaintiff received an email (Exhibit 104) from

Attorney Vecchio which stated:

> I received an update from Attorney Port regarding your mother's condition.  She was discharged from Marlborough Hospital and is back at Marlborough Hills.  Her condition is stable at this time.  He will let us know when he receives another update.

582.   On May 29, 2012, at 4:00 p.m. Plaintiff sent an email (Exhibit 105) to Attorney

Vecchio stating, *inter alia,*

**I want the court to determine if my parents are suffering from elder abuse.** Remember **the newly minted no trespass order, if it holds up it means I can never see my parents again, and I refuse to accept that just because it's what Crazy Carol and the other unstable siblings want**.
[emphasis added]

**It was issued on only their say, without any police involvement or documentation that anything bad occurred. Soon I will photographs showing you the deceptively friendly text messages that Nancy sent to lure me to Marlborough Hospital Tuesday, and the whole thing was a set up.**
[emphasis added]

583.   On May 30, 2012, at 5:46 p.m. Plaintiff received an email from Attorney Vecchio

(**Exhibit 106**):

I recently spoke with Attorney Port. He indicated that he would be filing supplemental memoranda to his motions to dismiss early this week and that he would mark up the motions to dismiss for hearing. As we have discussed, the court is likely to grant such motions because the deadline for filing medical certificates has expired and no certificates have been filed. Since both of your parents filed answers to the petitions for Conservatorship, you cannot unilaterally dismiss the petitions.
. . .
. . . **Please be advised the longer you wait to file your responsive pleadings the more time you allow for your parents to file additional pleadings of their own in which they might make additional allegations against you and the less likely they will be to agree to dismissals on your terms**.
[emphasis added]

On 5/30/12, Lisa Vecchio <lisa@drblaw.com> wrote:
> Dear Sarah,
-
> At this time, we have not received any drafts from you. As we have
> discussed, it will likely take a least a day or two for our office to edit
> and prepare final drafts of the documents you deliver. Please be advised
> that the longer you wait to file your responsive pleadings, the more time
> you allow for your parents to file additional pleadings of their own (in
> which they might make additional allegations against you), and the less
> likely your parents will be to agree to dismissals on your terms.
> Sincerely,
> Lisa Vecchio

163

584.  On June 5, 2012, Plaintiff prepared, and Attorney D.R. Brown and Vecchio filed, the Affidavits of Sarah A. Oulton in Response to Respondent's Opposition to Petitioner's Motion for Extension of Time to [sic] Medical Certificate in the case of both Donald (Docket: MI12P0268PM) (Exhibit 107) and Carol (Docket:  MI12P0269PM) (Exhibit 108).  The Affidavits had been heavily edited by Attorney D.R. Brown and Attorney Vecchio.

585.  On June 8, 2012, at 4:42 p.m. Plaintiff received an email (Exhibit 109) from Attorney Vecchio which read, "Jason has not been in contact with your parents yet.  But we agree to continue the Motion Hearing scheduled for Wednesday."

586.  On June 8, 2012, at 7:09 p.m. Plaintiff, who was afraid that she had been tricked and would not be able to visit with the Oultons despite signing the dismissals of the Petitions for Conservator sent an email to Attorney D.R. Brown (Exhibit 109 also):

>  Don't you find it strange that Jason Port has claimed, since Wednesday this week (i.e., two days ago) that he's been unable to put a simple call in to speak with them at the nursing home?  It seems incredibly far-fetched while they are stuck in bed next to, or right down the hall from, a telephone. — **Do we have a plan in place for anyone keeping me posted on how they're doing?  I think they'd want me to know.  And if they don't I'd like to hear it from them, not the siblings.**
>  [emphasis added]

587.  Attorney D.R. Brown did not respond to Plaintiff's email.

588.  On June 18, 2012, after being coerced by Attorney Port, Attorney D.R. Brown, and Attorney Vecchio with promises of visitation with her parents and the appointment of disinterested third party to get powers of attorney, Plaintiff agreed to file Petitioner's Assent to Respondent's Motion to Dismiss In the Matter of Donald P. Oulton (Docket No.: MI12P 0268-PM) (Exhibit 110) and Petitioner's Assent to Respondent's Motion to Dismiss In the Matter of Carol J. Oulton (Docket No.: MI12P 0269-PM) (Exhibit 111).

589.    On June 19, 2012, at 5:10 p.m. Plaintiff received an email (**Exhibit 112**) from Attorney Vecchio:

> Were you able to obtain a copy of the Notice sent out rescheduling the hearing for July 9th?  I spoke with Attorney Port this morning and neither of us has received any notice about a new date. — Attorney Port indicated that your parents will not move to strike the Affidavits you filed and they are amenable to the court discussing both cases without the parties appearing for a hearing.

590.    On July 12, 2012, Dennis R. Brown, P.C. sent Plaintiff an Invoice in the amount of $21,309.00 (**Exhibit 113**).  Like the Invoice sent on April 10, 2012, this Invoice does not state the basis for the amounts that Dennis R. Brown, P.C. is charging Plaintiff.  The Invoice simply lists the tasks that Attorneys Brown and Vecchio allegedly performed, but it does not reflect the amount of time devoted to each task.  The Invoice plainly states that Plaintiff owes Dennis R. Brown, P.C. the sum of $21,309.00, but there is no way that Plaintiff can ascertain if the stated "amount due" is accurate.

591.    On July 25, 2012, a Decree of Dismissal of Petition for Conservator – In matter of Donald Oulton (**Exhibit 114**) was entered.

592.    On July 25, 2012, a Decree of Dismissal of Petition for Conservator in the matter of Carol Oulton (**Exhibit 115**) was entered.

593.    Upon information and belief, the Sibling Defendants had been converting the Oultons' jointly-held assets since late 2011, and on August 8, 2012, only **14 days AFTER** Attorney D.R. Brown, Attorney Vecchio, and Attorney Port fraudulently induced Plaintiff to dismiss the Petitions for Conservator that she sought to protect the Oultons and their jointly-held assets, Defendants N. Williams and C. Hladick, with the assistance of Mirick O' Connell attorneys, unlawfully seized complete control of the remainder of the Oultons' jointly-held assets.

594.     On August 8, 2012, the incapacitated Oultons execute void Durable Powers of Attorney (the "Oultons' Void DPOAs") in the locked Alzheimer's Unit of Marlborough Hills under constraint, undue influence and duress, and in the absence of <u>any</u> witnesses.

595.     On August 8, 2012, Attorney Bergeron had Carol execute a void Durable Power of Attorney of Carol Jane Oulton (the "Void DPOA –Carol") (<u>Exhibit 116</u>).

596.     The document footer in the Void DPOA of Carol (which was automatically inserted into the documents by <u>Mirick O'Connell's</u> internal document management software) is nearly identical to the document footers in the "Original Affidavits" of Marlborough Hills employees Kumar (<u>Exhibit 73</u>) and Lincoln (<u>Exhibit 74 and Exhibit 75</u>).

597.     The footer in the Void DPOA of Carol reveals unique, <u>Mirick O'Connell law firm-specific</u> details:

         a)       <u>Practice Area</u>:  Probate;

         b)       <u>Client Number</u>:  **23982**;

         c)       <u>Matter Number</u>:  000**01**; and

         d)       <u>Document Number</u>:  A2063320.DOC.

598.     An image of the footer contained in the Void DPOA of Carol appears below:

[Practice Area:Probate:23982:00001:A2063320.DOC]

599.     The Void DPOA of Carol makes no statement attesting to Carol's competency on the date of document execution.  It says nothing about Carol "being a competent adult, at least eighteen years of age or older, of sound mind, and under no constraint or undue influence."

600.     The Void DPOA of Carol, in contrast with the promises through which Attorneys D.R. Brown, Vecchio, and Port fraudulently induced Plaintiff to dismiss her Petitions for Conservator, names <u>N. Williams</u> – not a third-party - as Carol's "lawful attorney with full power to take the following action for me in my name."

601.    The Void DPOA of Carol was recorded in the Middlesex County Registry of

Deeds at Book 60174, Page 501, on October 4, 2012.



**DURABLE POWER OF ATTORNEY**

Bk: 60174 Pg: 501    Doc: PA
Page: 1 of 7    10/04/2012 12:23 PM

o

I, CAROL JANE OULTON, of Natick, Massachusetts, appoint my daughter, NANCY
WILLIAMS, to be my lawful attorney, with full power to take the following action for me and in
my name:

602.    The Void DPOA of Carol contains a notation, at the bottom of Page 1, indicating

that the document is to be returned to Mirick O'Connell after recording.

{Practice Areas\Probate\23982\00001\A2063320 DOC}

DURABLE POWER OF ATTORNEY OF
CAROL JANE OULTON
PAGE 1

Mirick O'Connell
100 Front St.
Worcester m 01602

603.    The Void-DPOA-Carol, in contrast with the promises through which Attorneys

D.R. Brown, Vecchio, and Port fraudulently induced Plaintiff to dismiss her Petitions for

Conservator, names C. Hladick –not a third party- as N. Williams's successor:

> If NANCY WILLIAMS fails or ceases to serve as my attorney by reason of her resignation,
> death, or inability to make informed decisions as to my property or financial interests or to
> manage my affairs because of advanced age, mental weakness, mental illness, or physical
> incapacity, I appoint my daughter, CAROL B. HLADICK, to be my lawful attorney as NANCY
> WILLIAMS's successor, and upon acceptance, CAROL B. HLADICK will have all the power,
> authority, and discretion provided in this Power of Attorney. A written affidavit by CAROL B.
> HLADICK, under oath, declaring that she is accepting the duties as my attorney, and further
> declaring that NANCY WILLIAMS is not serving, will be conclusive evidence of CAROL B.
> HLADICK's authority to serve as my attorney under this Power of Attorney.

604.    The Void DPOA of Carol is stated as being a <u>sealed instrument</u> that contains what

is allegedly Carol's signature:

167

Signed by me as a sealed instrument this _8th_ day of _August_ , 2012.

_Carol Jane Oulton_
CAROL JANE OULTON

605.     The Void DPOA of Carol contains no language indicating that Carol's execution of the document was witnessed, and no witnesses attest that Carol signed the document "voluntarily for its stated purpose."

606.     The Void DPOA of Carol was "notarized" by Attorney Bergeron, a Mirick O'Connell attorney who profited from the Void DPOA of Carol, in the absence of any witnesses.

607.     Attorney Bergeron failed to apply any Notary Seal to the Void DPOA of Carol, either ink or embossed.

608.     The Notary Acknowledgment signed (but not sealed) by Attorney Bergeron in his purported capacity as Notary Public states:

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

On _August 8_ , 2012, before me, the undersigned notary public, personally appeared CAROL JANE OULTON (the "Principal") and acknowledged to me that the Principal signed the preceding or attached document voluntarily for its stated purpose. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document, which was:

☑ *A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or*

☐ *On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or*

☐ *Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or*

☐ *The following evidence of identification:* _____

Notary Public: _Arthur P. Bergeron, Esq._
My Commission Expires: _January 4, 2019_
*[Seal]*

609.     Also on August 8, 2012, Attorney Bergeron had Donald execute a void Durable Power of Attorney of Donald Paul Oulton (the "Void DPOA –Donald") (**Exhibit 117**).

610.     The document footer in the Void DPOA of Donald (which was automatically inserted into the documents by <u>Mirick O'Connell's</u> internal document management software) is nearly identical to the document footers in the perjurious "Original Affidavits" of Marlborough Hills employees Kumar (**Exhibit 73**) and Lincoln (**Exhibit 74 and Exhibit 75**).

611.     The footer in the Void DPOA of Donald reveals unique, <u>Mirick O'Connell law firm-specific</u> details:

      a)     <u>Practice Area</u>:  Probate;

      b)     <u>Client Number</u>:  **23982**;

      c)     <u>Matter Number</u>:  000**01**; and

      d)     <u>Document Number</u>:  A2063284.DOC.

612.     An image of the footer contained in the Opposition of Donald appears below:

{Practice Areas\Probate\23982\00001\A2063284.DOC}

613.     The Void DPOA of Donald makes no statement attesting to Donald's competency on the date of document execution.  It says nothing about Donald "being a competent adult, at least eighteen years of age or older, of sound mind, and under no constraint or undue influence."

614.     The Void DPOA of Donald, in contrast with the promises through which Attorneys D.R. Brown, Vecchio, and Port fraudulently induced Plaintiff to dismiss her Petitions for Conservator, names <u>N. Williams</u> as Donald's lawful attorney.

615.     The Void DPOA of Donald was recorded in the Middlesex County Registry of Deeds at Book 60174, Page 494, on October 4, 2012.

**DURABLE POWER OF ATTORNEY**

Bk: 60174 Pg: 494    Doc: PA
Page: 1 of 7    10/04/2012 12:23 PM

I, DONALD PAUL OULTON, of Natick, Massachusetts, appoint my daughter, NANCY WILLIAMS, to be my lawful attorney, with full power to take the following action for me and in my name:

616.    The Void DPOA of Donald contains a notation, at the bottom of Page 1,

indicating that the document is to be returned to Mirick O'Connell after recording.

{Practice Area\Probate\29982\00001\A2063284.DOC}

Mirity O'Conned

100 Frout Sur
Worcest My 01608

DURABLE POWER OF ATTORNEY OF
DONALD PAUL OULTON
PAGE 1

617.    The Void-DPOA-Donald, in contrast with the promises through which Attorneys

D.R. Brown, Vecchio, and Port fraudulently induced Plaintiff to dismiss her Petitions for

Conservator, names <u>C. Hladick</u> as N. Williams's successor:

If NANCY WILLIAMS fails or ceases to serve as my attorney by reason of her resignation, death, or inability to make informed decisions as to my property or financial interests or to manage my affairs because of advanced age, mental weakness, mental illness, or physical incapacity, I appoint my daughter, CAROL B. HLADICK, to be my lawful attorney as NANCY WILLIAMS's successor, and upon acceptance, CAROL B. HLADICK will have all the power, authority, and discretion provided in this Power of Attorney. A written affidavit by CAROL B. HLADICK, under oath, declaring that she is accepting the duties as my attorney, and further declaring that NANCY WILLIAMS is not serving, will be conclusive evidence of CAROL B. HLADICK's authority to serve as my attorney under this Power of Attorney.

618.    The Void DPOA of Donald is stated as being a <u>sealed instrument</u> that contains

what is allegedly Donald's signature:

Signed by me as a sealed instrument this _8th_ day of _August_, 2012.

_Donald Paul Oulton_
DONALD PAUL OULTON

170

619.    The Void DPOA of Donald contains no language indicating that Donald's execution of the document was witnessed, and no witnesses attest that Donald signed the document "voluntarily for its stated purpose."

620.    The Void DPOA of Donald was "notarized" by Attorney Bergeron, an attorney who profited from the Void DPOA of Donald, in the absence of witnesses.

621.    Attorney Bergeron failed to apply any Notary Seal to the Void DPOA of Donald, either ink or embossed.

622.    The Notary Acknowledgment signed (but not sealed) by Attorney Bergeron in his purported capacity as Notary Public states:

> On August 8, 2012, before me, the undersigned notary public, personally appeared **DONALD PAUL OULTON** (the "Principal") and acknowledged to me that the Principal signed the preceding or attached document voluntarily and for its stated purpose.  The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document, which was:
>
> **On the oath or affirmation of a CREDIBLE WITNESS UNAFFECTED BY THE DOCUMENT or transaction who is personally known to the notary public and who personally knows the Principal**.
> [emphasis added]

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

On _August 8_ , 2012, before me, the undersigned notary public, personally appeared DONALD PAUL OULTON (the "Principal") and acknowledged to me that the Principal signed the preceding or attached document voluntarily for its stated purpose. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document, which was:

☐   *A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or*

☒   *On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or*

☐   *Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or*

☐   *The following evidence of identification: _____.*

Notary Public: _Arthur P. Bergeron, Esq._
My Commission Expires: _____ _January 4, 2019_ _____
[Seal]

623.    By the time the Oultons were forced to execute the Oultons' Void DPOAs from the locked Alzheimer's Unit of Marlborough Hills on August 8, 2012, both of the Oultons had been falsely imprisoned in Marlborough Hills for more than eight months and both of the Oultons had been subjected to unimaginably cruel and inhumane abuse – both physical and mental – by the Sibling Defendants, Marlborough Hills administrators and staff, and others.

624.    Moreover, both of the Oultons' Health Care Proxy documents had been repeatedly and unlawfully "invoked" by Marlborough Hills administrators and staff.  The Oultons had been denied the right to choose with whom they could freely associate, communicate by telephone, correspond by United States Mail, and visit.

625.    All of the Oultons' property – real and personal – was jointly held, and all of the Oultons' property – real and personal – was converted by the Defendants through the use of the Oultons' Void DPOAs that were created by Mirick O'Connell, not properly notarized, and

172

executed by the incapacitated Oultons at Marlborough Hills in the absence of disinterested witnesses.

626.    Note that Attorneys Port, D.R. Brown and Vecchio had informed Plaintiff <u>that if Plaintiff dismissed the Petitions for Conservator</u>:

        a)      <u>she would be allowed to visit the Oultons again</u>; and

        b)      <u>a disinterested, third party would be given power of attorney for Donald and Carol</u>

but Attorneys Port, D.R. Brown, and Vecchio did not honor these promises after fraudulently inducing Plaintiff to dismiss the Petitions for Conservator.

627.    On August 21, 2012, **13 days AFTER** Attorney Bergeron, N. Williams, and C. Hladick unlawfully seized control of the Oultons' jointly-held assets through the fraudulent execution of the Oultons' Void-DPOAs and, upon information and belief, during the same time period in which the Sibling Defendants were converting Plaintiff's property and the Oultons' jointly-held personalty from the Oulton Home in preparation for the fraudulent conveyance of the property, the Natick Police Department responded to an alleged "Burglary (B&E)" call at the Oulton Home.

628.    Officer Murphy, the personal friend of Capt. Hladick who responded to the Oulton Home on November 30, 2011, after the Hladicks had stolen the Oultons' Checkbook, wallet, and pocketbook, investigated the alleged "BURGLARY (B&E)" call at the Oulton Home.

629.    The Natick Police Log entry related to Officer Murphy's investigation of the alleged "BURGLARY (B&E)" ("Natick Incident No. 12-14359") at the Oulton Home (**Exhibit 118**) states, "REPORT TO BE FILED" and "REFER TO INCIDENT 12-1015-OF."

Natick Police Department

12-14359        1352    BURGLARY (B & E)                    Report to be filed
        Primary Id:      2927 - OFFICER ROBERT F MURPHY
    Location/Address:    54 MACARTHUR RD
            Unit:        9441  OFFICER ROBERT F MURPHY
    Refer To Incident:   12-1015-OF

630.    On August 22, 2012, the Natick Police Department instructed the Agawam Police

Department to issue a NO TRESPASS ORDER on Plaintiff, who had not been at the Oulton

Home since January 8, 2012, the last date on which she retrieved the Oultons' mail.

631.    The NO TRESPASS ORDER, which was served on Plaintiff on the evening of

August 22, 2012, prevented Plaintiff from going to the Oulton Home and retrieving her personal

property that was at the Oultons from her frequent trips there to care for them.

632.    Upon information and belief, the Natick Police Department issued this NO

TRESPASS ORDER at the request of Capt. Hladick and his co-conspirators solely so that

Plaintiff would not be able to prevent the conversion of Plaintiff's and the Oultons' personalty

from the Oulton Home or interfere with the Defendants' fraudulent sale of the Oulton Home.

633.    Sometime between January 8, 2012, (the last day on which Plaintiff went to the

Oulton Home to retrieve the Oultons' mail from Mr. and Mr. Maichen for them) and September

21, 2012, when the Oulton Home was fraudulently conveyed to Bracciale through a $354,864.69

CASH transaction (discussed below), the Sibling Defendants unlawfully removed Plaintiff's,

Donald's, and Carol's personalty from the Oulton Home.

634.    Beginning on September 9, 2012, and again on September 14, 2012, and

September 16, 2012, Plaintiff received three Google Alerts indicating that the Oulton Home was

placed on the market (Exhibit 119).  The Listing Agent was Alex Jowdy and the asking price

was $339,000.00.

174

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*



Sarah Oulton< saoulton@gmail.com>

## Google Alert - 54 macarthur road natick

**Google Alerts** < googlealerts-noreply@google.com>
To: saoulton@gmail.com

Sun, Sep 9, 2012 at 2:50 PM

**Web**                                    1 new result for **54 macarthur road natick**

**54 Macarthur Road Natick** MA 01760 Home for sale - MLS #71434717
First Open House 9/16 2-3:30PM Don't miss this quintessential cape located in a very desirable
east **Natick** neighborhood. Features include 4 bedrooms and 2 ...
www.massrealty.com/metro-west/natick/.../54.../71434717



en Español | Find an Agent | Find an Office | KW Worldwide | KW Luxury Homes | KW Commercial | KW Keller Williams Canada | Contact

Home    Buying a Home    Selling Your Home    Careers    About Us

Search Homes for Sale    54 Macarthur Road

**54 Macarthur Road | Natick, MA 01760**

4 bed | 2 full bath | 1610 sqft | Single Family      **$339,000**
search similar                          Est. Monthly Payment: $2032.48/mo
                                        revise your payment calculation

MAKE AN OFFER

email a friend | request a showing | print flyer



**Alex Jowdy**
Visit my website
View my listings
mobile: 781-706-1394

CONTACT ME



Learn more about
**Transactions**

MLS Number
Address
Zip
MA
- County -
- City -
- Minimum Price -
- Maximum Price -
search

     

First Open House 9/16 2-3:30PM Don't miss this quintessential cape located in a very desirable east Natick
neighborhood. Features include 4 bedrooms and 2 full baths, front entrance leads to a spacious living room with
fireplace, dining room, expanded family room and updated kitchen. Home boasts replacement windows, hardwood
floors, first floor laundry and much more. Beautiful level backyard leads to conservation area...one of a kind lot! Click
on BLUE BOX/tour for floorplan and more pictures.

175

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

635.    On September 21, 2012, a void Mortgage in the amount of $100,988.50 was

executed by N. Williams, granting the Oultons' jointly-held Oulton Home (54 MacArthur Road,

Natick, Massachusetts), as collateral for said Mortgage to Colonial Health Group-Westridge,

LLC, a Massachusetts Limited Liability Company doing business as Marlborough Hills

Healthcare Center, with Mortgage covenants (the "Void Mortgage of Marlborough Hills")

(Exhibit 120).

636.    N. Williams had no legal authority to execute the Void Mortgage of Marlborough

Hills because the Void DPOA of Carol (Exhibit 116) and Void DPOA of Donald (Exhibit 117),

allegedly naming N. Williams as the Oultons' "lawful attorney," were fraudulently executed.

Attorney Bergeron, the Sibling Defendants, and possibly others used undue influence to force the

incapacitated to Oultons execute the "Oultons' Void DPOAs after the Oultons had been falsely

imprisoned – and cruelly subjected to near-lethal physical, mental, and emotional abuse at

Marlborough Hills – under constraint and duress, and in the absence of disinterested witnesses.

637.    The Void Mortgage of Marlborough Hills was prepared by Mirick O'Connell and

signed by N. Williams, the alleged attorney in fact for Donald and Carol.  However, Attorney

Bergeron notarized the document only where N. Williams signed on behalf of Donald.  Attorney

Bergeron DID NOT notarize for where N. Williams had signed on behalf of Carol.

638.    The Void Mortgage of Marlborough Hills was prepared by Mirick O'Connell.

639.    The document footer in the Void Mortgage of Marlborough Hills (which was

automatically inserted into the documents by Mirick O'Connell's internal document management

software) is nearly identical to the document footers in the perjurious "Original Affidavits" of

Marlborough Hills employees Kumar (Exhibit 73) and Lincoln (Exhibit 74 and Exhibit 75).

640.    The footer in the Void Mortgage of Marlborough Hills reveals unique, Mirick

O'Connell law firm-specific details:

a)    Practice Area:  Probate;

b)    Client Number:  **23982**;

c)    Matter Number:  00**001**; and

d)    Document Number:  A2099574.DOC.

641.    An image of the footer contained in the Opposition of Donald appears below:

{Practice Areas\Probate\23982\00001\A2099574.DOC}

642.    The Void Mortgage of Marlborough Hills was recorded in the Middlesex County Registry of Deeds at Book 60174, Page 520, on October 4, 2012, and it also contains a notation, at the top of Page 1, indicating that the document is to be returned to Mirick O'Connell after recording.



**Record and return to:**

Arthur P. Bergeron, Esq.
Mirick O'Connell
100 Front Street
Worcester, MA 01608

*2012 00216493*
Bk: 60174 Pg: 520    Doc: MTG
Page: 1 of 12    10/04/2012 12:23 PM

*This space reserved for Recorder's use only*

## MORTGAGE

643.    The Void Mortgage of Marlborough Hills contains the following introductory paragraph:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

**DONALD P. OULTON** and **CAROL J. OULTON**, both of 54 MacArthur Road, Natick, Middlesex County, Massachusetts 01760 (collectively referred to as the "Mortgagor"), husband and wife, as tenants by the entirety, for consideration paid, grants the Premises to **COLONIAL HEALTH GROUP WESTRIDGE, LLC**, a Massachusetts limited liability company, doing business as **MARLBOROUGH HILLS HEALTHCARE CENTER**, having a principal place of business at 121 Northboro Road East, Marlborough, Massachusetts 01752 ("Mortgagee") with **MORTGAGE COVENANTS**, to secure the payment, performance and observance of all the Obligations. The term "Obligations" means all of the debts, liabilities, agreements and other obligations of Mortgagor and every other party to the Loan Documents due Mortgagee, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or arising in the future including, but not limited to, the payment of **ONE HUNDRED THOUSAND NINE HUNDRED EIGHTY-EIGHT AND 50/100 DOLLARS ($100,988.50)**. The term "Loan Documents" includes that certain $100,988.50 Mortgage Note of Mortgagor payable to Mortgagee dated September 21, 2012 (the "Note"), this Mortgage, all other documents delivered to Mortgagee in connection with this Mortgage by Mortgagor or by others and all amendments, restatements, modifications, extensions and renewals of this Mortgage and the other agreements and documents referred to above.

644.    Void Mortgage of Marlborough Hills also contains, *inter alia*, a the following

clauses:

**Section 1- General Covenants of Mortgagor**. Until the Obligations are paid, performed and observed in full, in addition to the **STATUTORY CONDITION**, Mortgagor agrees as follows:

1.3    **Mortgages and Encumbrances**. To keep the title to the Premises free of all mortgages and other encumbrances, except the lien for Taxes not yet due and encumbrances assented to by Mortgagee, regardless of whether the mortgage or encumbrance has priority over this Mortgage.

645.    N. Williams's execution of the Void Mortgage of Marlborough Hills "under seal" was witnessed by Attorney Bergeron, not by a disinterested third-party.

WITNESS the execution hereof under seal as of September 21, 2012.

_____                    Donald P. Oulton, by his Attorney-in-Fact,
Witness                                                     Nancy Williams, pursuant to a Durable Power
                                                                   Attorney dated August 8, 2012, and recorded
                                                                   with the Middlesex South District Registry of
                                                                   Deeds in Book _60179_ , Page
                                                                   _444_

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Carol J. Oulton, by her Attorney-in-Fact, N. Williams POA

Witness

Carol J. Oulton, by her Attorney-in-Fact,
Nancy Williams, pursuant to a Durable Power
Attorney dated August 8, 2012, and recorded
with the Middlesex South District Registry of
Deeds in Book 60174, Page 301.

646. After N. Williams signed the Void Mortgage of Marlborough Hills, the document was then "notarized" by Attorney Bergeron.

647. Attorney Bergeron failed to apply any Notary Seal to the documents, either ink or embossed.

648. The notary block for "Donald's signature appears on Page 10 and Page 11 of the document, but Carol's signature was not notarized in the Void Mortgage of Marlborough Hills.

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

On September $\underline{21}$, 2012, before me, the undersigned notary public, personally appeared Nancy Williams, Attorney-in-Fact for Donald P. Oulton (the "Principal") and swore or affirmed to me that the contents of the preceding or attached document were truthful and accurate to the best of the Principal's knowledge and belief. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☑ A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐ On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☐ Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐ The following evidence of identification: _____

_____

Notary Public: _____

Printed Name: _____ Arthur P. Bergeron _____

My Commission Expires: _____ January 4, 2019 _____

*[Seal]*

[Practice Areas\Probate\339827\00001\A2099574 DOC]      10

*Oulton v. Hladick, et al. -- Amended Verified Complaint and Demand for Jury Trial*

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

On September _2/_ , 2012, before me, the undersigned notary public, personally appeared Nancy Williams, Attorney-in-Fact for Donald P. Oulton (the "Principal") and swore or affirmed to me that the contents of the preceding or attached document were truthful and accurate to the best of the Principal's knowledge and belief. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☑ A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐ On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☐ Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐ The following evidence of identification: _____

_____

Notary Public:_____

Printed Name:_____Arthur P. Bergeron_____

My Commission Expires:_____January 4, 2019_____

*[Seal]*

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

650.    On September 21, 2012, N. Williams executed a Mortgage in the amount of $7,000.00, granting the Oultons' jointly-held home as collateral for said Mortgage to Mirick O'Connell, with Mortgage covenants (the "Void Mortgage of Mirick O'Connell") (Exhibit 121).

651.    The Void Mortgage of Mirick O'Connell was prepared by Mirick O'Connell.

652.    The document footer in the Void Mortgage of Mirick O'Connell (which was automatically inserted into the documents by Mirick O'Connell's internal document management software) is nearly identical to the document footers in the perjurious "Original Affidavits" of Mirick O'Connell employees Kumar (Exhibit 73) and Lincoln (Exhibit 74 and Exhibit 75).

653.    The footer in the Void Mortgage of Mirick O'Connell reveals unique, Mirick O'Connell law firm-specific details:

    a)    Practice Area:  Probate;

    b)    Client Number:  23982;

    c)    Matter Number:  00001; and

    d)    Document Number:  A2099648.DOC.

654.    An image of the footer contained in the Opposition of Donald appears below:

{Practice Areas\Probate\23982\00001\A2099648.DOC}

655.    The Void Mortgage of Mirick O'Connell was recorded in the Middlesex County Registry of Deeds at Book 60174, Page 508, on October 4, 2012, and it also contains a notation, at the top of Page 1, indicating that the document is to be returned to Mirick O'Connell after recording.





Bk: 60174 Pg: 508    Doc: MTG
Page: 1 of 12    10/04/2012 12:23 PM

*This space reserved for Recorder's use only*

<u>**Record and return to:**</u>

Arthur P. Bergeron, Esq.
Mirick O'Connell
100 Front Street
Worcester, MA 01608

## MORTGAGE

656.    The Void Mortgage of Mirick O'Connell contains the following introductory

paragraph:

> **DONALD P. OULTON** and **CAROL J. OULTON**, both of 54 MacArthur Road,
> Natick, Middlesex County, Massachusetts 01760 (collectively referred to as the "Mortgagor"),
> husband and wife, as tenants by the entirety, for consideration paid, grants the Premises to
> **MIRICK, O'CONNELL, DeMALLIE & LOUGEE, LLP**, a Massachusetts limited liability
> partnership having a principal place of business at 100 Front Street, Worcester, Massachusetts
> 01608 ("Mortgagee") with **MORTGAGE COVENANTS**, to secure the payment, performance
> and observance of all the Obligations. The term "Obligations" means all of the debts, liabilities,
> agreements and other obligations of Mortgagor and every other party to the Loan Documents due
> Mortgagee, whether direct or indirect, absolute or contingent, joint or several, due or to become
> due, now existing or arising in the future including, but not limited to, the payment of **SEVEN
> THOUSAND AND 00/100 DOLLARS ($7,000.00)**. The term "Loan Documents" includes that
> certain $7,000.00 Mortgage Note of Mortgagor payable to Mortgagee dated September 21, 2012
> (the "Note"), this Mortgage, all other documents delivered to Mortgagee in connection with this
> Mortgage by Mortgagor or by others and all amendments, restatements, modifications,
> extensions and renewals of this Mortgage and the other agreements and documents referred to
> above.

657.    In various documents (described below) Mirick O'Connell claims that the Void

Mortgage of Mirick O'Connell was taken to cover the Oultons' "FUTURE LEGAL

EXPENSES."

658.    The Oultons paid $7,025.00 (an amount greater than the amount in the Void

Mortgage of Mirick O'Connell) in satisfaction of the Void Mortgage of Mirick O'Connell

(discussed below), and three weeks later, both of the Oultons were dead.

183

659.     The Oultons could not have exhausted the $7,025.00 paid to Mirick O'Connell for "FUTURE LEGAL EXPENSES" in the three weeks they lay, tragically separated from each other and dying, at Marlborough Hills.

660.     Indeed, the HUD-1 Settlement Statement sent from Mirick O'Connell Attorney Port to N. Williams after the sale of the Oulton Home (discussed below) reflects that, in addition to the $7,025.00 "for FUTURE LEGAL EXPENSES," Mirick O'Connell also billed the Oultons $2,500.00 for "ADDITIONAL LEGAL FEES REGARDING SALE OF THE PROPERTY," and $1,500.00 for "THE APPLICATION FEES FOR THE PLAN OF MASSACHUSETTS.

661.     In the **1,130 days** between November 20, 2012, (the date of the Discharge of the Void Mortgage of Mirick O'Connell) and December 24, 2015, (the date on which this lawsuit was filed), Mirick O'Connell made no attempt to refund the $7,025.00 that the Oultons paid for "FUTURE LEGAL EXPENSES" to the Estate of Carol or the Estate of Donald.

662.     When queried multiple times about the funds by Plaintiff (through counsel), Mirick O'Connell Attorney Port and Winston Law Group, LLC ("Winston Law") Attorney Michael Couture ("Attorney Couture") (who served as the fiduciary of the Estate of Carol for **883 days** prior to the filing of this lawsuit [discussed below]) each refused to answer or provide any explanation of any kind.

663.     On September 26, 2013, **311 days AFTER** discharging the Void Mortgage of Mirick O'Connell Attorney Bergeron was paid an additional $1,964.63 by Attorney Couture from the Estate of Carol for services that Attorney Bergeron claimed to have rendered (including telephone calls) to his deceased "clients"

664.     Like the Void Mortgage of Marlborough Hills, the Void Mortgage of Mirick O'Connell was fraudulently executed by N. Williams, who lacked authority to execute legal

184

documents on behalf of the Oultons because the Oultons' Void DPOAs were, themselves, a product of the fraud and criminality underlying this lawsuit.

665. N. Williams's execution of the Void Mortgage of Mirick O'Connell "under seal" was witnessed by Attorney Bergeron, not by a disinterested third-party.

WITNESS the execution hereof under seal as of September 21, 2012.

Donald P. Oulton, by his Attorney-in-Fact, Nancy Williams, pursuant to a Durable Power Attorney dated August 8, 2012, and recorded with the Middlesex South District Registry of Deeds in Book 60174, Page 444

Witness

Carol J. Oulton, by her Attorney-in-Fact, Nancy Williams, pursuant to a Durable Power Attorney dated August 8, 2012, and recorded with the Middlesex South District Registry of Deeds in Book 60174, Page 501

Witness

666. After N. Williams signed the Void Mortgage of Mirick O'Connell, the document was then "notarized" by Mirick O'Connell Attorney Bergeron.

667. Notably, Attorney Bergeron failed to apply any Notary Seal to the documents, either ink or embossed.

668. Quite significant is the fact that only the signature for "Donald" was "notarized" by Attorney Bergeron in the Void Mortgage of Mirick O'Connell, which has the footer on each page indicating that the Void Mortgage of Mirick O'Connell is "Document Number: A2099648.DOC" in Mirick O'Connell's document management system.

669. The notary block for "Donald's" signature appears on Page 10 and Page 11 of the document, but no signature for "Carol" appears in the document.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

670.   "Carol's" signature was not notarized in the Void Mortgage of Mirick O'Connell.

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

On September 21, 2012, before me, the undersigned notary public, personally appeared Nancy Williams, Attorney-in-Fact for Donald P. Oulton (the "Principal") and swore or affirmed to me that the contents of the preceding or attached document were truthful and accurate to the best of the Principal's knowledge and belief. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☑ A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐ On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☐ Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐ The following evidence of identification: _____

_____

Notary Public: _____

Printed Name: _____ Arthur P. Bergeron _____

My Commission Expires: _____ January 4, 2019 _____

*[Seal]*

[Practice Areas\Probate\23982\00000]\A3099648.DOC]          10

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

On September 2/___, 2012, before me, the undersigned notary public, personally appeared Nancy Williams, Attorney-in-Fact for Donald P. Oulton (the "Principal") and swore or affirmed to me that the contents of the preceding or attached document were truthful and accurate to the best of the Principal's knowledge and belief. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☑  A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐  On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☐  Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐  The following evidence of identification: _____

Notary Public: _____

Printed Name: _____Arthur P. Bergeron_____

My Commission Expires:____January 4, 2019____

*[Seal]*

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

671.     On November 16, 2012, a void Quitclaim Deed with Quitclaim Covenants (the

"Void Quitclaim Deed") (Exhibit 122) was executed by N. Williams, in violation of

G. L. c. 183 § 39[33].  The execution of the Void Quitclaim Deed did not take place before "at least

one subscribing witness," in violation of G. L. c. 183 § 39.

672.     The Void Quitclaim Deed was prepared by Mirick O'Connell.

673.     The Void Quitclaim Deed was recorded in the Middlesex County Registry of

Deeds at Book 60550, Page 485, on November 21, 2012.

674.     The Void Quitclaim Deed also contains a notation, at the top of Page 1, indicating

that the document is to be returned to Attorney Philip C. Brown ("Attorney P.C. Brown") (an

attorney with a Massachusetts Board of Bar Overseers disciplinary history related to

improprieties with his real estate practice) after recording.

**Record and Return to:**

Philip C. Brown, Esq.
Law Office of Philip C. Brown, Esq.
615 Concord St. 2nd Floor
Framingham, MA 01702

2012 00256326

Bk: 60550 Pg: 485     Doc: DEED
Page: 1 of 4     11/21/2012 03:59 PM

*This space reserved for Recorder's use only*

### QUITCLAIM DEED

675.     Attorney P.C. Brown represented Bracciale, the purported "Buyer" of the Oulton

Home, in the fraudulent conveyance of the Oulton Home.

676.     The fraudulent conveyance of the Oulton Home was effected with a **$346,864.69**

**CASH** transaction, which is discussed more fully below.

677.     The document footer in the Void Quitclaim Deed (which was automatically

inserted into the documents by Mirick O'Connell's internal document management software) is

---

[33] M.G.L c. 183 § 39:  Proof of Execution of Deed; Necessity of Subscribing Witness.  The execution of a deed
shall not be proved in the manner before provided unless it has at least one subscribing witness.

*Oulton v. Hladick, et al. -- Amended Verified Complaint and Demand for Jury Trial*

nearly identical to the document footers in the "Original Affidavits" of Marlborough Hills

employees Kumar (<u>Exhibit 73</u>) and Lincoln (<u>Exhibit 74 and Exhibit 75</u>).

678.   The footer in the Void Quitclaim Deed reveals unique, <u>Mirick O'Connell law</u>

<u>firm-specific</u> details:

a)    <u>Practice Area</u>:  Probate;

b)    <u>Client Number</u>:  **23982**;

c)    <u>Matter Number</u>:  000**04**; and

d)    <u>Document Number</u>:  A2145020.DOC.

679.   Quite notably, the "Client Number" assigned to the Void Quitclaim Deed is

**23982**, the same "Client Number" used in all Mirick O'Connell-generated documents, but – for

the first time in any document that Mirick O'Connell created in this case – the <u>Matter Number is</u>

<u>0000</u>**4**.

680.   The Void Quitclaim Deed states:

**WE, DONALD P. OULTON** and **CAROL J. OULTON**, husband and wife, both of
Marlborough, Middlesex County, Massachusetts, for good and valuable consideration paid of
**THREE HUNDRED FIFTY-ONE THOUSAND FIVE HUNDRED AND 00/100 DOLLARS
($351,500.00)**, grant to **CYNTHIA BRACCIALE**, with a mailing address of 54 MacArthur
Road, Natick, Massachusetts 01760, **WITH QUITCLAIM COVENANTS**, the land in Natick,
Middlesex County, Massachusetts with quitclaim covenants thereon, being Lot 47 as shown on a
plan entitled "Portion of Oak Park Manor" in Natick, dated April 29, 1946, and recorded with the
Middlesex South District Registry of Deeds at the end of Book 7026, bounded and described as
follows:

681.   N. Williams executed the Void Quitclaim Deed, as "<u>an instrument under seal</u>," for

both Donald and Carol on November 16, 2012.

EXECUTED as an instrument under seal this _16th_ day of November, 2012.

_Donald P. Oulton_
_by N Williams POA_
_____
Donald P. Oulton, by his Attorney-in-Fact
Nancy Williams, pursuant to a Durable Power
Attorney dated August 8, 2012, and recorded with
the Middlesex South District Registry of Deeds in
Book 60174, Page 494.

_Carol J. Oulton_
_by N Williams POA_
_____
Carol J. Oulton, by her Attorney-in-Fact
Nancy Williams, pursuant to a Durable Power
Attorney dated August 8, 2012, and recorded with
the Middlesex South District Registry of Deeds in
Book 60174, Page 501.

682.   N. Williams lacked authority to execute the Void Quitclaim Deed on behalf of the

Oultons because the Oultons' Void DPOAs were, themselves, a product of the fraud and

criminality underlying this lawsuit.

683.   The execution of the Void Quitclaim Deed did not take place before "at least one

subscribing witness," in violation of G. L. c. 183 § 39.

684.   The Void Quitclaim Deed was "notarized" by Mirick O'Connell Attorney Port.

_Oulton v. Hladick, et al. -- Amended Verified Complaint and Demand for Jury Trial_

## COMMONWEALTH OF MASSACHUSETTS

Worcester , ss.

On November _16_, 2012, before me, the undersigned notary public, personally appeared Nancy Williams, Attorney-in-Fact for Donald P. Oulton (the "Principal") and swore or affirmed to me that the contents of the preceding or attached document were truthful and accurate to the best of the Principal's knowledge and belief. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☐   A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐   On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☒   Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐   The following evidence of identification: _____

_____

Notary Public: _____

Printed Name: Jason J. Poit

My Commission Expires: October 15, 2015

*[Seal]*

191

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

COMMONWEALTH OF MASSACHUSETTS

Worcester , ss.

On November 16 , 2012, before me, the undersigned notary public, personally appeared Nancy Williams, Attorney-in-Fact for Carol J. Oulton (the "Principal") and swore or affirmed to me that the contents of the preceding or attached document were truthful and accurate to the best of the Principal's knowledge and belief. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☐  A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐  On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☒  Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐  The following evidence of identification: _____

_____

Notary Public: _____

Printed Name: Jason J. Port

My Commission Expires: October 15, 2015

[Seal]

685.     Attorney Port failed to apply any Notary Seal to the documents, either ink or embossed.

686.     The HUD-1 Settlement Statement allegedly filed in connection with the fraudulent conveyance of the Oulton Home (which was effected through a $354,864.69 cash transaction) (the "HUD-1") (Exhibit 123) contains a wealth of information.

687.     On the "HUD-1" is the warning listed at the bottom of Page 2 of the document:

> **WARNING:  It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see:  Title 18 U.S. Code Section 1001 and Section 1010.**"
> [emphasis added]

192

688.    Attorney Philip Colby Brown ("Attorney P.C. Brown") represented Bracciale in the fraudulent conveyance of the Oulton Home.

689.    By willfully and knowingly participating in the fraudulent conveyance of the Oulton Home to Bracciale, The Jowdy Group, Jowdy, Freedom Homes Realty, and Piccioli violated 254 Code Mass. Regs. § 3.00(14)(f) (1998)[34]

690.    The HUD-1 is below (**Exhibit 123**):

---

[34] **254 Code Mass. Regs. § 3.00(14)(f) (1998):  Additional Grounds for Discipline**.  [A] broker or salesperson shall comply with all laws of The Commonwealth, the United States, and those of any other state in which he/she is licensed.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

A. Settlement Statement

U.S. Department of Housing
and Urban Development

| Type of Loan | | | | | | |
|---|---|---|---|---|---|---|
| 1. ☐ FHA  2. ☐ mHA  3. ☐ Conv. Unins. | | 6. File Number | 7. Loan Number | | 8. Mortgage Insurance Case Number | |
| 4. ☐ VA  5. ☐ Conv. Ins. | | 12 brxccode 031 | | | | |

D.  NAME AND ADDRESS OF BORROWER:   Cynthia Brascoate
54 MacArthur Road
Natick MA 01760

E.  NAME AND ADDRESS OF SELLER:   Donald P. Oulton and Carol J. Oulton
54 MacArthur Road
Natick MA 01760

F.  NAME AND ADDRESS OF LENDER:

G.  PROPERTY LOCATION:   54 MacArthur Road
Natick MA 01760

H.  SETTLEMENT AGENT:   Law Office of Philip C. Brown, Esq.

PLACE OF SETTLEMENT:   Law Office of Philip C. Brown, Esq.
615 Concord Street
Framingham MA 01702

I.  SETTLEMENT DATE:   20-Nov-12        DISBURSEMENT DATE   11/20/12

| J.  SUMMARY OF BORROWER'S TRANSACTION | | K.  SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100.  GROSS AMOUNT DUE FROM BORROWER:** | | **400.  GROSS AMOUNT DUE TO SELLER:** | |
| 101.  Contract sale price | $  351,500.00 | 401.  Contract sale price | $  351,500.00 |
| 102.  Personal Property | | 402.  Personal Property | |
| 103.  Settlement charges to borrower: | | 403. | |
| (from line 1400) | $  2,808.45 | | |
| 104. | | 404. | |
| 105. | | 405. | |
| **ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE** | | **ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE** | |
| 106.  City/Town taxes   11/20/12 to 12/31/12 | 556.24 | 406.  City/Town taxes   11/20/12 to 12/31/12 | 556.24 |
| 107.  County taxes   / / to / / | | 407.  County taxes   / / to / / | |
| 108.  Assessments   / / to / / | | 408.  Assessments   / / to / / | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120.  GROSS AMOUNT DUE FROM BORROWER:** | $  354,864.69 | **420.  GROSS AMOUNT DUE TO SELLER:** | $  352,056.24 |
| **200.  AMOUNT PAID BY OR IN BEHALF OF BORROWER:** | | **500.  REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201.  Deposit or earnest money | 6,000.00 | 501.  Excess deposit (see instructions) | |
| 202.  Principal amount of new loan(s) | | 502.  Settlement charges to seller (line 1400) | 23737.64 |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204.  Proceeds from 2nd loan | | 504.  Pay-off to Middlesex Savings Bank | 10260.00 |
| 205. | | 505.  Pay-off to Mark O'Connell | 7025.00 |
| 206. | | 506.  Pay-off to Colonial Health Group | 102031.56 |
| 207. | | 507.  Reimbursement to  Alex Jewety | 124.99 |
| 208. | | 508. | |
| 209. | | 509. | |
| **ADJUSTMENTS FOR ITEMS UNPAID BY SELLER** | | **ADJUSTMENTS FOR ITEMS UNPAID BY SELLER** | |
| 210.  City/Town taxes | | 510.  City/Town taxes | |
| 211.  County taxes   / / to / / | | 511.  County taxes   / / to / / | |
| 212.  Assessments   / / to / / | | 512.  Assessments   / / to / / | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| | | **520.  TOTAL REDUCTIONS IN AMOUNT** | |
| **220.  TOTAL PAID BY/FOR BORROWER:** | $  6,000.00 | **DUE SELLER:** | $  143,199.79 |
| **300.  CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600.  CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301.  Gross amount due from borrower (line 120) | $  354,864.69 | 601.  Gross amount due to seller (line 420) | $  352,056.24 |
| 302.  Less amount paid by/for borrower (line 220) | $  6,000.00 | 602.  Less total reductions in amount due seller (line 520) | $  143,159.79 |
| 303.  CASH ☑ FROM   ☐ O BORROWER: | ($348,864.69) | 603.  CASH ☐ TO   ☐ FROM SELLER: | ($208,896.45) |

HUD-1 (3/86)

RESPA, HB 4305 2

Page 1

*Oulton v. Hladick, et al. — Amended Verified Complaint and Demand for Jury Trial*

HUD-1 (3/86)

| | SETTLEMENT CHARGES | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|---|
| 700. | TOTAL SALES/BROKER'S COMMISSION: | | | | | |
| | BASED ON PRICE: | $ 351,500.00 | @ 5.00% | = 17,575.00 | | |
| | **DIVISION OF COMMISSION (line 700) as follows:** | | | | | |
| 701. | $8,787.50 | to | Freedom Homes Realty | | | |
| 702. | $2,787.50 | to | Jowdy Group | $6,000.00 poc | | $ 17,575.00 |
| 703. | Commission paid at settlement | | | | | |
| 704 | | | | | | |
| | **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | | (P.O.C.) | | |
| 801. | Loan Origination Fee | to | | | | |
| 802. | Loan Discount | to | | | | |
| 803. | Appraisal fee to: | | | | | |
| 804. | Credit Report to: | | | | | |
| 805. | Underwriting fee to: | | | | | |
| 806. | M.E.R.S. fee to: | | | | | |
| 807. | Loan Processing fee to: | | | | | |
| 808. | Tax Service Fee to: | | | | | |
| 809. | Courier Fee to: | | | | | |
| 810. | Flood Certification fee to: | | | | | |
| 811. | Lender's doc prep to: | | | P.O.C. | | |
| | **900. ITEMS REQUIRED BY LENDERS TO BE PAID IN ADVANCE:** | | | | | |
| 901. | Credit Interest from | | /day ( days) | | | |
| 902. | Mortgage Insurance premium for | | mos. to | | | |
| 903. | Hazard Insurance premium for | | yrs. to | | | |
| 904. | Flood insurance premium for | | yrs. to | | | |
| 905. | | | | | | |
| | **1000. RESERVES DEPOSITED WITH LENDER:** | | | | | |
| 1001. | Hazard Insurance | months @ | $ | per month | | |
| 1002. | Mortgage Insurance | months @ | $ | per month | | |
| 1003. | City property taxes | months @ | $ | per month | | |
| 1004. | County property taxes | months @ | $ | per month | | |
| 1005. | Annual assessments | months @ | $ | per month | | |
| 1006. | Flood Insurance | months @ | $ | per month | | |
| 1007. | | months @ | $ | per month | | |
| 1008. | Aggregate Accounting Adjustment | | | | | |
| | **1100. TITLE CHARGES:** | | | | | |
| 1101. | Settlement or closing fee to | Law Office of Philip C. Brown, Esq. | | | 500.00 | |
| 1102. | Abstract or title search to | | | | 250.00 | |
| 1103. | Title examination to | | | | | |
| 1104. | Buyer's contract review | Philip C. Brown, Esq. | | | 300.00 | |
| 1105. | Document preparation to | | | | | |
| 1106. | Title update fee to: | | | | | |
| 1107. | Attorney's fees to | | | | | |
| | includes above items numbers: | | | | | |
| 1108. | Title Insurance to | Stewart Title | | | 1288.45 | |
| | includes above items numbers: | | | | | |
| 1109. | Lender's Coverage | | | | | |
| 1110. | Owner's Coverage | $ 351,500.00 | $ 1,288.45 | | | |
| 1111. | MLC | | Town of Natick | | 65.00 | |
| 1112. | Courier Fee to: | | Philip Brown | | 30.00 | |
| 1113. | Plot plan | | | | 150.00 | |
| | **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | | | | |
| 1201. | Recording fees: | $ 125.00 Mortgage | $ 175.00 Release | $ 75.00 | 125.00 | 375.00 |
| 1202. | City/county tax/stamps: | Deed | | Mortgage $ | | 1603.84 |
| 1203. | State tax/stamps: | Deed | $ | Mortgage $ | | |
| 1204. | MLC recording | | | | 65.00 | |
| 1205. | Discharge tracking | | | | | 225.00 |
| | **1300. ADDITIONAL SETTLEMENT CHARGES:** | | | | | |
| 1301. | Seller's Attorney's fee | to: Minck O'Connell | | | | 2500.00 |
| 1302. | Management fee to: | | | | | |
| 1303. | Overnight/ Courier fee | | | | | |
| 1304. | Declaration of Homestead | | | | 35.00 | |
| 1305. | | | | | | |
| 1306. | PLAN Application fees to: Minck O'Connell | | | | | 1500.00 |
| 1307. | | | | | | |
| | **1400. TOTAL SETTLEMENT CHARGES (Enter on line 103, Section J and line 502, Section K)** | | | | $ 2,808.45 | $ 23,727.04 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

| | | | Date |
|---|---|---|---|
| BUYER | Cynthia Bracciale | BUYER | |
| | | | Date |
| SELLER | Donald P. Oulton | SELLER | Carol J. Oulton |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

| | | |
|---|---|---|
| Settlement Agent | | Date |
| | Law Office of Philip C. Brown, Esq. | |

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Page 2

195

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

691.   The HUD-1 lists the "**CASH AT SETTLEMENT FROM BORROWER (BRACCIALE)**" as **$346,864.69** and also lists the "**CASH AT SETTLEMENT TO SELLER (THE OULTONS)**" as **$208,896.45**.

| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | | 600. CASH AT SETTLEMENT TO/FROM SELLER: | |
|---|---|---|---|---|
| 301. Gross amount due from borrower (line 120) | $ | 354,864.69 | 601. Gross amount due to seller (line 420) | $ 352,056.24 |
| 302. Less amount paid by/for borrower (line 220) | $ | 6,000.00 | 602. Less total reductions in amount due seller (lin $ | 143,159.79 |
| 303.  CASH ☑ FROM  ☐ TO BORROWER: | | ($346,864.69) | 603. CASH ☑ TO  ☐ FROM SELLER: | ($208,896.45) |

692.   The HUD-1 lists the "**SETTLEMENT CHARGES**" reflecting a "**Total Sales/Broker's Commission**" of **$17,575.00**, which reflects the following payments:

a)   **Freedom Homes Realty** - **$8,787.50**; and

b)   **The Jowdy Group** - **$8,787.50**.

| L. | | | SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION: BASED ON PRICE: | | $  351,500.00 | @  5.00% | = 17,575.00 | | |
| DIVISION OF COMMISSION (line 700) as follows: | | | | | | |
| 701. | $8,787.50 | to | Freedom Homes Realty | | | |
| 702. | $2,787.50 | to | Jowdy Group | $6,000.00 poc | | $  17,575.00 |
| 703.  Commission paid at settlement: | | | | | | |
| 704 | | | | | | |

693.   On January 11, 2013, Bracciale executed a Declaration of Homestead on the Oulton Home and Recorded it at Middlesex County Registry of Deeds Book 61296, Page 413 ("Bracciale's Declaration of Homestead") (Exhibit 124).

694.   Bracciale's signature on Bracciale's Declaration of Homestead was notarized by Attorney P.C. Brown.

695.   Of equal interest is the fact that the Oultons died within one month of the November 20, 2012, closing date of the fraudulent conveyance of the Oulton Home.  As of the date of the filing of this lawsuit, i.e., in the **1,130 days** since Mirick O'Connell took the **Oultons'**

196

$1,500.00 allegedly for "PLAN Application Fees," Mirick O'Connell has made no effort to

return those funds to either the Estate of Carol or the Estate of Donald.

| 1300. ADDITIONAL SETTLEMENT CHARGES: | | |
|---|---|---|
| 1301. Seller's Attorney's fee       to: Mirick O'Connell | | 2500.00 |
| 1302. Management fee to: | | |
| 1303. Overnight/ Courier fee | | |
| 1304. Declaration of Homestead | 35.00 | |
| 1305. | | |
| 1306. PLAN Application fees to: Mirick O'Connell | | 1500.00 |
| 1307. | | |

696.   The HUD-1 lists the following "**TOTAL SETTLEMENT CHARGES**":

  a)      **"Paid from Borrower's (Bracciale's) Funds at Settlement"** - **$2,808.45**;

and

  b)      **"Paid from Seller's (the Oultons') Funds at Settlement"** - **$23,777.84**.

| PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|
| **1400. TOTAL SETTLEMENT CHARGES (Enter on line 103, Section J and line 502, Section K)**   $   2,808.45 | $   23,777.84 |

697.   The "HUD-1" also contains signature blocks for the following parties:

  a)      **BUYER** – Cynthia Bracciale;

  b)      **SELLER** – Donald P. Oulton; and

  c)      **SELLER** – Carol J. Oulton.

698.   Finally, it is extremely important to note that the HUD-1 was neither signed nor

dated by Bracciale, "Donald", or "Carol."

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

| | | | |
|---|---|---|---|
| | | | Date _____ |
| BUYER | Cynthia Bracciale | BUYER | |
| | | | Date _____ |
| SELLER | Donald P. Oulton | SELLER | Carol J. Oulton |

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement

Settlement Agent _____   Date: _____

Law Office of Philip C. Brown, Esq.

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Page 2

699.   On November 19, 2012, a Discharge of Mortgage for the Void Mortgage of Mirick O'Connell (discussed above) was executed by David E. Surprenant on behalf of Mirick O'Connell, and it acknowledged satisfaction of the $7,000.00 Void Mortgage of Mirick O'Connell (the "Discharge of the Void Mortgage of Mirick O'Connell") (Exhibit 125).

700.   The Discharge of the Void Mortgage of Mirick O'Connell was recorded in the Middlesex County Registry of Deeds at Book 60660, Page 493 on November 21, 2012, and it also contains a notation, at the top of Page 1, indicating that the document is to be returned to Mirick O'Connell after recording.

Record and return to,

Arthur P. Bergeron, Esq.
Mirick O'Connell
100 Front Street
Worcester, MA 01608



Bk: 60560 Pg: 493   Doc: DIS
Page: 1 of 2   11/21/2012 03:69 PM

*This space reserved for Recorder's use only*

### DISCHARGE OF MORTGAGE

701.   The document footer in the Discharge of the Void Mortgage of Mirick O'Connell (which was automatically inserted into the documents by Mirick O'Connell's internal document

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

management software) is nearly identical to the document footers in the "Original Affidavits" of Marlborough Hills employees Kumar (**Exhibit 73**) and Lincoln (**Exhibit 74 and Exhibit 75**).

702.    The document footer in the Discharge of the Void Mortgage of Mirick O'Connell reveals unique, <u>Mirick O'Connell law firm-specific</u> details:

    a)    <u>Practice Area</u>:  Probate;

    b)    <u>Client Number</u>:  **23982**;

    c)    <u>Matter Number</u>:  000**04**; and

    d)    <u>Document Number</u>:  A2145094.DOC.

703.    The "Client Number" assigned to the Discharge of the Void Mortgage of Mirick O'Connell is **23982**, but – as with the Void Quitclaim Deed that Mirick O'Connell created in this case – the <u>Matter Number is 0000**4**</u>.

704.    An image of the footer contained in the Discharge of the Void Mortgage of Mirick O'Connell appears below:

{Practice Area\PROBATE\2398200004\A2145094.DOC}

705.    The Discharge of the Void Mortgage of Mirick O'Connell states:

**Marginal Reference to Book 60174, Page 508**

**MIRICK, O'CONNELL, DeMALLIE & LOUGEE, LLP**, a Massachusetts limited liability partnership having a principal place of business at 100 Front Street, Worcester, Massachusetts 01608, holder of a Mortgage from **DONALD P. OULTON** and **CAROL J. OULTON**, dated September 21, 2012, and recorded with the Middlesex South District Registry of Deeds in Book 60174, Page 508, hereby acknowledges satisfaction of the same.

**Property Address:    54 MacArthur Road, Natick, Massachusetts**

706.    The Discharge of the Void Mortgage of Mirick O'Connell states that it was

"executed a sealed instrument" on November 19, 2012, and was then signed by Mirick

O'Connell Managing Partner David E. Surprenant.

> Executed as a sealed Instrument this *17th* day of November, 2012.
>
> MIRICK, O'CONNELL, DeMALLIE &
> LOUGEE, LLP
>
> By: *David E. Surprenant*
> Its: *Managing Partner*

707.    Attorney Port failed to apply any Notary Seal to the Discharge of the Void

Mortgage of Mirick O'Connell, either ink or embossed.

708.    The Notary Acknowledgment signed (but not sealed) by Attorney Port in his

purported capacity as Notary Public states:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

## COMMONWEALTH OF MASSACHUSETTS

_Worcester_ , ss.

On November _19th_, 2012, _Scott F. Supernant_ , _Managing Partner_ of Mirick, O'Connell, DeMallie & Lougee, LLP (the "Principal"), personally appeared before me and acknowledged to me that the Principal signed the preceding or attached document voluntarily for its stated purpose. The Principal proved to me through satisfactory evidence of identification that the Principal is the person whose name is signed on the preceding or attached document. The satisfactory evidence of identification provided to me was:

☐ A current document issued by a federal or state government agency bearing the photographic image of the Principal's face and signature; or

☐ On the oath or affirmation of a credible witness unaffected by the document or transaction who is personally known to the notary public and who personally knows the Principal; or

☑ Identification of the Principal based on the notary public's personal knowledge of the identity of the Principal; or

☐ The following evidence of identification: _____

Notary Public

Printed Name: _Jason J. Past_

My Commission Expires: _October 15, 2015_

[Seal]

709.   On November 20, 2012, a Discharge of Mortgage for the Void Mortgage of Marlborough Hills (discussed above) was executed by Richard Kravetz on behalf of Colonial Health Group-Westridge, and it acknowledged satisfaction of the $100,988.50 Void Mortgage of Marlborough Hills (the "Discharge of the Void Mortgage of Marlborough Hills") (**Exhibit 126**).

710.   The Discharge of the Void Mortgage of Marlborough Hills was recorded in the Middlesex County Registry of Deeds at Book 80660, Page 495 on November 21, 2012, and it also contains a notation, at the top of Page 1, indicating that the document is to be returned to Mirick O'Connell after recording.

201



2012 00256430
Bk: 80550 Pg: 498   Doc: DIS
Page: 1 of 2   11/21/2012 09:59 PM

*This space reserved for Recorder's use only*

Record and return to:

Arthur P. Bergeron, Esq.
Mirick O'Connell
100 Front Street
Worcester, MA 01608

## DISCHARGE OF MORTGAGE

711.    The document footer in the Discharge of the Void Mortgage of Marlborough Hills (which was automatically inserted into the documents by Mirick O'Connell's internal document management software) is nearly identical to the document footers in the perjurious "Original Affidavits" of Marlborough Hills employees Kumar (Exhibit 73) and Lincoln (Exhibit 74 and Exhibit 75).

712.    The footer in the Discharge of the Void Mortgage of Marlborough Hills reveals unique, Mirick O'Connell law firm-specific details:

   a)    Practice Area:  Probate;

   b)    Client Number:  **23982**;

   c)    Matter Number:  000**04**; and

   d)    Document Number:  A2145093.DOC.

713.    The "Client Number" assigned to the Discharge of the Void Mortgage of Marlborough Hills is **23982,** but – as with the Void Quitclaim Deed and the Discharge of the Void Mortgage of Mirick O'Connell that Mirick O'Connell created in this case – the Matter Number is 0000**4**.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

714.   An image of the footer contained in the Discharge of the Void Mortgage of Marlborough Hills appears below:

{Practice Area\PROBATE\1982\00004\A2145093.DOC}

715.   The Discharge of the Void Mortgage of Marlborough Hills states:

**Marginal Reference to Book 60174, Page 520**

**COLONIAL HEALTH GROUP WESTRIDGE, LLC**, a Massachusetts limited liability company, doing business as **MARLBOROUGH HILLS HEALTHCARE CENTER**, having a principal place of business at 121 Northboro Road East, Marlborough, Massachusetts 01752, holder of a Mortgage from **DONALD P. OULTON** and **CAROL J. OULTON**, dated September 21, 2012, and recorded with the Middlesex South District Registry of Deeds in Book 60174, Page 520, hereby acknowledges satisfaction of the same.

**Property Address:   54 MacArthur Road, Natick, Massachusetts**

716.   The Discharge of the Void Mortgage of Marlborough Hills also states that it was "executed as a <u>sealed</u> instrument" on November 20, 2012.

Executed as a sealed instrument this *20th* day of November, 2012.

717.   The Discharge of the Void Mortgage of Marlborough Hills was executed by Richard I. Kravetz, Senior Administrator/Partner/Principal of Colonial Health Group Westridge, LLC.

COLONIAL HEALTH GROUP
WESTRIDGE, LLC

By: Richard I. Kravetz
Its: Senior Administrator / Partner / Principal

203

718.    The Discharge of the Void Mortgage of Marlborough Hills was notarized (and

sealed) by Michelle Miller.  In fact, this is the only one of the Defendants numerous documents

presented in this case that was properly notarized "under seal."

COMMONWEALTH OF MASSACHUSETTS

*Middlesex* , ss.

On November *20th*, 2012, *Richard I. Krantz* of Colonial Health
Group Westridge, LLC (the "Principal"), personally appeared before me and acknowledged to
me that the Principal signed the preceding or attached document voluntarily for its stated
purpose. The Principal proved to me through satisfactory evidence of identification that the
Principal is the person whose name is signed on the preceding or attached document.  The
satisfactory evidence of identification provided to me was:

☐    A current document issued by a federal or state government agency bearing the
photographic image of the Principal's face and signature; or

☐    On the oath or affirmation of a credible witness unaffected by the document or
transaction who is personally known to the notary public and who personally knows the
Principal; or

☐    Identification of the Principal based on the notary public's personal knowledge of the
identity of the Principal; or

☒    The following evidence of identification: *Drivers License*

Notary Public

Printed Name: *Michelle Miller*

My Commission Expires: *March 19, 2015*

[Seal]

719.    On November 27, 2012, Mirick O'Connell Attorney Port sent two FedExes

(totaling $24.08) to unknown recipients (for which Mirick O'Connell "**Client No. 24520 –**

**Oulton, Carol and Donald, Estate of**" was invoiced a total of $1,964.63 on August 2, 2013

[Exhibit 127]):

| | | |
|---|---|---|
| 11/27/12 | Federal Express - - VENDOR: Federal Express Corporation/jjp | 12.04 |
| 11/27/12 | Federal Express - - VENDOR: Federal Express Corporation/jjp | 12.04 |

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

720.    On November 29, 2012, Mirick O'Connell Attorney Port mailed a letter

(**Exhibit 128**) addressed to the Oultons c/o Nancy Williams at 291 Flat Rock Road Athol, MA

01331.  The letter to N. Williams states the following:

> I have enclosed a copy of the settlement statement signed at the
> closing for your records.  **As you can seem the $351, 500.00 sales**
> **price was increased by a credit for prepared real estate taxes in**
> **the amount of $556.24.  This brought the gross amount due to**
> **$352,056.24.  This gross amount was decreased by (i) a payoff**
> **to Middlesex Savings Bank for the home equity line in the**
> **amount of $10,200.00; (ii) a payoff to Mirick O'Connell for the**
> **outstanding mortgage provided to our firm to cover FUTURE**
> **LEGAL EXPENSES; (iii) a PAYOFF TO COLONIAL**
> **HEALTH GROUP IN THE AMOUNT OF $102,031.96; (iv)**
> **$124.99 paid to Alex Jowdy for reimbursement for obtaining**
> **smoke detector certificate and final water and sewer bill for**
> **the property; and (v) settlement charges in the amount of**
> **$23,777.84**.
> [emphasis added]
>
> **The Settlement charges included** (1) a **broker's commission in**
> **the amount of $17,575.00** which was reduced by the initial
> deposits held by the Jowdy Group in the amount of $6,000.00,
> bringing a net commission due of $11,575.00; (2) **recording fees**
> **in the amount of $375.00**; (3) **deed stamps in the amount of**
> **$1,602.84**; (4) a **discharge tracking fee payable to the buyer's**
> **attorney in the amount of $225.00**; (5) **$2,500 PAYABLE TO**
> **MIRICK O'CONNELL FOR ADDITIONAL LEGAL FEES**
> **REGARDING SALE OF THE PROPERTY**; and (6) **$1,500.00**
> **PAYABLE TO MIRICK O'CONNELL REPRESENTING**
> **THE APPLICATION FEES FOR THE PLAN OF**
> **MASSACHUSETTS FOR BOTH OF YOU**.  [emphasis added]
>
> The **total proceeds from the sale of the property was**
> **$208.896.45**.
> [emphasis added]

721.    Donald allegedly died only **20 days AFTER** Attorney Port sent his letter stating

that the Oultons paid Mirick O'Connell $1,500.00 for "Application Fees for the PLAN of

Massachusetts [sic]."

205

722.     On December 4, 2012, and December 5, 2012, WNE Law Professors William

Baker and Leora Harpaz wrote letters of recommendations for Plaintiff in support of her

application to the Massachusetts Bar (Exhibit 129).

723.     Professor Baker's letter or recommendation stated:

**William G. Baker**
PROFESSOR OF LAW
SCHOOL OF LAW
WESTERN NEW ENGLAND UNIVERSITY
1215 WILBRAHAM ROAD
SPRINGFIELD, MASSACHUSETTS 01119-2684

Phone: 413-782-1423
Fax: 413-796-2067
E-mail: wbaker@law.wne.edu

William G. Baker
Professor of Law

December 4, 2012

Board of Bar Examiners
Suffolk County Courthouse
3 Pemberton Square
Room 114
Boston, Massachusetts 02108

Re: Application of Sarah Oulton to the Massachusetts Bar

Dear Members of the Board:

Sarah Oulton has asked me to write a letter of recommendation in support of her application to the Massachusetts bar.  Sarah was a student in my Trusts and Estates course and my Estate Planning course at Western New England College School of Law.  I have known her for approximately three years.

In my opinion, Sarah Oulton is an outstanding person. I am aware that she had to deal with difficult family issues while she was enrolled as a law student. I believe that these problems are behind her. I know of no facts that would impugn her character or honesty.  She has always performed her duties in a conscientious and professional manner. She should be allowed to take the Massachusetts bar examination and should be admitted to the Massachusetts bar if she passes the exam.

If you should need any additional information, please contact me.

Very truly yours,

William G. Baker
Professor of Law
Member – New York State Bar
Registration Number: 1254614

724.     Professor Harpaz's letter of recommendation stated:

206

SCHOOL *of* LAW
WESTERN NEW ENGLAND **WNE**
UNIVERSITY

FACULTY OFFICES

Leora Harpaz
Professor of Law

Phone: 413-782-1437
E-mail: lharpaz@law.wne.edu

December 5, 2012

Massachusetts Board of Bar Examiners
Suffolk County Courthouse
3 Pemberton Square, Room 114
Boston, Massachusetts 02108

To the Board of Bar Examiners:

I am writing to recommend Ms. Sarah A. Oulton for admission to the Bar of the Commonwealth of Massachusetts.

I have known Ms. Oulton for over three years. I was her faculty advisor while she was a law student at Western New England University School of Law and she also was a student in my Internet Law class.

Ms. Oulton is an exceptionally hard worker who took seriously every aspect of her law school education. Her goal was always to learn as much as possible. While her grades on examinations did not always reflect the hard work and dedication she brought to her studies, her performance when writing papers and other forms of legal writing was of the highest caliber.

One example Ms. Oulton's dedication is reflected in the work she did when representing indigent clients in the law school's Housing Clinic. I know she often went above and beyond her responsibilities as a student in the clinic to make sure that her clients received the best representation possible, including volunteering to work on their cases long after her semester in the clinic had ended. I am sure this kind of dedication to the interests of her clients will be a hallmark of Ms. Oulton's career as a lawyer.

Ms. Oulton has faced a number of personal challenges while a law student, including issues related to her physical health and the mental and physical health of other members of her family. Despite these challenges, Ms. Oulton has been able to balance her responsibilities to her education and her family and succeed in her law studies.

I recommend Ms. Oulton as a prospective member of the Bar of the Commonwealth of Massachusetts. I know of no fact that would impair her fitness to serve as a member of the legal profession.

Sincerely,

Leora Harpaz

Leora Harpaz
Professor of Law

1215 Wilbraham Road
Springfield, MA 01119-2684

www.law.wne.edu

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

725.    On December 5, 2012, **while the Oultons were still alive at Marlborough Hills**, Mirick O'Connell Attorney Bergeron, Paralegal Brenda Costa performed tasks related to the Oultons' funerals and then corresponded with N. Williams, and C. Hladick (tasks for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
12/05/12     Email to and call from Brenda Costa regarding prepaid
             funerals; email to Nancy Williams and Carol Hladick
             regarding same.
```

726.    On December 5, 2012, Mirick O'Connell Attorney Bergeron reviewed the status of one of the Oultons' funeral contracts (singular) (a task for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
12/05/12     Review status of funeral contract.
```

727.    On December 6, 2012, Attorney D.R. Brown mailed to Plaintiff an Invoice (Exhibit 130) in the amount of $21,609.00.  Like the Invoice sent on April 10, 2012, (prior to execution of a Fee Agreement) and like the Invoice sent on July 12, 2012, this Invoice does not state the basis for the amounts that Dennis R. Brown, P.C. is charging Plaintiff.  The Invoice simply lists the tasks that Attorneys Brown and Vecchio allegedly performed, but it does not reflect the amount of time devoted to each task.

728.    Moreover, the Invoice plainly states that Plaintiff owes Dennis R. Brown, P.C. the sum of $21,609.00, which is $600.00 more than the amount listed on the July 12, 2012, Invoice. Attorney Brown and Vecchio had not returned Plaintiff's telephone calls after they fraudulently induced Plaintiff to dismiss her Petitions for Conservator in July 2012.

729.    On December 11, 2012, **while the Oultons were still alive at Marlborough Hills**, Mirick O'Connell Attorney Bergeron performed the following task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

**12/11/12**      **Review status of Application and D(4)(c).**

730.    On December 17, 2012, Mirick O'Connell Attorney Bergeron performed the

following tasks (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2,

2013 [Exhibit 127]):

> **12/17/12**      **Review discharge from Middlesex Savings;**
> **correspondence with opposing counsel regarding**
> **discharge.**

It is unclear to which "discharge" and "opposing counsel" Attorney Bergeron is referring.  The

Oulton's Middlesex Bank accounts remained opened until December 2013.

731.    On December 19, 2012, Mirick O'Connell Attorney Bergeron, N. Williams, and

Mirick O'Connell Attorney Port performed the following tasks (for which the Estate of Carol

was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

> **12/19/12**      **Email to and calls to and from Nancy Williams**
> **regarding insurance matter; obtain advice from**
> **Attorney Port regarding same; review file for Social**
> **Security numbers for children; telephone to Nancy**
> **Williams regarding same.**

732.    Also on December 19, 2012, **while the Oultons were still alive at Marlborough**

**Hills**, Mirick O'Connell Attorney Bergeron and his co-Defendants were strategizing the Oultons'

"**life insurance and probate issues**" (for which the Estate of Carol was invoiced a total of

$1,964.63 on August 2, 2013 [Exhibit 127]):

**12/19/12      Conference regarding life insurance and probate issues.**

Note that these discussions of the Oultons' probate issues were held **before the Oultons died,**

clearly proving that Attorney Sweeney-2 had unlawfully revealed the confidential contents of the

Alleged Will of Donald and the Alleged Will of Carol in furtherance of the conspiracy behind

this lawsuit.  This conference was held **98 days BEFORE** the Alleged Will of Carol and

fraudulent Codicil (the "Fraudulent Codicil of Carol") (discussed in detail below) were offered to

209

the Middlesex County Probate and Family Court, and **164 days BEFORE** the Alleged Will of

Donald and Codicil of Donald (the "Fraudulent Codicil of Donald," discussed in detail below)

were offered to the Middlesex County Probate and Family Court.

733.    On December 20, 2012, after Donald had allegedly died but **while Carol was still**

**alive** Mirick O'Connell Attorney Bergeron, N. Williams, and Mirick O'Connell Attorney Port

performed the following tasks related to the Oultons' funeral contracts (for which the Estate of

Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
12/20/12      Calls from and to Nancy William regarding funeral
              contracts; obtain advice from Attorney Port regarding
              the same.
```

734.    Also on December 20, 2012, **while Carol (but NOT Donald) was still alive**,

Mirick O'Connell Attorney Bergeron and others performed the following task (for which the

Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
12/20/12      Conference regarding MassHealth Application.
```

735.    Mirick O'Connell claimed, in the firm's response to Plaintiff's Ch. 93A Demand

Letter (sent by Attorney Goodwin in June 2015), that Mirick O'Connell was in the process of

applying for MassHealth benefits for Donald only.

736.    On December 22, 2012, Plaintiff learned that Donald allegedly died on December

19, 2012.  Plaintiff was notified of her father's death via Google Alert (Exhibit 131).  At no time

did any of the Defendants or anyone affiliated with any hospital or facility notify Plaintiff of her

father's death.

Gmail - Google Alert - donald oulton                                      Page 1 of 1



Sarah Oulton< saoulton@gmail.com>

---

## Google Alert - donald oulton

---

Google Alerts < googlealerts-noreply@google.com>          Sat, Dec 22, 2012 at 11:47 PM
To: saoulton@gmail.com

Web                                                 1 new result for donald oulton

Donald P Oulton Obituary View **Donald Oulton's** Obituary by ...
**Donald Paul Oulton**, Esq., 82, a longtime Natick resident and retired attorney, died peacefully
surrounded by family on Wednesday evening, Dec.
www.legacy.com/obituaries/.../obituary.aspx?n=donald-p...

Tip: Use a minus sign (-) in front of terms in your query that you want to exclude. Learn more.

Delete this alert.
Create another alert.
Manage your alerts.

737.     Plaintiff was overcome with grief and anguish upon learning that her father died,

for Plaintiff realized that there was absolutely no chance to ever be reunited with Donald or to

resolve the many problems created by the Defendants.

738.     On December 22, 2012, Plaintiff's uncle (Andrew Oulton) called Plaintiff to warn

her to stay away from Donald's wake, funeral, and burial or Plaintiff would be arrested by the

Natick Police.

739.     Three days later, on December 25, 2012, Plaintiff learned, via Google Alert

(**Exhibit 132**), of Carol's death.  At no time did any of the Defendants or anyone affiliated with

any hospital or facility notify Plaintiff of her mother's death.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Gmail - Google Alert - carol oulton                                    Page 1 of 1



Sarah Oulton< saoulton@gmail.com>

Google Alert - carol oulton

Google Alerts < googlealerts-noreply@google.com>              Tue, Dec 25, 2012 at 8:48 PM
To: saoulton@gmail.com

Web                                                            1 new result for carol oulton

CAROL JANE OULTON Obituary View CAROL OULTON's Obituary by The ...
OULTON, Carol Jane Age 79, a longtime Natick resident, went to be with the Lord and her
beloved husband Don on Tuesday, December 25, 2012, at Marlborough ...
www.legacy.com/Link.asp?l=LS000161969169

Tip: Use a minus sign (-) in front of terms in your query that you want to exclude. Learn more.

Delete this alert.
Create another alert.
Manage your alerts.

740.    Plaintiff was, once again, overcome with grief and anguish upon learning that her

mother died, for Plaintiff realized that there was absolutely no chance to ever be reunited with

Carol or to resolve the many problems created by the Defendants.

741.    On December 26, 2012, **before the deceased Oultons were even buried**, Mirick

O'Connell Attorney Bergeron performed the following task (for which the Estate of Carol was

invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

**12/26/12    Conference with client regarding probate issues.**

Mirick O'Connell billed for services rendered to its "client" and was continuing to strategize the

Oultons' "probate issues" before the Oultons had even been buried.  Notably, this was still **91**

**days BEFORE** the Defendants offered the Alleged Will of Carol and fraudulent Codicil to the

Middlesex County Probate and Family Court on March 26, 2013.  Furthermore, Mirick

O'Connell attorneys have steadfastly maintained, since their first encounter with Plaintiff, that

the firm was retained <u>by the Oultons</u> for the very limited purpose of contesting Plaintiff's

Petitions for Conservator and qualifying <u>Donald</u> (but not Carol) for MassHealth benefits.

742.    Also on December 26, 2012, **a point at which both Oultons were deceased**,

Mirick O'Connell Attorney Bergeron and Mirick O'Connell Attorney Port performed the

following task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2,

2013 [Exhibit 127]):

> **12/26/12      Emails with Jason Port regarding MassHealth strategy
> issues.**

743.    On December 27, 2012, **before the deceased Oultons were even buried**, Mirick

O'Connell Attorney Bergeron performed the following task (for which the Estate of Carol was

invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

> **12/27/12      Advice regarding probate of Mrs. Oulton's estate.**

It is unclear with whom Attorney Bergeron conferred in rendering (or seeking) "<u>advice regarding

probate of Mrs. Oultons' estate</u>" but the task is noteworthy because:

(a) Donald predeceased Carol;

(b) the Defendants willfully and knowingly concealed the Oultons' Wills from

both their named Executors (Attorney Alan Lehman and Attorney Gerard Mahaney) and

the Middlesex County Probate and Family Court, in violation of G. L. c. 190B § 2-516;

(c) the Defendants willfully and knowingly conspired to commingle the Oultons'

estates, and – most significantly –

(d) Mirick O'Connell attorneys have steadfastly maintained, since their first

encounter with Plaintiff, that the firm was retained by <u>the Oultons</u> for the very limited

purpose of contesting the Petitions for Conservator and qualifying <u>Donald (but not Carol)</u>

for MassHealth benefits.

744.    Also on December 27, 2012, **before the deceased Oultons were even buried**,

Mirick O'Connell Attorney Bergeron performed the following task (for which the Estate of

Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
12/27/12      Conference with Attorney Moore regarding probate issue.
```

It is noteworthy that, once again, Attorney Bergeron is improperly discussing the Oultons'

**probate issues** because the Defendants should have notified the Oultons' named Executors

(Attorney Alan Lehman and Attorney Gerard Mahaney) of the Oultons' deaths as soon as they

knew that the Oultons died.

745.    Upon information and belief, "Attorney Moore" is Mirick O'Connell attorney

Janet W. Moore, a Mirick O'Connell partner.

746.    On December 28, 2012, **the day of the Oultons' public funerals and burials**,

Mirick O'Connell Attorney Bergeron, fully involved as executor de son tort, improperly

conferred with N. Williams (for which the Estate of Carol was invoiced a total of $1,964.63 on

August 2, 2013 [Exhibit 127]):

```
12/28/12      Conference with N. Williams regarding funeral
              arrangements; review invoices; conference with funeral
              director regarding costs; conference with Dolphin
              Restaurant regarding costs; correspond with all
              regarding checks for payment.
```

Defendants unlawfully paid vendors with assets from the Oultons' estates without any authority

to do so.  Checks paid to these various vendors are described above.

747.    Also on December 28, 2012, Mirick O'Connell sent two FedExes (totaling

$76.60) to unknown recipients (for which the Estate of Carol was invoiced a total of $1,964.63

on August 2, 2013 [Exhibit 127]):

```
12/28/12      Federal Express - - VENDOR: Federal Express          8.78
              Corporation
12/28/12      Federal Express - - VENDOR: Federal Express          67.82
              Corporation
```

214

748.     On December 27 and 28, 2012, the Oultons' public wakes, funerals, and burials were held through the John Everett & Sons Funeral Home in Natick, Massachusetts ("Everett Funeral Home").  Copies of the Oultons' obituaries (which give details regarding the Oultons' public wakes, funerals, and burials and which contain distastefully glowing praise for Marlborough Hills), are attached to this Amended Complaint (**Exhibit 133**).

749.     Plaintiff had been warned by N. Williams, in November 2011, that if she ever attempted to attend her parents' funerals, the Sibling Defendants would have her arrested. Plaintiff's uncle reiterated that threat to Plaintiff as recently as December 22, 2012.  Given Capt. Hladick's status on the Natick Fire Department and that Capt. Hladick had personal friends on the Natick Police Department, and given that the Natick Police had already conspired with the Marlborough Police to harass Plaintiff over the Oultons' Car in January 2012, Plaintiff took the threat of arrest quite seriously.

750.     Plaintiff was absolutely devastated to learn that she would be unable to say a final "goodbye" and pay her final respects to her parents, with whom she had been exceptionally close since 2001 and from whom she had been unlawfully separated for the last, torturous year of their lives.

751.     Upon information and belief, the Sibling Defendants, Everett Funeral Home,  and Natick Police barred Plaintiff from attending the Oultons' public wakes, funerals.

752.     **Nobody** – not the Defendants in this case, the Everett Funeral Home, or the Natick Police Department – **had legal grounds for barring Plaintiff from the Oultons' public wakes, funerals, and burials**.  No court order was in effect to bar Plaintiff from the Oultons' public wakes, funerals, and burials.  Plaintiff has never been in trouble with the law in any jurisdiction.

753.    In the contracting for and conduct of the Oultons' public wakes, funerals, and burials, Everett Funeral Home violated 239 Code Mass. Regs. § 3.13[18] [2012][35].

754.    The Oultons' public wakes were held on December 27, 2012, from 4:00 p.m. until 7:00 p.m., at the Everett Funeral Home, located at 4 Park Street, Natick, Massachusetts.

755.    The Natick Police Department dispatched at least one Natick Police Officer (Officer James F. Keohane, a long-time, personal friend of the Hladicks) to the Oultons' public wakes in order to bar Plaintiff from attending her parents' services.

756.    The Natick Police Log entry related to the Natick Police Department's illegal barring of Plaintiff from the Oultons' public wakes (**Exhibit 134**) states:

```
               Natick Police Department
          Dispatch Log From: 12/27/2012  Thru: 12/27/2012

12-22206       0940    ESCORT/ TRANSPORT              P - Services Rendered
   Location/Address:   [NAT 1550] JOHN EVERETT AND SONS FUNERAL HOME - 4 PARK ST
           Unit:    69  OFFICER JAMES F KEOHANE
```

757.    The Oultons' public funerals and burials were held on December 28, 2012, beginning at 8:00 a.m., at the Everett Funeral Home (4 Park Street), Saint Linus Church (119 Hartford Street), and the Glenwood Cemetery, in Natick Massachusetts.

758.    The Natick Police Department dispatched at least two Natick Police Officers (Officer Joseph J. Thurston and Officer James F. O'Shaughnessy) to the Oultons' public funerals and burials in order to bar Plaintiff from attending her parents' services.

759.    The Natick Police Log entries related to the Natick Police Department's illegal barring of Plaintiff from the Oultons' public funerals (**Exhibit 135**) states:

```
               Natick Police Department
          Dispatch Log From: 12/28/2012  Thru: 12/28/2012
```

---

[35] **239 Code Mass. Regs. § 3.13(18) (2012):  Code of Conduct and Professional Ethics**.  No person who is registered with the Board, nor any person who holds an ownership interest in or is employed by any funeral establishment licensed by the Board, shall engage in, authorize, or aid or abet fraud, deceit, misrepresentation of any material fact, provision of any false or forged evidence, or bribery.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

```
12-22251        0845    ESCORT/ TRANSPORT                    Log Entry
        Primary Id:     42939 - OFFICER JOSEPH J THURSTON
   Location/Address:    [NAT 1550] JOHN EVERETT AND SONS FUNERAL HOME - 4 PARK ST
               Unit:    68  OFFICER JOSEPH J THURSTON
               Unit:    68  OFFICER JOSEPH J THURSTON
12-22252        0851    ASSIST OTHER AGENCY                  P - Services Rendered
   Location/Address:    63 SOUTH ST
               Unit:    71  OFFICER JAMES F O'SHAUGHNESSY
```

760.     Everett Funeral Home and its staff inflicted severe emotional distress on Plaintiff

by collaborating with the Sibling Defendants and the Natick Police Department to unlawfully bar

Plaintiff from her parents' public wakes, funerals, and burials.

761.     Everett Funeral Home employees further exacerbated the damage, eight weeks

later (in violation of 239 Code Mass. Regs.3.13[7][36],), by revealing confidential information

about the Oultons' funerals, and by disparaging Plaintiff over the telephone.

762.     On February 26, 2013, at approximately 9:30 a.m., Plaintiff anonymously called

Everett Funeral Home to make general inquiries about the services provided and the policies and

practices in effect at the time.  Plaintiff telephoned Everett Funeral Home from a "blocked"

telephone number and she neither identified herself nor was asked to do so.

763.     Plaintiff spoke with Everett Funeral Home employees Maureen Reeve ("Reeve")

and Susan Davis ("Davis"), and Plaintiff was shocked to hear both employees speaking freely

about the Oultons' wakes and funerals, even referring to the family by name.

764.     When asked, by Plaintiff, "[w]hat could be done to keep an unwanted person

away from a wake or funeral?" Reeve and Davis revealed private details about the Oultons'

ceremonies and disparaged Plaintiff, by spreading lies about Plaintiff, in the process.

---

[36] (7) **239 Code Mass. Regs. § 3.13(7) (2012):  Code of Conduct and Professional Ethics**.  A person who is registered with the Board, or who holds an ownership interest in or is employed by any funeral establishment licensed by the Board, shall not disclose confidential or private information, such as causes of death, financial information, or other such personal information about a client or any member of any household or family which he or she serves, comment on the condition of any dead human body entrusted to his or her care, or engage in any other conduct adverse to the interests of that client based on information obtained in confidence. Notwithstanding the above, this paragraph shall not be interpreted to bar cooperation with a Board investigation or from making other disclosures as required by law or for purposes of insurance and debt collection activities.

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

765.    Reeve and Davis informed Plaintiff that Everett Funeral Home and its staff worked in concert with the Natick Police to keep Plaintiff away from the Oultons' funerals because "the Oultons had a restraining order against their daughter (Plaintiff)."

766.    Reeve and Davis described, in detail, how undercover Natick Police officers were assigned to bar Plaintiff from attending the Oultons' public wakes, funerals, and burials.  Reeve and Davis informed Plaintiff that  the Everett Funeral Home "dress men" assigned to the Oultons' services each carried photos of Plaintiff in order to identify her if Plaintiff dared to attend her parents' funerals.

767.    On the following day, February 27, 2013 additional harm was further inflicted on Plaintiff by Everett Funeral Home Brian Falvey ("Falvey").

768.    At approximately 3:40 p.m. Plaintiff called Everett Funeral Home to get additional information about the Oultons' wakes and funeral services, and that second telephone call to Everett was answered by Falvey.

769.    Falvey did not ask Plaintiff to identify herself so she did not do so.  Falvey was just as willing to reveal confidential details about the Oultons' public wakes, funerals, and burials (and disparage Plaintiff in the process) as Reeve and Davis had been the day before.

770.    Falvey reiterated what Reeve and Davis had told Plaintiff (i.e., that the Natick Police were on hand to prevent Plaintiff from attending the Oultons' public wakes, funerals, and burials and that the Oultons had a restraining order against their daughter [Plaintiff]).

771.    Plaintiff asked Falvey for the names of the "dress men" who worked the Oultons' public wakes, funeral, and burials.  Falvey informed Plaintiff that Dennis Cunningham was the Funeral Director in charge of the Oultons' arrangements and that the other "dress men" who worked the Oultons' public wakes, funerals, and burials were Richard Kelly, Luke Simpson, and himself (Falvey).

218

772.    Following the deaths of Carol and Donald, the Sibling Defendants and their co-conspirators willfully and knowingly refrained from contacting the Executors named in both the Alleged Will of Donald (Attorney Alan Lehman) and the Alleged Will of Carol (Attorney Gerard Mahaney) because the Defendants had planned, all along, to have Attorney Sweeney-2 unlawfully intermeddle and cover up the Defendants' crimes through probate actions filed in the Middlesex County Probate and Family Court.

773.    On December 28, 2012, Mirick O'Connell, as executor de son tort, unlawfully issued a check (**Exhibit 136**) to Alan Bush in the amount of $1,800.00 drawn from an Attorney IOLTA account at People's United Bank.

774.    On December 28, 2012, Mirick O'Connell, as executor de son tort, unlawfully issued a check (**Exhibit 137**) to Dolphin Seafood Restaurant in the amount of $3,745.50 drawn from an Attorney IOLTA account at People's United Bank.  This was payment for a party thrown by the Sibling Defendants after the Oultons' public wakes, funerals, and burials from which Plaintiff was unlawfully banned, and the Dolphin invoice should have never been paid with assets of the Estate of Carol.  This $3,745.50 charge would not have been incurred by the Estate of Carol if Attorney Gerard Mahaney, who was named as the Executor of the Estate of Carol in the FOURTH PARAGRAPH of the Alleged Will of Carol, had assumed his role as Executor of the Estate of Carol.

775.    On December 28, 2012, Mirick O'Connell, as executor de son tort, unlawfully issued a check (**Exhibit 138**) to Everett Funeral Home in the amount of $23,731.69 drawn from an Attorney IOLTA account at People's United Bank.  Despite repeated request from Plaintiff (through counsel) for copies of all service contracts and fee agreements related to funds stolen from the Oultons' estates, none of the Defendants has provided a copy of the Everett Funeral Home contract.

219

776.     On December 28, 2012, Mirick O'Connell, as executor de son tort, unlawfully

issued a check (Exhibit 139) to Glenwood Cemetery Association in the amount of $2,300.00

drawn from an Attorney IOLTA account at People's United Bank.

777.     On December 31, 2012, Mirick O'Connell Attorney Bergeron performed the

following task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2,

2013 [Exhibit 127]):

12/31/12     Conference regarding payments to vendors and probate.

778.     On December 31, 2012, a Statement of Account (Exhibit 140) from Brookline

Credit Union was mailed to Carol Oulton.  It showed a Dividend Percentage Yield of $158.54.

779.     On January 2, 2013, Plaintiff learned that Attorney D.R. Brown, who, upon

information and belief, had never visited with or telephoned the Oultons in the 12 years that

Plaintiff lived in close proximity to the Oultons, had attended the wakes of Carol and Donald.

780.     Upon information and belief Attorney D.R. Brown learned from his clients

(D. Oulton and Capt. Hladick) and others, while at the Oultons' wake, that Plaintiff had been

barred from attending the Oultons' public wakes, funerals, and burials.

781.     On January 2, 2013, at 4:34 p.m., after Plaintiff learned that Attorney D.R. Brown

had attended the funeral of the Oulton's, Plaintiff sent an email to Attorney D.R. Brown

(Exhibit 141) that asked:

> Do you always attend the wakes, funerals, and burials of the
> parties against whom you represented a client? What about that
> little attorney-client privilege thing?

782.     Twenty-nine minutes later, on January 2, 2013, at 5:03 p.m., Plaintiff received a

response email (also Exhibit 142) from Attorney Dennis Brown which stated:

> No, I don't always attend the Wakes, funerals, and burials of the
> parties against whom I represented a client.  I do routinely attend
> wakes, funerals, and burials of people I have known for many

years who have treated me kindly over the years and for whom I have a great deal of respect. Both of your parents easily fit into that category. I'm not really sure what you mean by "what about that little attorney-client privilege thing as I surely wasn't conveying any privileged information to your parents or others. Moreover, as I recall the proceedings in which I was fairly recently involved were styled in the matter of Donald P. Oulton and in the matter of Carol J. Oulton and were guardianship proceedings designed to advance their best interests. I'm sorry I missed you at the wake. Had you been at the wake when I was there I most surely would have conveyed my condolences to you about your parents' passing as I can't fathom that their deaths wouldn't be anything but a great loss to you.

783.   Within one week after Attorney D.R. Brown sent the above email to Plaintiff on January 2, 2013, Attorney D.R. Brown sent a letter to Plaintiff in which he forgave the "debt" for which Attorney D.R. Brown billed throughout the Petitions for Conservator matter.

784.   In the three years since sending Plaintiff his letter of debt forgiveness, Plaintiff has made no payments to D.R. Brown, P.C. and Attorney D.R. Brown has taken no action to collect payment from Plaintiff for "representation" in the Petitions for Conservator matter.

785.   In July 2015, however, in response to the Chapter 93A Demand Letter that Plaintiff's counsel, Attorney Goodwin, sent to Attorney D.R. Brown and Attorney Vecchio, Attorney D.R. Brown responded (through counsel) with a threat to file suit against Plaintiff for collection of the debt that Attorney D.R. Brown discharged in January 2013.

786.   On January 7, 2013, Mirick O'Connell Attorney Bergeron conferred with N. Williams (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

**01/07/13    Conference with N. Williams regarding probate issues.**

787.   On January 8, 2012, Mirick O'Connell Attorney Bergeron performed the following task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
01/08/13      Draft spreadsheet detailing assets in Oulton estates.
```

As stated above, Mirick O'Connell had unlawfully intermeddled in the Oultons' estates and had

no authority to do any work related to the Oultons' estates.

788.    Also on January 8, 2012, Mirick O'Connell Attorney Bergeron conferred with

Marlborough Hills and conferred with their co-conspirator, N. Williams (for which the Estate of

Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
01/08/13      Conference with Marlborough Hills regarding payment;
              review account balances; correspond with Nancy
              Williams.
```

789.    On January 29, 2013, Mirick O'Connell Attorney Bergeron performed the

following task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2,

2013 [Exhibit 127]):

```
01/29/13      Correspond with client regarding status of probate;
              conference regarding status of estates.
```

Notably, Attorney Bergeron is once again corresponding with his "client" more than one month

after Mirick O'Connell's purported clients (the Oultons) have died.  Moreover, the co-

conspirators are once again discussing the status of the Oultons' "**probate**," and the status of the

Oultons' "estates" (plural).

790.    On February 1, 2013, Mirick O'Connell Attorney Bergeron performed the

following task with his "client" and with Attorney Sweeney-2 (for which the Estate of Carol was

invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

```
02/01/13      Review correspondence from client regarding Probate;
              conference with Attorney Sweeney regarding Probate of
              Estates.
```

791.    On February 13, 2013, Mirick O'Connell Attorney Bergeron performed the

following task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2,

2013 [Exhibit 127]):

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

02/13/13        Review status of matter; contact client to review
                status of probate of estate.

792.    On February 21, 2013, The Allen Daniel Associates, Inc., a debt collection

agency, mailed a $91.27 Invoice to Carol Oulton at 20 Causeway Street, Medway, Massachusetts

02053, the address of C. Hladick, for services rendered on September 9, 2011, to Carol by Fallon

Ambulance (Exhibit 142).

793.    It is apparent from this Invoice that the Oultons' finances were not being properly

managed during the time that numerous Defendants (Attorney Port, Lincoln, Kumar, et al.)

claimed that the Oultons had capacity and were fully capable of managing their finances, given

that this outstanding bill from 2011 was, as of 2013, still unpaid.

794.    On March 7, 2013, PBMM Paralegal Rossi performed the following task (for

which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013

[Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 3/7/2013 | SR | Conference with Tom Moylan; set up new file for client; draft transmittal letter to probate court to commence proceedings. | 0.90 | 90.00 |

795.    Also on March 7, 2013, 2013, PBMM Attorney Moylan performed the following

task (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013

[Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 3/7/2013 | TJM | Attention to file, review financial information and estate planning documents forwarded by decedent's daughter, phone conference with Nancy Williams, prepare documents needed to open probate. | 2.90 | 870.00 |

796.    On March 12, 2013, PBMM Paralegal Rossi performed the following task (for

which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013

[Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 3/12/2013 | SR | Scan in all tax info and financial info provided by client; prepare letters to heirs, Medical Division, and Veterans Affairs to transmit notice of petition and send all via certified mail return receipt requested with copies to Jerome V. Sweeney, II. | 1.60 | 160.00 |

223

797.    Also on March 12, 2013, PBMM made the following disbursement in the amount

of $36.66 (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18,

2013 [Exhibit 143]):

| | | |
|---|---|---|
| 3/12/2013 | Certified mail to heirs, Veterans, and Medical Assistance to give Notice of Petition | 36.66 |

798.    Also on March 12, 2013, 2013, PBMM Attorney Moylan performed the following

task (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013

[Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 3/12/2013 | TJM | Review email sent from Nancy Williams to Jerry Sweeney containing question regarding probate proceedings for Carol Oulton; respond to client's email and address all questions. | 0.50 | 150.00 |

799.    On March 22, 2013, PBMM Paralegal Rossi performed the following task (for

which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013

[Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 3/22/2013 | SR | Update Cover letter, prepare packet of probate docs to be sent via fedex to Probate Court for filing; search for year purchased home and amount purchased for income Tax Return. | 0.60 | 59.61 |

800.    Also on March 22, 2013, PBMM made the following disbursement in the amount

of $419.06 (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18,

2013 [Exhibit 143]):

| | | |
|---|---|---|
| 3/22/2013 | Middlesex County Probate Court - open probate | 405.00 |
| | FedEx-probate docs to court for filing | 14.06 |

801.    On March 26, 2013, **92 days AFTER** the date on which Carol allegedly died,

Attorney Moylan filed, on behalf of Attorney Sweeney-2, a Petition for Informal Probate of Will

and Appointment of Personal Representative for the Estate of Carol (the "Petition for Informal

Probate of the Alleged Will of Carol") (Exhibit 144).

| PETITION FOR INFORMAL<br>☒ **PROBATE OF WILL**<br>☒ **APPOINTMENT OF PERSONAL**<br>**REPRESENTATIVE**<br><br>PURSUANT TO G.L. c. 190B, § 3-301 | Docket No.<br><br>M113P 6886A | Commonwealth of Massachusetts<br>The Trial Court<br>Probate and Family Court |
|---|---|---|
| **Estate of:**<br>    Carol       Jane       Oulton<br>  First Name   Middle Name   Last Name<br><br>**Date of Death:**    **December 25, 2012** | | **Middlesex**         Division<br>**208 Cambridge Street**<br>**East Cambridge, MA 02141**<br>**(617) 768-5800** |

802.     Although Donald allegedly predeceased Carol by six days, Attorney Moylan and

Attorney Sweeney-2 did not file any petitions – either formal or informal – to commence Probate

proceedings for the Estate of Donald.

803.     The Petition for Informal Probate of the Alleged Will of Carol falsely stated that

Attorney Sweeney-2 is the "Personal Representative named in the (Alleged) Will" of Carol.

**2.  Information about the Petitioner(s):**

| Name: |     Jerome<br>First Name |     V.<br>M.I. |     Sweeney, ii<br>Last Name | | |
|---|---|---|---|---|---|
| | **171 Milk Street**<br>(Address) | **Suite 30**<br>(Apt, Unit, No. etc.) | **Boston**<br>(City/Town) | **MA**<br>(State) | **02109**<br>(Zip) |

Mailing Address, if different:
                         (Address)    (Apt, Unit, No. etc.)   (City/Town)   (State)   (Zip)

Primary Phone #: **(617) 574-0054**

Interest of the Petitioner (e.g., Personal Representative named in Will, surviving spouse, heir, devisee, etc.-*See* G.L. c. 190B § 1-201(24)):   **Personal Representative named in Will**

804.     The Petition for Informal Probate of the Alleged Will of Carol also referenced the

Alleged Will of Carol and the Fraudulent Codicil of Carol (discussed below) and stated that "the

original Will . . . accompanies this Petition."

805.     The Petition for Informal Probate of the Alleged Will of Carol also indicates that:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

☒ Testate Estate (Check this box only if there is a Will)

The date of the Decedent's last Will is ___April 19, 2001___

☒ The dates of all codicils are ___January 17, 2006___

Choose one of the following:

☒ The original Will is in the possession of the Court or accompanies this Petition.

☐ The Will has been probated in Massachusetts and the Petitioner adopts the statements in the Petition for Probate.

☐ The Will has been probated in the State of _____ . Duly authenticated copies of the Will and of the statement probating it are filed with this Petition.

The Will and any codicils are referred to as the Will. The Petitioner, to the best of his or her knowledge, believes the Will was validly executed. After the exercise of reasonable diligence, the Petitioner is unaware of any instrument revoking the Will and believes that the Will is the Decedent's last Will, or the following is a statement of why such an instrument is not being probated:

9.   ☒   The Petitioner requests the following qualified person, who has priority and is 18 years of age or older, be appointed:

☒ Self.

The Petitioner requests that the Court:

☒ Informally admit the Decedent's Will to probate.

☒ Informally appoint the nominee as Personal Representative in unsupervised administration to serve:

☒ without sureties on the bond

☐ with sureties on the bond with the penal sum amount of $ _____

and that Letters be issued.

806.    The Petition for Informal Probate of the Alleged Will of Carol was signed by both

Attorney Moylan and Attorney Sweeney-2 "under the penalties of perjury."

## SIGNED UNDER THE PENALTIES OF PERJURY

I certify under the penalties of perjury that the foregoing statements are true to the best of my knowledge and belief.

Date: ___3-11-13___

Signature of Petitioner

Date: _____

Signature of Co-Petitioner (if applicable)

Information on Attorney for Petitioner

Signature of Attorney

Thomas J. Moylan, Esq.
(Print name)

171 milk Street                            Suite 32
(Address)                                  (Apt, Unit, No. etc.)

Boston                    MA          02109
(City/Town)              (State)       (Zip)

Primary Phone #:  (617) 542-0600

B.B.O. # 564781

Email:   tmoylan@pbmmlegal.com

226

807.    Also on March 26, 2013, PBMM Paralegal Stephanie Rossi sent a letter

(**Exhibit 145**) to the Middlesex County Probate and Family Court transmitting "an extra $10.00"

for the Informal Probate filing fee and requesting the Certificate of Appointment (appointing

Attorney Sweeney-2 as PR of the Estate of Carol).

808.    Also on March 26, 2013, PBMM made the following disbursement in the amount

of $10.00 (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18,

2013 [**Exhibit 143**]):

3/26/2013 Middlesex County Probate Court - Certificate of Appointment                          10.00

809.    On March 30, 2013, Mirick O'Connell Attorney Bergeron performed the

following tasks with his co-conspirator, Marlborough Hills (for which the Estate of Carol was

invoiced a total of $1,964.63 on August 2, 2013 [**Exhibit 127**]):

> 03/30/13     Review correspondence from Marlborough Hills;
>              correspond with Marlborough Hills regarding probate of
>              estates.

Notably, this discussion between Mirick O'Connell and Marlborough Hills was held **four days**

**AFTER** PBMM Attorney Moylan filed the Alleged Will of Carol (but not Donald) with the

Middlesex County Probate and Family Court.

810.    On April 10, 2013, Mirick O'Connell Attorney Bergeron performed the following

task (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013

[**Exhibit 127**]):

> 04/10/13     Conference with Attorney Masterson regarding
>              Marlborough Hills issues and estates.

Mirick O'Connell Attorney Bergeron billed the Estate of Carol for time spent conspiring with

Attorney Masterson on April 10, 2013.

227

811.     Throughout the entire period of time during which this case has unfolded,

Attorney Masterson has repeatedly and stated – both to Plaintiff, privately, and before the

Middlesex County Probate and Family Court (orally and in writing, as discussed below), that she

was brought into this case merely as a "collections attorney" for Marlborough Hills.

812.     As discussed at length below, Attorney Masterson was a willing joint venturer in

the criminal enterprise forming the foundation of this lawsuit, and she was involved in the

conspiracy to hide and convert the Oultons' jointly-held assets from a point in time far earlier

than what she claimed, under oath, before the Middlesex County Probate and Family Court.

813.     On April 19, 2013, PBMM made the following disbursement in the amount of

$36.66 (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013

[Exhibit 143]):

| | |
|---|---|
| 4/19/2013 Notice of Petition for Informal Appointment to heirs, Division of Medical Assistance and Veterans Affairs. | 36.66 |

814.     On April 23, 2013, Plaintiff went to Middlesex County Probate and Family Court

to get a copy of the Petitions for Conservator docket sheets (Exhibit 146) for her Board of Bar

Examiners Application.  On this day a clerk at the Probate Court summoned Plaintiff over to the

Clerk's counter and notified Plaintiff that there was "something funny" going on in the Probate

matter for the Estate of Carol.

815.     The Probate clerk informed Plaintiff that, in addition to the Alleged Will of Carol

an irregular Codicil (the "Fraudulent Codicil of Carol") (Exhibit 147) was offered in Carol's

probate matter.  The Clerk also gave Plaintiff a copy of the judge's case notes which flagged that

something with the Codicil was amiss.

816.     The judge's notes to which the Probate Clerk directed Plaintiff's attention

(Exhibit 148) follow:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

*[Handwritten notes:]*

Jaime Severney II
781-910-8899

13818028

#5 Need Nancy as known in will as " "
WILL DATED 4/19/01
CODICIL FOR WILL DATED 6-28-00
    SO ISSUE W/ PPR b/c codicil on
wrong will?  Need AFF. + present (per M.G.)

817.    The Fraudulent Codicil of Carol features the following irregularities:

CODICIL

OF

CAROL JANE OULTON

I, CAROL JANE OULTON, of Natick, County of Middlesex, Commonwealth of Massachusetts, hereby declare this instrument to be a codicil to my Last Will and Testament dated June 28, 2000

818.    The primary irregularity is that the Fraudulent Codicil of Carol offered refers to a prior-dated Alleged Will of Carol.

819.    The Fraudulent Codicil of Carol has additional disturbing features, not the least of which is that the Fraudulent Codicil of Carol was crafted by Attorney Sweeney-2 solely for the

229

purpose of naming the self-dealing Attorney Sweeney-2, who concocted the criminal scheme

underlying this lawsuit at least as early as December 7, 2011, as the Executor of the Estate of

Carol.

> I.      I hereby amend my Last Will and Testament dated June 28, 2000, by substituting
>
> the following as Clause FOURTH:
>
>> FOURTH:     I hereby nominate and appoint my spouse as Executor of
>> this my Last Will and Testament and I direct that my spouse be allowed to serve
>> without bond or surety in any jurisdiction.  I grant to my Executor all powers
>> granted to fiduciaries by statute or rule of court, to be exercised without
>> application to any court, unless required by law.  This grant includes, but is not
>> limited to, power to sell, exchange, convey, transfer, assign, mortgage, pledge,
>> lease or rent the whole or any part of the property of my estate; to invest, reinvest
>> and retain the property of my estate; to make distributions of my estate in cash or
>> in kind, or partly in each, even if shares be composed differently; to make
>> distributions directly to minor beneficiaries, or for their sole use and benefit, in
>> any manner authorized by law; to pay or compromise any and all taxes of any
>> nature whatsoever in my Executor's complete discretion; and to perform all acts
>> and to execute all instruments necessary or proper to accomplish the foregoing
>> powers.  If my spouse shall predecease me, fail to qualify, refuse or cease to act
>> as Executor for any reason, I nominate and appoint attorney JEROME V.
>> SWEENEY, II, now of Boston, Massachusetts.  In the event JEROME V.
>> SWEENEY, II shall be unwilling or unable to serve hereunder, then I hereby
>> nominate and appoint attorney JEROME SWEENEY, III, now of Boston,
>> Massachusetts, respectively, in lieu thereof, to serve without bond or surety in any
>> jurisdiction, and with all the powers hereinabove conferred.

820.     Quite notably, Carol's alleged initials (but no date) appear at the end of the new

"FOURTH" paragraph in the Fraudulent Codicil of Carol.

821.     The Fraudulent Codicil of Carol also states, once again, that the Codicil was

written in connection with a prior-dated Will, i.e., Carol's "Last Will and Testament dated June

28, 2000 (Exhibit 5)."

> II.     In all other respects, I hereby ratify and confirm my said Last Will and Testament
>
> dated June 28, 2000.

822.     The Fraudulent Codicil of Carol, like every other "sworn" document offered by

the Defendants in this matter, was not, in fact, properly notarized.

IN WITNESS WHEREOF, I have hereunto set my hand and seal to this my codicil to my

Last Will and Testament, this *17th* day of *January* , ~~2005~~. *2006 090*

*Carol Jane Oulton*

Carol Jane Oulton

823.     Just as with the Fraudulent Codicil of Donald (discussed below) and with both the

Alleged Will of Carol and the Alleged Will of Donald, the alleged date of execution of the

Fraudulent Codicil of Carol has been altered.  It has also been initialed with letters that do not

appear to be in Carol's handwriting.

824.     Furthermore, the "signed, <u>sealed</u>, published, and declared" Fraudulent Codicil of

Carol once again refers to a prior-dated Will, not the Will of Carol at issue in this lawsuit.

Signed, sealed, published and declared by the said CAROL JANE OULTON as and for a

codicil to her Last Will and Testament dated June 28, 2000, in the presence of us, who, being all

present at the same time, at her request, in her presence and in the presence of each other, have

hereunto subscribed our names and addresses as witnesses.

825.     The execution of the Fraudulent Codicil of Carol was witnessed by William

Kirschner III of Ayer, Massachusetts and Edward L. Fitzmaurice, Jr. of Milton, Massachusetts.

*William H. Kirschner III*                    *10 Winthrop Avenue, Ayer, MA 01432*
William H. Kirschner III

*Edward L. Fitzmaurice Jr*                   *39 Oak Rd, Milton, MA 02186*
Edward L. Fitzmaurice, Jr

826.     The Fraudulent Codicil of Carol was "notarized" by Cynthia A. Keefe who, like

every other purported Notary Public who "notarized" the Defendants' fraudulent documents,

failed to apply a valid Notary Seal (either in ink or embossed) to the document.

231

Data/sweeneyghost/oulton/codicil(w)

STATE OF MASSACHUSETTS)
                       )
COUNTY OF MIDDLESEX    )

As subscribed and sworn to before me on this 17th day of January 2006

*Cynthia A. Keefe*
(Notary Public)

My commission expires:  March 28, 2008 ₂

827.    The Fraudulent Codicil of Carol contains an errant <u>document footer</u> in the notary

block and it reveals that the document – "**codicil (w)**" – was created as some sort of "<u>ghost file</u>"

on the Keough + Sweeney document management system:

<div align="center">Data/sweeneyghost/oulton/codicil(w)</div>

828.    Plaintiff requested the case file from the Probate clerk.  Only when the clerk

showed the Probate and Family Court file for the case, In Re: Estate of Carol Jane Oulton, did

Plaintiff learn that she was a devisee named in both the Alleged Will of Donald and the Alleged

Will of Carol.

829.    Plaintiff made note of several key facts in the case file for the Estate of Carol:

        a)    the Petition for Informal Probate of the Alleged Will of Carol filed by Attorney

Moylan of PBMM on behalf of Attorney Sweeney-2 (described above at <u>Exhibit 144</u>)

was brought fourth solely so that Attorney Sweeney-2 could unlawfully seize control of

the estates;

        b)    the Alleged Will of Carol filed with the Probate and Family Court named

**<u>Attorney Gerard Mahaney</u>** – <u>not Attorney Sweeney-2</u> – as second successor Executor;

<div align="center">232</div>

FOURTH: I hereby nominate and appoint my spouse as Executor of this WILL and I direct that my spouse be allowed to serve without bond or surety in any jurisdiction. I grant to my Executor all powers granted to fiduciaries by statute or rule of court, to be exercised without application to any court, unless required by law. This grant includes, but is not limited to, power to sell, exchange, convey, transfer, assign, mortgage, pledge, lease or rent the whole or any part of the property of my estate; to invest, reinvest and retain the property of my estate; to make distributions of my estate in cash or in kind, or partly in each, even if shares be composed differently ; to make distributions directly to

FILED MAR 2 6 2013

minor beneficiaries, or for their sole use and benefit, in any manner authorized by law; to pay or compromise any and all taxes of any nature whatsoever in my Executor's complete discretion; and to perform all acts and to execute all instruments necessary or proper to accomplish the foregoing powers. If my spouse shall predecease me, fail to qualify, refuse or cease to act as Executor for any reason, I nominate and appoint attorney JOHN MAHANEY, now of Natick, MA as executor to serve in my spouse's place, without bond or surety in any jurisdiction, and with all the powers hereinabove conferred. If my spouse and JOHN MAHANEY shall predecease me, fail to qualify, or refuse or cease to act as Executor for any reason, I nominate and appoint attorney GERARD MAHANEY, now of NATICK, MA as Executor to serve without bond or surety in any jurisdiction, and with all the powers hereinabove conferred.

c) despite the fact that Attorney Gerard Mahaney was the Executor named in the Alleged Will of Carol (which was drafted by Attorney Sweeney-2), Attorney Moylan and Attorney Sweeney-2 misrepresented to the Court that Attorney Sweeney-2 was the "Personal Representative named in Will";

2. Information about the Petitioner(s):

| Name: | Jerome | | V. | | Sweeney, II | |
|---|---|---|---|---|---|---|
| | First Name | | M.I. | | Last Name | |
| | 171 Milk Street | | Suite 30 | Boston | MA | 02109 |
| | (Address) | | (Apt, Unit, No. etc.) | (City/Town) | (State) | (Zip) |
| Mailing Address, if different: | | | | | | |
| | | (Address) | (Apt, Unit, No. etc.) | (City/Town) | (State) | (Zip) |

Primary Phone #: (617) 574-0054

Interest of the Petitioner (e.g., Personal Representative named in Will, surviving spouse, heir, devisee, etc.-See G.L. c. 190B § 1-201(24)): **Personal Representative named in Will**

and

d) both Attorney Moylan and Attorney Sweeney-2 signed their Petition for Informal Probate under the penalties of perjury.

233

## SIGNED UNDER THE PENALTIES OF PERJURY

I certify under the penalties of perjury that the foregoing statements are true to the best of my knowledge and belief.

Date: 3-11-13

Signature of Petitioner

Date:

Signature of the Petitioner (if applicable)

Information on Attorney for Petitioner

Signature of Attorney

Thomas J. Moylan, Esq.
(Print name)

171 milk Street (Address) — Suite 32 (Apt, Unit, No, etc.)

Boston (City/Town) — MA (State) — 02109 (Zip)

Primary Phone #: (617) 542-0600

B.B.O. # 564781

Email: tmoylan@pbmmlegal.com

830.   On April 25, 2013, **only two days AFTER** the kind Probate Clerk informed Plaintiff that Attorney Moylan and Attorney Sweeney-2 filed the Petition for Informal Probate of the Alleged Will of Carol, Plaintiff filed a Petition for Formal Probate In Re Estate of Carol Oulton requesting that disinterested third party be appointed Personal Representative ("Plaintiff's Petition for Formal Probate of the Alleged Will of Carol") (Exhibit 149).

| PETITION FOR FORMAL | Docket No. | Commonwealth of Massachusetts |
|---|---|---|
| [X] PROBATE OF A WILL<br>[ ] ADJUDICATION OF INTESTACY<br>[X] APPOINTMENT OF A PERSONAL REPRESENTATIVE<br>[ ] OTHER:<br>PURSUANT TO G.L. c. 190B, § 3-402 | MU3P1828 EA | The Trial Court<br>Probate and Family Court |
| Estate of:<br>CAROL JANE OULTON<br>First Name  Middle Name  Last Name<br>Date of Death: 12-25-2012 | Middlesex  Division<br>208 Cambridge Street<br>East Cambridge, MA 02141<br>(617) 768-5800 | |

The Petitioner(s) (hereafter "Petitioner"), an interested person(s), makes the following statements:

831.   Plaintiff's Petition for Formal Probate of the Alleged Will of Carol noted that "NO VALID CODICILS" exist.

234

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

☒ Testate Estate (Check this box only if there is a Will)

The date of the Decedent's last Will is _4-19-2001_

☒ The dates of all codicils are _NOT APPLICABLE; NO VALID CODICILS EXIST_

Choose one of the following:

☒ The original Will is in the possession of the Court or accompanies this Petition.

☐ The original Will is lost, destroyed or otherwise unavailable and its contents are set forth in the attached statement which is incorporated herein.

☐ The Will has been probated in the State of _____. Duly authenticated copies of the Will and of the statement probating it are filed with this Petition.

832.    Plaintiff's Petition for <u>Formal</u> Probate of the Alleged Will of Carol clearly

requested that the Middlesex County Probate and Family Court appoint "a <u>disinterested, third</u>

<u>party</u>" fiduciary to administer the Estate of Carol.

9. ☒ The Petitioner requests the following qualified person, who is 18 years of age or older, be appointed:

☐ Self: _PETITIONER RESPECTFULLY REQUESTS THAT THE COURT PLEASE APPOINT A DISINTERESTED THIRD PARTY WHO, UNLIKE JEROME V. SWEENEY II, ESQ., IS ETHICAL, I.E., WHO OBEYS THE_

☒ Other: _MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND WHO HAS NOT, DESPITE THE OBVIOUS EXISTENCE OF CONFLICTS OF INTEREST, REPRESENTED A NUMBER OF MEMBERS OF THE OULTON FAMILY (INCLUDING PETITIONER) IN A VARIETY OF COMPLEX LEGAL CASES IN THE PAST._

_____ (First Name) _____ (M.I.) _____ (Last Name)

_____ (Address) _____ (Apt, Unit, No. etc.) _____ (City/Town) _____ (State) ___ (Zip)

Mailing Address, if different: _____ (Address) _____ (Apt, Unit, No. etc.) _____ (City/Town) _____ (State) ___ (Zip)

Primary Phone #: _____

833.    Plaintiff's Petition for <u>Formal</u> Probate of the Alleged Will of Carol requested

<u>supervised</u> administration of the Estate of Carol.

13. The Petitioner requests:

☒ Supervised administration

☐ The Will directs supervised administration.

☐ The Will directs unsupervised administration, but it is necessary for protection of persons interested in the estate because:

☒ No Will directs supervised administration but it is necessary under the circumstances, specifically _JEROME V. SWEENEY II, ESQ. DID NOT, DESPITE HIS CLAIM MADE UNDER THE PENALTIES OF PERJURY MADE ON 3-11-2013, GIVE PETITIONER NOTICE OF HIS PETITION FOR INFORMAL PROBATE. MOREOVER, DEVISEES DAVID OULTON, NANCY WILLIAMS, & CAROL HLADICK HAVE UNLAWFULLY INTERFERED WITH PETITIONER'S WONDERFUL RELATIONSHIP WITH BOTH PARENTS (CAROL & DONALD OULTON) SINCE AT LEAST NOVEMBER 2011 & THEY LIQUIDATED THE ASSETS OF THE_ ESTATE _IN 2012, PRIOR TO THE DEATH OF CAROL JANE OULTON, OR DONALD PAUL OULTON, & WITHOUT NOTICE TO PETITIONER, A DEVISEE UNDER THE WILL._

MPC 160 (3/18/12)                        page 5 of 6

235

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

834.   On May 3, 2013, PBMM Paralegal Rossi performed the following task (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013 [Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 5/3/2013 | SR | Telephone call with Kathleen at the Probate Court regarding issues with Estate; | 0.25 | 25.00 |

835.   On May 6, 2013, **42 days AFTER** Attorney Moylan and Attorney Sweeney-2 filed a Petition for Informal Probate of the Alleged Will of Carol and **12 days AFTER** Plaintiff filed her Petition for Formal Probate of the Alleged Will of Carol, Mirick O'Connell Attorney Bergeron corresponded with N. Williams regarding "status of estate administration," (for which the Estate of Carol was invoiced a total of $1,964.63 on August 2, 2013 [Exhibit 127]):

| | |
|---|---|
| 05/06/13 | Review correspondence from N. Williams; correspond with N. Williams regarding status of estate administration. |

836.   On May 10, 2013, PBMM Attorney Moylan performed the following task (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013 [Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 5/10/2013 | TJM | Attention to file, conference with Jerome Sweeney to discuss motion filed by Sarah Oulton, review motion | 1.40 | 490.00 |

837.   Also on May 10, <u>Attorney Sweeney-2, immediately after meeting with Attorney Moylan for 1.40 hours, billed $300.00</u> (in the Invoice allegedly prepared by Attorney Sweeney-2's own counsel, PBMM) for the following task that he performed (for which the Estate of Carol was invoiced a total of $10,753.56 by PBMM on November 18, 2013 [Exhibit 143]):

| | | | | |
|---|---|---|---|---|
| 5/10/2013 | JVS | Travel to probate court to review file and discuss issues with clerk. | 2.00 | 300.00 |

838.   On May 14, 2013, PBMM Attorney Moylan performed the following task (for which the Estate of Carol was invoiced a total of $10,753.56 on November 18, 2013 [Exhibit 143]):

| 5/14/2013 | TJM | Prepare Notice of Appearance and Objection to Motion; Phone conference with Nancy; Conference with paralegal. | 1.90 | 665.00 |

Notably, Attorney Moylan conferred with N. Williams.

839.    On May 22, 2013, Plaintiff wrote a letter to Springwell Agency (discussed above

at **Exhibit 45**), the investigative agency for Elder Abuse reports, asking the following:

> 1. **whether I have ever been reported to your office at Springwell for allegedly committing elder abuse** against any person in the Commonwealth of Massachusetts;
> [emphasis added]
>
> 2. the name(s), if any, of the elderly person(s) on behalf of whom the complaints against me may have been filed with your office;
>
> 3. the dates, if any, on which I allegedly abused the person(s) on behalf of whom complaints against me may have been filed with your office;
>
> 4. the name(s), if any, of the part(y/ies) who may have reported me to your office;
>
> 5. **copies of police reports, if any, that accompanied the complaints against me** that may have been filed with your office;
> [emphasis added]
>
> 6. the steps, if any, that your office took to investigate me; and
>
> 7. **the results of the investigation**, if any, that was conducted by Springwell.
> [emphasis added]

Plaintiff also stated in the letter:

> For your information, **I have never been contacted by anyone in your office (or the Massachusetts Department of Elder Affairs) for any reason at any time in the past**.
> [emphasis added]

840.    On May 23, 2013, Mirick O'Connell Attorney Bergeron (who had no legal

authority to work on the Oultons' estates) corresponded with Attorney Masterson (who falsely

claims to have been working solely for Marlborough Hill) regarding "status" of the

administration of the Oultons' estates (for which the Estate of Carol was invoiced a total of

$1,964.63 on August 2, 2013 [**Exhibit 127**]):

05/23/13      Correspond with Attorney Masterson regarding status.

841.    On May 26, 2013, which was:

(a) **62 days AFTER** PBMM Attorney Moylan filed and Attorney Sweeney-2 filed the Petition for Informal Probate of the Alleged Will of Carol;

(b) **32 days AFTER** Plaintiff filed her Plaintiff's Petition for _Formal_ Probate of the Alleged Will of Carol; and

(c) a full **61 days BEFORE** Attorney Couture was nominated by Attorney Masterson and appointed as Special Personal Representative of the Estate of Carol, PBMM allegedly prepared an Invoice (Exhibit 150) in the amount of $2,044.20 to Attorney Couture.

842.    The Invoice billed for preparation of decedents' final tax returns in the amount of $750.00, Preparation of petition for informal probate of will, Appointment of Personal Representative, Bond, Military Affidavit, Notice of Informal probate, Notice of Informal Probate and Order of Informal Probate of Will in the amount of $750.00.  In addition, the Invoice also billed for expenses for Probate fees in the amount of $430.00, Federal Express [sic] in the amount of $44.86, and Certified Mail in the amount of $69.34.  The total due on the PBMM Invoice was $2,044.20.

843.    The date on which the PBMM Invoice was sent to Attorney Couture, May 26, 2013, is crucial to note.

844.    Attorney Masterson was _not_ merely a "collections attorney" seeking to collect a "valid debt" from Marlborough Hills and Attorney Couture was _not_ innocently nominated by Attorney Masterson, as the Defendants have stated in sworn testimony and court documents (discussed below).

238

845.    Attorney Couture (who is Attorney Port's Suffolk Law School Class of 2008 classmate and a personal friend of Attorney Sweeney-2) was brought into this case by Mirick O'Connell, Marlborough Hills, Attorney Masterson, Attorney Sweeney-2 and PBMM Attorneys (Attorney Moylan and Attorney Curley) in May 2013, i.e., at least two months prior to Attorney Masterson's nomination of Attorney Couture as SPR on July 25, 2013 (discussed below).



Plourde
Bogue
Moylan &
Marino LLP
Boston · Providence

Thomas Moylan
tmoylan@pbmmlegal.com

May 26, 2013

Michael R. Couture, Esq.
Winston Law Group
440 Broadway
Somerville, MA 02145

Re:    Estate of Carol Jane Oulton

For tax services rendered in connection with the above mentioned matter, including, but not limited to:

### Legal Fees

| | | |
|---|---|---|
| Preparation of decedent's final tax returns. | S | 750.00 |
| Preparation of Petition for Informal Probate of Will Appointment of Personal Representative, Bond, Military Affidavit, Notice of Informal Probate, Order of Informal Probate of Will. | S | 750.00 |
| **Expenses** | | |
| Middlesex County Probate fees | S | 430.00 |
| Federal Express | S | 44.86 |
| Certified Mail | S | 69.34 |
| **Total Amount Due:** | | **S 2,044.20** |

846.    None of the charges in PBMM's $2,044.20 invoice of May 26, 2013, would have been incurred by the Estate of Carol if Attorney Gerard Mahaney, who was named as the

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

Executor of the Estate of Carol in the FOURTH PARAGRAPH of the Alleged Will of Carol, had

assumed his role as Executor of the Estate of Carol. The Defendants in this case willfully and

knowingly bypassed Attorney Mahaney (in violation of G. L. c. 190B § 2-516), causing the

Estate of Carol to incur numerous unnecessary charges.

847.    On May 28, 2013, **34 days AFTER** Plaintiff filed her Petition for <u>Formal</u> Probate

of the Alleged Will of Carol, Mirick O'Connell Attorney Bergeron conferred with Attorney

Masterson regarding the "<u>Special Personal Representative</u>," (for which the Estate of Carol was

invoiced a total of $1,964.63 on August 2, 2013 [<u>Exhibit 127</u>]):

> 05/28/13    Conference with <u>Attorney Masterson</u> regarding Special
> Personal Representative.

848.    On May 29, 2013, **3 days AFTER** Attorney Moylan sent the PBMM Invoice to

Attorney Couture in Attorney Couture's anticipated capacity as fiduciary of the Estate of Carol,

and **35 days AFTER** Plaintiff filed Plaintiff's Petition for <u>Formal</u> Probate of the Alleged Will of

Carol seeking the appointment of a disinterested third-party fiduciary, Attorney Masterson filed a

Notice of Appearance and Objection on behalf of Colonial Health Group-Westridge LLC (the

"Notice of Appearance and Objection of Marlborough Hills") (<u>Exhibit 151</u>).

849.    The purpose of the Notice of Appearance and Objection of Marlborough Hills

was to contest the appointment of <u>Plaintiff</u> as fiduciary of the Estate of Carol. However, as stated

above (in the discussion of Plaintiff's Petition for <u>Formal</u> Probate of the Alleged Will of Carol

[<u>Exhibit 149</u>]), this objection was not necessary because Plaintiff sought the appointment of a

<u>disinterested third-party fiduciary</u> to administer the Estate of Carol.

850.    Lincoln, Marlborough Hills and Attorney Masterson, however, seized the

opportunity to discredit Plaintiff and inflict as much emotional distress and professional harm on

Plaintiff as possible.

851.    Filed with the Notice of Appearance and Objection of Marlborough Hills, was a fraudulent Affidavit of Lincoln (the "Affidavit of Lincoln for Objection") (**Exhibit 152**) on the Middlesex County Probate and Family Court, similar to the perjurious "Original Affidavits" of Marlborough Hills employees Kumar (**Exhibit 73**) and Lincoln (**Exhibit 74 and Exhibit 75**) that Mirick O'Connell created and Attorney Port had proffered during the 2012 "Petitions for Conservator" matter.

852.    It is important to note that, as discussed above in **Exhibit 127**, Attorney Masterson had been conspiring with Mirick O'Connell at least as early as April 10, 2013, i.e., at least almost two months before filing the Notice of Appearance and Objection of Marlborough Hills.

853.    The Affidavit of Lincoln filed with the Notice of Appearance and Objection of Marlborough Hills was, like Lincoln's other perjurious documents, signed by Lincoln "under the pains and penalties of perjury."

Signed under the pains and penalties of perjury this ⎽⎽ day of May, 2013.

_Michael Lincoln_
MICHAEL LINCOLN

854.    The Affidavit of Lincoln for Objection contained the following untrue statements, among others:

> 4.  Carol J. Oulton owes Marlborough Hills the sum of $34,542.71 for nursing home services rendered to her.

> 5.  Donald P. Oulton owes Marlborough Hills the sum of $36,462.83 for nursing home services rendered to him.

855.    The amounts that Lincoln claims are allegedly outstanding in the Affidavit of Lincoln for Objection are different from the amounts for which Marlborough Hills billed its obligor, C. Hladick, on August 5, 2013 (discussed below).

856.    The amounts owing stated by Lincoln in the Affidavit of Lincoln for Objection also conflict with the amounts that Attorney Masterson claimed were owed by the Oultons in the lawsuit that Attorney Masterson filed against The Estate of Carol on August 5, 2013 (discussed in greater detail below).

857.    Also, Marlborough Hills was already paid $100,988.50 through the Discharge of the Void Mortgage of Marlborough Hills described above (Exhibit 126), and both the HUD-1 (Exhibit 123) and Mirick O'Connell Attorney Port's letter of November 29, 2012 (Exhibit 128), indicate that the Oultons paid $102,031.96 to Marlborough Hills.

858.    Finally, in the Notice of Appearance and Objection of Marlborough Hills, Lincoln and Attorney Masterson seized the opportunity to defraud the Middlesex County Probate and Family Court in order to, once again, defame Plaintiff and inflict as much emotional distress and professional harm on Plaintiff as possible.

859.    Lincoln's Affidavit of Lincoln for Objection stated the following lies:

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

7. On or about May 23, 2012 an incident occurred at Marlborough Hills, involving Sarah Oulton, daughter of Mr. and Mrs. Oulton who was alleged to have engaged in unstable and irrational behavior at the facility, reportedly threatening to kill herself if her mother, Carol Oulton, did not write her a check. The facility also learned that Sarah Oulton had a License to Carry a firearm and they were unsure of whether she had a gun. This incident resulting in the Marlborough Police being called and reporting to the facility. A copy of the Police Report is attached hereto and incorporated herein by reference as Exhibit "A".

8. Marlborough Hills issued a No Trepass order to Sarah Oulton in which she instructed not to come to the facility.

860. Lincoln and Masterson purposely defrauded the Middlesex County Probate and Family Court and omitted the truth, which has been described in detail above.

861. As stated above, the Defendants' setup of Plaintiff on May 23, 2012, took place at Marlborough <u>Hospital</u>, not Marlborough Hills.

862. Furthermore, the Marlborough Hills NO TRESPASS ORDER to which Lincoln refers was prepared by Lincoln on <u>May 22</u>, 2012, one day prior to the setup, in anticipation of the setup. Also:

> a.)  **No police were called to Marlborough Hospital;**
>
> b)  **N. Williams, in fact, illegally tape-recorded the events at Marlborough Hospital and, yet, never produced the tape, because Plaintiff did nothing illegal or wrong at Marlborough Hospital;**
>
> c)  **the Marlborough Police were never called to Marlborough Hospital by the Sibling Defendants because Plaintiff was not the instigator of the setup;** and

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*

**d)  Plaintiff -- not the Sibling Defendants --requested the
Marlborough Hospital Security Guard escort after
C. Hladick's assault on Plaintiff in Carol's Marlborough
Hospital Intensive Care Unit room.**

863.    Attorney Sweeney-2, Attorney Moylan, Attorney Curley, Attorney Masterson,

Colonial (d/b/a Marlborough Hills), and the Sibling Defendants, working with others, advocated

strenuously to have Attorney Sweeney-2 appointed as Personal Representative for the Estate of

Carol, and have claimed, under oath, that Attorney Sweeney-2 was the "Personal

Representative" named in the Will of Carol.

864.    The Defendants have consistently been desperate to seize and maintain control

over the Oultons' estates.

865.    Quite notably, Attorney Gerard Mahaney, the attorney whom Carol appointed as

Executor in the Alleged Will of Carol was never contacted by anyone after Carol died.  Instead,

the Sibling Defendants, Keough + Sweeney attorneys, Mirick O'Connell attorneys, and PBMM

attorneys purposely kept the named Executor completely in the dark about Carol's death and his

duty as Executor of the Estate of Carol.  (See below.)

866.    On May 29, 2013, Plaintiff received a letter (<u>Exhibit 45</u>) from April Evans at

Springwell, Inc. which stated as follows:

> I received your letter dated May 22, 2013, seeking information on
> any reports filed with Springwell Protective Services listing you as
> the alleged perpetrator of elder abuse.  As per Executive Office of
> Elder Affairs Program Instruction (PI-07-01), I am not able to tell
> you who filed a report of concern, nor am I able to release any
> information except that which you provided to us directly; as we
> did not interview you as part of our investigation, there is little
> information that I am able to release to you.
>
> However I can tell you the following: <u>our office has received only
> one report, on January 18, 2012, listing you as the alleged
> perpetrator of elder abuse, against your mother, Carol
> Oulton.  There were no accompanying police reports.  We
> investigated the allegations against you, but they were</u>

**unsubstantiated**.
[emphasis added]

867.   On May 31, 2013, which was **164 days AFTER** the date on which Donald

alleged died, and **67 days AFTER** filing the Petition for Informal Probate of the Alleged Will of

Carol, Attorney Moylan and Attorney Sweeney-2 filed a Petition for Formal Probate of a Will

and Appointment of Personal Representative in the Estate of <u>Donald, who allegedly predeceased

Carol by six days</u> (Docket No. 13P2822 EA) (the "Petition for Formal Probate of the Alleged

Will of Donald") (<u>Exhibit 153</u>).

| PETITION FOR FORMAL | | | Docket No. | Commonwealth of Massachusetts The Trial Court Probate and Family Court |
|---|---|---|---|---|
| ☒ PROBATE OF A WILL | | | | |
| ☐ ADJUDICATION OF INTESTACY | | | | |
| ☒ APPOINTMENT OF A PERSONAL REPRESENTATIVE | | | | |
| ☐ OTHER: _____ | | | | |
| PURSUANT TO G.L. c. 190B, § 3-402 | | | 13P2822EA | |

| Estate of: | | | Middlesex                                 Division |
|---|---|---|---|
| Donald | Paul | Oulton | 208 Cambridge Street |
| First Name | Middle Name | Last Name | East Cambridge, MA 02141 |
| Date of Death: _____ December 19, 2012 | | | (617) 768-5800 |

The Petitioner(s) (hereafter "Petitioner"), an interested person(s), makes the following statements:

868.   In their Petition for Formal Probate of the Alleged Will of Donald, Attorney

Moylan and Attorney Sweeney-2 claimed, once again, that Attorney Sweeney-2 was the

"Personal Representative" named in the Alleged Will of Donald:

2.   Information about the Petitioner(s):

| Name: | Jerome | | V. | | Sweeney | |
|---|---|---|---|---|---|---|
| | First Name | | M.I. | | Last Name | |
| | 171 Milk Street | Suite 30 | | Boston | MA | 02109 |
| | (Address) | (Apt, Unit, No. etc.) | | (City/Town) | (State) | (Zip) |
| Mailing Address, if different: | | | | | | |
| | | (Address) | (Apt, Unit, No. etc.) | (City/Town) | (State) | (Zip) |

Primary Phone #: (617) 574-0054

Interest of the Petitioner (e.g., Personal Representative named in Will, surviving spouse, heir, devisee, etc.-See G.L. c. 190B § 1-201(24)):   Personal Representative named in Will

| BOND | Docket No. | Commonwealth of Massachusetts |
|---|---|---|
| ☒ Without sureties | | The Trial Court |
| ☐ With personal sureties | | Probate and Family Court |
| ☐ With corporate surety Bond #: | 13P2822EA | |

| In the Interests of: | | | Middlesex                                   Division |
|---|---|---|---|
| Donald | Paul | Oulton | 208 Cambridge Street |
| First Name | Middle Name | Last Name | |
| | | | East Cambridge, MA 02141 |
| Incapacitated Person/Protected Person/Ward/Decedent/Trust | | | (617) 768-5800 |

The condition of this bond is the faithful discharge by the fiduciary of all duties according to law.  By executing this bond, a Personal Representative or Trustee submits personally to the jurisdiction of any court of the Commonwealth in any proceeding pertaining to the estate that may be instituted by any interested person.  By executing this Bond, any other fiduciary submits personally to the jurisdiction of the Court which issued the Letters of Appointment.  This bond is not void after the first recovery but may be proceeded against from time to time until the whole penalty is exhausted.

Estimated Value of Real Estate _____    Estimated Value of Personal Estate $30,000

13.  The Petitioner requests:

   ☒ Unsupervised administration

      ☐ There is no Will.

      ☐ The Will directs unsupervised administration.

      ☐ The Will directs supervised administration, but circumstances have changed since the execution of the Will and there is no necessity for supervised administration because:

869.    Key issues with the Petition for Formal Probate of the Alleged Will of Donald are

that:

      a)    the dates in the Alleged <u>Will</u> of Donald (as described above at <u>Exhibit 4</u>)

appear to have been altered;

      b)    the Alleged Will of Donald was allegedly witnessed by Edward L.

Fiztmaurice, Jr. of Milton, Massachusetts, John K. Harms of Fitchburg, Massachusetts,

and Cynthia A. Keefe of Lowell, Massachusetts;

*Oulton v. Hladick, et al. – Amended Verified Complaint and Demand for Jury Trial*